# Exhibit 5

STATE OF CALIFORNIA
DEPARTMENT OF TECHNOLOGY
STATEWIDE TECHNOLOGY PROCUREMENT
**STANDARD AGREEMENT**
TECH 213 (rev. 02/2020)

| | SCO ID: | AGREEMENT NUMBER: **TC25-009** |

| **1.** | This Agreement is entered into between the Contracting Agency and the Contractor named below: |
|---|---|
| | CONTRACTING AGENCY NAME |
| | DEPARTMENT OF MOTOR VEHICLES |
| | CONTRACTOR NAME |
| | AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS |

| **2.** | The term of this Agreement is: | June 15, 2025, or upon approval by CDT-STP, whichever is later, through June 14, 2030 |
|---|---|---|

| **3.** | The maximum amount of this Agreement is: | $17,120,038.03 |
|---|---|---|
| | | *(Seventeen Million One Hundred Twenty Thousand Thirty-Eight Dollars and 03 Cents)* |

**4.** The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made a part of the Agreement:

*EXHIBIT TITLE*      *PAGES*

Exhibit A:  Statement of Work.............................................................................................................................. 9

Exhibit B:  Information Security and Privacy Provisions (4/2022) ........................................................................ 7

Exhibit C:  Cost Data Sheet................................................................................................................................. 2

Appendix 1:  AAMVA Data Privacy & Security Provisions ................................................................................... 5

Attachment 1*:  Information Technology General Provisions Non-Cloud Goods & Services (REV. 02/20/2025) at the following: https://www.dgs.ca.gov/-/media/Divisions/PD/Acquisitions/Solicitation-Document-Attachments/IT-General-Provisions-NonCloud-DGS-PD-403ITGP-Revised-02202025.pdf

Attachment 2*:  AAMVA Product & Services Catalog:  Government Rate Schedule (October 2024) at the following: https://www.aamva.org/getmedia/77a13732-0cf7-4872-ada1-b7a96acb5f6c/networkservices-govtrates-11182024.pdf

Items shown with an asterisk (*) are hereby incorporated by reference and made part of this agreement as if attached hereto.

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

| **CONTRACTOR** | | Department of Technology (CDT), Statewide Technology Procurement (STP) Use Only |
|---|---|---|
| CONTRACTOR NAME *(If other than an individual, state whether a corporation, partnership, etc.)* AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINSTRATORS | | |
| CONTRACTOR AUTHORIZED SIGNATURE *Wendy Sibley* Wendy Sibley (Jul 25, 2025 09:26:21 EDT) | DATE SIGNED Jul 25, 2025 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING WENDY SIBLEY, VICE PRESIDENT, FINANCE & CFO | | APPROVED 07/29/2025 DATE Nicole Delgado Signed |
| ADDRESS 4401 WILSON BOULEVARD., SUITE 700, ARLINGTON, VA  22203 | | |
| **STATE OF CALIFORNIA** | | |
| CONTRACTING AGENCY NAME DEPARTMENT OF MOTOR VEHICLES | | |
| CONTRACTING AGENCY AUTHORIZED SIGNATURE *Debbie Casey* | DATE SIGNED Jul 25, 2025 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING DEBBIE CASEY, CHIEF, BUSINESS MANAGEMENT BRANCH | | ☐ EXEMPT PER: |
| CONTRACTING AGENCY ADDRESS 2415 FIRST AVENUE, SACRAMENTO, CA  95818 | | |

## STATEMENT OF WORK (SOW)

### 1. CONTRACT DESCRIPTION AND SCOPE

The purpose of this contract is to define the terms and conditions for the agreement between the California Department of Motor Vehicles (DMV) and the American Association of Motor Vehicle Administrators (AAMVA) for DMV's use of AAMVAnet services.  The DMV acknowledges that the right to use AAMVAnet permits the DMV to use AAMVAnet to obtain access to such databases and other information systems to which the DMV has been provided authorized access.  AAMVAnet is used by the DMV to access and /or support the following applications:

### A. Commercial Driver License Information System (CDLIS)

CDLIS was established under the Commercial Motor Vehicle Safety Act of 1986, based on the Federal Motor Carrier Safety Regulations in 49 CFR 383 and 384. CDLIS is a nationwide computer system that enables state driver licensing agencies (US and Canada) to ensure that each commercial driver has only one driver's license and one complete record.  State driver licensing agencies use CDLIS to complete various procedures including transmitting out of state convictions and withdrawals; transferring the driver record when a commercial driver's license holder moves to another state; and responding to requests for driver status and history. States must be connected to CDLIS and the National Driver Register (NDR) in order to exchange information about commercial drivers, traffic convictions, and disqualifications. A State must use both the CDLIS and NDR – NDR to check a driver's record and CDLIS to make certain that the applicant does not already have a commercial license or is disqualified.

### B. Problem Driver Pointer System/National Driver Register (PDPS/NDR)

The Problem Driver Pointer System (PDPS) is a system that allows jurisdictions and other organizations to search the NDR data.  The NDR is a repository of information on problem drivers provided by all 51 U.S. jurisdictions.  Based on information received as a result of an NDR search, PDPS "points" the inquiring jurisdiction to the State of Record (SOR), where an individual's driver status and history information is stored.  Based on the information received from the SOR, the issuing state decides if the applicant is eligible to receive a new or renewed driver license.  PDPS was developed and is maintained by the National Driver Register organization, which is part of the U.S. Department of Transportation, National Highway Transportation Safety Administration (NHTSA).

### C. Business Partner Electronic Vehicle Registration (BPEVR)

The BPEVR is an application, which allows business partners of jurisdictions to apply for registrations and titles electronically.

### D. Network Services

The primary service provided by AAMVA is the Network connectivity. This provides the ability to move data electronically from one point of the Network connection to another point of the connection.

### E. Information Exchange (IE)

1. Paperless Title:  The system gives the capability to electronically exchange lien and title information between the lienholder and the motor vehicle agency, utilizing "mailboxes".

2. Electronic Insurance:  The system gives the capability to electronically exchange liability insurance information between the insurance companies and the motor vehicle agency.

### F.  Social Security Number On-Line Verification (SSOLV)

Motor vehicle departments are now authorized to obtain Social Security Number (SSN) verification information in batch or on-line modes.  The on-line support allows a jurisdiction to verify an individual's SSN during the driver license issuance or renewal process while an applicant is still at the counter.

### G.  Help America Vote Verification (HAVV)

Section 303 of Public Law 107-252 (Help America Vote Act of 2002) requires states and localities to develop centralized, computerized voter databases and to verify voter registration information.  Individuals registering to vote must provide their driver's license number to the state election agency.  If the registrant has no driver's license, they must supply the last four digits of their Social Security Number (SSN).  The statute requires that the chief state election official and officials responsible for the state motor vehicle authorities to enter into agreements to match voter registration information with motor vehicle administration (MVA) information.  The statute further requires the MVA officials and the Commissioner of Social Security to reach agreements for the purpose of verifying name, date of birth, the last four digits of the SSN and any information recorded in Social Security Administration's (SSA) records about the death of an individual.  With the SSOLV, the Help America Vote Verification (HAVV) transaction allows a MVA to submit an inquiry to SSA.  The SSA verifies the information and responds to the MVA with the results.

### H.  Unified Network Interface (UNI)

The UNI product resides on a site's host and fills an "interface" role between a site's application system and the telecommunication network (AAMVA).  Within this interface role between application and network, UNI provides both application interface functions, as well as network interface functions.  Due to its efficiency, the UNI software facilitates the development of site applications by allowing the sites to focus on the application specific functions.

### I.  National Motor Vehicle Title Information System (NMVTIS)

The National Motor Vehicle Title Information System (NMVTIS) is a system that allows the titling agency to instantly and reliably verify the information on the paper title with the electronic data from the state that issued the title.  NMVTIS is designed to protect consumers from fraud and unsafe vehicles and to keep stolen vehicles from being resold. NMVTIS is also a tool that assists states and law enforcement in deterring and preventing title fraud and other crimes. Consumers can use NMVTIS to access important vehicle history information.

### J.  Driver's License Data Verification (DLDV)

DLDV Service allows an organization that is presented with a license or ID card the ability to verify that the data on the card matches the data held by the jurisdiction that issued the document.  The Social Security Administration (SSA) via AAMVA will verify the identity of SSA clients requesting a replacement Social Security card by matching them with the driver's license. The matching system will use an existing process through PDPS with the same input and output file layout.

**K. United States Passport Verification System (USPVS)**

The U.S. Passport Verification Service (USPVS) provides a means for driver license agencies to verify U.S. passport document data against the Department of Homeland Security's (DHS) back end systems. The service assists states in issuing more secure driver's licenses and identification (ID) cards.

**L. Optional Additional Services**

Other driver, vehicle, or other services that DMV elects to obtain from AAMVA during the term of this contract.

## 2. CONTRACT TERM

The term of this contract is five (5) years base term with two (2) optional one (1) year subject to the termination rights set forth in the General Provisions. The total contract value shall not exceed $17,120,038.03.  The Contract value is based on the DMV's projected use during the contract term, as indicated in Exhibit C, Cost Data Sheet.

## 3. FEES

The DMV agrees to pay the base rates for California and actual utilization rates as outlined in AAMVA's Products and Services Government Rate Schedule located at:

Product Services Catalog Government Rate October 2024.

 Any changes to the pricing for products and services will be mutually agreed upon in good faith and documented in a written amendment signed by both parties.

The DMV agrees to pay sales tax (current rate is 8.75%) for UNI Maintenance. Per California Department of Tax and Fee Administration (CDTFA), Regulation 120.0365 of the Data Processing Services and Equipment, taxes apply to charges for optional software maintenance if the customer receives revised or updated versions of the programs on tangible storage media. UNI Maintenance updated versions are stored in-house on a DMV tangible storage media; therefore, the maintenance is taxable.

AAMVA agrees to credit a royalty from the DLDV transactions.  The royalty will be equal to 50% of revenue derived from driver license data verification requests submitted to DMV for which driver status inquiry response data is returned.  The royalty will be applied as a credit to invoices related to this contract.

## 4. DMV'S RESPONSIBILITIES

A. The **DMV Contract Manager** responsible for overseeing the performance, and any requested services, and approval of invoices is:

| Name: | Neha Shah |
|---|---|
| Telephone Number: | 916.578.9528 |
| Email Address: | Neha.Shah@dmv.ca.gov |

## 5. PAYMENT TERMS AND INVOICING REQUIREMENTS

For services rendered and upon receipt and approval of the invoices, the DMV agrees to compensate AAMVA for actual expenditures incurred in accordance with the AAMVA's prevailing rates for such services.

A. Following the end of each calendar month, AAMVA will submit to the DMV an invoice detailing the charges incurred.

B.  Invoices will identify the contract number TC24-044.

C.  Accounts Payable will pay only those invoices approved by the DMV Contract Manager and verified by the IT Acquisitions Unit.

D.  Invoices must be submitted to:

> Department of Motor Vehicles
> Accounts Payable
> PO BX 932382    M/S F109
> Sacramento, CA  94232-3820

E.  Upon receipt of the invoice, the DMV shall pay the full amount due.  Remittances shall be made payable to:

> AAMVA
> P.O. Box 71297
> Philadelphia, PA 19176

## 6.  COMPLIANCE WITH POLICIES AND PROCEDURES

### A.  NETWORK MANAGEMENT AND SUPPORT

1.  The DMV agrees to allow Network and application vendors to provide statistics, management information, and financial information to AAMVA.

2.  The DMV will appoint a service administrator to act as a coordinator between the end users of a Service and AAMVA. The service administrator's responsibilities are primarily to act as the single point of contact and coordinator in operational matters related to AAMVA Services.

### B.  PRIVACY AND DISCLOSURE

1.  The DMV is responsible for any record keeping or tracking of data that may be required due to state or federal disclosure laws. AAMVA will reasonably assist DMV in responding to any disclosure imposed by applicable state and federal laws.

### C.  ACCESS TO AND USE OF SERVICES

1.  AAMVA will provide to the DMV a USERID(s) or other means to enable access to the Services.  The DMV is responsible for the control and distribution of DMV's USERID(s) to its end users.  AAMVA shall have no liability for any misuse of these USERID(s) by DMV or its end users. In addition, the DMV agrees to pay for any resulting loss, damage or expense for any misuse by DMV's end users.

2.  The DMV is responsible for ensuring that the DMV's use of a Service will not breach any laws, regulations or conventions related to, but not limited to, data privacy, international communications and exportation of technical or personal data.  The DMV is also responsible for obtaining the necessary governmental, regulatory or statutory approvals for DMV's use of the Services.

3.  Upon 30 days advance written notice to DMV, AAMVA reserves the right to withdraw access to a Service from the DMV when DMV's misuse of a Service causes any part of a Service to malfunction and DMV fails to address such misuse to correct the malfunctions(s).

4.  If the DMV provides access to data, programs or other material, for use with a Service, DMV warrants that:

i. AAMVA will not be violating the rights of any third parties in providing the Service; and

ii. The discloser or use of such material during the course of the Service will not involve a breach of any confidential or contractual relationship.

5. AAMVAnet will be available during such hours as are established from time to time by the third-party vendor providing telecommunications services to AAMVA. AAMVAnet may be unavailable from time to time as the result of the need to perform system maintenance; reasonable efforts will be made to minimize inconvenience to Subscribers.

## D. CONFIDENTIALITY/SECURITY

1. The DMV agrees that it will comply with policies and procedures, regarding-equipment, security, information transmitted over AAMVAnet, and other operational procedures as set forth herein.

2. AAMVA shall comply with the information security and privacy controls set forth in the National Institute of Standards and Technology (NIST) Special Publication, including, but not limited to NIST SP 800-53 and the State Administrative Manual (SAM) Chapter 5300, Exhibit B (Information Security and Privacy Provisions (4/2022)) and AAMVA Data Privacy and Security Provisions provided in Appendix 1 of this agreement.

3. The DMV recognizes that AAMVA is not responsible for loss of data, information or programs of any kind whatsoever, except for loss of data, information or program resulting from AAMVA's failure to implement information security and privacy controls as required herein. The DMV is responsible for developing and/or maintaining procedures, external to the Service, to safeguard DMV's programs, information, data, and for the backup and reconstruction of loss data, information, programs or procedures.

4. DMV releases AAMVA from all liability for the loss or alteration of DMV's programs or data or information or their acquisitions by another party, except for AAMVA's failure to implement information security controls and privacy procedures as required herein.

5. AAMVA will not be responsible for transmission errors, corruption of data or for the security of data during transmission via public telecommunications facilities, except for those resulting from AAMVA's failure to implement information security and privacy security controls as required herein.

6. AAMVA and the DMV agree to comply with the Information Security and Privacy Provisions (4/2022) provided in Exhibit B and AAMVA Data Privacy and Security Provisions provided in Appendix 1 of this agreement. In the event of any conflict, duplicity, or inconsistency between Exhibit B (Information Security and Privacy Provisions 04/2022) and Appendix 1 (AAMVA's Data Privacy & Security Provisions), the terms of Exhibit B shall prevail.

7. DMV acknowledges that AAMVA has established minimum security requirements for the interconnection of the DMV's internal network to AAMVAnet. DMV agrees to provide the following protection for the AAMVA-provided network and DMV Premises Equipment (SPE):

    1. DMV shall supply a detailed diagram of the network it plans to interconnect to the AAMVA-provided network, showing all external network connections,

including the Internet.

2. DMV shall provide protection for the AAMVA-provided SPE and connection in the form of a fully functioning firewall performing stateful packet inspection.

3. DMV agrees that AAMVA-provided SPE must be installed either on the secure side of the customer firewall or on an isolated segment off that firewall.

4. DMV shall ensure that sessions initiated from the Internet or other unauthorized external networks cannot be established to the secure side/LAN segment where the AAMVA-provided SPE connection terminates.

5. DMV agrees that IP addresses to be routed/accessed across the AAMVA-provided network must be issued by AAMVA or its network-supplier.

6. DMV agrees that the devices and interconnections associated with the DMV/AAMVA interface must be located in a secure room, equipment cage or cabinet.

7. DMV agrees that access to the devices and interconnections must be controlled and limited to those personnel whose duties require such access.

8. DMV agrees that access to the devices and interconnections by any personnel including service or equipment vendors must be controlled and logged.

9. Changes to the environment, equipment or configuration of the interconnection with AAMVA must be planned and scheduled using a formal change control procedure, and coordinated in advance with AAMVA.

10. To facilitate out-of-band maintenance and management of the AAMVA-provided CPE, DMV shall provide an analog, dial tone enabled telephone circuit for use by AAMVA and its network provider.

11. AAMVA-supplied or designated equipment may not be altered, encumbered, relocated, removed or transferred to a third party, except with AAMVA's prior written approval. DMV is liable for any loss of or damage to AAMVA-supplied or designated equipment, ordinary wear and tear excepted.

## 7. ALL APPLICATION SERVICES

1. DMV is responsible for developing, operating, and maintaining its Application Services in accordance with the appropriate System Specification provided by AAMVA.

2. DMV must successfully complete structured tests administered by AAMVA to confirm that DMV has met the criteria set forth in the System Specification provided by AAMVA.

## 8. NMVTIS SERVICES

In addition to requirements listed in Section 7 which apply to NMVTIS Services, the following also applies to NMVTIS:

1. NMVTIS Data includes all the motor vehicle title and registration data supplied by participating states to be incorporated into NMVTIS. Title to NMVTIS Data shall at all times remain in the applicable states, which are the source thereof. DMV shall not have any ownership rights to the NMVTIS Data, except to the extent that the DMV may have

ownership rights thereto pursuant to separate agreements between DMV and a participating governmental jurisdiction. Since governmental jurisdictions retain ownership of the NMVTIS Data, DMV must obtain approval of the applicable governmental jurisdiction before using NMVTIS Data for any purpose.

2.  AAMVA is also establishing and maintaining information which is utilized to assist the government in performing its official business. In order to protect the rights of the citizens, with respect to the use of this information, it is understood and agreed by the NMVTIS Subscriber which requests and/or receives information from another NMVTIS Subscriber, information maintained by AAMVA, Inc., information maintained by contractors on behalf of AAMVA and/or the NMVTIS Subscriber that such information will be used for the sole purpose of providing prospective purchasers of motor vehicles with motor vehicle data.

9.  **AAMVA SUPPORT HELP DESK CONTACTS\*\***

| 1.  CUSTOMER SERVICES | |
|---|---|
| Network Customer Service and Ordering | (813) 231 - 2511 |
| Billing | (703) 908 - 2865 |
| Contracts | (703) 908 - 8286 |
| 2.  NETWORK SERVICES | |
| Network Connectivity | (888) AAMVA80  opt. 1 |
| Network Account Management | (817) 581 - 6305 |
| After Hours | (888) AAMVA80  opt. 1 |
| 3.  MOTOR CARRIER SYSTEMS | |
| PRISM | (617) 494-3049<br>(617) 494-2572<br>(617) 494-3594 |
| 4.  INFORMATION TECHNOLOGY | |
| UNI & AMIE/ba, NLETS/AAMVA Gateway | (888) AAMVA80  opt. 4 |

\*\* Subject to revision by AAMVA upon 30 days prior written notice to the DMV.

10. **PROBLEM OR ISSUE ESCALATION**

The parties acknowledge and agree that certain technical and project-related problems or issues may arise, and that such matters shall be brought to the DMV's or AAMVA's attention from the moment a service problem is discovered to resolution.  Problems or issues shall also be reported in status reports.  However, there may be instances where the severity of the problem or issue justifies escalated reporting.  To this extent, the DMV or AAMVA will notify the appropriate party as follows:

A.  1st Level of Escalation:

Department of Motor Vehicles
and American Association of Motor Vehicle Administrators
Contract #TC25-009
Exhibit A, Page 8 of 9

1. Problem or issue (deviation) is identified by the DMV or AAMVA as follows:
   a. Project output, samples, or deliverables are not consistent with the requested status or quality, or
   b. Exceeded deadlines, or
   c. Services by DMV or AAMVA are not efficient or were not implemented.
2. Action(s):
   a. Meeting with AAMVA and DMV Contract Manager about the deviation and approach for resolution.
3. Consequence(s):
   a. Define necessary actions for deviation troubleshooting, resolution and completion time.
   b. Monitoring of status reports concerning deviation.

If actions are processed and successful at 1st Level of Escalation, no further process shall follow. If actions are deemed not successful by the DMV or AAMVA, proceed to 2nd level of escalation.

B. 2nd Level of Escalation:
1. Problem or issue (deviation) is identified by the DMV or AAMVA as follows:
   a. Declaration by DMV or AAMVA that 1st Level of Escalation was not effective.
2. Action(s):
   a. Meeting with AAMVA's Senior Management and DMV Contract Manager about the deviation and approach for resolution.
3. Consequence(s):
   a. Define necessary actions for deviation troubleshooting, resolution and completion time.
   b. Monitoring of status reports concerning deviation.

If actions are processed and successful at 2nd Level of Escalation, no further process shall follow.  If not successful, proceed to 3rd Level of Escalation.

C. 3rd Level of Escalation:
1. Problem or issue (deviation) is identified by the DMV or AAMVA as follows:
   a. Declarations by the DMV or AAMVA that 2nd Level of Escalation was not effective.
2. Action(s):
   a. Meeting with the AAMVA Executive(s) who holds the authority to bind the contract and DMV Executive(s) about the deviation and approach for resolution.  DMV Executive(s) will include the following:  Project Director, Enterprise Applications Branch Chief, Chief Information Officer, Information Systems Division Deputy Director, or Director.
   b. If necessary, place project "On Hold", in accordance with General Provisions – Information Technology (9/5/14), for "Stop Work".
3. Consequence(s):
   a. Analysis by AAMVA or DMV for immediate resolution, subject to DMV or AAMVA approval.

    b. If a deviation is in result of the AAMVA's performance, AAMVA shall submit an action plan documenting results of the 3rd Level Escalation meeting for DMV approval.

If actions are processed and successful at 3rd Level of Escalation, no further process shall follow.  If not successful, and the deviation is in result of the AAMVA's performance, the DMV will issue a Cure Notice, in accordance with Section 18, Cure Notices, of this contract.

## 11. CURE NOTICES

DMV will issue a cure notice to inform AAMVA in the event AAMVA fails to meet a contract requirement or performance. The cure notice specifies ten (10) days for AAMVA  to remedy the condition. If the condition is not corrected within this period, the cure notice states that AAMVA may face the termination of its contract for default.  Cure notices may be triggered by the any of the following conditions, or other conditions that arise in performance of the contract:

A. AAMVA continues to miss agreed-upon deadlines;
B. Quantifiable evidence is lacking to show that work is being accomplished;
C. Quality of deliverables does not meet DMV's standards;
D. AAMVA is non-responsive to DMV requests; or AAMVA does not replace its Staff in a timely manner.

## 12. AMENDMENTS

1. Should, during the course of the resulting contract, it become necessary to modify the terms of the Statement of Work (Exhibit A), those modifications may be made by mutual agreement by the contracting parties through a written amendment to the contract.  A contract amendment shall not be effective unless in writing and until fully executed by both parties.  No oral understanding or agreement not incorporated through the proper contractual process shall be binding on either AAMVAor the DMV.  All amendments will follow the rules and regulations set forth by the State Contracting Manual Volume 3. Any amendments issued for this contract agreement must be reviewed and approved by the California Department of Technology prior to final execution.

2. AAMVA resources will not be expended in excess of the authorized contract cost without written authorization from the DMV, in the form of a written contract amendment. Additionally, a contract amendment is required in the event that additional work is required that both parties agree was unanticipated, is necessary to successfully complete the project, and is within the project scope.  All contract amendments will be processed utilizing the guidelines of the current rules from the State Contracting Manual Volume 3 and AAMVA cannot begin work until they have received a fully executed copy of the written amendment from the DMV Information Technology Acquisitions Unit.  Any amendment to a contract that increases the dollar amount of the contract, and/or adds additional tasks, and/or time not in the scope of the contract, will be required to follow the Non-Competitive Bid (NCB) process as described in the State Contracting Manual – Volume 3.

3. Exercising the optional extensions as specified in the Cost Worksheet, Exhibit C, will be via an Amendment and will not go through the NCB process.

Department of Motor Vehicles
and American Association of Motor Vehicle Administrators
Contract #TC25-009
Exhibit B, Page 1 of 7

## INFORMATION SECURITY AND PRIVACY PROVISIONS (04/2022)

In the performance of this Agreement, AAMVA (or "Contractor") agrees to protect all Department of Motor Vehicles (DMV) information by implementing the necessary controls to comply with State mandated security and privacy requirements provided in California State Administrative Manual (SAM), National Institute of Standards and Technology (NIST), Federal Information Processing Standards (FIPS), Government Code §11015.5 and §11019.9, Vehicle Code, and California Information Practices Act (IPA) Civil Code §1798 et seq. The Contractor further agrees to implement the minimum administrative, physical, technical, and safeguards identified in this Agreement. The Contractor shall protect DMV information for the terms and length of this Agreement and while in possession of, maintaining, or accessing DMV information. The Contractor shall ensure any third parties adhere to these same provisions.

A. **DEFINITIONS** – For purposes of this Exhibit, the following definitions shall apply:

1. **Contractor** shall generally refer to any entity, private or public organization hired or working in conjunction with or for DMV to provide deliverables.

2. **Data** shall mean a representation of facts, concepts, or instructions in a formalized manner suitable for communication, interpretation, or processing by humans or by automated means.

3. **DMV Information** shall refer to DMV provided data.

4. **Confidential Information** shall have the same meaning as those terms in SAM, IPA, Civil Codes, and related Government Codes.

5. **Personal Information** shall have the same meaning as those terms in SAM, IPA, Civil Codes, and related Government Codes.

6. **Sensitive Information** shall have the same meaning as those terms in SAM, IPA, Civil Codes, and related Government Codes.

7. **Personnel** shall refer to any Contractor employees, volunteers, contractors, sub-contractors commissioned, employed by, or otherwise engaged in the performance of work associated with the Contractor.

8. **Systems** shall refer to workstations, laptops, servers, network, and other information processing components managed and hosted by Contractor which process, store, or transmit DMV information.

9. **Users** shall refer to any Contractor personnel with access to DMV information.

Department of Motor Vehicles
and American Association of Motor Vehicle Administrators
Contract #TC25-009
Exhibit B, Page 2 of 7

B.  **ADMINISTRATIVE SAFEGUARDS**

1.  **DATA OWNERSHIP**

    DMV information provided under this Agreement remains DMV exclusive property. Confidential, sensitive, and personal information is not open to the public and requires special precautions to protect from loss and unauthorized use, disclosure, modification, or destruction.  This information must not be shared without written permission from the DMV.

    The Contractor recognizes its responsibility to protect the confidentiality of information in their custody as provided by law and ensure such information is disclosed only to those individuals, and of such purpose as authorized by the respective laws.

    The Contractor shall have a non-exclusive right to use and process the disclosed information for the purposes stated in this Agreement.  This right shall be revoked immediately upon termination of this Agreement. Disclosure of this data does not transfer ownership of information to the Contractor.

2.  **USE OF INFORMATION**

    The Contractor acknowledges and agrees that the information furnished or secured pursuant to this Agreement shall be used solely for the purposes described in this Agreement and agrees to implement policies and procedures to ensure the confidentiality of said information.

    The Contractor further agrees that information obtained under this Agreement shall not be reproduced, published, sold, or released in original or any other form for any purpose other than identified in this Agreement.  Only the minimum necessary amount of DMV information required to perform necessary business functions may be processed, stored, or transmitted.

    The Contractor shall not use any DMV information that identifies real individuals for any purpose not described in this Agreement including for testing, training, or research.

3.  **BACKGROUND CHECKS**

    Contractor Personnel who may access DMV information, must undergo a thorough background check, with evaluation of the results to assure that there is no indication that the worker may present a risk to the security or integrity of confidential data or a risk for theft or misuse of confidential data.  The Contractor shall retain background check documentation for a period of three (3) years following contract termination.

4.  **STATEMENT OF CONFIDENTIALITY AND REQUIREMENTS**

    Information maintained by DMV is confidential under this Agreement and exempt from disclosure under the provisions of California Public Records Act (Government Code §6250-6265), the California Elections Code §2194), and other applicable state or federal laws.

The Contractor further understands and acknowledges that under California Penal Code §502, it is a public offense to knowingly and without permission alter, damage, delete, destroy, copy, or otherwise use any DMV data.  Such action can be prosecuted civilly or criminally and is punishable by fine and/or imprisonment.

The Contractor shall ensure that all users sign a confidentiality statement each year, attesting to the fact that he/she is aware of the confidential nature of the data and penalties for unauthorized disclosure under applicable state and federal law.  Copies of signed confidentiality statements must be made available to the DMV CISO upon request.

## 5.  INFORMATION SECURITY AND PRIVACY AWARENESS TRAINING

The Contractor shall ensure that all users must receive information security and privacy awareness training prior to accessing such information, and annually thereafter. Information security and privacy awareness training must contain instructional components such as, but not limited to, information about the confidential nature of information, laws and regulations protecting the confidentiality of information, user responsibility for protecting the information, and the consequences and legal liability of unauthorized use, access, or disclosure of said information. Upon request, the Contractor must provide the DMV Chief Information Security Officer (CISO) or Privacy Officer with a copy of its information security and privacy awareness training components and certification of its annual information security and privacy awareness training completion.

## 6.  EMPLOYEE ACCESS TO INFORMATION

The Contractor agrees that information shall be kept in the strictest confidence and only made available to authorized personnel on a "need-to-know" business basis, and only for the purposes authorized under this Agreement. The term "need-to-know" refers to those authorized persons who need information to perform their official duties in connection with the purpose described in the Agreement.

The Contractor shall maintain records of all authorized users and the authorization level of access granted to the information obtained under this Agreement with the purpose described in this Agreement.

## 7.  RISK ASSESSMENT

A risk assessment must be conducted annually on all Contractor systems which process, store or transmit DMV information.  Risk assessments must be documented at least every three (3) years or upon significant change to the system or environment. Risk assessment results must be provided to the CISO within 30 days of completion.

8. **INCIDENT REPORTING**

The Contractor shall immediately notify the DMV CISO/Designee of any actual or suspected security event involving DMV information accessed or obtained under this Agreement.  The Contractor shall cooperate fully with DMV to comply with the incident reporting requirements within Civil Code section 1798.29 and SAM section 5340.4.

The Contractor shall thoroughly investigate all unauthorized or suspected unauthorized access, use, and/or disclosure of information obtained under this Agreement.  DMV reserves the right to participate in the investigation of any information security incident involving its data and may conduct its own independent investigation, and the Contractor shall cooperate fully in such investigation.

The Contractor shall provide a preliminary report within three (3) working days of discovery of breach or unauthorized use or disclosure.  The report shall include, but not be limited to, the information specified above, as well as any pertinent preliminary information.  The Contractor shall then provide a full written report of the investigation to the DMV CISO and Privacy Officer within ten (10) working days of the discovery of the breach or unauthorized use or disclosure.  The report shall include, but not be limited to, the information specified above, as well as a full, detailed corrective action plan, including information on measures that were taken to halt and/or contain the improper use or disclosure.

DMV reserves the right to take corrective action at any time.

9. **BREACH OR DISCLOSURE OF DMV INFORMATION**

Disclosure of any DMV information to any person or entity not specifically authorized in this Agreement is strictly prohibited.  Personnel assigned to work with DMV's confidential information shall not reveal, share, or divulge to any person or entity any of the confidential information provided under this Agreement, except as authorized or required by law.

DMV shall not be held liable for any breach of Contractor systems that results in the release of any information provided by DMV.  Contractor agrees to indemnify and hold harmless DMV, its officers, and representatives from and against any liability, losses, costs, damages, or expenses (including but not limited to attorney fees) resulting from any claims arising from the performance of this Agreement, including but not limited to any and all liability, damages, costs, expenses, or attorney fees resulting from a breach of security of the system as defined in the California IPA unless such damages are determined to be the result of the negligence of DMV, its officers, employees, or representatives.

If the Contractor experiences a loss or breach of data, the Contractor shall immediately report the loss or breach to DMV. If DMV determines that notice to the individuals whose data has been lost or breached is appropriate, the Contractor shall bear any, and all costs associated with the notice, or any mitigation selected by the data owner. These costs include, but are not limited to, staff time, material costs, postage, media announcements, and other identifiable costs associated with the breach or loss of data.

## C.  PHYSICAL SAFEGUARDS

### 1.  ACCESS CONTROL

The Contractor shall ensure information in all forms, such as, but not limited to CDs, DVDs, USB flash drives, or other removable media must be stored in areas physically secure and free from access by unauthorized persons as described in this Agreement.

The Contractor shall ensure computer monitors, printers, hard copy printouts, or any other forms of information accessed or obtained under the performance of this Agreement must not be viewed by the public or other unauthorized persons as described in the Agreement.

### 2.  SUPERVISION OF DATA

DMV information in paper form shall not be left unattended at any time, unless it is locked in a file cabinet, file room, desk or office.  Unattended means that information is not being observed by an employee authorized to access the information.  DMV information in paper form shall not be left unattended at any time in vehicles or planes and shall not be checked in baggage on commercial airplanes.

### 3.  ESCORTING VISITORS

Visitors to areas where DMV information is contained shall be escorted and DMV information shall be kept out of sight while visitors are in the area.

### 4.  REMOVAL OF DATA

DMV information must not be removed from the premises of the Contractor except with express written permission.

## D.  TECHNICAL SAFEGUARDS

### 1.  DATA RETENTION AND DESTRUCTION

DMV information must be retained for the minimum necessary to perform the required business function.

All data received by the Contractor under this Agreement and any data created, copied, attributed to data received shall be destroyed when no longer needed for the business function for which they were obtained, or within 60 calendar days of termination of this Agreement.  Data must be destroyed in accordance with the requirements specified NIST Special Publication (SP) 800-88, Guidelines for Media Sanitization.

### 2.  ENCRYPTION

Confidential, sensitive, or personal information must be encrypted in accordance with Federal Information Processing Standards 140-3, Security Requirements for Cryptographic Modules.

3.  **DATA AT REST AND IN TRANSIT**

All Contractor systems that process, store, or transmit DMV confidential, sensitive, or personal information at rest and in transit must be encrypted in accordance with the security and privacy provisions specified within this Agreement.

4.  **ENDPOINT PROTECTION**

All Contractor systems that process, store, or transmit DMV information must install and actively use endpoint protection with automatic updates scheduled at least daily.

5.  **VULNERABILITY MANAGEMENT**

All Contractor systems which store, process, or transmit DMV information must be scanned for vulnerabilities monthly, and when new vulnerabilities potentially affecting the system are identified and reported.  Vulnerabilities by severity must be remediated within the following timeframe.

- Critical (3 business days or less)
- High (30 days)
- Medium (60 days)
- Low (90 days)

The CISO must be notified within 24 hours if critical vulnerabilities cannot be remediated within the required timeframe.

6.  **INTRUSION DETECTION**

All Contractor systems which store, process, or transmit DMV information that are accessible via the Internet must be protected by a comprehensive intrusion detection and prevention solution.

7.  **WARNING BANNERS**

All Contractor systems which store, process, or transmit DMV information must display a warning banner stating that data is confidential, systems are logged, and system use is for business purposes only by authorized users.  User must be directed to log off the system if they do not agree with these requirements.

8.  **IDENTIFICATION and AUTHENTICATION**

All users accessing DMV information from Contractor systems must be assigned uniquely identified accounts.

9.  **PASSWORD CONTROLS**

Contractor system user account passwords must be a minimum 15 characters and must be composed of a minimum one character each from the following four groups:

a.  Upper case letters (A-Z)
b.  Lower case letters (a-z)
c.  Arabic numerals (0-9)
d.  Non-alphanumeric characters (punctuation symbols)

Passwords must be changed at least every 180 days.

### 10. USER ACCOUNT MANAGEMENT

Contractor system user accounts must be immediately disabled or deleted upon personnel termination or a change in assigned duties which no longer require access to DMV information.

### 11. MULTI FACTOR AUTHENTICATION

Multi factor authentication must be enabled for all Contractor system users accessing DMV information.

### 12. SESSION LOCK

Contractor systems must not be left unattended and logged on.  Systems must be configured to prevent access by initiating a session lock after no more than 15 minutes of inactivity. Session locks must be retained until the user reestablishes access using established identification and authentication procedures.

### 13. CHANGE CONTROL

The Contractor shall notify the DMV 14 days prior of any changes to systems, hardware, software, applications, file structure, data, or record layout which process, store, or transmit DMV information.  The DMV shall notify the Contractor of any changes to DMV systems, hardware, software, applications, file structure, data, or record layout which process, store, or transmit information in the performance of this Agreement at the discretion of the DMV.  Any changes that do not impact CA DMV are exempt from prior notifications.

### 14. AUDITING

The Contractor shall maintain an audit trail and record data access of authorized users and the authorization level of access granted to information based on job function. Said logs must be made available to the DMV upon request.

To determine compliance with Agreement terms, the Contractor shall permit DMV authorized individuals to perform audit or inspections during regular business hours of hosted Contractor systems located on Contractor premises. Contractor shall permit audits or inspections with thirty (30) days prior notice.

Department of Motor Vehicles
and American Association of Motor Vehicle Administrators
Contract #TC25-009
Exhibit C, Page 1 of 2

**COT DATA SHEET**

| Product Services Catalog Government Rate October 2024 | | | | | | Fiscal Year is from 7/1 to 6/30 | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Description of Services | Billing Code | $ per unit | Yearly Transaction Volume as of 2024 | Unit Cost | 06/15/2025 - 06/30/2025 | FY25-26 | FY26-27 | FY27-28 | FY28-29 | FY29-30 | Totals |
| **AAMVA Billing Monthly (CADMV)** | | | | | | | | | | | |
| *Program Services Fee* | | | | | | | | | | | |
| US Jurisdiction** | MVA-APT FEES | $48,294.39 | NA | Month | $24,147.20 | $582,375. | $611,493.75 | $642,068.44 | $674,171.86 | $707,880.45 | $3,242,136.69 |
| *Technology Fees* | | | | | | | | | | | |
| US Jurisdiction** | MVA-TECH FEES | $20,865.37 | NA | Month | $10,432.69 | $251,6150 | $264,195.75 | $277,405.54 | $291,275.81 | $305,839.61 | $1,400,764.39 |
| *AAMVAnet Charges* | | | | | | | | | | | |
| Service Fee – Master Account | MVA-SVCFEE | $40. | NA | Month | $20. | $480. | $480. | $480. | $480. | $480. | $2,420. |
| UNI Windows** | MVA-UNIWINMNT | $2,155.30 | NA | Month | $1,077.65 | $26,000. | $27,300. | $28,665. | $30,098.25 | $31,603.16 | $144,744.06 |
| BPEVR – Stds Development Svc | MVA-BPEVR | $201.66 | NA | Month | $100.83 | $2,420. | $2,420. | $2,420. | $2,420. | $2,420. | $12,200.83 |
| SSOLV** | SSV-SSN | $0.05 | 9,297,178 | Month | $232,430.00 | $464,860. | $488,103. | $512,508.15 | $538,133.56 | $565,040.24 | $2,801,074.94 |
| *CDLIS Charges* | | | | | | | | | | | |
| CDLIS – master pointer fee** | CDL-MP | $0.03 | 1,682,186 | Month | NA | NA | NA | $270,000. | $540,000. | $567,000. | $1,377,000. |
| *USPVS Transaction Fee* | | | | | | | | | | | |
| USPVS – Transaction Fee** | USPVS-PV | $0.09 | 1,362,123 | Month | $5,108. | $122,600. | $128,730. | $135,166.50 | $141,924.83 | $149,021.07 | $682,550.39 |
| USP – Web Service Transaction Fee (2nd Gap Code)** | USP-WS | $0.09 | 581,621 | Month | $2,185. | $52,350. | $54,967.50 | $57,715.88 | $60,601.67 | $63,631.75 | $291,451.80 |
| | | | | | | | | | | | |
| **NMVTIS Billing Monthly (DMVX)** | | | | | | | | | | | |
| NMVTIS – State Fee** | California | $102,927.08 | NA | Month | $51,463.54 | $1,281,459. | $1,345,531.95 | $1,412,808.55 | $1,483,448.97 | $1,557,621.42 | $7,132,333.44 |

Department of Motor Vehicles
and American Association of Motor Vehicle Administrators
Contract #TC25-009
Exhibit C, Page 2 of 2

| AAMVA HAVA Quarterly (CAHAVA) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HAVA/HAVV – AAMVA Quarterly Fee | MVA-AMVAHAVMN | $1,100. | NA | Quarter | $184. | $4,400. | $4,400. | $4,400. | $4,400. | $4,400. | $22,184. |
| *SSA-HAVV Yearly Maintenance Fee | MVA-SSAHAVAYRL | $1,344.88 | NA | Yearly | $60. | $1,750. | $1,960. | $2,195.20 | $2,458.62 | $2,753.66 | $11,177.48 |
| Subtotal | | | | | $327,208.90 | $2,790,309. | $2,929,581.95 | $3,345,833.25 | $3,769,413.57 | $3,957,691.36 | $17,120,038.03 |
| | | | | | | | | | | | |
| Optional Services – | | | | | | | | | | | |
| Driver Services | | | | | | | | | | | |
| S2S – Annual per State Fee | | $29,651. | | Year | | | | $29,651. | $29,651. | $29,651. | $88,953. |
| Annual per Driver Fee – California | | $1,362,371. | | Year | | | | $1,362,371. | $1,430,489.55 | $1,502,014.03 | $4,294,874.58 |
| estimated start June 2027 | | | | | | | | | | | |
| Total - including optional services | | | | | $327,208.90 | $2,790,309. | $2,929,581.95 | $4,737,855.25 | $5,229,554.12 | $5,489,356.38 | $21,503,865.60 |
| | | | | | | | | | | | |
| Pricing Notes: | | | | | | | | | | | |

1. *SSA HAVV Maintenance Fee is a pass through charge from SSA. Each year SSA provides AAMVA a true up cost for the program. The cost could increase or decrease depending on the number of states participating and the SSA program cost.

2. **Pricing for services which are subject to change were escalated by 5% year over year.

3. Pricing for the transactions are based off of 2024 volumes.  In accordance with the Product Service Catalog, AAMVA will provide advance notice of any pricing changes.

## AAMVA DATA PRIVACY & SECURITY PROVISIONS

1.  **Definitions**.

    a.  "Authorized Personnel" means, with reference to a Party, those employees, contractors, representatives, agents, and auditors serving on behalf and under the direction of that Party who (i) have a need to know or otherwise access Confidential Information or Protected Data to enable that Party to perform its obligations under this Agreement, and (ii) are bound in writing by confidentiality obligations sufficient to protect that Confidential Information or Protected Data in accordance with the terms and conditions of this Agreement.

    b.  "Confidential Information" means all non-public, confidential, or proprietary information disclosed by one Party (Disclosing Party) to the other Party (Receiving Party), whether disclosed orally or disclosed or accessed in written, electronic, or other form or media and whether or not marked, designated or otherwise identified as "confidential." Confidential Information shall not include information that: (i) was previously known by the Receiving Party; (ii) is publicly available; or (iii) is lawfully obtained by the Receiving Party independently of its relationship with the Disclosing Party under this Agreement.

    c.  "Security Incident" means any act or omission that (i) compromises either the security, confidentiality, or integrity of Protected Data or the physical, technical, administrative, or organizational safeguards put in place by a Party that relates to the protection of the security, confidentiality, or integrity of Protected Data or (ii) breaches the requirements of this Agreement relating to such safeguards. For avoidance of doubt, a Security Incident under this Agreement shall have occurred if a Security Incident has occurred in a data system that is connected to an AAMVA data system.

    d.  "Protected Data" means information provided to a Party by or on behalf of the other Party that identifies or can be used to identify an individual (including, without limitation, names, signatures, addresses, telephone numbers, e-mail addresses and other unique identifiers) or can be used to authenticate an individual, including, without limitation, all Sensitive Data.

    e.  "Sensitive Data" means an individual's (i) government-issued identification number (including social security number, driver's license number or state-issued identified number); (ii) financial account number, credit card number, debit card number, credit report information, with or without any required security code, access code, personal identification number or password, that would permit access to an individual's financial account; (iii) photograph or image; or (iv) biometric, medical or disability information.

2.  **Use and Return of Confidential Information and Protected Data.**

    a.  Each Party acknowledges and agrees that during the term of this Agreement it may receive or have access to Confidential Information and Protected Data provided by the other Party. Each Party shall comply with the terms and conditions set forth in this Agreement concerning the use, collection, receipt, transmission, storage, disposal, and disclosure of such Confidential Information and Protected Data.

    b.  Each Party that receives Confidential Information or Protected Data (Receiving Party) from the other Party (Disclosing Party) agrees that the Receiving Party shall:

I.   Keep and maintain all Confidential Information and Protected Data in strict confidence, using the same degree of care (but in no event less than reasonable care) to avoid unauthorized disclosure or use of the disclosed Confidential Information or Protected Data as it normally uses to protect its own Confidential Information or Protected Data; and

II.  Use and disclose Confidential Information or Protected Data solely to Authorized Personnel to carry out each Party's obligations under this Agreement, and not use, sell, rent, transfer, distribute, or otherwise disclose or make available such Confidential Information or Protected Data to any person or for any purpose or object except as authorized by this Agreement.

c.  At any time during the term of this Agreement at a Disclosing Party's written request or upon the termination or expiration of this Agreement for any reason, the Receiving Party shall, and shall promptly return to the Disclosing Party all copies, whether in written, electronic or other form or media, of Confidential Information or Protected Data that was provided by the Disclosing Party in the Receiving Party's possession, or under its control, or securely dispose of all such copies, and certify in writing to the Disclosing Party that such Confidential Information or Protected Data has been returned to Disclosing Party or disposed of securely. Receiving Party shall comply with all directions provided by the Disclosing Party with respect to the return or disposal of Confidential Information or Protected Data.

**3.  Safeguarding Data Privacy and Security.**

a.  Each Party represents and warrants that its collection, access, use, storage, disposal and disclosure of Protected Data does and will comply with pertinent provisions of the Driver Privacy Protection Act (DPPA), the Federal Information Processing Standards and, to the extent required of a Party under this Agreement, by all other laws, regulations, and governmental directives (including, without limitation, the Federal Information Security Management Act (FISMA), the General Data Protection Regulation (GDPR) and the California Consumer Privacy Act (CCPA)).

b.  Each Party agrees to implement, maintain and monitor a comprehensive written information security program that complies with all applicable data privacy and security laws and regulations ("Information Security Policy") which shall be available promptly on request of the other Party.  The Information Security Policy maintained by each Party shall include appropriate administrative, technical, physical, organizational, and operational safeguards and other security measures designed to (i) ensure the security and confidentiality of Protected Data; (ii) protect against any anticipated threats or hazards to the security and integrity of Protected Data (such as unauthorized processing, access, collection, use, copying, modification, disposal or disclosure, unauthorized, unlawful, or accidental loss, destruction, acquisition, or damage); and (iii) protect against any actual or suspected unauthorized loss, use, disclosure or acquisition of or access to any Protected Data.

c.  Without limiting each Party's obligations under Section 3(b), each Party agrees to implement such administrative, physical, and technical safeguards to protect Protected Data from unauthorized access, acquisition, or disclosure, destruction, alteration, accidental loss, misuse, or damage that are no less rigorous than accepted industry practices including the International Organization for Standardization's standards: ISO/IEC 27001 – Information Security Management Systems – Requirements and ISO/IEC 27002 – Code of Practice for International Security Management, the Control Objectives for Information and related Technology (COBIT) standards, the National

Institute of Standards and Technology (NIST) Cybersecurity Framework, or other applicable industry standards for information security], and shall ensure that all such safeguards, including the manner in which Protected Data is created, collected, accessed, received, used, stored, processed, disposed of, and disclosed, comply with applicable data protection and privacy laws, as well as the terms and conditions of this Agreement.

d.  At a minimum, each Party's safeguards for the protection of Protected Data shall include:

    I.    Limiting access of Protected Data to Authorized Personnel;

    II.    Securing business facilities, data centers, paper files, servers, backup systems, and computing equipment, including, but not limited to, all mobile devices and other equipment with information storage capability;

    III.    Implementing network, application, database, and platform security;

    IV.    Securing information transmission, storage, and disposal;

    V.    Implementing authentication and access controls within media, applications, operating systems, and equipment;

    VI.    Encrypting Sensitive Data stored on any mobile media;

    VII.    Encrypting Sensitive Protected Data transmitted over public or wireless networks;

    VIII.    Strictly segregating Data from other information so that Protected Data is not commingled with any other types of information;

    IX.    Conducting risk assessments, penetration testing, and vulnerability scans and promptly implementing, at each Party's sole cost and expense, a corrective action plan to correct any issues that are reported as a result of the testing; and

    X.    Providing appropriate privacy and information security training to the Party's employees.

e.  Each Party shall implement appropriate personnel security and integrity procedures and practices with respect to all employees, including but not limited to, conducting pre-employment screening processes prior to their commencement of work for the Party that include verification of the highest degree held by such employees and criminal history screening that includes all localized law enforcement records for the past seven (7) years (exclusive of any incarceration time). Neither Party shall permit an individual to serve within the Authorized Personnel if that person has: (i) been convicted of a crime in connection with a dishonest act, breach of trust, or has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such offense, or (ii) been convicted of a felony.

f.  Each Party shall require its employees who are Authorized Personnel to abide strictly by the Party's obligations under this Agreement. Each Party agrees that it shall maintain a disciplinary process to address any unauthorized access, use or disclosure of Protected Data by any of that Party's Authorized Personnel.

**4.  Security Incidents.**

a.  Each Party shall provide the other with (i) the name and contact information for an employee or other representative who shall serve as the Party's primary data security contact on matters relating to data security and privacy (ii) contact information to reach an employee or other representative who shall be available to provide assistance twenty-four (24) hours per day, seven (7) days per week as a contact in resolving obligations associated with a Security Incident. The Parties provide the following contact information

for these individuals. Each Party shall provide prompt written notice to the other of any changes in this information.

> For AAMVA:
> > <u>Data Security Contact</u>:
> > Pierre Y. Boyer, CISO
> > 703 839 0646
> > pboyer@aamva.org
> >
> > <u>24 x 7 Security Incident Contact</u>:
> > security@aamva.org
> > 888-AAMVA80, opt. 1
>
> For California:
> > <u>Data Security Contact</u>:
> > Eric Harrald, CISO
> > 916-657-7665
> > Eric.harrald@dmv.ca.gov
> >
> > <u>24 x 7 Security Incident Contact</u>:
> > DMV Security Operations Center
> > 916-657-4788
> > ISDSecurityOpsCtr@dmv.ca.gov

b. A Party (Breached Party) shall notify the other Party within [48 (forty-eight)] hours of confirming the occurrence of a Security Incident affecting Protected Data in a Service or data system operated by the Breached Party that is included in this Agreement.

c. Promptly following the Breached Party's notification of a Security Incident, the Breached Party agrees to take prompt action immediately, at its own expense, to investigate the Security Incident, to take commercially reasonable actions to identify, prevent, and mitigate the effects of any such Security Incident, and to carry out any actions required by applicable law, including but not limited to notifications to affected persons. The Parties shall cooperate and coordinate with each other to investigate the Security Incident in accordance with the Breached Party's standard policies and procedures. The other Party shall provide the Breached Party with reasonable assistance to carry out investigation, prevention, and mitigation efforts and to comply with applicable legal requirements. If data furnished by the other Party is affected by the Security Incident, the Breached Party shall reasonably incorporate the directions of the other Party concerning investigation, prevention, and mitigation efforts.

d. The Breached Party shall keep the other Party informed of the status of the Security Incident, all assessments and plans of actions taken by it in response to the Security Incident, and all other related matters.  Unless required by law, the Breached Party will not notify any individual or any third party other than law enforcement of any potential Security Incident without first consulting with, and obtaining written permission of, the other Party.

5. **Verification of Information Security Safeguards.**

a. Security Questionnaire.  No more than once in any period of twelve consecutive months period and after each instance of a Security Incident each Party (Requesting Party) shall have the right to assess compliance with this Agreement by requesting the other Party (Responding Party) to promptly and accurately complete a written information security questionnaire provided by the Requesting Party (or a third party on behalf of the

Requesting Party) regarding the Responding Party's business practices and information technology environment in relation to all Protected Data being handled or transmitted by the Responding Party pursuant to this Agreement. The Responding Party shall fully cooperate with such inquiries.

b. On-Site Security Audit.  No more than once in any period of twelve consecutive months period and after each instance of a Security Incident, each Party (Requesting Party) on at least thirty (30) calendar days' prior written notice, and in compliance with the Responding Party's data privacy and security policies, shall have the right to audit and assess the other Party's compliance with this Agreement by performing (through the Requesting Party's employees or third party personnel) an on-site assessment of all controls in the Responding Party's physical and/or technical environment in relation to all Protected Data being handled pursuant to this Agreement.  Such assessment may include review of a party's current assessment reports, such as SOC 2 Type II, SSAE16, NIST 800-53 Assessment Report or equivalent reports produced by a third party organization that performs security inspections of a party's facilities and information processing systems. Each Party agrees to conduct data security assessments in accordance with the frequency specified in the assessment standards established by the applicable third-party organization.

## 6.  Material Breach.

Either Party's failure to comply with the provisions of this Agreement concerning the use, disclosure, protection or safeguarding of Confidential Information or Protected Data shall constitute a material breach of this Agreement.