# Exhibit 5

| SOLICITATION, OFFER, AND **AWARD** | Caption<br>**American Association of Motor Vehicles Administrators (AAMVA)** | Page of Pages |  |
|---|---|---|---|
|  |  | 1 | of 55 |

| 2. Contract Number<br>**CW124323** | 3. Solicitation Number | 4. Type of Solicitation<br>☐ Sealed Bid (IFB)<br>☐ Sealed Proposals (RFP)<br>☒ Exempt from Competition<br>☐ Emergency | 5. Date Issued | 6. Type of Market<br>☐ Open<br>☒ Set Aside<br>☐ Open Market with Set-Aside<br>CBE Designated Category |

| 7. Issued By | 8. Address Offer to: |
|---|---|
| Office of Contracting and Procurement<br>441 - 4th Street, N.W., Suite 700 South<br>Washington, D.C.  20001 | Submission should be made via email ONLY. |

NOTE: In sealed bid solicitations "offer" or "offeror" means "bid or "bidder"

## SOLICITATION

9.  Sealed offers in original and _____ copies for furnishing the supplies or services in the Schedule will via electronic format via the on-line solicitation software !

N/A  (Hour)          N/A  (Date)

CAUTION: Late submission, Modifications, and Withdrawals: See 27 DCMR chapters 15 & 16 as applicable.  All offers are subject to all terms & conditions contained in solicitation.

| 10. For Information Contact | A. Name | B. Telephone | | | C. E-mail Address |
|---|---|---|---|---|---|
|  | Lorraine Stanislaus | (Area Code)<br>202 | (Number)<br>805 – 3349 | (Ext) | Lorraine.stanislaus@dc.gov |

### 11. Table of Contents

| (X) | Section | Description | Page No. | (X) | Section | Description | Page No. |
|---|---|---|---|---|---|---|---|
| | | PART I – THE SCHEDULE | | | | PART II – CONTRACT CLAUSES | |
| X | A | Solicitation/Contract Form | 1 | X | I | Contract Clauses | 11 |
| X | B | Supplies or Services and Price/Cost | 2 | | | PART III – LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS | |
| X | C | Specifications/Work Statement | 5 | X | J | List of Attachments | 20 |
| X | D | Packaging and Marking | 6 | | | PART IV – REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | Inspection and Acceptance | 6 | | | Representations, certification and other | 21 |
| X | F | Deliverables or Performance | 6 | X | K | statements of offerors | |
| X | G | Contract Administration Data | 7 | X | L | Instructions, conditions & notices to Offerors | 21 |
| X | H | Special Contract Requirements | 10 | X | M | Evaluation Factors | 24 |

12.  In conjunction with the above, the undersigned agrees, if this offer is accepted within _____10_____ calendar days from the receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified herein.

| 13. Discount for Prompt Payment | 10 Calendar days % | 20 Calendar days % | 30 Calendar days % | _____ Calendar days % |
|---|---|---|---|---|

| 14. Acknowledgement of Amendments<br>(The offeror acknowledges receipt of amendments to the SOLICITATION): | Amendment Number | Date | Amendment Number | Date |
|---|---|---|---|---|

| 15A.  Name and Address of Offeror<br>**American Association of Motor Vehicles Administrators**<br>**4401 Wilson Blvd, Suite**<br>**Arlington, Virginia, 22203** | | 16.  Name and Title of Person Authorized to Sign Offer/Contract<br><br>Wendy Sibley, CFO |
|---|---|---|

| 15B. Telephone | | | ☐ 15 C. Check if remittance address is different from above – Refer to section G | 17. Signature **Wendy Sibley** Digitally signed by Wendy Sibley Date: 2025.03.19 17:31:20 -04'00' | 18. Award Date<br>3/19/2025 |
|---|---|---|---|---|---|
| (Area Code)<br>703 | (Number)<br>908 - 2941 | (Ext) | | | |

## AWARD (TO BE COMPLETED BY GOVERNMENT)

| 19. Accepted as to Items Numbered | 20. Amount<br>**$146,922.62** | 21. Accounting and Appropriation |
|---|---|---|

| 2. Name of contracting Officer (Type or Print)<br>Camille Christian signing for<br>Heather Reynolds - White | 23. Signature of Contracting Officer (district of Columbia)<br><br>*Heather Reynolds* | 24. Award Date<br>3/27/2025 |
|---|---|---|

Government of the District of Columbia                    Office of Contracting & Procurement

1

# SECTION B:  CONTRACT TYPE, SUPPLIES OR SERVICES AND PRICE/COST

**B.1**    The Office of Contracting and Procurement, on behalf of the District of Columbia Department of Motor Vehicles seeks an annual renewal for the maintenance and support services from the American Association of Motor Vehicles Administrators (AAMVA) for access and exchange of data through the AAMVA network.

**B.2**    The District contemplates the award of a fixed price and contingent price contract.

**B.3    AGGREGATE GROUP OR INDIVIDUAL ITEM**

The award, if made, will be to a single Offeror in the aggregate for those groups of items indicated by "Aggregate Award Group" herein. Offeror must quote unit prices on each item within each group to receive consideration.

**B.4    PRICE SCHEDULE**

**B.4.1   Base Year**

| Contract Line Item Number (CLIN) | Description | Monthly | Price |
|---|---|---|---|
| 0001 | Ethernet Access Dual 1M Port, Single Router | $2,026.22 | $24,314.64 |
| 0002 | Ethernet Access Dual 1M Port, Single Router Credit | $2,026.22 | ($24,314.64) |
| 0003 | S2S Per State Fee | $2,470.92 | $29,651.00 |
| 0004 | S2S Per Driver Fee | $1,771.41 | $21,256.92 |
| 0005 | AAMVA Program Services Fee | $841.53 | $10,098.36 |
| 0006 | AAMVA Technology Fee | $363.58 | $4,362.96 |
| 0007 | SSN Verification Fee ($.05 per transaction) | $869.09 | $10,429.08 |
| 0008 | Service Fee | $40.00 | $480.00 |
| 0009 | UNI Mainframe Maintenance Fee | $2,155.30 | $25,863.60 |
| 0010 | UNI Windows Maintenance Fee | $1,379.39 | $16,552.68 |
| 0011 | NMVTIS FY24 State Fees | $1,663.25 | $19,959.00 |
| 0012 | USPVS Support Services Fee ($0.09 per transaction) | $210.34 | $2,524.06 |
|  |  | Quarterly | 0 |
| 0013 | AAMVA HAVV Maintenance Fee 10/1/25 – 9/30/26 | $1,100.00 | $4,400.00 |
| 0014 | SSA HAVV Maintenance Fee 10/1/25 – 9/30/26 |  | $1,344.88 |
| 0015 | HAVV One Time Enhancement Fee |  | 0.00 |
| **Total Price** |  |  | **$146,922.62** |

2

**B.4.2  Option Year 1**

| Contract Line Item Number (CLIN) | Description | Monthly | Price |
|---|---|---|---|
| 1001 | Ethernet Access Dual 1M Port, Single Router | $2,087.01 | $25,044.08 |
| 10002 | Ethernet Access Dual 1M Port, Single Router Credit | ($2,087.01) | ($25,044.08) |
| 1003 | S2S Per State Fee | $2,475.00 | $29,700.00 |
| 1004 | S2S Per Driver Fee | $1,775.00 | $21,300.00 |
| 1005 | AAMVA Program Services Fee | $875.00 | $10,500.00 |
| 1006 | AAMVA Technology Fee | $380.00 | $4,560.00 |
| 1007 | SSN Verification Fee ($.05 per transaction) | $895.17 | $10,742.00 |
| 1008 | Service Fee | $40.00 | $480.00 |
| 1009 | UNI Mainframe Maintenance Fee | $2,220.00 | $26,640.00 |
| 1010 | UNI Windows Maintenance Fee | $1,420.00 | $17,040.00 |
| 1011 | NMVTIS FY24 State Fees | $1,715.00 | $20,580.00 |
| 1012 | USPVS Support Services Fee ($0.09 per transaction) | $210.34 | $2,524.08 |
| | **Service** | Quarterly | |
| 1013 | AAMVA HAVV Maintenance Fee (Billed 10/01/2026 – 09/30/2027) | $1,100.00 | $4,400.00 |
| 1014 | SSA HAVV Maintenance Fee (Billed 10/01/2026 – 09/30/2027) | | $1,344.88 |
| 1015 | HAVV One -Time Enhancement Fee | | $0.00 |
| **Total Price** | | | **$149,810.96** |

**B.4.3  Option Year 2:**

| Contract Line Item Number (CLIN) | Description | Monthly | Price |
|---|---|---|---|
| 2001 | Ethernet Access Dual 1M Port, Single Router | $2,149.62 | $25,795.40 |
| 2002 | Ethernet Access Dual 1M Port, Single Router Credit | ($2,149.62) | ($25,795.40) |
| 2003 | S2S Per State Fee | $2,475.00 | $29,700.00 |
| 2004 | S2S Per Driver Fee | $1,775.00 | $21,300.00 |
| 2005 | AAMVA Program Services Fee | $900.00 | $10,800 |
| 2006 | AAMVA Technology Fee | $395.00 | $4,740.00 |
| 2007 | SSN Verification Fee ($.05 per transaction) | $922.02 | $11,064.24 |
| 2008 | Service Fee | $40.00 | $480.00 |

3

| 2009 | UNI Mainframe Maintenance Fee | $2,290.00 | $27,480.00 |
|---|---|---|---|
| 2010 | UNI Windows Maintenance Fee | $1,465.00 | $17,580.00 |
| 2011 | NMVTIS FY24 State Fees | $1,770.00 | $21,240.00 |
| 2012 | USPVS Support Services Fee ($0.09 per transaction) | $210.34 | $2524.08 |
| | **Service** | Quarterly | |
| 2013 | AAMVA HAVV Maintenance Fee (Billed 10/01/2027 – 09/30/2028) | $1,100.00 | $4,400.00 |
| 2014 | SSA HAVV Maintenance Fee (Billed 10/01/2027 – 09/30/2028) | | $1,344.88 |
| 2015 | HAVV One-Time Enhancement Fee | | $0 |
| **Total Price** | | | **$152,653.20** |

**B.4.4  Option Year 3:**

| Contract Line Item Number (CLIN) | Description | Monthly | Price |
|---|---|---|---|
| 3001 | Ethernet Access Dual 1M Port, Single Router | $2,214.11 | $26,569.26 |
| 3002 | Ethernet Access Dual 1M Port, Single Router Credit | ($2,214.11) | ($26,569.26) |
| 3003 | S2S Per State Fe | $2,475.00 | $29,700.00 |
| 3004 | S2S Per Driver Fee | $1,775.00 | $21,300.00 |
| 3005 | AAMVA Program Services Fee | $928.00 | $11,136.00 |
| 3006 | AAMVA Technology Fee | $407.00 | $4,884.00 |
| 3007 | SSN Verification Fee ($.05 per transaction) | $949.68 | $11,396.19 |
| 3008 | Service Fee | $40.00 | $480.00 |
| 3009 | UNI Mainframe Maintenance Fee | $2,360.000 | $28,320.00 |
| 3010 | UNI Windows Maintenance Fee | $1,510.00 | $18,120.00 |
| 3011 | NMVTIS FY24 State Fees | $1,824.00 | $21,888.00 |
| 3012 | USPVS Support Services Fee ($0.09 per transaction) | $210.34.00 | $2,524.08 |
| | **Service** | **Quarterly** | 0 |
| 3013 | AAMVA HAVV Maintenance Fee (Billed 10/01/2028 – 09/30/2029) | $1,100.00 | $4,400.00 |
| 3014 | SSA HAVV Maintenance Fee (Billed 10/01/2028 – 09/30/2029) | n/a | $1,344.88 |
| 3015 | HAVV One Time Enhancement Fee | n/a | $0.00 |
| **Total Price** | | | **$155,493.15** |

**B.4.5  Option Year 4:**

| Contract Line Item Number (CLIN) | Description | Monthly | Price |
|---|---|---|---|
| 4001 | Ethernet Access Dual 1M Port, Single Router | $2,280.53 | $27,366.34 |
| 4002 | Ethernet Access Dual 1M Port, Single Router Credit | ($2,280.53) | ($27,366.34) |

4

| 4003 | S2S Per State Fe | $2,475.00 | $29,700.00 |
|---|---|---|---|
| 4004 | S2S Per Driver Fee | $1,775.00 | $21,300.00 |
| 4005 | AAMVA Program Services Fee | $955.00 | $11,460.00 |
| 4006 | AAMVA Technology Fee | $420.00 | $5,040.00 |
| 4007 | SSN Verification Fee ($.05 per transaction) | $978.17 | $11,738.08 |
| 4008 | Service Fee | $40.00 | $480.00 |
| 4009 | UNI Mainframe Maintenance Fee | $2,430.00 | $29,160.00 |
| 4010 | UNI Windows Maintenance Fee | $1,552.52 | $18,660.00 |
| 4011 | NMVTIS FY24 State Fees | $1,880.00 | $22,560.00 |
| 4012 | USPVS Support Services Fee ($0.09 per transaction) | $210.34 | $2,524.08 |
|  | **Service** | **Quarterly** | **$0** |
| 4013 | AAMVA HAVV Maintenance Fee (Billed 10/01/2029 – 09/30/2030) | $1,100.00 | $4,400.00 |
| 4014 | SSA HAVV Maintenance Fee (Billed 10/01/2029 – 09/30/2030) | n/a | $1,344.88 |
| 4015 | HAVV One-Time Enhancement Fee | n/a | $0.00 |
| **Total Price** | | | **$158,367.04** |

## SECTION C: SPECIFICATIONS/WORK STATEMENT

### C.1    SCOPE:

The Office of Contracting and Procurement, on behalf of the District of Columbia Department of Motor Vehicles, seeks an annual renewal for the maintenance and support services from the American Association of Motor Vehicles Administrators (AAMVA) for access and exchange of data through the AAMVA network.

### C.2    APPLICABLE DOCUMENTS

Not Applicable

### C.3    DEFINITIONS

Not Applicable

### C.4    BACKGROUND

The Commercial Motor Vehicle Safety Act (CMVSA) of 1986, Public Law 99-570, required the establishment of a clearinghouse of truck and bus driver license information to be shared among the motor vehicle systems of the fifty states to improve highway safety. In Section 12007, the CMVSA authorized the Secretary of the U.S. Department of Transportation (DOT) to enter into an agreement of the operation of an information system to be called the Commercial Driver License Information System (CDLIS). The Federal Highway Administration (FWHA) worked with the American Association of Motor Vehicle Administrators (AAMVA) to develop the CDLIS specifications. The CDLIS began operation on January 2, 1989.

In Section 12009, the CMVSA describes specific State notification requirements under which the States must communicate with CDLIS and the National Driver Register (NDR) prior to the issuance of a CDL. The implementation of CDLIS as an automated, nationwide, computer-based clearinghouse required that

5

the mode of communications between the States, CDLIS, and NDR be in electronic form. To standardize the mode of communications among all the CDLIS users and maintain a secure access to driver data, the FHWA designated AAMVAnet as the access method for CDLIS. To access the CDLIS environment as required by law, a State must utilize AAMVAnet.

.

## C.5    REQUIREMENTS

C.5.1 DMV needs continual access to the Commercial Driver License Information System (CDLIS) to allow data exchange with other jurisdictions.  DMV requires access to the AAMVAnet to perform CDLIS, HAVA, and NMVTIS transactions and Social Security verifications. The DESTINY system's software has been programmed to interface with the AAMVA system. AAMVA maintenance services are required from ***Date of Award in FY24 through September 30, 2025.***

## SECTION D: PACKAGING AND MARKING

Reserved

## SECTION E: INSPECTION AND ACCEPTANCE

**E.1**    The inspection and acceptance requirements for the resultant contract shall be governed by clause number six (6) Inspection of Services of the District of Columbia's Standard Contract Provisions for use with Supplies and Services Contracts, dated July 2010.

**E.2**    RESERVED

**E.3**    RESERVED

## SECTION F: PERIOD OF PERFORMANCE AND DELIVERABLES

**F.1**    TERM OF CONTRACT

The term of the contract shall be from the date of award through September 30, 2025.

**F.2**    OPTION TO EXTEND THE TERM OF THE CONTRACT

**F.2.1** The District may extend the term of this contract for a period of  four (4) one-year option periods, or successive fractions thereof, by written notice to the Contractor before the expiration of the contract; provided that the District will give the Contractor preliminary written notice of its intent to extend at least thirty (30) days before the contract expires. The preliminary notice does not commit the District to an extension. The exercise of this option is subject to the availability of funds at the time of the exercise of this option. The Contractor may waive the thirty (30) day preliminary notice requirement by providing a written waiver to the Contracting Officer prior to expiration of the contract.

**F.2.2** If the District exercises this option, the extended contract shall be considered to include this option provision.

**F.2.3** The price for the option period(s) shall be as specified in the Section B of the contract.

**F.2.4** The total duration of this contract, including the exercise of any options under this clause, shall not exceed five (5) years.

## F.3   DELIVERABLES

The Contractor shall perform the activities required to successfully complete the District's requirements and submit each deliverable to the Contract Administrator identified in section G.9 in accordance with the following:

| Reference CLIN | Deliverable | Quantity | Format/Method of Delivery | Due Date |
|---|---|---|---|---|
| C.5.3 | Product Documentation | 1 | Electronic | As requested |

## SECTION G: CONTRACT ADMINISTRATION

### G.1   INVOICE PAYMENT

**G.1.1**   The District will make payments to the Contractor, upon the submission of proper invoices, at the prices stipulated in this contract, for supplies delivered and accepted or services performed and accepted, less any discounts, allowances or adjustments provided for in this contract.

**G.1.2**   The District will pay the Contractor on or before the 30th day after receiving a proper invoice from the Contractor.

**G.1.3**   The District follows a specific policy for services related to Software/Hardware maintenance/licenses and support services. These services must be provided and billed with in the districts fiscal year (10/1 to 09/30). Invoices should only cover one fiscal year and the District cannot be held liable for any such services not billed and paid within the same fiscal year (October 1 to September 30). The District issues separate payment for each fiscal year for accounting and budgetary reasons.

**G.1.4**   By accepting this contract, for Software/Hardware maintenance/licenses and support services, you agree that a proper invoice constitutes a service period that covers only October 1 through September 30.

### G.2   INVOICE SUBMITTAL

**G.2.1**   The Contractor shall submit proper invoices on a monthly basis or as otherwise specified in the contract.

**G.2.2**   The Contractor shall submit payment requests in electronic format through the DC Vendor Portal www.vendorportal.dc.gov by selecting the applicable purchase order number which is listed on the Contractor's profile.

**G.2.3**   To constitute a proper invoice, the Contractor shall attach to all payment requests the invoice and all supporting documentation or information.

### G.3   FIRST SOURCE AGREEMENT REQUEST FOR FINAL PAYMENT

7

Reserved

**G.4    PAYMENT**

G4.1    Payment will be made on completion and acceptance by the District for each item ordered for the price as stated in the Price Schedule in Section B.3 of the contract and presentation of a properly executed invoice.

**G.5    ASSIGNMENT OF CONTRACT PAYMENTS**

G.5.1    In accordance with 27 DCMR 3250, the Contractor may assign to a bank, trust company, or other financing institution funds due or to become due as a result of the performance of this contract.

G.5.2    Any assignment shall cover all unpaid amounts payable under this contract, and shall not be made to more than one party.

G.5.3    Notwithstanding an assignment of contract payments, the Contractor, not the assignee, is required to prepare invoices. Where such an assignment has been made, the original copy of the invoice must refer to the assignment and must show that payment of the invoice is to be made directly to the assignee as follows:

"Pursuant to the instrument of assignment dated _____, make payment of this invoice to (name and address of assignee)."

**G.6    THE QUICK PAYMENT CLAUSE**

**G.6.1    Interest Penalties to Contractors**

G.6.1.1    The District will pay interest penalties on amounts due to the Contractor under the Quick Payment Act, D.C. Official Code §2-221.01 *et seq.*, for the period beginning on the day after the required payment date and ending on the date on which payment of the amount is made. Interest shall be calculated at the rate of 1% per month. No interest penalty shall be paid if payment for the completed delivery of the item of property or service is made on or before:

(1)    the 3rd day after the required payment date for meat or a meat product;
(2)    the 5th day after the required payment date for an agricultural commodity; or
(3)    the 15th day after the required payment date for any other item.

G.6.1.2    Any amount of an interest penalty which remains unpaid at the end of any 30-day period shall be added to the principal amount of the debt and thereafter interest penalties shall accrue on the added amount.

**G.7    CONTRACTING OFFICER (CO)**

Contracts will be entered into and signed on behalf of the District only by contracting officers. The contact information for the Contracting Officer is:

Heather Reynolds - White
Office of Contracting and Procurement

8

200 I Street SE, Suite 5608
Washington, D.C.  20003
E-mail: heather.reynolds2@dc.gov

**G.8**    **AUTHORIZED CHANGES BY THE CONTRACTING OFFICER**

**G.8.1**   The CO is the only person authorized to approve changes in any of the requirements of this contract.

**G.8.2**   The Contractor shall not comply with any order, directive or request that changes or modifies the requirements of this contract, unless issued in writing and signed by the CO.

**G.8.3**   In the event the Contractor effects any change at the instruction or request of any person other than the CO, the change will be considered to have been made without authority and no adjustment will be made in the contract price to cover any cost increase incurred as a result thereof.

**G.9**    **CONTRACT ADMINISTRATOR (CA)**

**G.9.1**   The CA is responsible for general administration of the contract and advising the CO as to the Contractor's compliance or noncompliance with the contract. The CA has the responsibility of ensuring the work conforms to the requirements of the contract and such other responsibilities and authorities as may be specified in the contract.  These include:

**G.9.1.1** Keeping the CO fully informed of any technical or contractual difficulties encountered during the performance period and advising the CO of any potential problem areas under the contract;

**G.9.1.2** Coordinating site entry for Contractor personnel, if applicable;

**G.9.1.3** Reviewing invoices for completed work and recommending approval by the CO if the Contractor's prices and costs are consistent with the contractual amounts and progress is satisfactory and commensurate with the rate of expenditure;

**G.9.1.4** Reviewing and approving invoices for deliverables to ensure receipt of goods and services.  This includes the timely processing of invoices and vouchers in accordance with the District's payment provisions; and

**G.9.1.5** Maintaining a file that includes all contract correspondence, modifications, records of inspections (site, data, equipment) and invoice or vouchers.

**G.9.2**   The address and telephone number of the CA is:
**Tyrone Sweatt – Chief of Staff**
DC Department of Motor Vehicles
95 M Street, SW, 3rd Floor | Washington, DC 20024
202.442.4346 Office | 202.594.7696 Mobile | tyrone.sweatt@dc.gov|

**G.9.3**   The CA shall NOT have the authority to:

(1) Award, agree to, or sign any contract, delivery order or task order. Only the CO shall make contractual agreements, commitments or modifications;
(2) Grant deviations from or waive any of the terms and conditions of the contract;
(3) Increase the dollar limit of the contract or authorize work beyond the dollar limit of the contract,

9

(4) Authorize the expenditure of funds by the Contractor;

(5) Change the period of performance; or

(6) Authorize the use of District property, except as specified under the contract.

**G.9.4** The Contractor will be fully responsible for any changes not authorized in advance, in writing, by the CO; may be denied compensation or other relief for any additional work performed that is not so authorized; and may also be required, at no additional cost to the District, to take all corrective action necessitated by reason of the unauthorized changes.

# SECTION H: SPECIAL CONTRACT REQUIREMENTS

**H.1    HIRING OF DISTRICT RESIDENTS AS APPRENTICES AND TRAINEES**

Reserved

**H.2    DEPARTMENT OF LABOR WAGE DETERMINATIONS**

Reserved

**H.3    PUBLICITY**

The Contractor shall at all times obtain the prior written approval from the CO before the Contractor, any of its officers, agents, employees or subContractors, either during or after expiration or termination of the contract, make any statement, or issue any material, for publication through any medium of communication, bearing on the work performed or data collected under this contract.

**H.4    FREEDOM OF INFORMATION ACT**

The District of Columbia Freedom of Information Act, at D.C. Official Code §2-532 (a-3), requires the District to make available for inspection and copying any record produced or collected pursuant to a District contract with a private Contractor to perform a public function, to the same extent as if the record were maintained by the agency on whose behalf the contract is made. If the Contractor receives a request for such information, the Contractor shall immediately send the request to the CA who will provide the request to the FOIA Officer for the agency with programmatic responsibility in accordance with the D.C. Freedom of Information Act. If the agency with programmatic responsibility receives a request for a record maintained by the Contractor pursuant to the contract,

the CA will forward a copy to the Contractor. In either event, the Contractor is required by law to provide all responsive records to the CA within the timeframe designated by the CA. The FOIA Officer for the agency with programmatic responsibility will determine the releasability of the records. The District will reimburse the Contractor for the costs of searching and copying the records in accordance with D.C. Official Code §2-532 and Chapter 4 of Title 1 of the *D.C. Municipal Regulations*.

**H.5    51% DISTRICT RESIDENTS NEW HIRES REQUIREMENTS AND FIRST SOURCE EMPLOYMENT AGREEMENT**

RESERVED

**H.6    SECTION 504 OF THE REHABILITATION ACT OF 1973, as amended.**

During the performance of the contract, the Contractor and any of its subContractors shall comply with Section 504 of the Rehabilitation Act of l973, as amended. This Act prohibits discrimination against disabled people in federally funded programs and activities. See 29 U.S.C. § 794 *et seq.*

**H.7    AMERICANS WITH DISABILITIES ACT OF 1990 (ADA)**

During the performance of this contract, the Contractor and any of its subContractors shall comply with the ADA. The ADA makes it unlawful to discriminate in employment against a qualified individual with a disability. See 42 U.S.C. §12101 *et seq.*

**H.8    WAY TO WORK AMENDMENT ACT OF 2006**

RESERVED

**H.9    SUBCONTRACTING REQUIREMENTS**

RESERVED

**H.10    FAIR CRIMINAL RECORD SCREENING**

RESERVED

**H.11    PREGNANT WORKERS FAIRNESS**

RESERVED

**H.12    UNEMPLOYED ANTI-DISCRIMINATION**

RESERVED

# SECTION I: CONTRACT CLAUSES

**I.1    APPLICABILITY OF STANDARD CONTRACT PROVISIONS**

RESERVED

**I.2    DISPUTES**

(Delete Article 14, Disputes, of the Standard Contract Provisions for use with District of Columbia Government Supplies and Services Contracts dated July 2010 and substitute the following Article I.2, Disputes) (Interim PPRA Version, July 2011).

I.2.1    All disputes arising under or relating to this contract shall be resolved as provided herein.

I.2.2    Claims by a Contractor against the District:

Claim, as used in paragraph I.2.2 of this clause, means a written assertion by the Contractor seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for

11

the relief sought by the claimant.

I.2.2.1  All claims by a Contractor against the District arising under or relating to a contract shall be in writing  and shall be submitted to the CO for a decision. The Contractor's claim shall contain at least the following:

I.2.2.1.1  A description of the claim and the amount in dispute;

I.2.2.1.2  Data or other information in support of the claim;

I.2.2.1.3  A brief description of the Contractor's efforts to resolve the dispute prior to filing the claim; and

I.2.2.1.4  The Contractor's request for relief or other action by the CO.

I.2.2.2  The CO may meet with the Contractor in a further attempt to resolve the claim by agreement.

I.2.2.3  The CO shall issue a decision on any claim within 120 calendar days after receipt of the claim. Whenever possible, the CO shall take into account factors such as the size and complexity of the claim and the adequacy of the information in support of the claim provided by the Contractor.

I.2.2.4  The CO's written decision shall do the following:

I.2.2.4.1  Provide a description of the claim or dispute;

I.2.2.4.2  Refer to the pertinent contract terms;

I.2.2.4.3  State the factual areas of agreement and disagreement.

I.2.2.4.4  State the reasons for the decision, including any specific findings of fact, although specific   findings of fact are not required and, if made, shall not be binding in any subsequent proceeding;

I.2.2.4.5  If all or any part of the claim is determined to be valid, determine the amount of monetary settlement, the contract adjustment to be made, or other relief to be granted;

I.2.2.4.6  Indicate that the written document is the CO's final decision; and

I.2.2.4.7  Inform the Contractor of the right to seek further redress by appealing the decision to the Contract Appeals Board.

I.2.2.5  Failure by the CO to issue a decision on a contract claim within 120 days of receipt of the claim  will be deemed to be a denial of the claim, and will authorize the commencement of an appeal to  the Contract Appeals Board as provided by D.C. Official Code § 2-360.04.

I.2.2.5.1  If a Contractor is unable to support any part of his or her claim and it is determined that the  inability is attributable to a material misrepresentation of fact or fraud on the part of the  Contractor, the Contractor shall be liable to the District for an amount equal to the unsupported  part of the claim in addition to all costs to the District attributable to the cost of reviewing that  part of the Contractor's claim.

I.2.2.5.2  Liability under Paragraph I.2.2.5.1 shall be determined within six (6) years of the commission of  the misrepresentation of fact or fraud.

I.2.2.6    Pending final decision of an appeal, action, or final settlement, the Contractor shall proceed diligently with performance of the contract in accordance with the decision of the CO.

**I.2.3        Claims by the District against a Contractor**:

I.2.3.1    Claim as used in paragraph I.2.3 of this clause, means a written demand or written assertion by the District seeking, as a matter of right, the payment of money in a sum certain, the adjustment of contract terms, or other relief arising under or relating to this contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant.

I.2.3.1.1    The CO shall decide all claims by the District against a Contractor arising under or relating to a contract.

I.2.3.1.2    The CO shall send written notice of the claim to the Contractor.  The CO's written decision shall do the following:

I.2.3.1.2.1    Provide a description of the claim or dispute;

I.2.3.1.2.2    Refer to the pertinent contract terms;

I.2.3.1.2.3    State the factual areas of agreement and disagreement;

I.2.3.1.2.4    State the reasons for the decision, including any specific findings of fact, although specific findings of fact are not required and, if made, shall not be binding in any subsequent proceeding;

I.2.3.1.2.5    If all or any part of the claim is determined to be valid, determine the amount of monetary settlement, the contract adjustment to be made, or other relief to be granted;

I.2.3.1.2.6    Indicate that the written document is the CO's final decision; and

I.2.3.1.2.7    Inform the Contractor of the right to seek further redress by appealing the decision to the Contract Appeals Board.

I.2.3.3    The CO shall support the decision by reasons and shall inform the Contractor of its rights as provided herein.

I.2.3.4    Before or after issuing the decision, the CO may meet with the Contractor to attempt to resolve the claim by agreement

I.2.3.5    The authority contained in this clause I.2.3 shall not apply to a claim or dispute for penalties or forfeitures prescribed by statute or regulation which another District agency is specifically authorized to administer, settle, or determine.

I.2.3.6    This clause shall not authorize the CO to settle, compromise, pay, or otherwise adjust any claim involving fraud.

I.2.4        Decisions of the CO shall be final and not subject to review unless the Contractor timely commences

13

an administrative appeal for review of the decision, by filing a complaint with the Contract Appeals Board, as authorized by D.C. Official Code § 2-360.04.

I.2.5 Pending final decision of an appeal, action, or final settlement, the Contractor shall proceed diligently with performance of the contract in accordance with the decision of the CO.

## I.3 CONFIDENTIALITY OF INFORMATION

The Contractor shall keep all information relating to any employee or customer of the District in absolute confidence and shall not use the information in connection with any other matters; nor shall it disclose any such information to any other person, firm or corporation, in accordance with the District and federal laws governing the confidentiality of records.

## I.4 TIME

Time, if stated in a number of days, will include Saturdays, Sundays, and holidays, unless otherwise stated herein.

## I.5 RIGHTS IN DATA

### A. Definitions

(1) "Products" - A deliverable under any contract that may include commodities, services and/or technology furnished by or through Contractor, including existing and custom Products, such as, but not limited to: a) recorded information, regardless of form or the media on which it may be recorded; b) document research; c) experimental, developmental, or engineering work; d) licensed software; e) components of the hardware environment; f) printed materials (including but not limited to training manuals, system and user documentation, reports, drawings); g) third party software; h) modifications, customizations, custom programs, program listings, programming tools, data, modules, components; and i) any intellectual property embodied therein, whether in tangible or intangible form, including but not limited to utilities, interfaces, templates, subroutines, algorithms, formulas, source code, and object code.

(2) "Existing Products" - Tangible Products and intangible licensed Products that exist prior to the commencement of work under the contract. Existing Products must be identified on the Product prior to commencement of work or else will be presumed to be Custom Products.

(3) "Custom Products" - Products, preliminary, final or otherwise, which are created or developed by Contractor, its subContractors, partners, employees, resellers or agents for the District under the contract.

(4) "District" – The District of Columbia and its agencies.

### B. Title to Project Deliverables

The Contractor acknowledges that it is commissioned by the District to perform services detailed in the contract. The District shall have ownership and rights for the duration set forth in the contract to use, copy, modify, distribute, or adapt Products as follows:

(1) <u>Existing Products</u>: Title to all Existing Licensed Product(s), whether or not embedded in, delivered or  operating in conjunction with hardware or Custom Products, shall: (1) remain with Contractor or third  party proprietary owner, who retains all rights, title and interest (including patent, trademark or  copyrights). Effective upon payment, the District is granted an irrevocable, non-exclusive, worldwide,  paid-up license to use, execute, reproduce, display, perform, adapt (unless Contractor advises the  District as part of Contractor's proposal that adaptation will violate existing agreements or statutes and  Contractor demonstrates such to the District's satisfaction) and distribute Existing Product to District  users up to the license capacity stated in the contract with all license rights necessary to fully effect the  general business purpose(s) of the project or work plan or contract; and (2) be licensed in the name of  the District. The District agrees to reproduce the copyright notice and any other legend of ownership on  any copies authorized under this paragraph.

(2) <u>Custom Products</u>: Effective upon Product creation, Contractor hereby conveys, assigns, and transfers  to the District the sole and exclusive rights, title and interest in Custom Product(s), whether preliminary,  final or otherwise, including all patent, trademark and copyrights. Contractor hereby agrees to take all  necessary and appropriate steps to ensure that the Custom Products are protected against unauthorized  copying, reproduction and marketing by or through Contractor.

C.    **Transfers or Assignments of Existing or Custom Products by the District**

The District may transfer or assign Existing or Custom Products and the licenses thereunder to another  District agency. Nothing herein shall preclude the Contractor from otherwise using the related or underlying general knowledge, skills, ideas, concepts, techniques and experience developed under a   project or work plan in the course of Contractor's business.

D.    **SubContractor Rights**
RESERVED

E.    **Source Code Escrow**

(1) For all computer software furnished to the District with the rights specified in section B.2, the Contractor shall furnish to the District, a copy of the source code with such rights of the scope as specified in section B.2 of this clause. For all computer software furnished to the District with the restricted rights specified in section B.1 of this clause, the District, if the Contractor either directly or  through a successor or affiliate shall cease to provide the maintenance or warranty services provided the  District under the contract or any paid-up maintenance agreement, or if the Contractor should be  declared insolvent by a court of competent jurisdiction, shall have the right to obtain, for its own and  sole use only, a single copy of the current version of the source code supplied under the contract, and a  single copy of the documentation associated therewith, upon payment to the person in control of the  source code the reasonable cost of making each copy.

F.    **Indemnification and Limitation of Liability**

(1) The Contractor shall indemnify and save and hold harmless the District, its officers, agents, and employees acting within the scope of their official duties against any liability, including costs and expenses,
  a)  for violation of proprietary rights, copyrights, or rights of privacy, arising out of the

15

publication, translation, reproduction, delivery, performance, use, or disposition of any data furnished  under this contract, or

b) based upon any data furnished under this contract, or based upon libelous or  other unlawful matter contained in such data.

c) No Consequential or Indirect Damages. In no event shall either party be liable for consequential, indirect, incidental, special, exemplary, punitive, or enhanced damages arising out of, relating to, or in connection with any breach of this agreement, regardless of,

(1) whether such damages were foreseeable,

(2) whether or not the party was advised of the possibility of such damages, and

(3) the legal or equitable theory (contract, tort, or otherwise) upon which the claim is based.

(2) Maximum liability. In no event shall either party's aggregate liability arising out of or related to this agreement (including, without limitation, liability for indemnification claims), whether arising out of or related to breach of contract, tort (including negligence), or otherwise, exceed the total of the amounts paid pursuant to this agreement in the six month period preceding the event giving rise to the claim.

(3) Exceptions. The limitations set forth in this section shall not apply to personal injury or death, or damage to any real or tangible personal property caused by either party's grossly negligent acts or omissions or willful misconduct, or to either party's fraudulent acts.

## I.6    OTHER CONTRACTORS

The Contractor shall not commit or permit any act that will interfere with the performance of work  by another District Contractor or by any District employee.

## I.7    SUBCONTRACTS

RESERVED

## I.8    INSURANCE

A. GENERAL REQUIREMENTS.  The Contractor at its sole expense shall procure and maintain, during the entire period of performance under this contract, the types of insurance specified below.  The Contractor shall have its insurance broker or insurance company submit a Certificate of Insurance to the CO giving evidence of the required coverage prior to commencing performance under this contract.  In no event shall any work be performed until the required Certificates of Insurance signed by an authorized representative of the insurer(s) have been provided to, and accepted by, the CO. All insurance shall be written with financially responsible companies authorized to do business in the District of Columbia or in the jurisdiction where the work is to be performed and have an A.M. Best Company rating of A- / VII or higher.  The Contractor shall require all of its subcontractors to carry the same insurance required herein.

All required policies shall contain a waiver of subrogation provision in favor of the Government of the District of Columbia.

The Government of the District of Columbia shall be included in all policies required hereunder to be maintained by the Contractor and its subcontractors (except for workers' compensation and professional liability insurance) as an additional insureds for claims against The Government of the District of Columbia relating to this contract, with the understanding that any affirmative obligation imposed upon the insured Contractor or its subcontractors (including without limitation the liability to pay premiums) shall be the sole obligation of the Contractor or its subcontractors, and not the additional insured. The additional insured status under the Contractor's and its subcontractors' Commercial General Liability insurance policies shall be effected using the ISO Additional Insured Endorsement form CG 20 10 11 85 (or CG 20 10 07 04 **and** CG 20 37 07 04) or such other endorsement or combination of endorsements providing coverage at least as broad and approved by the CO in writing. All of the Contractor's and its subcontractors' liability policies (except for workers' compensation and professional liability insurance) shall be endorsed using ISO form CG 20 01 04 13 or its equivalent so as to indicate that such policies provide primary coverage (without any right of contribution by any other insurance, reinsurance or self-insurance, including any deductible or retention, maintained by an Additional Insured) for all claims against the additional insured arising out of the performance of this Statement of Work by the Contractor or its subcontractors, or anyone for whom the Contractor or its subcontractors may be liable. These policies shall include a separation of insureds clause applicable to the additional insured.

If the Contractor and/or its subcontractors maintain broader coverage and/or higher limits than the minimums shown below, the District requires and shall be entitled to the broader coverage and/or the higher limits maintained by the Grantee and subcontractors.

1. <u>Commercial General Liability Insurance ("CGL")</u> - The Contractor shall provide evidence satisfactory to the CO with respect to the services performed that it carries a CGL policy, written on an occurrence (not claims-made) basis, on Insurance Services Office, Inc. ("ISO") form CG 00 01 04 13 (or another occurrence-based form with coverage at least as broad and approved by the CO in writing), covering liability for all ongoing and completed operations of the Contractor, including ongoing and completed operations under all subcontracts, and covering claims for bodily injury, including without limitation sickness, disease or death of any persons, injury to or destruction of property, including loss of use resulting therefrom, personal and advertising injury, and including coverage for liability arising out of an Insured Contract (including the tort liability of another assumed in a contract) and acts of terrorism (whether caused by a foreign or domestic source). Such coverage shall have limits of liability of not less than $1,000,000 each occurrence, a $2,000,000 general aggregate (including a per location or per project aggregate limit endorsement, if applicable) limit, a $1,000,000 personal and advertising injury limit, and a $2,000,000 products-completed operations aggregate limit.

2. <u>Automobile Liability Insurance</u> - The Contractor shall provide evidence satisfactory to the CO of commercial (business) automobile liability insurance written on ISO form CA 00 01 10 13 (or another form with coverage at least as broad and approved by the CO in writing) including coverage for all owned, hired, borrowed and non-owned vehicles and equipment used by the Contractor, with minimum per accident limits equal to the greater of (i) the limits set forth in the Contractor's commercial automobile liability policy or (ii) $1,000,000 per occurrence combined single limit for bodily injury and property damage.

3. <u>Workers' Compensation Insurance</u> - The Contractor shall provide evidence satisfactory to the CO of Workers' Compensation insurance in accordance with the statutory mandates of the District of Columbia or the jurisdiction in which the contract is performed.

4. <u>Employer's Liability Insurance</u> - The Contractor shall provide evidence satisfactory to the CO of employer's liability insurance as follows:  $500,000 per accident for injury; $500,000 per employee for disease; and $500,000 for policy disease limit.

   All insurance required by this paragraph 3 shall include a waiver of subrogation endorsement for the benefit of Government of the District of Columbia.

5. <u>Commercial Umbrella or Excess Liability</u> - The Contractor shall provide evidence satisfactory to the CO of commercial umbrella or excess liability insurance with minimum limits equal to the greater of (i) the limits set forth in the Contractor's umbrella or excess liability policy or (ii) $1,000,000 per occurrence and $1,000,000 in the annual aggregate, following the form and in excess of all liability policies. All liability coverages must be scheduled under the umbrella and/or excess policy. The insurance required under this paragraph shall be written in a form that annually reinstates all required limits. Coverage shall be primary to any insurance, self-insurance or reinsurance maintained by the District and the "other insurance" provision must be amended in accordance with this requirement and principles of vertical exhaustion.

6. <u>Cyber Liability Insurance</u> - The Contractor shall provide evidence satisfactory to the Contracting Officer of Cyber Liability Insurance, with limits not less than $2,000,000 per occurrence or claim, $2,000,000 aggregate.  Coverage shall be sufficiently broad to respond to the duties and obligations as is undertaken by Contractor in this agreement and shall include, but not limited to, claims involving infringement of intellectual property, including but not limited to infringement of copyright, trademark, trade dress, invasion of privacy violations, information theft, damage to or destruction of electronic information, release of private information, alteration of electronic information, extortion and network security.  The policy shall provide coverage for breach response costs as well as regulatory fines and penalties as well as credit monitoring expenses with limits sufficient to respond to these obligations. This insurance requirement will be considered met if the general liability insurance includes an affirmative cyber endorsement for the required amounts and coverages.

7. <u>Professional Liability Insurance (Errors & Omissions)</u> - The Contractor shall provide Professional Liability Insurance (Errors and Omissions) to cover liability resulting from any error or omission in the performance of professional services under this Contract. The policy shall provide limits of $1,000,000 per claim or per occurrence for each wrongful act and $2,000,000 annual aggregate. The Contractor warrants that any applicable retroactive date precedes the date the Contractor first performed any professional services for the Government of the District of Columbia and that continuous coverage will be maintained or an extended reporting period will be exercised for a period of at least ten years after the completion of the professional services.

B. PRIMARY AND NONCONTRIBUTORY INSURANCE

The insurance required herein shall be primary to and will not seek contribution from any other insurance, reinsurance or self-insurance including any deductible or retention, maintained by the Government of the District of Columbia.

C. DURATION.  The Contractor shall carry all required insurance until all contract work is accepted by the District of Columbia, and shall carry listed coverages for ten years for construction projects following final acceptance of the work performed under this contract and two years for non-construction related contracts.

D. LIABILITY.  These are the required minimum insurance requirements established by the District of Columbia. **HOWEVER, THE REQUIRED MINIMUM INSURANCE REQUIREMENTS**

PROVIDED ABOVE WILL NOT IN ANY WAY LIMIT THE CONTRACTOR'S LIABILITY UNDER THIS CONTRACT.

E. CONTRACTOR'S PROPERTY.  Contractor and subcontractors are solely responsible for any loss or damage to their personal property, including but not limited to tools and equipment, scaffolding and temporary structures, rented machinery, or owned and leased equipment.  A waiver of subrogation shall apply in favor of the District of Columbia.

F. MEASURE OF PAYMENT.  The District shall not make any separate measure or payment for the cost of insurance and bonds.  The Contractor shall include all of the costs of insurance and bonds in the contract price.

G. NOTIFICATION.   The Contractor shall ensure that all policies provide that the CO shall be given thirty (30) days prior written notice in the event of coverage and / or limit changes or if the policy is canceled prior to the expiration date shown on the certificate. The Contractor shall provide the CO with ten (10) days prior written notice in the event of non-payment of premium. The Contractor will also provide the CO with an updated Certificate of Insurance should its insurance coverages renew during the contract.

H. CERTIFICATES OF INSURANCE.  The Contractor shall submit certificates of insurance giving evidence of the required coverage as specified in this section prior to commencing work.  Certificates of insurance must reference the corresponding contract number.  Evidence of insurance shall be submitted to:
> Heather Reynolds- White
> The District of Columbia Government
> Office of Contract and Procurement
> 200 I Street S.E. | Washington, DC 20003

The CO may request and the Contractor shall promptly deliver updated certificates of insurance, endorsements indicating the required coverages, and/or certified copies of the insurance policies.  If the insurance initially obtained by the Contractor expires prior to completion of the contract, renewal certificates of insurance and additional insured and other endorsements shall be furnished to the CO prior to the date of expiration of all such initial insurance.  For all coverage required to be maintained after completion, an additional certificate of insurance evidencing such coverage shall be submitted to the CO on an annual basis as the coverage is renewed (or replaced).

I. DISCLOSURE OF INFORMATION.  The Contractor agrees that the District may disclose the name and contact information of its insurers to any third party which presents a claim against the District for any damages or claims resulting from or arising out of work performed by the Contractor, its agents, employees, servants or subcontractors in the performance of this contract.

J. CARRIER RATINGS.  All Contractor's and its subcontractors' insurance required in connection with this contract shall be written by insurance companies with an A.M. Best Insurance Guide rating of at least A-VII (or the equivalent by any other rating agency) and licensed in the in the District.

## I.8     EQUAL EMPLOYMENT OPPORTUNITY

In accordance with the District of Columbia Administrative Issuance System, Mayor's Order 85-85  dated June 10, 1985, the forms for completion of the Equal Employment Opportunity Information  Report are incorporated herein as Section J.3.  An award cannot be made to any bidder who has not  satisfied the equal employment requirements.

19

**I.9    ORDER OF PRECEDENCE**

The contract awarded as a result of this IFB will contain the following clause:

**ORDER OF PRECEDENCE**

A conflict in language shall be resolved by giving precedence to the document in the highest order of priority that contains language addressing the issue in question.  The following documents are incorporated into the contract by reference and made a part of the contract in the following order of precedence:

(1) An applicable Court Order, if any
(2) Contract document
(3) Standard Contract Provisions
(4) Contract attachments other than the Standard Contract Provisions; J9 - Jurisdiction Services Agreement
(5) IFB, as amended
(6) Bid

**I.10    CONFIDENTIALITY OF INFORMATION**

The Contractor shall keep all information relating to any employee or customer of the District in  absolute confidence and shall not use the information in connection with any other matters; nor shall it  disclose any such information to any other person, firm or corporation, in accordance with the District  and federal laws governing the confidentiality of records.

**I.11    GOVERNING LAW**

This contract, and any disputes arising out of or related to this contract, shall be governed by, and construed in accordance with, the laws of the District of Columbia.

**SECTION J: ATTACHMENTS**

The following list of attachments is incorporated into the solicitation by reference.

| Attachment Number | Document |
| --- | --- |
| J.1 | Government of the District of Columbia Standard Contract Provisions for Use with the Supplies and Services Contracts (July 2010) available at www.ocp.dc.gov click on "Solicitation Attachments" |
| J.2 | Reserved |
| J.3 | Office of Local Business Development Equal Employment Opportunity Information Report and Mayor's Order 85-85 available at www.ocp.dc.gov click on "Solicitation Attachments" |

| J.4 | Reserved |
|---|---|
| J.5 | Way to Work Amendment Act of 2006 - Living Wage Notice |
| J.6 | Way to Work Amendment Act of 2006 - Living Wage Fact Sheet |
| J.7 | Tax Certification Affidavit |
| J.8 | Bidder/Offeror Certifications |

The following list of attachments have been incorporated into the solicitation:

| Attachment Number | Document |
|---|---|
| J.9 | Exhibit A Excerpts From Jurisdiction Services Agreement |
| J.10 | Exhibit B DC ROOSTR agreement |
| J.11 | Exhibit C DC DIAEP |
| J.12 | Exhibit D DLDV Agreement |
| J.13 | Exhibit E DC S2S Agreement |

# SECTION K: REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF BIDDERS

Bidder/Offeror Certifications
available at www.ocp.dc.gov > "Opportunities & Support">"Solicitation Documents"

# SECTION L: INSTRUCTIONS, CONDITIONS AND NOTICES TO BIDDERS

## L.1    METHOD OF AWARD

L.1.1    The District reserves the right to accept/reject any/all bids resulting from this solicitation.  The Contracting Officer may reject all bids or waive any minor informality or irregularity in bids received whenever it is determined that such action is in the best interest of the District.

L.1.2    The District intends to award a single contract resulting from this solicitation to the responsive and responsible bidder who has the lowest bid.

**L.2      PREPARATION AND SUBMISSION OF BIDS**

L.2.3   N/A

**L.3      FAMILIARIZATION WITH CONDITIONS**

N/A

**L.4      BID SUBMISSION DATE AND TIME**

N/A

**L.5      WITHDRAWAL OR MODIFICATION OF BIDS**
N/A

**L.6      LATE SUBMISSIONS, LATE MODIFICATIONS, AND LATE WITHDRAWALS**

L.6.1   **Late Submissions**

N/A

L.6.2   **Late Modifications**

N/A

**L.7      ERRORS IN BIDS**

N/A

**L.8      QUESTIONS ABOUT THE SOLICITATION**

N/A

**L.9      BID PROTESTS**
N/A

**L.10    ACKNOWLEDGMENT OF AMENDMENTS**

N/A

**L.11    BIDS WITH OPTION YEARS**

Reserved

**L.12    LEGAL STATUS OF BIDDER**

N/A

**L.13    BID OPENING**

The District shall make publicly available the name of each bidder, the bid price, and other information that is deemed appropriate.

## L.14    CERTIFICATES OF INSURANCE

Prior to commencing work, the Contractor shall have its insurance broker or insurance company submit certificates of insurance giving evidence of the required coverage as specified in Section I.8 to:

> The District of Columbia Government
> Office of Contract and Procurement
> 441 4th St NW Suite 700S
> Washington, DC 20001

## L.15    GENERAL STANDARDS OF RESPONSIBILITY

The prospective Contractor must demonstrate to the satisfaction of the District its capability in all respects to  perform fully the contract requirements; therefore, the prospective Contractor must submit relevant documentation within five (5) days of the request by the District.

L.15.1 To be determined responsible, a prospective Contractor must demonstrate that it:

(1)    Has adequate financial resources, or the ability to obtain such resources, required to perform  the contract;

(2)    Is able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;

(3)    Has a satisfactory performance record;

(4)    Has a satisfactory record of integrity and business ethics;

(5)    Has a satisfactory record of compliance with the applicable District licensing and tax laws and regulations;

(6)    Has a satisfactory record of  compliance with labor and civil rights laws and rules, and the  First Source Employment Agreement Act of 1984, as amended, D.C. Official Code §2-219.01  *et seq.*;

(7)    Has, or has the ability to obtain, the necessary organization, experience, accounting, and operational control,  and technical skills;

(8)    Has, or has the ability to obtain, the necessary production, construction, technical equipment,  and facilities;

(9)    Has not exhibited a pattern of overcharging the District;

(10)    Does not have an outstanding debt with the District or the federal government in a delinquent status; and

23

(11)   Is otherwise qualified and is eligible to receive an award under applicable laws and regulations.

L.15.2  If the prospective Contractor fails to supply the information requested, the CO shall make the determination of responsibility or non-responsibility based upon available information.  If the available information is insufficient to make a determination of responsibility, the CO shall determine the prospective Contractor to be non-responsible.

## SECTION M:  EVALUATION FACTORS

### M.1.  PREFERENCES FOR CERTIFIED BUSINESS ENTERPRISES

RESERVED

### M.2   EVALUATION OF OPTION YEARS

The District will evaluate bids for award purposes by evaluating the total price for all options as well as the base year.  Evaluation of options shall not obligate the District to exercise them.  The total District's requirements may change during the option years. Quantities to be awarded will be determined at the time each option is exercised.

*********************INTENTIONALLY BLANK*********

## J.9 (Exhibit A): EXCERPTS FORM
## JURISDICTION SERVICES AGREEMENT

6.  **Responsibilities of AAMVA.**

    a.  <u>Services</u>. Services provided under this Agreement will conform to the applicable documentation, although AAMVA does not warrant that any Services will be free of interruption or be error-free. AAMVA will attempt to correct deficiencies in Services within a reasonable time. Jurisdiction agrees to permit AAMVA and its suppliers and service providers to take all reasonable measures to restore service deficiencies. Jurisdiction acknowledges that Services will be unavailable during such hours as are established from time to time by AAMVA or AAMVA's suppliers and service providers and as required for system maintenance. AAMVA agrees to make commercially reasonable efforts to minimize inconvenience to Jurisdiction.

    b.  <u>Software</u>. AAMVA may provide Software to enable Jurisdiction to connect to one or more Services. Except as otherwise provided in writing, AAMVA grants the Jurisdiction a nontransferable, nonexclusive license to use the Software solely in conjunction with the Services and in compliance with the provisions of this Agreement.

    c.  <u>Resolution of Equipment or Software Problems</u>. AAMVA's sole obligation in the event of a malfunction in Equipment or Software is to provide reasonable assistance to Jurisdiction in resolving problems or replacing defective or damaged Equipment or Software. AAMVA shall have no obligation with respect to Equipment or Software that is purchased by the Jurisdiction from a third-party vendor, even if AAMVA requires the use of that Equipment or Software or arranges for such purchase.

7.  **Responsibilities of Jurisdiction: Use of Services.**

    a.  <u>Use of Services</u>. Jurisdiction agrees to use Services in accordance with this Agreement and policies established by AAMVA from time to time. Jurisdiction is responsible for ensuring that its use of Services will not:

        i.   Breach any laws, regulations or conventions related to, but not limited to, data privacy, international communications, and exportation of technical or personal data; or

        ii.  Place any unusually heavy processing loads on the network or applications without prior coordination with AAMVA.

    b.  <u>Selection of Services</u>. Jurisdiction is solely responsible for the selection of, use of, and interpretation of results obtained from Services. Jurisdiction accepts all responsibility for programs, data, information, or equipment provided by the Jurisdiction or which the Jurisdiction accesses through the use of Services.

    c.  <u>Data Access</u>. If Jurisdiction provides access to data, programs or other material, for use with Services, Jurisdiction warrants that:

        i.   Such use will not cause AAMVA to violate the rights of any third parties of which AAMVA has provided notice to Jurisdiction. The Parties agree that this language does not create any rights of any kind accruing to third parties, and.

        ii.  The disclosure or use of such material using Services will not involve a breach of any Confidential Information or any other contractual obligation.

        iii. <u>Jurisdiction Responsible for the Use of Services</u>. Except as otherwise expressly provided in this Agreement, Jurisdiction is responsible for ensuring that all of its computers and associated equipment and software used in conjunction with Services comply with AAMVA requirements or specifications as established from time to time.

    d.  <u>No Unauthorized Use, Copying</u>. The Jurisdiction agrees that it shall not:

        i.   Modify, add to, translate, reverse assemble, reverse compile, decompile or otherwise attempt to derive the source code from any Software;

25

    ii.   Copy, sublicense or transfer the Software for any reason except that the Software may be copied for backup, testing or archival purposes;

    iii.   Remove any copyright or trademark notices contained in the Software; or

    iv.   Use AAMVA's logo, name, or any facsimile on any material without AAMVA's prior written permission.

e.   <u>Testing, Training, and Approval to Enter Production Mode</u>. Prior to accessing Services, Jurisdiction must participate in all AAMVA-required testing and training. AAMVA's written approval is required before the Jurisdiction may use any Services in production mode.

f.   <u>Sharing and Sub-licensing</u>. Jurisdiction must obtain AAMVA's approval before Jurisdiction shares the use of Services with any other entity or sublicenses use of the Services, Equipment or Software to any third party.

g.   <u>Return of Equipment and Software</u>. Upon the expiration or termination of this Agreement, Jurisdiction promptly shall return, destroy or delete, as specified by AAMVA in writing, all Equipment or Software used in conjunction with the Services.

h.   <u>Management of Connection for Services</u>. Jurisdiction shall manage its connection to permit AAMVA and other jurisdictions to send data to Jurisdiction and to permit Jurisdiction to receive data from AAMVA and other jurisdictions, on a timely basis throughout the day. AAMVA is not responsible for any delay in sending data (or for notifying any Party of such a delay) if the delay results from the Jurisdiction's failure to so manage its connection(s), or from any cause other than AAMVA's failure to exercise ordinary care or to act in good faith. AAMVA's records shall be determinative of when data has been received by AAMVA or when AAMVA sends data to or makes it retrievable by the Jurisdiction.

8.   **Safeguarding Data Privacy and Security**.

a.   <u>Compliance with Legal Obligations</u>.  Each Party represents and warrants that its collection, access, use, storage, disposal and disclosure of Protected Data does and will comply with pertinent provisions of the Driver Privacy Protection Act (DPPA), the Federal Information Processing Standards and, to the extent required of a Party under this Agreement, by all other applicable laws, regulations, and governmental directives.

b.   <u>Information Security Program</u>.  Each Party agrees to implement, maintain and monitor a comprehensive written information security program that complies with all applicable data privacy and security laws and regulations ("Information Security Policy"), which shall be available promptly on request of the other Party.  The Information Security Policy maintained by each Party shall include appropriate administrative, technical, physical, organizational, and operational safeguards and other security measures designed to (i) ensure the security and confidentiality of Protected Data; (ii) protect against any anticipated threats or hazards to the security and integrity of Protected Data (such as unauthorized processing, access, collection, use, copying, modification, disposal or disclosure, unauthorized, unlawful, or accidental loss, destruction, acquisition, or damage); and (iii) protect against any actual or suspected unauthorized loss, use, disclosure or acquisition of or access to any Protected Data.

c.   <u>Administrative and Technical Safeguards</u>.  Without limiting each Party's obligations under Section 8(b), each Party agrees to implement such administrative, physical, and technical safeguards to protect Protected Data from unauthorized access, acquisition, or disclosure, destruction, alteration, accidental loss, misuse, or damage that are no less rigorous than accepted industry practices including the International Organization for Standardization's standards: ISO/IEC 27001 – Information Security Management Systems – Requirements and ISO/IEC 27002 – Code of Practice for International Security Management, the Control Objectives for Information and related Technology (COBIT) standards, the National Institute of Standards and Technology (NIST) Cybersecurity Framework, or other applicable industry standards for information security, and shall ensure that all such safeguards, including the manner in which Protected Data is created, collected, accessed, received, used, stored, processed, disposed of, and disclosed, comply with applicable data protection and privacy laws, as well as the terms and conditions of this Agreement.

d.   <u>Minimum Safeguards</u>.  At a minimum, each Party's safeguards for the protection of Protected Data shall include: (i) limiting access of Protected Data to Authorized Personnel; (ii) securing business facilities, data centers, paper files, servers, backup systems, and computing equipment, including, but not limited to, all mobile devices and other equipment with information storage capability; (iii) implementing network, application, database, and platform security; (iv) securing information transmission, storage, and disposal; (v) implementing authentication and access

26

controls within media, applications, operating systems, and equipment; (vi) encrypting Sensitive Protected Data stored on any mobile media; (vii) encrypting Sensitive Protected Data transmitted over public or wireless networks; (viii) strictly segregating Protected Data from other information so that Protected Data is not commingled with any other types of information; (ix) conducting risk assessments, penetration testing, and vulnerability scans and promptly implementing, at each Party's sole cost and expense, a corrective action plan to correct any issues that are reported as a result of the testing; and (x) providing appropriate privacy and information security training to the Party's employees.

e.  <u>Personnel Practices</u>.  Each Party shall implement appropriate personnel security and integrity procedures and practices with respect to all employees, including but not limited to, conducting pre-employment screening processes prior to their commencement of work for the Party that includes verification of the highest educational degree held by such employees and criminal history screening that includes all localized law enforcement records for the past seven (7) years (exclusive of any incarceration time). Neither Party shall permit an individual to serve within the Authorized Personnel if that person has: (i) been convicted of a crime in connection with a dishonest act, breach of trust, or has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such offense, or (ii) been convicted of a felony.

f.  <u>Prevention of Unauthorized Use or Access</u>.  Each Party shall require its employees who are Authorized Personnel to abide strictly by the Party's obligations under this Agreement. Each Party agrees that it shall maintain a disciplinary process to address any unauthorized access, use or disclosure of Protected Data by any of that Party's Authorized Personnel.

9.  **Security Incidents**.

a.  <u>Provision of Contact Information</u>.  Each Party shall provide the other with (i) the name and contact information for an employee or other representative who shall serve as the Party's primary data security contact on matters relating to data security and privacy, and (ii) contact information to reach an employee or other representative who shall be available to provide assistance twenty-four (24) hours per day, seven (7) days per week as a contact in resolving obligations associated with a Security Incident. The Parties provide the following contact information for these individuals. Each Party shall provide prompt written notice to the other of any changes in this information.

For AAMVA:

Data Security Contact:

Pierre Y. Boyer, CSISQ
(703) 839-0646
pboyer@aamva.org
24 x 7 Security Incident Contact:

security@aamva.org
(888) AAMVA80, opt.1

For Jurisdiction:

Data Security Contact:

Suneel Cherukuri
Chief Information Security Officer, (CISO)

Office of the Chief Technology Officer (OCTO)
Government of the District of Columbia
Desk: 202-741-5008
Mobile: 202-853-2824
suneel.cherukuri@dc.gov

27

24 x 7 Security Incident Contact:

Network Operations Center (NOC)
Office of the Chief Technology Officer (OCTO)
Government of the District of Columbia

noc@dc.gov | 202-724-2028

b.  Notification Concerning Security Incidents.  A Breached Party shall notify the other Party as soon as practicable, but no later than within forty-eight (48) hours of confirming the occurrence of a Security Incident affecting Protected Data in a Service or data system operated by the Breached Party that is included in this Agreement.  If such notification occurs via telephone, such notification shall be subsequently followed by a written communication memorializing the notification and discussion.

c.  Investigation and Remediation Obligations.  Promptly following the Breached Party's notification of a Security Incident, the Breached Party agrees to take prompt action, at its own expense, to investigate the Security Incident; to take commercially reasonable actions to identify, prevent, and mitigate the effects of any such Security Incident; and to carry out any actions required by applicable law, including but not limited to notifications to affected persons. The Parties shall cooperate and coordinate with each other to investigate the Security Incident in accordance with the Breached Party's standard policies and procedures. The other Party shall provide the Breached Party with reasonable assistance to carry out the investigation, prevention, and mitigation efforts and to comply with applicable legal requirements. If data furnished by the other Party is affected by the Security Incident, the Breached Party shall reasonably incorporate the directions of the other Party concerning the investigation, prevention, and mitigation efforts.

d.  Continuing Obligation of Information. The Breached Party shall keep the other Party informed of the status of the Security Incident; all assessments and plans of actions taken by it in response to the Security Incident; and all other related matters.  Unless required by law, the Breached Party will not notify any individual or any third party other than law enforcement of any potential Security Incident without first consulting with and obtaining written permission of the other Party.

10.  **Verification of Information Security Safeguards**.

a.  Security Questionnaire.  No more than once in any period of twelve consecutive months, and after each instance of a Security Incident each Party (Requesting Party) shall have the right to assess compliance with this Agreement by requesting the other Party (Responding Party) to promptly and accurately complete a written information security questionnaire provided by the Requesting Party (or a third-party on behalf of the Requesting Party) regarding the Responding Party's business practices and information technology environment in relation to all Protected Data being handled or transmitted by the Responding Party pursuant to this Agreement. The Responding Party shall promptly and fully cooperate with such inquiries.

b.  On-Site Security Audit.  No more than once in any period of twelve consecutive months, and after each instance of a Security Incident, each Party (Requesting Party) on at least fourteen (14) calendar days' prior written notice, and in compliance with the Responding Party's data privacy and security policies, shall have the right to audit and assess the other Party's compliance with this Agreement by performing (through the Requesting Party's employees or third-party personnel) an on-site assessment of all controls in the Responding Party's physical and/or technical environment in relation to all Protected Data being handled pursuant to this Agreement.  Such assessment may include a review of a Party's current assessment reports, such as SOC 2 Type II, SSAE16, NIST 800-53 Assessment Report or equivalent reports produced by a third-party organization that performs security inspections of a Party's facilities and information processing systems. Each Party agrees to conduct data security assessments in accordance with the frequency specified in the assessment standards established by the applicable third-party organization.

12. **Disclaimer of Warranties**.  EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, SERVICES, EQUIPMENT, AND SOFTWARE ARE PROVIDED "AS IS." NEITHER AAMVA NOR ANY OF AAMVA'S SUPPLIERS OR SERVICE PROVIDERS MAKES ANY WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY ARISING BY STATUTE OR FROM A COURSE OF DEALING OR USAGE OF TRADE. WITHOUT LIMITING THE FOREGOING, AAMVA MAKES NO WARRANTY OF ANY KIND THAT THE SERVICES (INCLUDING ANY SOFTWARE OR EQUIPMENT) WILL MEET JURISDICTION'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY OTHER GOODS, SERVICES, OR TECHNOLOGIES, (INCLUDING ANY SOFTWARE, EQUIPMENT, HARDWARE, FIRMWARE, SYSTEM OR NETWORK), OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE OR ERROR-FREE. USE OF ANY INFORMATION OBTAINED BY OR THROUGH THE SERVICES IS AT JURISDICTION'S OWN RISK. AAMVA SPECIFICALLY DISCLAIMS ANY LIABILITY OR RESPONSIBILITY FOR THE ACCURACY OR QUALITY OF INFORMATION OBTAINED THROUGH SERVICES OR FOR LOSS OF DATA RESULTING FROM DELAYS, NONDELIVERIES, MISDELIVERIES, OR SERVICE INTERRUPTIONS, HOWEVER CAUSED. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY AAMVA SHALL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF AAMVA'S OBLIGATIONS UNDER THIS AGREEMENT.

**J.10 (EXHIBIT B): ROOSTR AGREEMENT**

## JURISDICTION SERVICE AGREEMENT

COMMERCIAL SKILLS TEST INFORMATION MANAGEMENT SYSTEM (CSTIMS) / REPORT OUT-OF-STATE TEST RESULTS (ROOSTR)

This JURISDICTION SERVICE AGREEMENT ("Agreement") is made as of January 10, 2019 (Effective Date), by and between DC Department of Motor Vehicles ("Jurisdiction") and the American Association of Motor Vehicle Administrators, a District of Columbia non-profit corporation ("AAMVA") (individually, a Party; collectively, the "Parties").

1.  Use of the Service.

    a.  AAMVA offers jurisdictions two alternative web applications to facilitate jurisdictional compliance with regulations concerning Commercial Driver's License (CDL) skills tests administered to a CDL applicant by another jurisdiction. The Report Out-of-State Test Results (ROOSTR) program is designed for the limited purpose of complying with CDL regulations for testing of out-of-state students (49 CFR §383.79). The Commercial Skills Test Information Management System (CSTIMS) combines this functionality with additional features that facilitate the management of CDL testing data.

    b.  Jurisdiction hereby requests the right to use the system selected below (the following selection is hereafter referred to in this Agreement as CSTIMS/ROOSTR):

        Check one, as applicable:

        ____ CSTIMS

        __X_ ROOSTR

    c.  AAMVA hereby grants to Jurisdiction the right to use CSTIMS/ROOSTR for the sole purpose of managing information and records related to the knowledge and skills test portions of the Commercial Driver License (CDL) program operated under the oversight of the Federal Motor Carrier Safety Administration (FMCSA).

2.  Fees. Jurisdiction will not be charged a user fee for use of CSTIMS/ROOSTR for the duration of the term provided below.

3.  Term. This Agreement is effective as of the Effective Date and shall continue until September 30, 2019.

4.  Termination. Either Party may terminate this Agreement without cause by giving at least thirty (30) calendar days written notice.

5.  Compliance. Jurisdiction agrees to use CSTIMS/ROOSTR in accordance with the terms and conditions in this Agreement, all applicable CDL regulations, the Driver Privacy Protection Act, and any applicable State and Federal laws and regulations.

rev 113018

30

6. Information Ownership. The Jurisdiction has ownership of the information it enters into CSTIMS/ROOSTR. The Jurisdiction acknowledges that it has no rights of ownership with respect to any other data it accesses through the use of CSTIMS/ROOSTR.

7. Security, Confidentiality and Privacy. CSTIMS/ROOSTR data includes information that can be used on its own or with other information to identify, contact, or locate a single person, or to identify an individual in context (Personal Identifiable Information or PII). Jurisdiction acknowledges that such information is sensitive and confidential.

   a. Jurisdiction shall implement all necessary administrative, technical and physical safeguards to prevent unauthorized use or disclosure of Personally Identifiable Information in accordance with all applicable Federal and State privacy protection requirements.

   b. Jurisdiction agrees to restrict access to CSTIMS/ROOSTR Web user interface to those persons who require such access to perform their official duties. Jurisdiction agrees to:

      i. Immediately disable accounts upon resignation/termination, or when access is no longer needed

      ii. Conduct a review of access accounts at least every 120 days to ensure that any obsolete accounts are disabled

      iii. Monitor use of accounts having access to CSTIMS/ROOSTR information.

   c. Jurisdiction shall enter into written agreements with any independent contractors or organizations working on behalf of Jurisdiction and using CSTIMS/ROOSTR services (including, without limitation, Third Party Testers) under which such contractors and organizations agree to comply with the provisions of Section 7 of this Agreement (Security, Confidentiality and Privacy).

   d. Connectivity. Jurisdiction or its users shall connect to CSTIMS/ROOSTR services over the public Internet using a compatible browser.

8. Integration with Tablet Solutions. The following shall apply to Jurisdiction interfacing tablet solutions with CSTIMS, either internally, or through a tablet solution vendor:

   a. The Jurisdiction acknowledges and agrees that a formal certification testing by AAMVA, based on a structured test plan provided by AAMVA, of the tablet solution is required prior to implementation in production.

   b. The Jurisdiction acknowledges and agrees that any changes to the business rules governing its CDL testing program may require modification of the tablet solution, and will require re-certification, by AAMVA, of the integration prior to implementation in production.

   c. Should the Jurisdiction rely on a tablet solution vendor, the Jurisdiction acknowledges and agrees not to provide access to CSTIMS to such vendor, and to implement contractual requirements with such vendors to protect the confidentiality of the CSTIMS data.

9. Limitation of Liability. AAMVA shall not be liable for any damages caused by Jurisdiction's failure to carry out its obligations under this Agreement. AAMVA shall not

2

31

have liability for any consequential, incidental, exemplary, indirect damages, loss, or expenses, even if AAMVA has been advised of the possibility of such damages, losses, or expenses.   AAMVA's aggregate liability to Jurisdiction under this Agreement shall in no event exceed $100,000.00. The Parties understand and agree that AAMVA shall be precluded from relying on any contractual damages limitation language within this Agreement where AAMVA acts fraudulently or in bad faith.

10. Notices.  All notices required or permitted to be given under the terms of this Agreement shall be deemed given when delivered either via email, in person or on the third business day after being deposited in the United States mail, first class postage prepaid addresses as follows:

> For Jurisdiction:
>
> > Joan B. Saleh
> > Driver Services Administrator
> > 202-727-5540
> > Joan.saleh@dc.gov
>
> For AAMVA:
>
> > Hal Gollos
> > Director, Contracts Administration
> > AAMVA
> > 703-340-7376
> > hgollos@aamva.org

11. Amendments.  This Agreement may be amended only by the mutual written consent from authorized representatives of each of the Parties.

12. Disputes. The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation between executives who have authority to resolve the controversy and who are at a higher level of management than the persons with direct responsibility for administration of this Agreement.

13. Choice of Law.  This Agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Virginia, without regard to conflicts of laws principles.

14. Assignment.  Neither party may assign any rights or obligations under this Agreement without the express prior written approval of the other party.

15. Entire Agreement.  This Agreement constitutes the entire agreement among the parties and merges any and all prior agreements and representations respecting the matters contemplated in this Agreement, whether oral or written, by and among the Parties.

16. Counterparts.  This Agreement may be executed in two or more identical counterparts, each of which shall be deemed an original binding the signer thereof against the other signing parties, but all counterparts together shall constitute one and the same instrument.

17. Severability; Non-waiver.  Should any provisions of the Agreement be held to be void, invalid, unenforceable or illegal by a court, the validity and enforceability of the other

3

provisions shall not be affected thereby.   Failure of any Party to enforce any provision of this Agreement shall not constitute or be construed as a waiver of such provisions or of the right to enforce such provision.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed by their authorized officials as of the Effective Date.

**JURISDICTION**

**AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS**

By: _____

Lucinda Babers
Director, DC DMV

By: _____

Anne S. Ferro
President and CEO

4

33

## MODIFICATION 2
### to
## COMMERCIAL SKILLS TEST INFORMATION MANAGEMENT SYSTEM (CSTIMS)/REPORT OUT-OF-STATE TEST RESULTS (ROOSTR) AGREEMENT

This MODIFICATION 2 to the CSTIMS/ROOSTR AGREEMENT (Modification 2) is effective as of October 1, 2020, by and between AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS, a District of Columbia nonprofit corporation (AAMVA), 4401 Wilson Boulevard, Suite 700, Arlington, VA 22203 and the DC Department of Motor Vehicles ("Jurisdiction").

### Preliminary Statement

AAMVA and Jurisdiction (collectively, the "Parties") entered into a CSTIMS/ROOSTR Agreement (Agreement) as of January 10, 2019 and Modification 1 as of October 1, 2019 for the purpose of managing information and records related to the knowledge and skills test portion of the Commercial Driver License (CDL) program operated under the oversight of the Federal Motor Carrier Safety Administration (FMCSA).

### Agreements

**NOW THEREFORE,** the Parties hereby agree as follows:

1.  Unless otherwise specified in this Modification 2, all capitalized terms in this Modification 2 shall have the same meaning as ascribed to such terms in the Agreement.

2.  The Parties agree to amend the provisions of Section 2. Fees, and replace the language with the following:

    "Fees. CSTIMS/ROOSTR is currently supported by funds AAMVA receives in the form of an annual grant from the Federal Motor Carrier Safety Administration (FMCSA) of the Department of Transportation. There will be no fees charged to the Jurisdiction while CSTIMS/ROOSTR is supported by the annual FMCSA grant. Should FMCSA not renew the grant funding AAMVA may establish a fee on 12 months' written notice."

3.  The Parties agree to amend the provisions of Section 3. Term of the Agreement, and replace the language with the following:

    "The term of this Agreement shall begin on the Effective Date and, unless sooner terminated in accordance with the Agreement, shall remain in effect."

4.  Except as expressly provided in this Modification 2, all provisions of the Agreement and Modification 1 shall remain in full force and effect.

**IN WITNESS WHEREOF,** the undersigned have caused the Agreement to be executed by their duly authorized officials as of the date of first written above.

**AAMVA**                                      **Jurisdiction**

*Harold M. Gollos*
Harold M. Gollos

1

34

**J.11 (EXHIBIT C): DC DIAEP AGREEMENT**

## *Agreement to Share Digital Images & Accompanying Personal Information and to Provide Restrictions on Access and Use*

## AAMVA Task #8 Working Group Pilot Project

### 1. Goal of the Pilot Project

The Administrators of motor vehicle agencies in several states have joined in this Pilot Project to be administered by the American Association of Motor Vehicle Administrators (AAMVA), to deter license fraud and identity theft by persons seeking to transfer alleged driving privileges from a former state of residence to a new state of residence. Evaluation of the results of the Pilot Project will determine the feasibility for offering the protocols and technology links to other motor vehicle agencies in North America who wish to participate in this program and who agree to abide by the terms of a final agreement.

### 2. Basic Design of Program to Deter License and/or Identity Theft

The Pilot Project will utilize available secure technology to allow a driver licensing official in the applicant's new state of residence (**State of Inquiry, or SOI**) to electronically request and temporarily access the applicant's digital image and certain personal information from the state of former residence (**State of Record, or SOR**). The temporary access to such digital image and other information is intended to help to ensure that the applicant claiming to have a valid license from the former state of residence is the individual who holds a license issued by that other state, and is not fraudulently using the personal information of another individual, or is not presenting a counterfeit license purporting to have been issued by the other state. The information will also disclose if an existing license is suspended or revoked. If the record maintained by the SOR contains information indicating the data subject is deceased it shall also transmit that information to the SOI.

### 3. Agreements Between and Among Administrators

Each Administrator whose jurisdiction is engaged in this Pilot Project agrees that its employees, agents and contractors shall be bound by the terms of this Agreement. Each Administrator further agrees that it shall provide necessary and reasonable enforcement methods to ensure compliance. The AAMVA Project Administrator will maintain and will make available the current list of all jurisdictions participating in this Pilot Project. AAMVA, acting through its Project Administrator, may remove a jurisdiction from this Pilot Project if it and a majority of the remaining participating Administrators determine that the jurisdiction has failed to substantially comply with the terms of this Agreement.

1

### 4. Continuing Responsibility to Protect Personal Information

(i)     The Administrators are mindful of their roles in this Pilot Project as guardians of the "personal" and "highly restricted personal information" (hereinafter "personal information"[1]) of individual licensees entrusted to their respective agencies, and agree that such personal information is required to be held as confidential and protected under the provisions of the *Federal Driver Privacy Protection Act (DPPA)*, 18 USC §2721 et seq and under their respective state laws, whichever provides the highest degree of protection.  The exchange of "personal information" between driver licensing authorities to deter license fraud and help prevent identity theft is authorized by the provisions of 18 USC §2721(b)(1) to the extent that the licensing authorities are sharing and exchanging such information to carry out their governmental functions.

(ii)     Each Administrator agrees that all of the participating Administrators are entitled to expect that the digital image and personal information that is conveyed in an electronic transmission to another participating state will be protected by that receiving state in accordance with the *DPPA*, and state laws of a similar nature existing in the receiving state that are consistent with the terms of this Agreement.

### 5. No Improper Use of Images or Personal Information Acquired as SOI

(i)     Each Administrator agrees to ensure that a digital image and the personal information received therewith in an electronic transmission from a participating state will be used solely by the motor vehicle agency (or the agency of which it is a part) and only for the purposes identified in this Agreement. Therefore, each Administrator agrees that its agency shall not provide any portion of the information received to any other agency or entity nor make any use of an image or personal information acquired in its capacity as a SOI that is not permitted by the terms of this Agreement.

(ii)     A digital image and its accompanying personal information as received from a SOR shall not be separated by the SOI for display or storage purposes but shall remain together so that the image is clearly connected to the accompanying personal information and the SOR, which transmitted the information, can be clearly identified.

(iii)     The SOI may not download, format, print or otherwise use a received digital image and/or the personal information accompanying it for any purpose other than the visual identification of a license applicant.

---

[1] 18 USCA § 2725 says: (3) "personal information" means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status.  For the purposes of this agreement, "personal information" pertains exclusively to the social security number, driver identification number and name as received with the individual's photograph in the image response.

2

(iv)    A SOI shall not use a digital image acquired from a SOR as an image on its own manufactured license.

## 6. Limited Law Enforcement Use

(i)    Because of the confidentiality required as a part of this Agreement to protect the personal information of licensees in the States of Record, each Administrator agrees to brief the law enforcement officers it works with in detecting and prosecuting license fraud of the nature of this Agreement and its limitations. Administrators agree that the digital images and personal information received from a SOR may be used for purposes of investigation and prosecution of the individual who has fraudulently attempted to obtain a license while using the personal information of another individual whose image and/or personal information was received from the SOR, and for other law enforcement purposes related thereto.

(ii)    Each Administrator shall ensure, to the extent possible, that any request by law enforcement in the SOI for any use of a digital image and/or personal information obtained from an SOR other than as authorized by this Agreement is declined. Each Administrator agrees that he/she shall take all actions that are necessary and available to prevent any use not authorized by this Agreement.

## 7. Digital Image & Personal Information to Remain Property of State of Record

(i)    When the SOI has received the image and personal information from the SOR and is satisfied that the applicant is the same individual, the SOI shall cause the image and personal information of the received record, in whatever format it may be in or may have been converted to, to be safely and securely discarded within a reasonable time-frame.

(ii)    If the SOI is not satisfied that the applicant is the same individual whose image and personal information has been received from the SOR, it may retain the image and personal information in a secure, temporary file until such time as the SOI either confirms the identity or refers the file to a supervisor and/or law enforcement.  Once it has been confirmed that the applicant is the same individual whose image has been received, and except as provided in subparagraph (iii) of this section, the image and information shall be disposed of as indicated above.

(iii)    An Administrator of a SOI who has probable cause to believe that a license applicant in an SOI is using the image and/or personal information of another individual as received from the SOR shall refer the matter to law enforcement in the SOI for investigation. If investigation and/or prosecution are pursued, the image and personal information may be shared with law enforcement, consistent with the terms of this Agreement.  The received image and personal information may, however, become a permanent part of a prosecutor's file, if required.

3

8. Responsibility for Notifying Individual to Whom Record Relates and State of Record of Identity Theft & Fraud

(i)    Each Administrator further agrees that it shall be a high priority under this program to notify each individual whose digital image and/or personal information has been wrongfully used by an applicant in another state to obtain or attempt to obtain a driver's license, or for any other unlawful purpose.

(ii)    Each Administrator of a SOI agrees to conduct further inquiry and/or investigation whenever the digital image and/or personal information received from the SOR fails to provide a match with the individual license applicant. Since identity theft or administrative error could have originally occurred in the SOR, it is possible that the license applicant in the SOI is truly the individual whose personal information has been received from the SOR, but with another individual's digital image. An inquiry/investigation is required to ensure that the applicant in the SOI is not summarily accused of any wrongdoing without further review. Administrators agree to work together to resolve records disparities and to insist that their staff personnel, and the law enforcement officers they work with, are professional, discreet and thorough in resolving any disparity between an image and record received from an SOR and the applicant in the SOI. A supervisor in the SOI should expeditiously contact a supervisor in the SOR to provide notification of an apparent disparity and should discuss the matter with the Administrator (or his/her designee) of the SOI, if the disparity cannot be reasonably explained and resolved. When the Administrator in the SOI has conducted such inquiry/investigation and is satisfied that no reasonable explanation exists for the disparity of identity or appearance between the applicant and the personal information and digital image received from the SOR, other than the providing of false information by the applicant, the Administrator shall refer the matter to the appropriate law enforcement agency in the SOI for further investigation and possible prosecution as provided in section 7, (iv). The Administrator of the SOI shall also notify the Administrator of the SOR, in writing, which may be by electronic means, of the full details of the matter and the referral to law enforcement. The Administrator of the SOI shall again contact the Administrator of the SOR if, after further review, law enforcement fails to proceed with prosecution of the matter, or the applicant is arrested, charged, cited, or indicted. Further notification on the status of the criminal investigation or prosecution between Administrator's shall not be required in the particular matter unless the Administrators agree to such further notifications. Any notification required by this Agreement of an Administrator in a SOI to an Administrator in a SOR, shall be made as soon as possible after the facts requiring such notification have become clear, but in no case later than three (3) business days after such factual clarity has been reached.

(iii)    The Administrator in the SOI, if satisfied as to the true identity of the applicant who wrongfully used the image and/or personal information of another, may disclose the identity of the applicant directly to law enforcement and to the Administrator of the SOR. Disclosure of the identity (personal information) of the applicant is not deemed to be protected by the provisions of the DPPA since the probable source of information of the applicant's actual identity is not a "motor vehicle record"[2] maintained by the licensing authority. Other than disclosure of the

4

identity of the individual to whom the record relates to law enforcement and to the Administrator in the SOR, the Administrator in the SOI shall not knowingly disclose the personal information or the digital image of the individual to the public, the media or any other entity not directly involved in the investigation and/or prosecution of the applicant.

(iv)     The Administrator of a SOR who has been notified by the Administrator of a SOI of the apparent wrongful use of personal information of an individual in the database of the SOR by a license applicant in the SOI, whether or not prosecution is being pursued in the SOI, shall notify the individual to whom the record relates in a timely manner, by the best method available, which shall be followed up in writing if not initially in that form. The Administrator of the SOR shall provide relevant information forwarded from the Administrator in the SOI and inform the individual that his/her digital image and or personal information was used to obtain or to attempt to obtain a license in the other jurisdiction. If the Administrator of the SOI has disclosed the identity of the applicant to the Administrator of the SOR, he/she should also disclose and explain the method by which the applicant's identity was established. If an administrative or criminal investigation or prosecution has been commenced in the SOI, the Administrator of the SOR may refer the individual to whom the record relates to the law enforcement personnel involved in the case. If the Administrator of the SOI has disclosed to the Administrator of the SOR the actual source of the personal information of the individual used by the applicant, the Administrator should provide whatever information is known. The Administrator shall provide information to the individual to whom the record relates on the manner in which the attempt to use the individual's personal information was discovered and/or prevented by the procedures adopted by this Pilot Project, if that is the case. A brief explanation of the Pilot Project and its purpose should be included.

(v)     The Administrator of the SOR should provide sufficient information to the individual to allow him/her to identify and contact the investigators or supervisors in the motor vehicle department of the SOI and any law enforcement officers and/or prosecutors in the SOI who are familiar with the details of the case.

(vi)     The Administrator of the SOR should urge the individual to whom the record relates to contact all major credit bureaus to obtain his/her own credit reports to determine if credit was wrongfully obtained using his/her personal information.

---

[2] 18 USCA § 2725 says:  (1) "motor vehicle record" means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles.

## 9. Disclosure

Each Administrator agrees to make public disclosure of its participation in this Pilot Project on its website and/or in other appropriate media by describing the goal as deterring license fraud and identity theft and explaining the basic design of the program as described in paragraph #2 of this Agreement.

## 10. Previous Versions

This Agreement supersedes any previous Agreement to Share Digital Images & Accompanying Personal Information and to Provide Restrictions on Access and Use.

ACKNOWLEDGED AND AGREED

On behalf of the District of Columbia as a participant in this *Agreement to Share Digital Images*, I agree to be bound by and to honor the terms of this agreement.

Signature: _____    Date: ___10/19/06___

Anne Witt
Director

95 M St., NW
Suite 300
Washington, DC  20024

(202) 727-2200
(202) 727-1010 (fax)

anne.witt@dc.gov

ACCEPTED:

_____    ___REED RUSNIAK___
Signature of AAMVA Project Administrator    Printed Name

Date of Acceptance: ___10/25/06___

6

40

## J.12 (EXHIBIT D): DC DLDV AGREEMENT

### DRIVER LICENSE DATA VERIFICATION SYSTEM
### JURISDICTION SERVICE AGREEMENT

This **DRIVER LICENSE DATA VERIFICATION SYSTEM JURISDICTION SERVICE AGREEMENT** ("Agreement") is made _____August 19_____, 2015, by and between Washington, DC ("Jurisdiction"), with principal offices located at 95 M Street, SW, Washington, DC 20024 and the American Association of Motor Vehicle Administrators, a District of Columbia non-profit corporation with principal offices located at 4301 Wilson Boulevard, Suite 400, Arlington, Virginia 22203 ("AAMVA") (individually, a Party; collectively, the "Parties").

### RECITALS

A. Jurisdiction, utilizing a system provided by AAMVA, currently provides certain agencies of state government with a driver status inquiry capability that enables state agencies that issue driver licenses, driver permits and identification card documents to access certain data from other jurisdictions pertaining to individuals to whom a jurisdiction has issued a driver license, driver permit or identification card.

B. AAMVA desires to provide a Driver License Data Verification System ("System") under which other participating organizations and governmental entities ("Participants") or entities which have entered into an agreement with a Participant pursuant to this Agreement (an "End User") may verify select data contained in driver license, driver permit and identification card documents presented to Participants or End Users by individuals ("Inquiry Subjects").

### AGREEMENTS

1. Purpose. Jurisdiction has determined to participate in the operation of the System in order to prevent identity theft and fraud by providing authorized participants with the capability of receiving select verified data contained in driver license, driver permit and identification card documents ("Driver License Data").

2. Participants. Participants include organizations or governmental entities that enter into an agreement with AAMVA to access the System and are in compliance with the terms and conditions of that agreement and applicable information privacy and security policies established by AAMVA.

3. Key Operational Characteristics of the System.

   A. The System is based on request data provided by Participants or End Users with respect to Inquiry Subjects, and data records provided by Jurisdiction that are matched by the AAMVA verification engine.

   B. The System will verify Driver License Data elements submitted by Participants or End Users and made available by the Jurisdiction, from among the following data elements:

      i. date of birth;

1

41

     ii.   document number;

    iii.  last name;

    iv.  first name;

    v.   middle name;

    vi.  name suffix;

    vii.  state code;

   viii.  address;

    ix.  document type;

    x.   expiration date;

    xi.  eye color;

    xii.  gender;

   xiii.  height; and

   xiv.  weight.

C. Participants will transmit inquiry information from among the foregoing data fields to AAMVA. AAMVA will then send a request for a driver status inquiry to the respective Jurisdiction. Jurisdiction will respond to the request with data from the driver license or identification card document record. AAMVA will then attempt to match the data elements on the Participant's inquiry against the document holder's record provided by the Jurisdiction. If Jurisdiction is not able to locate the driver record requested by AAMVA, then Jurisdiction will return a no match or similar response.

4. Responsibilities of the Parties with Respect to Systems, Data Update and Coordination.

   A. Jurisdiction will:

     i.  Continue to operate the driver status inquiry system that it has in operation on the date of this Agreement.

    ii.  Provide AAMVA with information required for implementation of the System;

   iii.  Upon receipt of a request for driver status inquiry verification originated by a Participant with respect to an Inquiry Subject, provide pertinent Driver License Data in accordance with System specifications.

   iv.  Be responsible for all costs associated with the ongoing maintenance of Jurisdiction's processing capability of the driver status inquiry transactions related to the operation of the System.

   B. AAMVA will:

     i.  Operate and maintain those elements of the System between the interface through which Jurisdiction connects to the System and the interface through which Participants connects to the System.

    ii. Restrict use of the System to Participants which have entered into a DLDV Services Agreement and an Interconnection Security Agreement and operate the System in a manner that promotes compliance with applicable privacy and data security requirements.

    iii. Be responsible for all costs associated with development and ongoing maintenance of the System identified by section B.i., as well as System enhancement costs determined by AAMVA to be necessary or appropriate.

    iv. Remit payment of Royalty fees as agreed in Section 7.

5. Obligations of the Parties Concerning Privacy and Data Security.

    A. AAMVA and Jurisdiction shall comply with the Driver Privacy Protection Act (DPPA; 18 U.S.C. 2721 et seq.), Federal Information Processing Standards and pertinent provisions of the Federal Information Security Management Act (44 U.S.C. 3541 et seq.), the DLDV Privacy Policy and the security policies respective of each organization.

    B. AAMVA agrees not to store any personally identifiable information after performing the verification check. AAMVA will only log message header data and envelope information for monitoring and billing purposes and the response indicators for the purposes of evaluating the system.

    C. Each of the Parties shall provide written notice (unless otherwise specified) of specific events as indicated below:

      i. Each Party shall notify the other Party in writing promptly, and in no event more than twenty-four (24) hours following such time that either Party becomes aware of any breach of the security of the interconnected systems or unauthorized use or disclosure of any personal information shared under this Agreement.

      ii. Disasters and Other Contingencies - The Parties shall immediately notify each other by telephone or email in the event of a disaster or other contingency that disrupts the normal operation of the connected systems.

    D. Participants shall have no access to driver license and identification card data furnished by participating Jurisdictions.

6. Disposition of Data. It is understood that AAMVA will temporarily store the Participant request data in order to compare against the Jurisdiction response data. Once the verification is complete and the result is sent to the Participant, AAMVA will dispose of both the request data and response data from the Jurisdiction.

7. Royalty Fees.

    A. Jurisdiction shall earn a royalty from the sale of Driver License verification transactions. The royalty will be equal to 50% of revenue (net of applicable state and local sales taxes) derived from driver license data verification request submitted to the Jurisdiction for which driver status inquiry response data is returned. Jurisdiction acknowledges that AAMVA may allow Participant or any End User to submit test transactions (Test Transactions) free of charge for the purpose of testing and analysis

3

43

at the outset of Participant/End User's initial access to the System. Jurisdiction shall receive no royalty payments with respect to Test Transactions.

B. Royalty fees earned will be remitted to a Jurisdiction either through direct payment or through the establishment of an account credit than can be accumulated and applied to AAMVA-related service fees as designated by a Jurisdiction. A Jurisdiction must annually elect whether a direct payment of account credit is desired. Such requests must be made by no later than September 30 of any year with respect to royalty fees earned during the fiscal year ending on the following September 30. Royalties shall be earned monthly and payment shall be made within 45 days of the last day of the month for which the Royalty was earned.

8. Right to Review Records. Jurisdiction agrees that AAMVA or representatives of AAMVA may review all records relating to Jurisdiction's performance of its obligations under this Agreement.

9. Term and Termination. This Agreement is effective as of the date of execution and shall continue for a period of three (3) years, unless mutually extended or until sooner terminated by Jurisdiction or AAMVA as provided in this Agreement. Either Party may terminate this agreement without cause by giving written notice to the other Party at least one hundred eighty (180) calendar days prior to the desired termination.

10. Limitation of Liability. AAMVA'S LIABILITY TO JURISDICTION UNDER THIS AGREEMENT FOR ANY CLAIM SHALL IN NO EVENT EXCEED THE AMOUNT OF REVENUES RECEIVED BY AAMVA WITH RESPECT TO DRIVER LICENSE DATA VERIFICATION REQUESTS SUBMITTED TO THE JURISDICTION UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTHS PRECEDING THE DATE THAT SUCH CLAIM ARISES. AAMVA SHALL HAVE NO LIABILITY TO JURISDICTION FOR ANY INDIRECT DAMAGES, INCLUDING ANY LOST PROFITS, LOST SAVINGS, OR OTHER INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RESULTING FROM THE SERVICES PROVIDED UNDER THIS AGREEMENT OR THE USE OR INABILITY TO USE SUCH SERVICES EVEN IF AAMVA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

11. Notices. All notices required or permitted to be given under the terms of this Agreement shall be deemed given when delivered in person or on the third business day after being deposited in the United States mail, first class postage prepaid addresses as follows:

For Jurisdiction, the point of contact for this Agreement is:
Amit Vora
Chief Information Officer, DC DMV
Amit.vora@dc.gov, 202-729-7110

For AAMVA, the point of contact for this Agreement is:
Hal Gollos
Director, Contracts Administration
AAMVA
703-908-8286
hgollos@aamva.org

4

44

12. Amendment. This Agreement may be amended only by the mutual written consent from authorized representatives of the Parties. Addendum(s) or amendment(s) will not require re-execution of the original Agreement.

13. Disputes The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation between executives who have authority to resolve the controversy and who are at a higher level of management than the persons with direct responsibility for administration of this Agreement. Any person may give the other party written notice of any dispute not resolved in the normal course of business. Within 15 days after delivery of the notice, the receiving party shall submit to the other a written response. The notice and response shall include (a) a statement of that party's position and a summary of arguments supporting that position, and (b) the name and title of the executive who will represent that party and of any other person who will accompany the executive. All negotiations pursuant to this clause are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

14. Choice of Law. This Agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Virginia, without regard to conflicts of laws principles.

15. Assignment. Jurisdiction may not assign any rights or obligations under this Agreement without the express prior written approval of AAMVA; provided, however, that AAMVA may at any time upon written notice to Jurisdiction assign all of its rights and delegate all of its obligations to any wholly-owned entity.

16. Entire Agreement. This Agreement constitutes the entire agreement among the parties and merges any and all prior agreements and representations respecting the matters contemplated in this Agreement, whether oral or written, by and among the Parties.

17. Counterparts. This Agreement may be executed in two or more identical counterparts, each of which shall be deemed an original binding the signer thereof against the other signing parties, but all counterparts together shall constitute one and the same instrument.

18. Severability; Non-waiver. Should any provisions of the Agreement be held to be void, invalid, unenforceable or illegal by a court, the validity and enforceability of the other provisions shall not be affected thereby. Failure of any Party to enforce any provision of this Agreement shall not constitute or be construed as a waiver of such provisions or of the right to enforce such provision.

**IN WITNESS WHEREOF**, the undersigned have caused the Agreement to be executed by their duly authorized officials as of the date of first written above.

5

45

AMERICAN ASSOCIATION OF MOTOR
VEHICLE ADMINISTRATORS

By: _____
Marc Saitta, Chief Financial Officer

WASHINGTON, D.C.

By: _____
Lucinda Babers, Director
Washington, D.C. Department of
Motor Vehicles

6

46

**MODIFICATION 2**
to
**DRIVER LICENSE DATA VERIFICATION SYSTEM JURISDICTION SERVICE (DLDV) AGREEMENT**

This Modification 1 to the DLDV Agreement (Modification 2) is effective as of August 19, 2021, by and between the American Association of Motor Vehicle Vehicles, a District of Columbia nonprofit corporation (AAMVA), 4401 Wilson Boulevard, Suite 700, Arlington, VA  22203 and Washington, D.C. ("Jurisdiction"), with principal offices located at 95 M Street, SW, Washington, D.C.  20024.

**Preliminary Statement**

AAMVA and Jurisdiction (collectively, the "Parties") entered into a DLDV Agreement (Agreement) as of August 19, 2015 and Modification 1 effective August 18, 2018 for the purpose of authorizing the Jurisdiction's participation in the operation of the DLDV System, as provided in the Agreement. The Parties desire to extend the term of the Agreement.

**Agreements**

**NOW THEREFORE,** the Parties hereby agree as follows:

1. Unless otherwise specified in this Modification 2, all capitalized terms in this Modification 2 shall have the same meaning as ascribed to such terms in the Agreement.

2. The Parties agree to amend the provisions of Section 9. Term and Termination of the Agreement, to replace the first sentence with the following:

   "The term of this Agreement shall begin on the Effective Date and, unless sooner terminated in accordance with the Agreement, shall remain in effect."

3. Except as expressly provided in this Modification 2, all provisions of the Agreement and Modification 2 shall remain in full force and effect.

**IN WITNESS WHEREOF,** the undersigned have caused the Agreement to be executed by their duly authorized officials as of the date of first written above.

**AAMVA**                                                 **Washington, D.C.**


Harold M. Gollos                               7/1/2021
Director, Contracts Administration          Gabriel Robinson, Director, Washington
                                            D.C. Department of Motor Vehicles

1

47

**J.13 (EXHIBIT): DC S2S AGREEMENT**

05/04/2021

## STATE-TO-STATE VERIFICATION SERVICE AGREEMENT

THIS STATE-TO-STATE VERIFICATION SERVICE AGREEMENT ("Agreement") is made as of October 5, 2021 ("Effective Date") between the undersigned driver licensing agency of the State of DC Department of Motor Vehicles ("DLA") and the AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS, a District of Columbia nonprofit corporation (AAMVA). The DLA and AAMVA are individually referred to in this Agreement as a "Party" and collectively as the "Parties".

### BACKGROUND

A. AAMVA has developed and operates the State-to-State Verification Service ("S2S"). S2S enables jurisdictions participating in the S2S program ("Participating Jurisdictions") to help determine whether an applicant for a driver license or identification card holds a driver license or identification card issued by another Participating Jurisdiction.

B. DLA desires to participate in the S2S program in accordance with the terms and conditions set forth in this Agreement.

### AGREEMENTS

IN CONSIDERATION of the mutual promises made in this Agreement, the parties agree as follows:

1. Primary S2S Responsibilities.

   a. Subject to the terms and conditions of this Agreement, AAMVA agrees to provide DLA with online driver license and identification card (DL/ID) issuance verification services using S2S.

   b. DLA agrees to carry out its obligations under this Agreement and to comply with the current *Enforcement of S2S Compliance* document (available on AAMVA website at http://www.aamva.org/State-to-State) as amended by the S2S Governance Committee from time to time.

2. Onboarding.

   a. DLA agrees to develop and maintain a coded interface to S2S that is compliant with the current version of the *S2S Specifications.* (available on AAMVA website at http://www.aamva.org/State-to-State)  AAMVA agrees to provide reasonable assistance to DLA in order to facilitate interfacing with S2S.  DLA agrees to consult with AAMVA prior to making any modifications to the coded interface during the term of this Agreement.

48

b. Testing with AAMVA is limited to transactions between DLA and S2S. AAMVA shall have no responsibility for testing the DLA's graphical user interface (GUI) through which it will access S2S.

c. DLA agrees that it will not access S2S until AAMVA has completed, to its satisfaction, structured tests of DLA's application (including testing of the initial load process) and has issued written authorization for DLA to access S2S.

3. Fees. DLA agrees to pay for use of S2S on the basis of DLA's actual utilization of S2S in accordance with the charges set forth in the current AAMVA's Products & Services Government Rate Schedule (available on AAMVA website at http://www.aamva.org/Network-Services/). All fees, are exclusive of any applicable state or local sales, use or other taxes of a similar nature. Unless it furnishes a current, valid sales and use tax exemption certificate, DLA shall be responsible for all such taxes imposed upon AAMVA for amounts paid by DLA to AAMVA under this Agreement.

4. All charges for DLA's use of S2S are subject to change upon at least twelve (12) months written notice from AAMVA to DLA.

5. Data Use, Privacy and Security.

a. AAMVA

i. AAMVA agrees to institute the controls as detailed in the *S2S System Security and Privacy Plans,* copies of which are available on request. The *S2S System Security and Privacy Plans* are subject to modification by AAMVA. Controls include, but are not limited to, the following privacy and security tenets of the Plan:

1. Access and Authorization;

2. Contingency Planning;

3. Data and Communication Protections; and

4. Security Event Monitoring

ii. AAMVA agrees to implement the administrative, technical and physical safeguards created to protect and ensure the proper handling of Personally Identifiable Information ("PII"). AAMVA will not disclose, reuse or sell the S2S data per the privacy protections described in the *S2S Privacy Impact Assessment* (available on AAMVA website at http://www.aamva.org/State-to-State) and the *S2S System Security and Privacy Plans.*

b. DLA

i. DLA's use of any data furnished by a Participating Jurisdiction is strictly limited to the uses permitted under this Agreement. DLA agrees to limit the use of, and access to, S2S information and the records

2

49

created by the data exchange under this Agreement to the purpose of administering their driver's license and/or identification card programs, including investigations of DL/ID related fraud. DLA shall not allow any other state or local governmental agency or other organization or person to have access to S2S, or information obtained by DLA from S2S, without prior written authorization by AAMVA.

ii. DLA agrees to adopt policies and procedures to ensure that data exchanged under this Agreement is used in accordance with the terms and conditions of this Agreement and any applicable laws.

iii. DLA acknowledges and agrees that the jurisdiction that contributes original data to a driver history record has a continuing right to make that data available, subject to applicable federal law or applicable law of the jurisdiction that contributed the original data, whether or not that jurisdiction is the state of record (SOR) for the pointer associated with that data.

iv. DLA further acknowledges that it has responsibility to maintain all pointers that it creates or that it receives as a result of a SOR transaction. This maintenance responsibility extends to any driver history associated with such pointers.

1. A jurisdiction that is the SOR for a pointer may make available, subject to applicable federal law or applicable law of the jurisdiction of the SOR, all driver history data that the SOR originated or received for that pointer.

2. A jurisdiction that served as the SOR for a pointer but that no longer is the SOR for that pointer may make available, subject to applicable federal law or applicable law of the jurisdiction of the SOR, all driver history data it originated or received during the time the jurisdiction served as SOR for that pointer.

v. DLA acknowledges and agrees that its implementation and use of S2S shall have no impact on the operational and legal requirements established from time to time for state participation in the Commercial Driver's License Information System (CDLIS).

c. DLA acknowledges that a positive ("match") verification only establishes that the data it submitted matches the data contained within the S2S pointer service, subject to the tolerances established in the S2S matching routines. The jurisdiction receiving S2S data is then responsible, among other things, for:

i. authenticating the identity of the applicant

ii. determining if the information received pertains to the applicant

iii. determining whether or not to issue a driver's license or identification card

3

d. DLA agrees to limit the storage of data received from Participating Jurisdictions through S2S, as follows:

    i. If DLA determines that the information received does not pertain to the person applying for a driver's license or identification card, DLA may retain only the minimum information that is needed for its governmental business purposes and agrees to securely destroy the remaining information it received from the other state.

    ii. If DLA determines that the information received does pertain to the person applying for a driver's license or identification card, and for any reason decides not to issue a driver's license or identification card, DLA agrees to retain only the minimum information needed for its governmental business purposes, and agrees to securely destroy the remaining information it received from the other state.

    iii. If DLA determines that the information received pertains to the person applying for a driver's license or identification card, and decides to issue a driver's license or identification card, DLA may add some or all of the received driver history to the person's driver record in the receiving state.

e. DLA agrees to restrict access to the information obtained from S2S, through DLA's systems or directly through the S2S web user interface, to only those authorized State employees, State agents, State representatives or State contractors who need it to perform their official duties in connection with the intended uses of the information authorized in this Agreement. DLA will restrict access to S2S information by taking actions including, but not limited to:

    i. Immediately disabling accounts upon resignation/termination, or when access is no longer needed;

    ii. Conducting a review of access accounts at least every 120 days to ensure that any obsolete accounts are disabled; and

    iii. Monitoring use of accounts having access to S2S information.

f. DLA agrees to audit user access to the systems and network infrastructure connecting to S2S, processing S2S information or storing S2S information.

g. DLA agrees to prevent, detect and deter unauthorized access to its driver files, or to the systems and network infrastructure connecting to S2S, processing S2S information, or storing S2S information.

h. DLA agrees to notify AAMVA within 1 calendar day following any confirmed incidents of data breach.

i. DLA agrees to establish and enforce penalties for misuse of S2S data within its state.

j. DLA acknowledges and agrees that when it sends data to another state, the

4

receiving state may choose to retain all or parts of the data, and the protection of the retained data is governed by the receiving state's data retention and disclosure rules.

k.  DLA agrees to use the *AAMVA Best Practices for the Deterrence and Detection of Fraud* (March 2015) (available on AAMVA website at http://www.aamva.org/Best-Practices/) as a guideline for state policy and procedures for safeguarding information provided under this Agreement.

l.  DLA agrees to provide notice to the applicants that the PII collected for the purpose of issuing a Driver License or ID card may be verified against nationwide systems for accuracy.

m.  DLA agrees to comply with the requirements and procedures set forth in the current *Enforcement of S2S Compliance* document, as amended by the S2S Governance Committee from time to time.

6.  Term, Termination and Suspension of Service.

a.  The term of this Agreement shall begin on the Effective Date and, unless sooner terminated in accordance with this Agreement, shall remain in effect.

b.  Either AAMVA or DLA may terminate this Agreement upon 90 days' prior written notice to the other. Such termination will be effective 90 days from the date of the notice, or at a later date specified in the notice.

c.  AAMVA may immediately temporarily suspend DLA's access to S2S under this Agreement if it determines that DLA has: (1) incurred an unauthorized use of S2S, (2) violated or failed to comply with the terms of this Agreement or (3) if suspension is required to protect the integrity of S2S. Following suspension of DLA's access to S2S under this Agreement, AAMVA will work with DLA to resolve the issues necessitating the suspension, with the goal of restoring DLA's access as soon as possible.

d.  As of the effective date of termination of this Agreement, or the suspension of access to S2S, DLA shall no longer have visibility or access to S2S data or functionality. S2S data provided by DLA prior to termination or suspension of service shall be removed from the system as a part of the termination process.

e.  The parties acknowledge that DLA's participation in S2S requires significant modification of DLA's information technology systems, and that the termination of DLA's participation in S2S may require significant programming and administrative transitions. In the event of termination of DLA's participation in S2S as provided above, the parties agree to cooperate in good faith to accomplish the programming, administrative and other aspects of the required transition in a manner that promotes the effective administration of state driver licensing and the Commercial Driver License (CDL), and other federal and state governmental programs. DLA acknowledges that it shall have exclusive responsibility for its expenses associated with the termination of its participation in S2S.

5

7. No Warranties. The State to State Verification Services provided under this Agreement are provided "as is." Except as expressly provided in this Agreement, AAMVA makes no warranties, express or implied, including, but not limited to, those of merchantability or fitness for a particular purpose or any other warranty arising by statute or from a course of dealing or usage of trade. Without limiting the foregoing, AAMVA makes no warranty of any kind that S2S will meet DLA's requirements, operate without interruption, achieve any intended result, be compatible or work with any other services, technologies, information or be error free. Use of information obtained through S2S is at DLA's own risk. AAMVA specifically disclaims any liability or responsibility for the accuracy or quality of data provided by Participating Jurisdictions, or for loss of data resulting from delays, non-deliveries, mis-deliveries, or service interruptions, however caused. No oral or written information or advice given by AAMVA shall create a warranty, or in any way increase the scope of AAMVA's obligations to DLA under this Agreement.

8. Limitation of Liability.

   a. Unless expressly contrary to law of the state of the DLA, AAMVA shall have no liability for any consequential, incidental, exemplary, indirect damages, loss, or expenses of any similar kind, even if AAMVA has been advised of the possibility of such damages, losses, or expenses. In no event shall AAMVA be liable for any damages caused by DLA's direct failure to carry out its obligations under this Agreement. AAMVA's aggregate liability to DLA under this Agreement, whether arising out of or related to breach of contract, tort (including negligence) or otherwise shall in no event exceed the total amount of fees paid by DLA to AAMVA pursuant to this Agreement in the twelve month period preceding the event giving rise to the claim.

   b. Excluded from the foregoing liability limitations are claims related to fraud, bad faith, infringement issues, bodily injury, death and physical damage to tangible personal or real property.

9. Miscellaneous.

   a. Headings and Captions. Headings and captions are inserted for reference and convenience only, and are not a part of, and shall not affect the meaning or interpretation of this Agreement.

   b. Force Majeure. In no event will AAMVA be liable or responsible to DLA or be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, when and to the extent such failure or delay is caused by any circumstances beyond AAMVA's reasonable control.

   c. Notices. All notices and communications relating to this Agreement, shall be in writing and shall be sent by certified mail, return receipt requested, or delivered personally or by email to the respective address set forth below, or to such other address(es) as either party shall designate by written notice.

To AAMVA:

AAMVA
4401 Wilson Boulevard, Suite 700
Arlington, VA 22203
Attention: Contracts Administration
hgollos@aamva.org

To DLA:

DC Department of Motor Vehicles
95 M Street, SW, Suite 300
Washington, DC  20024
Attention: Driver Services Administrator
Joan.saleh@dc.gov

d.  Assignment. Neither Party may assign or transfer this Agreement without the prior written consent of the other Party.

e.  Severability. A determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or enforceability of any other part of this Agreement. Similarly, a determination that any provision is invalid or unenforceable in one application will not affect the validity or enforceability of the same provision in other contexts.

f.  Survival. The provisions of Sections 3, 4, 6, 7 and 8 shall survive the expiration or earlier termination of this Agreement.

g.  Governing Law. This Agreement shall be governed by the substantive laws of the Commonwealth of Virginia, without regard to its choice of law principles.

h.  Entire Agreement. This Agreement (including any exhibit or other attachment to this Agreement) constitutes the entire agreement between the parties pertaining to the subject matter herein, and supersedes all prior oral and written agreements and any proposals, correspondence and memoranda with respect thereto.

i.  Order of Precedence. In the event of conflicts among the terms of this Agreement and any attachment or exhibit, the provisions of the attachment or exhibit shall prevail.

j.  Modification. No modification to this Agreement will be effective unless it is in writing and signed by all of the Parties of this Agreement.

IN WITNESS WHEREOF, the undersigned have caused the Agreement to be executed by their authorized officials as of the Effective Date.

**DC DEPARTMENT OF MOTOR VEHICLES**

**AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS**

By: _____
Gabriel Robinson    10/5/2021
Director

By: _____
Anne Ferro (Oct 7, 2021 19:29 EDT)
Anne S. Ferro
President and CEO

8

55