**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, et al.,<br><br>*Plaintiffs*,<br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, et al.,<br><br>*Defendants*. | No. 1:26-cv-2547 |

# PLAINTIFF STATES' BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER


Kwame Raoul
*Attorney General of Illinois*
Cara Hendrickson*
*Executive Deputy Attorney General*
Katharine Roller*
Paul Berks*
*Complex Litigation Counsels*
Gretchen Helfrich*
*Deputy Chief, Special Litigation Bureau*
Molly Mauck*
*Assistant Attorney General*
OFFICE OF THE ILLINOIS ATTORNEY GENERAL
115 South LaSalle St.
Chicago, IL 60603
312-814-3000

Counsel for the State of Illinois

** Pro hac vice forthcoming*
*Additional counsel in signature block*

Jay Jones
*Attorney General of Virginia*
Tillman J. Breckenridge (#85647)
*Solicitor General*
Megan C. Keenan (#102489)
*Deputy Solicitor General*
Counsel of Record
Mikaela A. Phillips (#97164)
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 786-1991
SolicitorGeneral@oag.state.va.us

Counsel for the Commonwealth of Virginia


August 13, 2026

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. STATEMENT OF THE ISSUES ........ 3

III. BACKGROUND ........ 3

A. The Commercial Driver's License Information System ........ 3

B. Privacy Protections That Govern CDLIS ........ 5

C. The FMCSA Data Demand ........ 7

IV. LEGAL STANDARD ........ 10

V. ARGUMENT ........ 10

A. Plaintiff States Are Likely to Succeed on the Merits, or at a Minimum, Plaintiffs Present Serious Questions Going to the Merits ........ 11

B. Plaintiff States Are Likely to Succeed on the Merits of Their APA Claims ........ 11

1. The Data Demand is a final agency action ........ 11

2. The Data Demand is contrary to law ........ 12

a. FMCSA issued the Data Demand without consulting with the States ........ 12

b. The Data Demand violates the DPPA ........ 14

c. The Data Demand violates the Privacy Act ........ 17

3. The Data Demand is arbitrary and capricious ........ 18

C. Plaintiff States Are Likely to Succeed on the Merits of Their Spending Clause Claim. ........ 21

D. The Contract Plaintiffs Are Likely to Succeed on the Merits of Their Breach of Contract Claims ........ 22

E. Plaintiff States Face Irreparable Harm in the Absence of Preliminary Relief ........ 23

F. The Equities Favor Plaintiff States and an Injunction Is in the Public Interest ........ 26

VI. CONCLUSION ........ 27

## I. INTRODUCTION

The federal government has launched an unprecedented campaign to obtain the contents of a database, known as the Commercial Drivers License Information System (CDLIS), that houses State records containing the sensitive personal information of millions of drivers. Several weeks ago, the Federal Motor Carrier Safety Administration (FMCSA) issued a demand (the Data Demand) that the Association of American Motor Vehicle Administrators (AAMVA)—a nonprofit that holds these records on behalf of the States—turn over the 17 million records in this database or face an immediate cutoff of all of its federal funding. When AAMVA did not immediately comply with the Data Demand, the Department of Homeland Security (DHS) issued a subpoena for the same records, claiming that it needed them for immigration enforcement. At first, AAMVA told the federal government that it would produce the records to FMCSA, at which point DHS withdrew its subpoena. But after nearly two dozen States objected that this disclosure would breach their contracts with AAMVA, violate their laws, and violate federal law, AAMVA informed FMCSA that it was considering an opt-out mechanism under which it would produce only the records of those States that did not object to their production.

Dissatisfied with this proposed compromise, DHS issued a new subpoena for the records and FMCSA presented Defendant AAMVA with a new ultimatum: Turn over the database by **Monday, August 17**, or face immediate termination of all of AAMVA's federal funding, including approximately $10 million that funds the database itself. If AAMVA resists the Data Demand, and that threat is carried out, the CDLIS database will cease to function, forcing every State to either cease issuing CDLs or risk their federal highway funding. But if AAMVA yields to the threat and turns over the sensitive personal information of millions of drivers, it will breach the assurances of confidentiality the States have provided to millions of individuals, foreseeably deter many

people from applying for CDLs, deprive the States of revenue, and break the States' bargain with the federal government and AAMVA itself.

Put to this untenable choice, AAMVA has informed the States that it will not comply with the Data Demand and turn the records over to FMCSA by August 17, as FMCSA demands. Accordingly, absent court intervention, the CDLIS system will cease operating as soon as Monday, upending the licensing systems in all 50 states and the District of Columbia and sowing chaos on the nation's streets and highways. Plaintiff States therefore respectfully request a temporary restraining order keeping in place the status quo before the federal government carries out its threat.

Plaintiff States are likely to succeed in demonstrating that the Data Demand is unlawful. No statute authorizes FMCSA to take custody of Plaintiff States' confidential driver records, and its demand to do so violates the Driver's Privacy Protection Act (DPPA), the Privacy Act of 1974, and the statute governing CDLIS itself. Further, FMCSA has violated the Administrative Procedure Act (APA) by acting to shut down or dramatically alter the structure of CDLIS without a shred of reasoned explanation, consideration of reliance interests, or even acknowledgment that it is changing policy. And FMCSA has violated the Spending Clause by imposing a new condition on States' receipt of federal highway funding without clear notice.

AAMVA is likewise barred from acceding to the Data Demand, including by producing records in response to DHS's subpoena. AAMVA's contracts with many States flatly bar the disclosure of their records, and the federal government's lawless threats do not excuse AAMVA's breach of those agreements.

The equities also weigh decisively in favor of enjoining the Data Demand. The Plaintiff States will suffer grave and irreparable harm if FMCSA carries out either prong of its ultimatum: either they will lose the ability to license drivers of buses, trucks, and other commercial vehicles—

a core area of state authority—or the federal government will expropriate millions of confidential state records. And the public manifestly has an interest in preserving the States' ability to license commercial drivers, protecting public safety and personal privacy, and ensuring the federal government obeys the law. Accordingly, Plaintiff States request that the Court preserve the status quo by enjoining FMCSA's demand for Plaintiff States' data and ordering AAMVA not to produce that data to FMCSA or DHS. Given FMCSA's vow to carry out its threat on August 17, 2026, Plaintiff States respectfully request that a temporary restraining order be entered by **5 p.m. Eastern Time on Friday, August 14, 2026**.

## II. STATEMENT OF THE ISSUES

1. Whether the Court should temporarily restrain Defendants from carrying out their threat to cut off AAMVA's funding—thereby disabling CDLIS—unless it transfers Plaintiff States' confidential driver information from CDLIS to FMCSA.

2. Whether the Court should temporarily restrain AAMVA from transferring the States' confidential driver information to FMCSA or DHS.

## III. BACKGROUND

### A. The Commercial Driver's License Information System

Licensing and regulation of drivers, including commercial drivers, is a traditional police power of the States. *See United States v. Snyder*, 852 F.2d 471, 475 (9th Cir. 1988). In 1986, Congress determined that the absence of an efficient means for States to share information about CDL holders had led to "the practice of multiple license use by commercial drivers," which allowed them to "spread their traffic violations over a number of licenses, and maintain a 'good driver' rating regardless of the number of violations." S. Rep. No. 99-570, at 3 (1986). To remedy this problem, Congress directed the Secretary of Transportation to "maintain an information system," known as CDLIS, "that will serve as a clearinghouse and depository of information

pertaining to the licensing and identification of operators of commercial motor vehicles and the disqualification of such operators from operating commercial motor vehicles." 49 U.S.C. §§ 31309(a), (d). The Secretary could maintain this database either directly or through a third-party "authorized operator." *Id.* § 31309(d). Since 1988, the Secretary has designated AAMVA, a nonprofit member association composed of motor vehicle administrators in every State and territory, to serve as CDLIS's authorized operator. *See* Commercial Driver's License Information System State Procedures Manual, Release 5.2.0, 76 Fed. Reg. 68328, 68329 (Nov. 4, 2011); Triepke Decl. at 3 ¶ 8.

States must participate in CDLIS as a condition of receiving up to eight percent of formula-based federal highway funds. 49 U.S.C. § 31314(c). Congress has detailed the "Requirements of State participation" in CDLIS. *Id.* § 31311. Each participating State must make available through CDLIS records containing personally identifying information about every CDL holder in the State, as well as every person disqualified from holding a CDL or whose CDL has been revoked, suspended, or canceled. *Id.* §§ 31311(a)(5), (7)–(8), (23). Those records—known as "master pointer records," or MPRs—consist of an individual's name, date of birth, Social Security number (SSN) (or a non-SSN with an indicator that the number is an SSN alternative), sex, driver's license number, and the State of Record. 49 U.S.C. § 31309(b); Duesterhaus Decl. at 4 ¶ 10. Before a State issues a CDL, it must query CDLIS to learn whether another State has records about the applicant. 49 U.S.C. §§ 31311(a)(5), (c). Whenever a record "points" the requesting State to another jurisdiction, the State must request therefrom "all information about the driving record of [that] individual." *Id.* § 31311(a)(6); *see* Arroyo Decl. at 4 ¶ 11. If that request reveals information that disqualifies a person from receiving a license—for instance, prior infractions, or a CDL in another State—the State must deny the license. *See, e.g.*, *id.* §§ 31311(a)(9)–(12).

Congress made clear that States play a central role in CDLIS's design and operation. The statute governing CDLIS provides that "[t]he Secretary shall consult with the States in carrying out this section." *Id.* § 31309(a). Likewise, when Congress instructed the Secretary to develop a plan to "modernize" CDLIS, it directed him to do so "in consultation with . . . State safety enforcement [and] licensing agencies." *Id.* §§ 31309(f)(1)–(2), (5); *see* Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109-59, § 4123, 119 Stat. 1736 (2005).

Defendants, moreover, have long administered and understood this database as a platform for States to share information with each other. *See e.g.*, Jack Decl. at 3 ¶¶ 10–16. DOT has affirmed that "FMCSA does not own CDLIS, and it is not a Federal system of records." FMCSA, Commercial Driver's License (CDL) Standards; Incorporation by Reference of a New State Procedures Manual (SPM), 89 Fed. Reg. 50235, 50237 (June 13, 2024). Instead, as DOT has explained, CDLIS is "maintained and operated by the States" through AAMVA. U.S. Dep't of Transp., *Privacy Impact Assessment for CDLIS* (Jan. 11, 2011), available at https://www.transportation.gov/sites/dot.gov/files/2020-11/Privacy - FMCSA - SCORE - PIA - Approved - 110920.pdf. Thus, all information stored in CDLIS is contributed by the States, and only the States—not AAMVA or FMCSA—have the power to add, delete, or alter the records they have contributed. *See, e.g.*, AAMVA, CDLIS SPM d.2, at 17, 50–52 (2025); *see, e.g.*, Wakumoto Decl. at 4 ¶ 13; Wint Decl. at 4 ¶ 13.

### B. Privacy Protections That Govern CDLIS

Several statutes and agreements protect the confidentiality of information maintained on CDLIS. First, the DPPA makes it unlawful for "any person" to knowingly "obtain or disclose [any] personal information[] from a motor vehicle record" unless an exception applies. 18 U.S.C. § 2722(a); *see id.* § 2725(3). The DPPA grants heightened protection to "[h]ighly restricted

personal information," including social security numbers. 18 U.S.C. § 2725(4). Given the "substantial . . . intrusion on privacy" that disclosure of highly restricted information would entail, the DPPA's exceptions authorizing the disclosure of such information are "read . . . narrowly," and may not be construed to permit disclosure absent "clear and explicit" language. *Maracich v. Spears*, 570 U.S. 48, 60, 64 (2013) (citation omitted).

As relevant here, one of those exceptions, commonly referred to as the government use exception, provides that personal information or highly restricted personal information may be disclosed "[f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions." 18 U.S.C. § 2721(b)(1). As the *en banc* Seventh Circuit has explained, this provision requires that "the actual information disclosed . . . must be information that is *used* for the identified purpose." *Senne v. Vill. of Palatine*, 695 F.3d 597, 606 (7th Cir. 2012) (en banc). In other words, an agency must demonstrate that "all of th[e] information" it obtained "actually *was used* in effectuating" its legitimate government function. *Id.* at 608.

Second, the Privacy Act sharply restricts how federal agencies may collect personal information like CDLIS data and whom they may share it with. 5 U.S.C. § 552a. Enacted out of concern that creation of "formal or de facto national data banks" would erode trust in government and deter participation in public services, *United States v. Weber*, 816 F. Supp. 3d 1168, 1194 (C.D. Cal. 2026); S. Rep. No. 93-1183, at 4, 8 (1974), the Act requires agencies to give the public notice and an opportunity to comment on new or modified "systems of record" (SORs) and to grant Congress time to evaluate the systems' impacts on privacy—*before* ingesting personal information. 5 U.S.C. §§ 552a(e)(4), (e)(11), (r). The Act also directs all agencies with a SOR to maintain "only such information about an individual as is relevant and necessary" for a purpose "required to be accomplished" by law. *Id.* § 552a(e)(1). And to ensure that personal information

is not misused after collection, the Act prohibits agencies from "disclos[ing] any record" from a SOR "to any person, or to another agency" without the consent of the individual to whom the record pertains, unless" a specific statutory exception applies. *Id.* § 552a(b).

Finally, AAMVA has entered into contracts with Plaintiff States, many of which sharply restrict AAMVA's authority to share records stored on CDLIS. For example, AAMVA's contract with California provides that information shared with AAMVA "remains [the State's] exclusive property," that information "must not be shared without written permission from" the State, and that AAMVA must comply with all state and federal privacy laws. ECF No. 1-5 at 13 ¶ B(1).) Other States' contracts contain similar provisions. *See, e.g.*, ECF No. 1-3 at 13 ¶ 4.8, 18 5.1; ECF No.1-10 at 13 ¶ 30(B); ECF No. 1-11 at 14 ¶ I.3, 20 ¶ I.10

### C. The FMCSA Data Demand

Notwithstanding the limits in the CDLIS statute and the privacy protections that apply to Plaintiff States' records, FMCSA has made an unprecedented effort, in coordination with DHS, to obtain Plaintiff States' MPRs. *See* Vasquezi Decl. at 5 ¶¶ 21–23.

On June 25, FMCSA sent a letter to AAMVA demanding that it turn over every MPR in CDLIS, going back five years—some 17 million records—to FMCSA. ECF No. 1-2 at 2. FMCSA followed up with a threat: if AAMVA did not accede to its demand, it would "terminat[e] . . . all of AAMVA's federal grants and contracts," including the grant that funds CDLIS, thereby rendering CDLIS inoperative and preventing the States and the District of Columbia from issuing any CDLs. *Id.* at 11. FMCSA did not consult with the States before or after making this demand. *See, e.g.*, Johnson Decl. at 6 ¶ 21–24; ECF No. 1-2; *cf.* 49 U.S.C. § 31309(a).

In response to FMCSA's ultimatum, AAMVA noted that "this [was] the first AAMVA ha[d] ever received such a request from" FMCSA and asked FMCSA to explain the request's legal basis. ECF No. 1-2 at 3–4. FMCSA responded that the disclosure was permissible under the

government use exception in the DPPA, on the theory that "[d]irect access" to all 17 million records would help FMCSA fulfill its "statutory safety and regulatory mandates" under "49 U.S.C. Chapters 311 and 313" and "49 U.S.C. § 113"—statutes that, collectively, set forth all of FMCSA's statutory authorities. *Id.* at 9. FMCSA further claimed that, once it obtained the information, the DPPA would allow it to share the data with any other agency for use in carrying out that agency's statutory functions. *Id.* FMCSA asserted that, to comply with the Privacy Act, it would maintain this information within existing systems of records. *Id.*

On July 24, AAMVA informed FMCSA that it would accede to the Data Demand and "intend[ed] to disclose the records . . . on or around August 17." *Id.* at 11. On July 27, AAMVA informed the States and the District of Columbia of FMCSA's demand and stated that it was "preparing to transmit the data within the next few weeks." *Id.* at 17–18. In response, over 20 States sent letters objecting to the disclosure and explaining that disclosing their records would violate federal and state law, as well as AAMVA's contracts with the States. *Id.* at 13.

Meanwhile, on July 28, DHS served a subpoena titled "Immigration Enforcement Subpoena" on AAMVA, demanding the same records as FMCSA, for the stated purpose of "an investigation or inquiry relating to the enforcement of U.S. immigration laws." *Id.* at 14. After AAMVA indicated that it would comply with FMCSA's demand, FMCSA informed AAMVA the agencies had "coordinated on their data demands" and explained that DHS would withdraw the subpoena "due to AAMVA's efforts to cooperate with FMCSA." *Id.*

In light of its members' objections, and the confirmation that the records would be used for a purpose other than that stated by FMCSA," AAMVA informed FMCSA in a letter of August 7, 2026, that disclosure of the records "would create significant questions as to AAMVA's compliance with its obligations" under state contracts and state law, particularly given that

FMCSA clearly had an "immigration enforcement purpose in collection of the data" and that the States "own the data." *Id.* at 13–14. AAMVA informed FMCSA that it would hold a meeting of its Board of Directors on August 14, at which point AAMVA intends to consider an "opt-in or opt-out choice by the states whether to authorize AAMVA's transmission of that state's data." *Id.* at 14. AAMVA noted that FMCSA had requested that production begin on a rolling basis on August 10, but stated that it could not produce any bulk data before the August 14 meeting, emphasizing that "[a]t bottom, this is state data that does not belong to AAMVA, necessitating a measured approach." *Id*.

The federal government evidently disagreed. On August 11—*i.e.*, two business days after the federal government learned that AAMVA might not produce all fifty States' records on August 17 after all—DHS served a second subpoena on AAMVA (hereinafter, "the subpoena"). Smith Decl. at 6 ¶ 26. The subpoena is identical to the First Subpoena and the FMCSA data demand, right down to the specific requirement that records without an SSN must specify when the SSN was deleted. *See* Bellows Decl. at 9 ¶ 32. The title of the subpoena, again, is "IMMIGRATION ENFORCEMENT SUBPOENA." *Id.* at 8 ¶ 31, 14–19. It demands compliance by 8:00 a.m. Eastern Time on August 17, 2026—less than one week after service, and the same date that AAMVA had previously planned to disclose the records at issue to FMCSA. *Id.* The stated reason for the subpoena, as identified in the cover letter, is "investigating illegal practices in commercial driver's license (CDL) schools, identifying and addressing criminal fraud regarding the issuance of CDLs to illegal aliens, and conducting civil immigration enforcement." *Id.*

Also on August 11, 2026, FMCSA sent AAMVA another letter rejecting the opt-in/opt-out proposal before it was even formally made, calling it "unacceptable." ECF No. 1-2 at 21. FMCSA also told AAMVA that, "[u]nless AAMVA provides DOT with the requested records by August

17, DOT will pursue all available options to secure production [of the records], including canceling AAMVA's grants, filing an enforcement action to enforce the subpoena [a subpoena issued by DHS, notably *not* DOT], and considering terminating its contract with AAMVA." *Id*. On August 12, AAMVA informed Plaintiff States that it would not produce the requested records to either FMCSA or DHS by August 17. Roller Decl. at 3 ¶ 5.

Plaintiff States therefore seek relief from this Court to prevent the disclosure of records and the withdrawal of AAMVA's grants.

## IV. LEGAL STANDARD

"The purpose of . . . interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (citation modified), *as amended* (Jan. 14, 2020). "A party seeking either a temporary restraining order or a preliminary injunction 'must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" *AJP Educ. Found., Inc. v. Miyares*, 806 F. Supp. 3d 603, 623 (E.D. Va. 2025) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). The last two *Winter* factors (equities and public interest) "'merge when the Government is the opposing party.'" *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## V. ARGUMENT

The Court should grant a TRO against Defendants to prevent them from carrying out either prong of FMCSA's illegal threat against AAMVA—either cutting off its funding and shutting down CDLIS, or disclosing Plaintiff States' records containing the sensitive personal information of millions of drivers—until this Court has the opportunity to fully consider the legal violations

alleged in the Complaint. The Court should also fashion a TRO that prohibits AAMVA from providing Plaintiff States' data to FMCSA or DHS. Plaintiff States are entitled to this relief because they are likely to succeed on the merits of their claims under the APA, the Spending Clause, and many state contracts with AAMVA. As detailed below, Plaintiff States face irreparable harm in the absence of an injunction, including violation of their sovereign rights, loss of control of their proprietary data, and irreparable harm to the functioning of their system for licensing commercial drivers. And these burdens far outweigh the minimal burden to the federal defendants, who have carried out their responsibilities related to commercial drivers for decades without seeking turnover of these records. Moreover, Defendant AAMVA has so far avoided producing the MPRs, and thus would experience no burden whatsoever if enjoined from doing so. *See* ECF No. 1-2.

### A. Plaintiff States Are Likely to Succeed on the Merits, or at a Minimum, Plaintiffs Present Serious Questions Going to the Merits

Plaintiff States are likely to prevail on their APA claims, because FMCSA acted in excess of its statutory authority in issuing the Data Demand and failed to engage in reasoned decisionmaking; on their Spending Clause claim, because FMCSA failed to provide "clear notice" that it might pillage the States' CDLIS data when it conditioned their highway funds on participation in CDLIS; and on their breach of contract claims, because the terms of Plaintiff States' contracts expressly prohibit AAMVA from disclosing their data without permission.

### B. Plaintiff States Are Likely to Succeed on the Merits of Their APA Claims

#### 1. The Data Demand is a final agency action

FMCSA's Data Demand is a "final agency action" subject to review under the APA, 5 U.S.C. § 704. The APA defines "agency action" broadly, *see* 5 U.S.C. § 551(13), and the definition "is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (citation omitted). An agency

action is "final" if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified). Finality is "interpreted in a pragmatic and flexible manner[,]" "focus[ing] on the practical and legal effects of the agency action." *Saliba v. SEC*, 47 F.4th 961, 967 (9th Cir. 2022) (quotation omitted).

The Data Demand meets these requirements. FMCSA has definitively and repeatedly demanded that AAMVA produce 17 million MPRs, and has unequivocally stated that it will terminate AAMVA's contract and grant funding if AAMVA does not comply by Monday, August 17. ECF No. 1-2. FMCSA's demand is not "merely tentative or interlocutory," but decidedly final. *Bennett*, 520 U.S. at 177–78. And "legal consequences will flow" from that demand, *id.*, no matter how AAMVA acts: either FMCSA will terminate AAMVA's contracts and funding, thereby disabling CDLIS and preventing the States from issuing or renewing CDLs to any of their residents, or AAMVA will transfer 17 million State-owned records to federal custody. These are "legal consequences" by any measure. *Id.*

### 2. The Data Demand is contrary to law

#### a. FMCSA issued the Data Demand without consulting with the States

The Data Demand is unlawful because FMCSA issued it without "consult[ing] with the States." 49 U.S.C. § 31309(a). The statute governing the maintenance, operation, and design of CDLIS provides that "[t]he Secretary *shall* consult with the States in carrying out this section." *Id.* (emphasis added). Under the "ordinary meaning" of the word consult, this provision requires, at minimum, that Agency Defendants engage in "a dialogue" with the States "*before*" the Secretary makes any significant changes concerning CDLIS. *HIAS, Inc. v. Trump*, 985 F.3d 309, 320–21 (4th Cir. 2021); *accord Cal. Wilderness Coal. v. Dep't of Energy*, 631 F.3d 1072, 1087 (9th Cir.

2011) (the "ordinary meaning of the word consult" requires that the Secretary "confer with the . . . States before" taking action). The Fourth Circuit, like other courts, has repeatedly held that an agency's failure to follow similar consultation requirements renders its action unlawful. *See HIAS*, 985 F.3d at 321; *see also e.g.*, *Cal. Wilderness Coal.*, 631 F.3d at 1095; *Confederated Tribes & Bands of Yakima Indian Nation v. Fed. Energy Regul. Comm'n*, 746 F.2d 466, 474 (9th Cir. 1984); *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1133 (9th Cir. 1998). And such consultation must consist of more than bare "[n]otice," but must also include, at minimum, the receipt and meaningful consideration of States' views. *HIAS*, 985 F.3d at 319; *see, e.g.*, *Confederated Tribes & Bands of Yakima Indian Nation*, 746 F.2d at 474 (9th Cir. 1984) (agency failed to fulfill its "consultation obligation" merely by giving "notice"); *Cal Wilderness Coal.*, 631 F.3d at 1087 (notice means "more than 'an opportunity for comment'"); *cf. Env't Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 864 (9th Cir. 2003) (agency met its "statutory duty of consultation" because it "circulated" its proposed plan to affected States and "revised [it] based on comments received").

Here, Agency Defendants did not confer with the States before issuing or carrying out the Data Demand. Among other things, they did not notify the States of the demand, request or receive their views, or take those views into account before taking this action. *See e.g.,* Johnson Decl. at 6 ¶ 21–24; ECF No. 1-2. Nor have they conferred with the States at any point since issuing the Data Demand.

Further, the Data Demand is plainly the type of action that triggers the consultation requirement. If carried out, it would represent a dramatic alteration in the way FMCSA "carr[ies] out" its statutory role regarding CDLIS, 49 U.S.C. § 31309(a), either by shutting down CDLIS entirely, or by changing the system from a platform in which States mutually exchange information contained in State-owned records to one in which FMCSA may assume control of State records

and redisclose them to other agencies or entities as it sees fit. In addition, FMCSA has expressly acknowledged that the Data Demand is for the purpose of carrying out the CDLIS statute itself. ECF No. 1-2 at 9, 13, 17 (stating that FMCSA seeks to "execute its statutory safety and regulatory mandates under 49 U.S.C. Chapter[] . . . 313.").

Finally, FMCSA's failure to consult was not "harmless error." *Cal. Wilderness Coal.*, 631 F.3d at 1090. Had the States been consulted, they would have provided a wealth of relevant information to FMCSA: Among other things, they would have informed the agency of the dire practical consequences for the States if FMCSA carried through on its threat to shut down CDLIS; the serious adverse consequences the data-sharing would have on the States' CDL programs; and the contractual agreements between AAMVA and many States that barred AAMVA from sharing information with FMCSA. *See infra* at V.B. The relevant correspondence indicates that FMCSA took into account none of these considerations before making its decision.

**b. The Data Demand violates the DPPA**

The Data Demand is also contrary to the DPPA. That statute prohibits "any person" from "obtain[ing] or disclos[ing] personal information[] from a motor vehicle record" unless one of fourteen exceptions applies. 18 U.S.C. § 2722(a); *see id.* §§ 2721(a)(1), (c). "Highly restricted personal information" may be disclosed only if one of four exceptions applies. *Id.* § 2721(a)(2).

The MPRs sought by the Data Demand contain "personal information" drawn directly from the States' "motor vehicle records." *See id.* § 2725(3) (defining "personal information" to mean "information that identifies an individual," including their "driver identification number" and "name"); *id.* § 2725(1) (defining "'motor vehicle record'" to include "any record that pertains to a motor vehicle operator's permit"). Moreover, the MPRs contain "highly restricted personal information," including "social security number[s]." *Id.* § 2725(4). Thus, this disclosure is prohibited unless one of the four enumerated exceptions applies.

The sole exception FMCSA has identified as basis for the disclosure is the government use exception. *See* ECF No. 1-2 at 5. Under the exception, an agency may disclose highly restricted personal information "[f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions." 18 U.S.C. § 2721(b)(1). Because this exception pertains to the disclosure of highly restricted personal information, the Supreme Court has instructed that it must be "narrowly . . . read," and construed to permit only those disclosures that the statute authorizes in "clear and explicit language." *Maracich*, 570 U.S. at 60, 64. As the *en banc* Seventh Circuit has explained, this exception permits disclosure only where the requesting agency demonstrates that "*all* of th[e] information" it obtains "actually [i]s used in effectuating" a legitimate government function. *Senne*, 695 F.3d at 608 (citation modified).

The Data Demand does not satisfy this requirement. FMCSA has not demonstrated that "all of th[e] information" in the 17 million MPRs that it has demanded will "actually [be] used in effectuating" any of FMCSA's statutory functions. Instead, FMCSA has vaguely asserted that it "intends to use this data to execute its statutory safety and regulatory mandates" under various provisions of law, and that "[d]irect access to this data" will assist FMCSA in those responsibilities. *See* ECF No. 1-2 at 9. But FMCSA has not claimed that it will "actually" use "all" 17 million names, social security numbers, dates of birth, and driver's license numbers currently held by AAMVA in carrying out any statutory function—nor is it plausible that the agency has any present intention of using every "particular piece of disclosed information" in that vast database. *Senne*, 695 F.3d at 606; *see Weber*, 816 F. Supp. 3d 1168, 1195 & n.35 (C.D. Cal. 2026) (federal government's attempted collection of "millions of Californians' driver's license numbers" unlawful because the federal government "ha[d] not identified" how all of that

information would be used). And an agency's mere desire for "[d]irect access" to information does not constitute "*use*" of the information "in carrying out [the agency's] functions," as the DPPA requires.

Further, FMCSA has not sufficiently identified any statutory function it believes this information will help it carry out. In its correspondence with AAMVA, FMCSA asserted that it would use this information to carry out its functions under "49 U.S.C. Chapters 311 and 313" and its "core responsibilities under 49 U.S.C. § 113." ECF No. 1-2 at 5. These sections of the U.S. Code, however, collectively encompass the entirety of FMCSA's statutory mandate. 49 U.S.C. § 113 alone vests the Administrator of FMCSA with the "duties and powers related to motor carriers or motor carrier safety vested in the Secretary by chapters 5, 51, 55, 57, 59, 133 through 149, 311, 313, 315, and 317 and by section 18 of the Noise Control Act of 1972," as well as any "additional duties and powers prescribed by the Secretary." 49 U.S.C. § 113(f). FMCSA's request thus does nothing to narrow or specify the functions for which FMCSA will ostensibly use the information.

What is more, FMCSA has made clear that its purpose in demanding the MPRs is not solely to use those records itself, but also to share them with DHS for "immigration enforcement purpose[s]." ECF No. 1-2 at 14; *see infra* at V.B.3. The government use exception, however, authorizes disclosure "[f]or *use* by any government agency . . . in carrying out *its* functions." 18 U.S.C. § 2721(b)(1). Obtaining records to pass them to another agency does not constitute the requesting agency's "use" of those records. And this exception only allows FMCSA to obtain records to assist in carrying out "its" functions—not to aid other agencies in fulfilling their own mandates. The Data Demand thus violates the DPPA for that reason, as well.

**c. The Data Demand violates the Privacy Act**

The Data Demand also ignores a host of core privacy protections in the Privacy Act. These include notice requirements that FMCSA must satisfy before ingesting data into a new or newly modified "system of records," restrictions on what information FMCSA may ingest into such a system, and prohibitions against disclosing personal information to third parties, including other federal agencies. In creating a new, sharable database of Plaintiff States' driver data without any public notice, without giving the public opportunity to comment, and without any lawful purpose, FMCSA's Data Demand violates every one of these basic privacy protections.

First, the Privacy Act imposes several notice requirements for creating or modifying "systems of records." The Data Demand, which will effectively create a new database of CDLIS information searchable "by the name of the individual or by some identifying number," will create a "system of records" subject to these requirements. 5 U.S.C. § 552a(a)(5). But FMCSA has taken none of the steps the Privacy Act requires. The agency has not published the notice required by 5 U.S.C. § 552a(e)(4) explaining why FMCSA is collecting States' driver data and how it will access, use, store, and share that data. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1193. Nor has FMCSA afforded the public an opportunity to comment on the proposed uses of the data. *See* 5 U.S.C. § 552a(e)(11); *Weber*, 816 F. Supp. 3d at 1193. FMCSA has also failed to provide "advance notice of" the new (or significantly changed) database to Congress, which the Privacy Act mandates "in order to permit an evaluation of the probable or potential effect of [the agency's] proposal on the privacy or other rights of individuals." 5 U.S.C. § 552a(r).

Second, the Privacy Act requires an agency to maintain "only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order." *Id.* § 552a(e)(1). FMCSA, whose only role in CDLIS is to maintain a platform on which *States* can post their own records for the purpose of

exchanging information *with other States*, has not articulated *any* specific purpose for collecting CDLIS data, much less one that FMCSA itself is "required to . . . accomplish[]" by law.

Third, the Data Demand, which FMCSA foresees will result in the "subsequent redisclosure [of States' driver data] to federal partner agencies" violates the Privacy Act's basic prohibition against disclosing personal information without consent. *See* 5 U.S.C. § 552a(b)(1); *Am. Fed'n of Gov't Emps. v. Off. Pers. Mgmt.*, 777 F. Supp. 3d 253, 274 (S.D.N.Y. 2025). Though agencies may share personal information externally if one of eleven narrowly defined exceptions applies. None does here: A plan to share drivers' personal information with unspecified "partner agencies" for unspecified purposes (or to assist those agencies with immigration enforcement) cannot satisfy the Act's narrow exceptions for FOIA disclosures (*id.* § 552a(b)(2)), census and statistical research (*id.* §§ 552a(b)(4), (b)(5)), individual health and safety (*id.* § 552a(b)(6)), congressional or Government Accountability Office oversight (*id.* §§ 552a(b)(9), (b)(10)), compliance with court orders (*id.* § 552a(b)(11)), or the Debt Collection Act (*id.* § 552a(b)(12)). The Privacy Act's exception for sharing of records for "civil or criminal law enforcement" requires a written request for the "*particular portion*" of an individual record and cannot authorize bulk data transfers. *Id.* § 552a(b)(7) (emphasis added). And FMCSA cannot take advantage of the Act's "routine use" exception to the consent rule (*id.* § 552a(b)(3)) because that exception requires agencies to publish a detailed notice explaining the "routine uses" that will require disclosure and the purposes behind each use. *See, e.g.*, *Cooper v. Fed. Aviation Admin.*, 816 F. Supp. 2d 778, 787–90 (N.D. Cal. 2008). FMCSA has not published *any* public notice about how it will use CDLIS data.

### 3. The Data Demand is arbitrary and capricious

The Data Demand is also arbitrary and capricious. Under the APA, an agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found

and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). An action is arbitrary and capricious if the agency "'failed to consider . . . important aspects of the problem'" or weigh relevant "alternatives." *Dep't Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). In addition, when an agency changes policy, it must "display awareness that it is changing position," "provide a reasoned explanation for the change" and consider any "serious reliance interests" engendered by its prior policy. *FDA v. Wages & White Lion Invests., LLC*, 604 U.S. 542, 568 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)). And an agency may not provide a justification for a policy that is "pretextual." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019).

The Data Demand falls short on every ground. First, FMCSA has not provided a "satisfactory explanation for its action." The sole explanations contained in its letters to AAMVA state in conclusory terms that FMCSA seeks the information to "conduct routine reviews and data analysis to oversee the national CDL program" and to carry out its "statutory safety and regulatory mandates" under every one of its governing statutes. ECF No. 1-2 at 9. These generic statements do not explain why FMCSA requires the bulk collection of CDLIS data for the first time in the program's history. They fail entirely to consider "important aspects of the problem," including the costs of disclosing the sensitive personal information of 17 million individuals and the dire consequences that would ensue if FMCSA carried out its threat to shut down CDLIS and thereby disable the licensing of commercial drivers nationwide. Nor do they reflect any consideration of alternatives to the wholesale disclosure of all 17 million records.

Second, FMCSA did not "display awareness" of its dramatic change in policy, much less acknowledge reliance interests or provide a reasoned explanation for the change. FMCSA has

never previously demanded "[d]irect access" to the entirety of the pointer records in CDLIS to perform its statutory functions or claimed that the records there are "DOT's own records." ECF No. 1-2 at 21. Instead, FMCSA has long acknowledged that CDLIS is not a federal database and FMCSA is not the owner of the data in CDLIS. *See supra* at III.A. States have relied on the security and confidentiality of CDLIS records in designing their own driver information systems, establishing practices relating to the maintenance of such records, and notifying applicants for CDLs about how their information would be used and shared. *See e.g.*, Miles Decl. at 7 ¶ 38; Beuckens Decl. at 9 ¶ 35; Smith Decl. at 8 ¶ 43; Boardman Decl. at 8 ¶ 38. And drivers themselves have relied on these confidentiality protections in providing information to state agencies. By failing to consider these reliance interests, weigh the potential costs of its dramatic break with past practice, or consider alternatives to its chosen approach, the agency did not fulfill its obligation to ensure that its change of course was "the product of a reasoned decisionmaking process" and "properly explained." *California v. Dep't Health & Hum. Servs.*, No. 25-cv-05536-VC, 2025 WL 2356224, at *1 (N.D. Cal. Aug. 12, 2025) (enjoining agreement between HHS and DHS to share Medicaid data with DHS for immigration purposes, where agency departed without explanation from longstanding "policy against using Medicaid data for immigration enforcement purposes").

Finally, the Data Demand is arbitrary and capricious because FMCSA's stated rationale is plainly "pretextual." *Dep't of Com.*, 588 U.S. at 780. Although FMCSA claimed its purpose in collecting the records was to carry out its own statutory mandates, it admitted to AAMVA that it is coordinating its demands with DHS; DHS issued a subpoena requesting the same records three days after FMCSA submitted its request; DHS said it would withdraw that subpoena after AAMVA indicated it would comply with FMCSA's request; then DHS re-issued the subpoena after FMCSA rejected AAMVA's opt-in/opt-out plan; and FMCSA then threatened to move to

enforce the subpoena that DHS (not FMCSA) had served. ECF No. 1-2 at 14, 21. The obvious inference, as AAMVA itself concluded, is that FMCSA sought the records in significant part for an "immigration enforcement purpose." *Id.* And that straightforward conclusion is reinforced by the unprecedented nature of FMCSA's request and the absence of any apparent reason FMCSA would suddenly need this vast body of records (as it claimed) to fulfill its longstanding statutory mandates. The Supreme Court has reminded courts that they are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com.*, 588 U.S. at 785. This court should not accept the "contrived reasons" FMCSA has offered for its extraordinary demand. *Id.*

### C. Plaintiff States Are Likely to Succeed on the Merits of Their Spending Clause Claim.

The Data Demand also violates the Spending Clause. Because States' participation in CDLIS is a condition on the receipt of federal funding, Congress must provide "clear notice" of the condition it intended to impose. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Thus, any statutory "obligations" must "be set out 'unambiguously,'" so that the States can "clearly understand" the duties they are undertaking in exchange for federal funding. *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

The CDLIS statute nowhere expresses—let alone "unambiguously"—that States must agree to turn over their driver license records to the federal government as a condition of their participation in CDLIS. The CDLIS statute contains an explicit, detailed list of the "Requirements for State participation." 49 U.S.C. § 31311. None alludes to such a condition. Instead, the statute repeatedly states only that States are required to make relevant "information" available to the CDLIS operator for the benefit of other States considering CDL applications, and to query that database before issuing new licenses. *Id.* § 31311(a)(5)–(9).

Further, the CDLIS statute repeatedly makes clear that the federal government's sole role is to maintain and administer a platform on which States can post their own records for the purposes of exchanging information with other States when evaluating CDL applications. The statute provides that CDLIS "will serve as a clearinghouse and depository of information," *id.* § 31309(a)—both words that refer to a system that securely stores third-party information so that it can be viewed by others. *See* Webster's Third New International Dictionary 420 (1986) (defining "clearinghouse" as "an agency for collection, classification and distribution . . . of information . . . requiring wide distribution"); *id.* at 606 (defining "depository" as a place "with which something . . . is deposited for preservation or safekeeping"). Nothing in the statute says or even suggests that the federal government may take advantage of this service to help itself to State-provided records for its own purposes—let alone for immigration enforcement purposes wholly foreign to the statute's aim. *Cf.* S. Rep. No. 99-411, at 7 (1986) (stating that the establishment of CDLIS "will not affect the existing privacy rights of commercial drivers" because it will only permit "an inquiring State, employer, or prospective employer to obtain a person's commercial driving record"). Indeed, FMCSA itself has repeatedly affirmed that the data in CDLIS does not belong to the federal government. *See supra* III.A. States accordingly did not "voluntarily and knowingly" agree to that term as a condition of participation. *Arlington*, 548 U.S. at 296.

### D. The Contract Plaintiffs Are Likely to Succeed on the Merits of Their Breach of Contract Claims

Several Plaintiff States are also likely to succeed on their claims that AAMVA may not lawfully disclose their records under its contracts with those States. Illinois, California, Maine, and the District of Columbia (the "Contract Plaintiffs") each have contracts with AAMVA governing their data-sharing with CDLIS. *See* ECF Nos. 1-3 through 1-11 (hereinafter referred to collectively as the "State Contracts"). Each of these contracts dictates that any data the States provide to

AAMVA is considered confidential information, and imposes strict limitations on the disclosure of such information. *See* ECF Nos. 1-3 at 13 ¶ 4.8; 1-5 at 13 ¶ B(1); 1-10, at 13, ¶ 30(B); 1-11 at 14 ¶ I.3, 21 ¶ I.10. For example, the California and Maine contracts provide that the data shared with CDLIS remain property of the State, not AAMVA. ECF Nos. 1-5 at 13 ¶ B(1); 1-10, at 17 ¶ 42(A). Illinois', California's and Maine's contracts prohibit AAMVA from releasing such information without written permission from the State. ECF Nos. 1-3 at 13 ¶ 4.8 ("No confidential data collected . . . in the course of performance of this contract shall be disseminated except as authorized by law and with the written consent of the disclosing Party[.]"); 1-5 ¶ B(1); 1-10, ¶ 39(B). None of the Contract Plaintiffs has given AAMVA permission to disclose state data to FMCSA or DHS. To the contrary, they have communicated unambiguously that AAMVA does not have permission to go forward with a bulk transmission of their respective data. *See* Triepke Decl. at 4 ¶ 16, 11–21.

Further, AAMVA's contracts with Illinois, California, Maine, and District of Columbia prohibit disclosure of confidential information to third parties except in very narrow circumstances not present here. For example, the California Contract prohibits AAMVA from "disclos[ing] or mak[ing] available" any confidential information "to any person or for any purpose or object except as authorized by this agreement." ECF No. 1-5 at 22 ¶ 2(b)(II); *see also* ECF Nos. 1-3 at 13 ¶ 4.8; 1-10 at 13 ¶ 30(B); 1-11 at 15 ¶ I.3, 21 ¶ I.10. The State Contracts do not authorize disclosure of confidential information to FMCSA for the vague purposes it has provided—or for the immigration enforcement purposes that appear to be Agency Defendants' true motivation. Therefore, AAMVA's disclosure of state data to FMCSA or DHS would violate AAMVA's contracts with Illinois, California, Maine, and the District of Columbia.

### E. Plaintiff States Face Irreparable Harm in the Absence of Preliminary Relief

FMCSA informed AAMVA that, if it does not disclose Plaintiff States' highly sensitive driver data to FMCSA by Monday, August 17, it will terminate its grant funding, thereby shutting down CDLIS and rendering States unable to issue CDLs. Because Plaintiff States will be irreparably harmed by either of these outcomes, the Court should issue an immediate restraining order to prohibit FMCSA from terminating AAMVA's federal funding or obtaining the States' data, and to prohibit AAMVA from transferring the same data to FMCSA or DHS, while this Court considers Plaintiff States' forthcoming request for a preliminary injunction.

A party seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction," *Winter,* 555 U.S. at 22, but need not show that such irreparable harm is certain, *Michigan v. U.S. Army Corps of Eng'rs*, 667 F. 3d 765, 788 (7th Cir. 2011). Nor must a plaintiff show that the defendants' conduct is the exclusive cause of the plaintiff's injury. *M.R. v. Dreyfus*, 697 F.3d 706, 728–29 (9th Cir. 2012). Instead, Plaintiff States may show a "sufficient causal connection" between Defendants' conduct and Plaintiff States' injury requiring an immediate injunction. *City & Cnty. of San Fran. v. USCIS*, 408 F. Supp. 3d 1057, 1121 (N.D. Cal. 2019). "Irreparable harm is . . . harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

If AAMVA refuses FMCSA's demand to produce records by August 17—as it has informed the States that it will do—and FMCSA follows through on its threat to effectively shut down CDLIS by terminating the federal funding that sustains it, Plaintiff States' ability to issue CDLs and to monitor and ensure the safe operation of commercial motor vehicles within their border would be impaired or lost. *See e.g,.* O'Connell Decl. ¶ 34–37. Indeed, because the States are required to query CDLIS as a condition of receiving up to eight percent of their highway funds—at least hundreds of millions of dollars annually—the shutdown of CDLIS would put

Plaintiff States at risk of massive financial losses. *See* Nizer Decl. at 4 ¶ 14, 7 ¶¶ 32, 36; Duesterhaus Decl. at 4 ¶ 14, 7–8 ¶ 31, 36. Moreover, the loss of CDLIS would cause irreparable harm to public safety, and to Plaintiff States' sovereign interest in exercising one of their quintessential police powers. CDLIS is the only currently practicable means to check for disqualifying commercial driver information across state lines, (*see* Catalfamo Decl. at 3 ¶ 9–16) and many Plaintiff States also search for out-of-state CDL violations before issuing *non*-commercial driver's licenses, an option that would no longer exist if States could no longer access CDLIS. *See, e.g.*, Triepke Decl. at 4 ¶ 13–15.

On the other hand, Plaintiff States also will be irreparably harmed if AAMVA complies with the Data Demand. The records in CDLIS belong to the States that submit them. *See supra* III.A. The information therein is collected by Plaintiff States from their own residents, to whom they have made assurances of its confidentiality, and it is maintained in accordance with numerous state laws designed to ensure its security. *See, e.g.*, Bustle Decl. at 2 ¶ 4, 6 ¶¶ 26–33, 8 ¶¶ 40–42. Transfer of those records to FMCSA would irreparably damage public trust in Plaintiff States' handling of driver data, resulting in fewer people seeking CDLs and driver licenses generally, a drop in fee revenue, and an increase in unauthorized driving and the attendant public safety risk. *See e.g.*, Miles Decl. at 6 ¶¶ 29–31; Benfield Decl. at 6 ¶ 29. And it would profoundly alter the nature of the CDLIS database, turning a trove of sensitive State records into the federal government's personal data bank which it can ransack at will. By creating a brand-new database controlled by the federal government but coercively and unlawfully populated in the first instance by the States' data, FMCSA would deprive Plaintiff States of the ability to superintend, secure, and verify those records, and the ability to enforce their own laws governing the use of this information. *See Washington v. FDA*, 108 F.4th 1163, 1176 (9th Cir. 2024) (recognizing states'

"sovereign interest" in "creat[ing] and enforc[ing] a legal code"). FMCSA has set no limits on its use or transfer of this information, which could predictably result in adverse action against the States, orders to cancel licenses, or even immigration enforcement proceedings based on incomplete or erroneous data. *See* ECF No. 1-2; Hastings Decl. at 5 ¶¶ 25–28; Arroyo Decl. at 6 ¶ 26–32, 7 ¶ 35–36. Disclosure would also impose significant compliance burdens on the States, including notice to residents of the breach in data security and revisions to official forms and communications. *See e.g.*, Catalfamo Decl. at 8 ¶ 41–42; Nizer Decl. at 8 ¶ 40; Jack Decl. at 9 ¶ 44.

### F. The Equities Favor Plaintiff States and an Injunction Is in the Public Interest

Lastly, a preliminary injunction is appropriate where: (1) the balance of equities tips in favor of the applicants; and (2) an injunction is in the public interest. *Winter*, 555 U.S. at 20. When the federal government is a party, these last two factors merge. *Nken*, 556 U.S. at 435. By establishing "a likelihood of success on the merits," Plaintiff States here "establish[] that both the public interest and the balance of the equities favor a preliminary injunction," because where there is "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal.*, 757 F.3d at 1069. "[T]here is a substantial public interest in having governmental agencies abide by the federal laws." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation modified). There is also a "general public interest in open and accountable agency decision-making." *Cresote Council v. Johnson*, 555 F. Supp. 2d 36, 40 (D.D.C. 2008); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA.").

The balance of the equities here tips sharply in Plaintiff States' favor. As discussed in the preceding sections, FMCSA's demand and AAMVA's coerced compliance therewith violate the law. Furthermore, the shutdown of CDLIS or the disclosure of the MPRs would irreparably harm Plaintiff States and the broader public. Temporarily maintaining the status quo by enjoining the Data Demand and any implementation of it by AAMVA serves the public interest. On the other hand, a TRO would not harm Agency Defendants, because they have carried out their statutory functions for decades *without* the demanded data, and, in Defendant AAMVA's case, because it has itself stated that it does not intend to turn over the data. A temporary delay will cause no prejudice.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court enter an order temporarily enjoining FMCSA's demand for Plaintiff States' data and ordering AAMVA not to produce Plaintiff States' demanded records to FMCSA or DHS.

Date: August 13, 2026

Respectfully submitted,

**KWAME RAOUL**
Attorney General of Illinois

/s/ Molly Mauck
MOLLY MAUCK*
*Assistant Attorney General*
CARA HENDRICKSON*
*Executive Deputy Attorney General*
KATHARINE ROLLER*
PAUL BERKS*
*Complex Litigation Counsel*
GRETCHEN HELFRICH*
*Deputy Chief, Special Litigation Bureau*
Office of the Illinois Attorney General
115 S. LaSalle St.,
Chicago, IL 60603
312-814-3000
Cara.Hendrickson@ilag.gov
Katharine.Roller@ilag.gov

**JAY JONES**
Attorney General of Virginia

/s/ Megan C. Keenan
TILLMAN J. BRECKENRIDGE (#85647)
*Solicitor General*
MEGAN C. KEENAN (#102489)
*Deputy Solicitor General*
*Counsel of Record*
MIKAELA A. PHILLIPS (#97164)
*Assistant Solicitor General*
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219
804-786-2071
mkeenan@oag.state.va.us
mphillips@oag.state.va.us
*Counsel for Plaintiff Commonwealth of Virginia*

Paul.Berks@ilag.gov
Gretchen.Helfrich@ilag.gov
Molly.Mauck@ilag.gov
*Counsel for Plaintiff State of Illinois*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

/s/ Mitchell P. Reich
MITCHELL P. REICH*
*Senior Counsel to the Attorney General*
KARTHIK REDDY*
*Special Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth St. NW
Washington, DC 20001
202-279-1261
Mitchell.Reich@dc.gov
*Counsel for Plaintiff District of Columbia*

**ROB BONTA**
Attorney General of California

/s/ David Green
THOMAS S. PATTERSON*
MICHAEL L. NEWMAN*
*Senior Assistant Attorneys General*
SETH E. GOLDSTEIN*
ROBIN L. GOLDFADEN*
*Supervising Deputy Attorneys General*
DAVID GREEN*
MARIA BUXTON*
CHASE GOLDSTEIN*
EZRA KAUTZ*
EMILIA P. E. MORRIS*
*Deputy Attorneys General*
1300 I Street, Suite 125
Sacramento, CA 95814
916-210-6242
David.Green@doj.ca.gov
*Counsel for Plaintiff State of California*

**KRISTIN MAYES**
Attorney General of Arizona

/s/ Mary M. Curtin
MARY M. CURTIN*
*Senior Litigation Counsel*
Arizona Attorney General's Office
2005 N. Central Ave.
Phoenix, AZ 85004
602-542-3333
Mary.Curtin@azag.gov
ACL@azag.gov
*Counsel for Plaintiff State of Arizona*

**PHIL WEISER**
Attorney General of Colorado

/s/ Gabe Podesta
GABE PODESTA*
SARAH H. WEISS*
*Senior Assistant Attorneys General*
1300 Broadway, 10th Fl.
Denver, CO 80203
720-508-6000
Gabe.Podesta@coag.gov
Sarah.Weiss@coag.gov
*Counsel for Plaintiff State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

/s/ Vianca Malick
VIANCA MALICK*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Vianca.Malick@ct.gov
*Counsel for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

/s/ Ian R. Liston
IAN R. LISTON*
*Director of Impact Litigation*
VANESSA L. KASSAB*
*Deputy Attorney General*
ANURADHA SIVARAM*
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

302-683-8899
Ian.Liston@delaware.gov
*Counsel for Plaintiff State of Delaware*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

*/s/ Kalikoʻonālani D. Fernandes*
KALIKOʻONĀLANI D. FERNANDES*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
808-586-1360
kaliko.d.fernandes@hawaii.gov
*Counsel for Plaintiff State of Hawaiʻi*

**AARON M. FREY**
Attorney General of Maine

*/s/ Halliday Moncure*
HALLIDAY MONCURE*
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
Halliday.Moncure@maine.gov
*Counsel for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

*/s/ Yasmin Dagne*
YASMIN DAGNE*
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-223-1580
ydagne@oag.maryland.gov
*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

*/s/ Gerard J. Cedrone*
GERARD J. CEDRONE*
*Deputy State Solicitor*
MICHELLE PASCUCCI*
*State Trial Counsel*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
617-963-2282
Gerard.Cedrone@mass.gov
*Counsel for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
*Assistant Attorney General*
P.O. Box 30212
Lansing, MI 48909
517-241-1050
GiovanattiN@michigan.gov
*Counsel for the State of Michigan*

**AARON D. FORD**
Attorney General of Nevada

*/s/ K. Brunetti Ireland*
K. BRUNETTI IRELAND*
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov
*Counsel for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

*/s/ Amanda McElfresh*
AMANDA MCELFRESH*
*Deputy Attorney General*
New Jersey Office of the Attorney General
124 Halsey Street
Newark, NJ 07101

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
ANJANA SAMANT*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501

609-696-5363
Amanda.McElfresh@law.njoag.gov
*Counsel for Plaintiff State of New Jersey*

505-270-4332
asamant@nmdoj.gov
*Counsel for Plaintiff State of New Mexico*

**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM*
*Chief Counsel for Federal Initiatives*
ZOE LEVINE*
*Special Counsel for Immigrant Justice*
MATTHEW CONRAD*
*Assistant Attorney General*
28 Liberty St.
New York, NY 10005
212-416-8333
Rabia.Muqaddam@ag.ny.gov
Zoe.Levine@ag.ny.gov
Matthew.Conrad@ag.ny.gov
*Counsel for Plaintiff State of New York*

**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880
Scott.Kennedy@doj.oregon.gov
*Counsel for Plaintiff State of Oregon*

**JOSH SHAPIRO**
Governor for Commonwealth of Pennsylvania

*/s/ Jacob B. Boyer*
JENNIFER C. SELBER*
JACOB B. BOYER*
Governor's Office of General Counsel
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
JacobBoyer@pa.gov
*Counsel for Governor Josh Shapiro*

**CHARITY R. CLARK**
Attorney General of Vermont

*/s/ Ryan Patrick Kane*
RYAN PATRICK KANE*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
802-828-3171
Ryan.Kane@vermont.gov
*Counsel for Plaintiff State of Vermont*

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Lauryn K. Fraas*
LAURYN K. FRAAS*
*Assistant Attorney General*
800 Fifth Ave., Suite 2000
Seattle, WA 98104-3188
206-464-7744
Lauryn.Fraas@atg.wa.gov
*Counsel for Plaintiff State of Washington*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Brian Keenan*
BRIAN KEENAN*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707
608-266-0020
Brian.Keenan@wisdoj.gov
*Counsel for Plaintiff State of Wisconsin*