**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS; DISTRICT OF COLUMBIA; STATE OF CALIFORNIA; COMMONWEALTH OF VIRGINIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI‘I; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN;<br><br>*Plaintiffs*,<br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, *in his official capacity as Secretary of Transportation*; FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION; DEREK D. BARR, *in his official capacity as Administrator of the Federal Motor Carrier Safety Administration*; AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS,<br><br>*Defendants*. | No. 1:26-cv-2547 |

**DECLARATION OF KRISTIN TRIEPKE IN SUPPORT OF PLAINTIFFS’ APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

I, Kristin Triepke, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am a resident of the State of California. I am over the age of 18 and competent to testify as to the facts herein. I testify based on personal knowledge, records kept in the ordinary course of business at the California Department of Motor Vehicles (DMV), and information I learned from DMV personnel whose work I rely upon and who have assisted me in gathering this information from our agency.

2. I have been the Chief of the Licensing Policy Branch at DMV since 2012. As part of my job, among other responsibilities, I am responsible for overseeing California's regulatory implementation and program evaluation for both commercial and non-commercial driver licensing.

3. In California, DMV is the state driver licensing agency (SDLA) and has powers and duties relating to issuing and renewing both commercial drivers' licenses (CDLs) and non-commercial drivers' licenses. (*See, e.g.*, Cal. Veh. Code § 1650 *et seq.*; Cal. Veh. Code § 12500 *et seq.*) Among other things, DMV is responsible for verifying each driver's license applicant's legal eligibility and medical fitness, identifying and disciplining problem drivers, and protecting the privacy of drivers' personal information.

**California's Management of Driver Licensing**

4. DMV is responsible for issuing and renewing CDLs and non-commercial driver's licenses to residents of California.

5. As part of DMV's commitment to traffic safety, DMV follows stringent procedures to ensure that drivers do not receive a license unless they can safely operate a vehicle and observe all traffic laws. In pursuit of that goal, and in accordance with state and federal laws and regulations, DMV administers driving tests, assesses applicants' medical fitness, checks to ensure that each applicant is not the holder of a driver's license from any other state, and checks each applicant's driving history to ensure that the applicant has not been subject to discipline or had their license revoked. For CDLs, DMV also verifies the applicant's legal presence documentation.

6. To comply with our legal obligations and ensure that each driver is eligible for a CDL, it is necessary for DMV to have a means of checking each driver's history, not only in California, but in other states where the applicant may have held a license.

7. For CDLs, this check is conducted through a database called the Commercial Driver's License Information System (CDLIS).

**CDLIS**

8. CDLIS is a database that contains driver records owned and maintained by the states. It operates as a clearinghouse where states can assist one another in verifying the licensing status and driving history of individual CDL applicants. CDLIS is operated on behalf of the states as a cooperative endeavor by the American Association of Motor Vehicle Administrators (AAMVA), a trade association for SDLAs, of which all states and some foreign jurisdictions are members.

9. CDLIS does not contain a driver's full record. Rather, CDLIS contains a "Master Pointer Record" (MPR) for each CDL holder in the United States, which consists of each driver's state of record, driver license number, name, date of birth, social security number (SSN).

10. If DMV queries CDLIS and finds that an applicant has a Master Pointer Record, DMV will then send the identified state of record for that driver a request, via CDLIS, for the driver's full history, called a "driver record" or "Driver History Record," which the state of record would provide back to DMV via CDLIS. Similarly, if another state queries CDLIS and finds a Master Pointer Record for a driver licensed in California, DMV would send that driver's record to the requesting state via CDLIS.

11. To query CDLIS, a user must know either the driver's name and date of birth, the driver's license number, or the driver's SSN. Users cannot conduct indiscriminate batch searches, such as searching for all drivers born in 1987, or all drivers with the last name "Smith."

12. As stated above, the data in CDLIS is owned and maintained by the states. DMV has the power to update its own pointer records maintained in CDLIS—and regularly does so, to ensure that our data remains accurate and up to date. I am not aware that either AAMVA or the Federal Motor Carrier Safety Administration (FMCSA), on the other hand, has any power to make additions, deletions, or changes to DMV's CDLIS data.

13. Before issuing a CDL, DMV, like all states, is required to use CDLIS to determine whether an applicant for a CDL already holds one, whether his or her license has been disqualified, and whether the applicant is disqualified from operating a commercial motor vehicle. 49 C.F.R. § 383.73(b)(ii). DMV usually queries CDLIS multiple times per day.

14. DMV has participated in and relied on CDLIS to operate its CDL program since 1989. Even if we were not legally required to use CDLIS, we would need CDLIS or a comparable system to serve our public safety mission. That is because DMV needs to know whether an applicant has a history of dangerous or unlawful driving in order to fulfill its public safety mission. If CDLIS were to shut down, particularly on short notice, it would be a major impediment to the operation of our CDL program.

15. DMV also queries CDLIS before issuing a non-commercial driver's license in order to determine whether an applicant has a history of dangerous or unlawful driving. Thus, our operation of our non-commercial driver's license program would also be impaired by the loss of CDLIS.

16. DMV participates in CDLIS pursuant to a contract with AAMVA. Under this arrangement, DMV has provided information about California drivers that AAMVA has then used, along with information from other states, to create the MPR. DMV's contract with AAMVA explains that the data DMV has shared remains DMV's data. It also explicitly provides that "DMV information provided under this Agreement . . . must not be shared without written permission from the DMV." DMV has not provided written permission to share the information that FMCSA seeks from AAMVA. Instead, in an August 3, 2026, letter, DMV expressly objected to AAMVA sharing this information. Attached as Exhibit A is a true and correct copy of the August 3, 2026, DMV letter.

17. In addition to CDLIS, AAMVA also operates other critical programs that DMV uses and is required to use. For example, AAMVA operates the Problem Driver Pointer System (PDPS). PDPS allows states to search the National Driver Registry (NDR), which contains information on problem drivers. By carrying out a PDPS search, DMV obtains information that directs them to the jurisdiction that has a full record of a driver's history. Based on this information, DMV can

determine whether an applicant for a driver's license is eligible. Like CDLIS, PDPS was created by statute and is a function of the National Highway Transportation Safety Administration.

18. In addition to CDLIS and PDPS, DMV also contracts with AAMVA to access the following services: the Commercial Skills Test Information Management System (CSTIMS), which allows DVM to access applicant records relating to CDL skills testing; the Business Partner Electronic Vehicle Registration (BPEVR) service, which allows business partners of DMV to apply for vehicle registration and titles electronically; the Social Security Number On-Line Verification (SSOLV) system; the Help America Vote Verification (HAVV) system, which allows DMV to verify social security number information for voter registration purposes; the National Motor Vehicle Title Information System (NMVTIS), which allows DMV to verify vehicle title information with other states; the Driver's License Data Verification (DLDV) service, which allows the U.S. Social Security Administration (SSA) the ability to verify the identity of SSA clients holding a California DL/ID; and the United States Passport Verification System (USPVS), which allows DMV the ability to verify U.S. passport document data with the U.S. Department of Homeland Security. Furthermore, beginning in 2027, DMV is expected to begin utilizing the State-to-State (S2S) verification system, which will allow the DMV to verify whether applicants hold a Real ID credential or a driver license issued by another state and exchange driver history information for non-commercial drivers.

19. DMV queries at least one AAMVA system every time an individual applies for a driver's license.

**FMCSA's Demand for CDLIS Data**

20. On July 23, 2026, DMV learned that FMCSA had demanded that AAMVA turn over to FMCSA the entire contents of CDLIS, including California's records. DMV learned of this when the President and CEO of AAMVA, Ian Grossman, sent an e-mail to the AAMVA Board of Directors, which explained the situation and included copies of the communications between AAMVA and FMCSA regarding the request that had occurred as of the date of the e-mail. Bernard Soriano, Deputy Director of DMV's Policy Division, sits on the AAMVA Board of Directors and was a recipient of the e-mail.

21. I am unaware of FMCSA or any other federal agency ever previously requesting or demanding that AAMVA turn over the contents of CDLIS or any other AAMVA database.

22. I understand that FMCSA has asserted that it needs this data so that it can verify CDL validity and conduct motor carrier safety assessments. As described above, DMV already carries out those functions, as is typical for state agencies, in accordance with federal and state statutes and regulations.

23. I also understand that FMCSA has asserted that, once it obtains this data, it could lawfully share it with any other federal agency for use in carrying out that agency's functions. I am not aware of any data-security protections that would ensure the security and confidentiality of this data once it is in the hands of either FMCSA or any other agency.

**AAMVA's Disclosure to FMCSA Would Cause Irreparable Harm**

24. FMCSA's demand seeks California's proprietary and confidential records and data.

25. Once California's data is in FMCSA's hands, California would lose control and oversight of its confidential records. To my knowledge, FMCSA has not made any commitments to AAMVA that it will maintain the confidentiality of this data; to the contrary, it has affirmatively stated that it is authorized to redisclose it to any other federal agency. And even if FMCSA made promises to AAMVA regarding the security and/or privacy of this data, California would not have insight into how that information was used, and therefore may not be in a position to enforce those promises, and these new records may be used for purposes that violate our state laws and regulations regarding the confidentiality of information.

26. In particular, DMV understands itself to be bound by California laws strictly prohibiting the disclosure of personal information by state agencies, subject to very limited exceptions. *See, e.g.*, Cal. Civ. Code, § 1798.24; Cal. Gov. Code § 11015.5, Cal. Veh. Code § 1808.47. DMV also understands itself to be bound by California laws prohibiting the use of information maintained by DMV for immigration purposes. *See, e.g.*, Cal. Veh. Code § 1808.48. Handing over California's proprietary and confidential information to FMCSA is incompatible with those obligations.

27. DMV's contract with AAMVA also specifically requires AAMVA to comply with California privacy laws, providing that AAMVA will "implement[] the necessary controls to comply with State mandated security and privacy requirements provided in," among other laws, "Government Code §11015.5 and §11019.9, Vehicle Code, and California Information Practices Act (IPA) Civil Code §1798 et seq." *See* Compl. Ex. 3, Dkt. No. 1. Handing over California's proprietary and confidential information to FMCSA is thus also incompatible with DMV's contract with AAMVA. And as covered above, this contract further specifically prohibits sharing of DMV's information without DMV's written permission.

28. Moreover, if the data were turned over to FMCSA, California would not be able to update the data or ensure that it is accurate, creating the risk that out-of-date or erroneous data attributed to California could form the basis or justification for federal action.

29. Finally, residents of California entrust the state with their personal data when they apply for a commercial driver's license. California and DMV rely on that trust—without it, some California residents would be less inclined to disclose information to DMV, and thereby less likely to apply for driver's licenses using accurate information. Accordingly, California's contract with AAMVA strictly protects that information.

30. That trust would be destroyed if AAMVA breaches California's contract, and the data is turned over to FMCSA without strict controls limiting its use and disclosure, and without a clear statement of FMCSA's purpose in seeking it.

31. A readily foreseeable result of this breach of trust is that fewer people will seek CDLs from California. This means California will lose qualified commercial drivers, including for construction trucks, school buses, and paratransit vehicles.

32. In addition, there is also an acute risk that some individuals who are concerned about broadly disclosing their personal information to the federal government—such as individuals who are lawfully qualified to obtain a CDL but are part of mixed-status immigration families—may avoid the CDL process entirely and attempt to drive commercial motor vehicles without a license. If that occurs in even a small number of cases, it would pose grave public-safety risks, as states

would not be able to identify the drivers of those motor vehicles or ensure that they are properly qualified to drive commercial motor vehicles.

33. The full extent of the harm to California that flows from the public's loss of trust in DMV is virtually impossible to quantify in terms of money damages, and, given the difficulty in changing the public's negative perception, I believe that harm would be irreparable.

**California Would Be Irreparably Harmed if FMCSA Carried Out Its Threat to Withhold Funding From AAMVA**

34. I understand that FMCSA has threatened to terminate all of its funding to and contracts with AAMVA, including the funding that provides for the upkeep of CDLIS.

35. California would be irreparably harmed if FMCSA carried out those threats.

36. As stated above, DMV heavily relies on CDLIS, PDPS, and other resources and services operated by AAMVA.

37. In particular, without an effective, functioning, and up-to-date CDLIS, DMV would not be able to issue new CDLs or renew existing ones in compliance with federal law and regulations. This would destroy jobs, contribute to a shortage in qualified commercial drivers, and compromise the predominant mode of transportation for California's freight shipments, with trucking accounting for about 80% of freight shipments in state. And even if those laws and regulations did not apply, California would be harmed by losing access to an important public safety resource that keeps unsafe drivers off of California's roads.

**DMV Participated in CDLIS on the Understanding That Its Records Would Be Kept Secure**

38. I understand that California's participation in the CDLIS system is a condition to receiving certain federal highway funds.

39. It has never been California's understanding that FMCSA or any other federal agency has lawful authority to obtain the contents of CDLIS, nor that granting FMCSA the right to obtain and redisclose California's records was a condition of participation in CDLIS.

40. California has relied on the security and confidentiality of CDLIS records in designing its own information systems, in establishing practices relating to the maintenance of such

records, and in notifying applicants for CDLs about how their information would be used and shared.

41. If FMCSA is able to obtain and redisclose California's records whenever it wishes, California will need to alter its practices.

42. If DMV had been aware that those funds were conditioned on having to hand over driver data en masse as FMCSA is currently asking it to do, it would not have agreed to participate in CDLIS.

* * *

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on August 10, 2026, in Sacramento, California.

***/s/ Kristin Triepke***
Kristin Triepke
Chief, Licensing Policy Branch
California Department of Motor Vehicles

# Exhibit A

**OFFICE OF THE DIRECTOR**
**DEPARTMENT OF MOTOR VEHICLES**
P.O. BOX 932328
SACRAMENTO, CA 94232-3280

August 3, 2026

*Sent Via Email to:*
Cian Cashin
Vice President of Government Affairs
American Association of Motor Vehicle Administrators
4250 Fairfax Drive, Suite 1000
Arlington, VA 22203

Dear Mr. Cashin:

The California Department of Motor Vehicles (California DMV) is in receipt of American Association of Motor Vehicle Administrator's (AAMVA) President and CEO Ian M. Grossman's July 27, 2026, Memorandum to the U.S. State Driver Licensing Agency Chief Administrators, informing driver licensing agencies of the demand from the Federal Motor Carrier Safety Administration (FMCSA) for AAMVA to provide Commercial Driver's License Information System (CDLIS) Master Pointer Records (MPRs) for approximately 17 million drivers in the United States. That Memorandum gave the state agencies only one week to respond. While I am writing now to meet that deadline, as an initial matter, I am concerned that AAMVA is not affording state agencies or AAMVA itself sufficient time to consider the very serious legal concerns that FMCSA's unprecedented demand has raised.

I strongly urge that AAMVA not rush this process, including to give agencies like ours an adequate opportunity to weigh the issues involved and, relatedly, to give the Board the opportunity for more meaningful discussion and a formal vote on the matter. Because of the unreasonably short notice provided—less than 24 hours—some jurisdictions such as Maine, Texas, and New Hampshire could not attend. For California's part, our Board member was unable to fully participate in the Board's prior discussion on this matter, but he was forced to listen in while on a commercial flight where he could not speak freely. For present purposes, and until such time as we indicate otherwise in writing, California does not consent to the disclosure of its data nor to any records

holding such data in response to FMCSA's pending demand or any similar bulk demand.

The California DMV strongly opposes AAMVA's proposed disclosure of the MPRs to FMCSA. As AAMVA is aware, these records reflect sensitive, legally protected personal data, including Social Security Numbers, that California DMV and the State Driver Licensing Agencies more broadly have shared under strict confidentiality agreements. Moreover, FMCSA has provided no legitimate reason it needs to obtain this data en masse rather than make individual queries of the CDLIS database, as it has done in the past. It is no secret that the federal government has been amassing and centralizing the personal information of Americans to use in myriad ways including for immigration enforcement.[1] Giving FMCSA an unfettered copy of this trove of personal information puts that data at risk of being similarly misused. As detailed below, disclosing this information to FMCSA would violate the explicit terms of AAMVA's contract with the California DMV. It would further violate federal and state laws meant to protect individual privacy. And while FMCSA claims its contract with AAMVA authorizes the disclosure, AAMVA itself has rightly informed FMCSA that FMCSA misreads the contract. For these reasons, we ask that you commit in writing, by the close of business on **August 6, 2026**, that you will not disclose the California DMV's data, as reflected in the MPRs or otherwise, in response to FMCSA's request and that, if you are considering disclosure, you provide the California DMV with at least five business days' notice before any disclosure. Should AAMVA not agree to do so, we will be forced to pursue available legal avenues to enforce the California DMV's rights under the contract and all other applicable law.

## I. AAMVA's proposed disclosure is prohibited by the contract governing California's participation in CDLIS.

FMCSA's request covers troves of sensitive information about California drivers—information that the California DMV shared with AAMVA pursuant to the parties' July 2025 contract governing CDLIS. *See* attached (hereinafter "the

[1] *See* Exec. Order No. 14243, 90 Fed. Reg. 13,681 (Mar. 20, 2025) (directing federal agencies to eliminate so-called "information silos" and ensure "unfettered access to comprehensive data from all State programs" in furtherance of the Administration's goals.); *see also* Makena Kelly & Vittoria Elliott, *DOGE Is Building a Master Database to Surveil and Track Immigrants*, Wired (April 18, 2025), https://www.wired.com/story/doge-collecting-immigrant-data-surveil-track/ ("DOGE is knitting together immigration databases from across DHS and uploading data from outside agencies including the Social Security Administration (SSA), as well as voting records, sources say.")

Agreement"). As set forth in the Agreement, that data "remains DMV's exclusive property." Agreement, Ex. B ¶ B(1). Accordingly, DMV retains the right to control how that information is used and shared. Indeed, the Agreement dictates that "DMV information provided under this Agreement . . . **must not be shared without written permission from the DMV**." Agreement, Ex. B at 2 ¶ B(1). The California DMV does not consent to AAMVA sharing any of the California DMV's data with FMCSA in response to its request for bulk information. If FMCSA needs the California DMV's bulk data for a legitimate purpose, it must request that data from the California DMV, not AAMVA, which has no right to share it. *See id.* ("Disclosure of this data does not transfer ownership of information to the Contractor.").[2]

This strict limitation on sharing the California DMV's data with third parties is reiterated elsewhere in the Agreement. For example, per AAMVA's own security requirements, the parties agreed not to "disclose or make available" any confidential information "to any person or for any purpose or object except as authorized by this agreement." *Id.* App'x 1 at 2 ¶ 2(b)(II); *see also id.* Ex. B at 2 ¶ B(2) ("[I]nformation obtained under this Agreement shall not be . . . released . . . for any purpose other than identified in this Agreement."); *id.* at 4 ¶ B(9) ("Disclosure of any DMV information to any person or entity not specifically authorized in this Agreement is strictly prohibited.").[3] Nowhere does the Agreement authorize the sharing of bulk data with FMCSA or any other party, nor authorize disclosing it for any of the vague purposes FMCSA describes.

Further, even if disclosure to FMCSA were permissible under the Agreement, which it is not, AAMVA would be responsible for "ensur[ing]" FMCSA "adhere[s] to" the Agreement's "Information Security and Privacy Provisions" (Ex. B). *Id.* Ex. B at 1. Among other protections, this would require that FMCSA provide written assurances it will not disseminate the data outside of FMCSA, and that the information will only be used for FMCSA's commercial licensing program oversight responsibilities, and for no other purpose. *See* Agreement, Ex. B, p. 1.

---

[2] The Agreement contemplates that any disclosure required by law would have to come from the California DMV, not from AAMVA. It states: "AAMVA will reasonably assist DMV in responding to any disclosure imposed by applicable state and federal laws." *Id.* The Agreement does not impose the same requirement on the California DMV, as the data remains the California DMV's property, not AAMVA's.

[3] Further, even if disclosure to FMSCA were permissible under the Agreement, which it is not, AAMVA would be responsible for "ensur[ing]" FMSCA "adhere[s] to" the Agreement's "Information Security and Privacy Provisions" (Ex. B). *Id.* Ex. B at 1.

Should AAMVA violate any of these provisions by sharing the California DMV's data with FMCSA, such a disclosure would "constitute a material breach" of the Agreement and would cause the California DMV irreparable harm. *Id.* App'x 1 at 5 ¶ 6 ("Either Party's failure to comply with the provisions of this Agreement concerning the use, disclosure, protection or safeguarding of Confidential Information or Protected Data shall constitute a material breach of this Agreement.").

Moreover, AAMVA agreed to comply with state and federal privacy laws, which prohibit the sharing of the requested bulk data, as explained further below. It also expressly acknowledged in the Agreement that "under California Penal Code § 502, it is a public offense to knowingly and without permission . . . copy, or otherwise use any DMV data. Such action can be prosecuted civilly or criminally and is punishable by fine and/or imprisonment." Agreement, Ex. B at 3 ¶ B(4), Appx. 1 at 2 ¶ 3.a. As a member of AAMVA, the California DMV strongly urges AAMVA's leadership to avoid taking any action that could expose the organization to such liability.

## II. AAMVA's contract with FMCSA does not authorize the proposed disclosure.

As AAMVA has correctly observed, the CDLIS Cooperative Agreement of June 9, 2008 ("FMCSA Agreement"), does not authorize FMCSA to demand, nor AAMVA to provide, the millions of pointer records FMCSA now seeks. FMCSA has argued that Article 7 paragraph (b) of that agreement establishes its authority to demand these records, which states that "upon request, AAMVA shall make available" "to FMCSA" "all information on all *driver records*, including non-CDL holders who operate CMVs." (Emphasis added.) "Driver records" are different from the pointer records that FMCSA has requested. The term "driver records" has a specific meaning in the CDLIS context; it refers to "the electronic record of the individual CDL driver's status and history *stored by the State-of-Record*." 49 CFR § 383 (emphasis added). And the reference in paragraph (b) to "driver record," and not "pointer records," is intentional. Indeed, the very next line of the agreement refers to the disclosure of "pointer records," confirming that FMCSA understood the difference between the two data sets, and limited paragraph (b) only to "driver records." Thus, contrary to FMCSA's current assertion, Article 7 does not require the disclosure of pointer records to FMCSA.

## III. AAMVA's proposed disclosure would violate federal law.

**Driver's Privacy Protection Act of 1994**

AAMVA's disclosure of the pointer records to FMCSA would violate the Driver's Privacy Protection Act of 1994 (the DPPA).

The DPPA regulates the disclosure of personal information contained in the records of state motor vehicle departments and their contractors. 18 U.S.C. §§ 2721(a); *Reno v. Condon*, 528 U.S. 141, 143 (2000). It generally bars these entities from disclosing a driver's personal information without the driver's consent. 18 U.S.C. §§ 2721(a). It authorizes disclosure only in limited circumstances. Relevant here, it provides that personal information "*may*" be disclosed "[f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions." 18 U.S.C. § 2721(b)(1) (emphasis added). Courts have emphasized that this provision "must be read narrowly," *see Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 606 (7th Cir. 2012) (en banc), consistent with the statutory text and Congress's "chief aim of privacy protection," *id.*

Here, FMCSA argues that disclosure is permissible under this provision. Invoking 18 U.S.C. § 2721(b)(1), it asserts that it "intends to use this data to execute its statutory safety and regulatory mandates under 49 U.S.C. Chapters 311 and 313, including verifying Commercial Driver's License (CDL) validity and conducting motor carrier safety assessments," and it goes on to claim that "[d]irect access to this data enables FMCSA to fulfill its core responsibilities under 49 U.S.C. § 113, constituting a clear exercise of 'carrying out its functions' under federal law." FMCSA July 24, 2026, letter.

This vague, highly generalized statement is insufficient to justify the bulk disclosure of the confidential information of 17 million persons. Under 18 U.S.C. § 2721(b)(1), AAMVA may disclose personal information to FMCSA only if *each* piece of data for *each* person would be "[f]or use" by FMCSA "in carrying out its functions." *See Senne*, 695 F.3d at 606 ("the actual information disclosed . . . must be information that is *used* for the identified purpose"; [w]hen a particular piece of disclosed information is not *used* to effectuate that purpose in any way, the exception provides no protection for the disclosing party." (emphasis in original)). AAMVA raised this very issue to FMCSA. It explained that it "must consider whether each data element requested is necessary to the governmental purposes for which it was requested. In other words, we must at

least know what government agency will use the records for what government function." AAMVA July 10, 2026, letter.

But in fact, FMCSA has not provided information sufficient to allow AAMVA to determine whether disclosure could be permissible under the DPPA. While vaguely alluding to various planned uses, FMCSA has not explained how disclosure of millions of highly sensitive records would help it fulfill its goals. It never explained, for example, why the disclosure of 17 million social security numbers is necessary to "verify[] Commercial Driver's License (CDL) validity," "conduct[] motor carrier safety assessments," and "fulfill its core responsibilities." FMCSA July 24, 2026, letter. That some records may be helpful to FMCSA in carrying out its legitimate governmental functions cannot be sufficient under the DPPA's exception to justify the disclosure of the records of 17 million individuals. Disclosure is particularly problematic for those individuals who are in the CDLIS database but neither have a commercial credential nor any commercial violation history—and so plainly will not have their data used for the vague purposes FMCSA has described. Therefore, FMCSA's request for this information violates the DPPA. *See United States v. Weber*, 816 F. Supp. 3d 1168, 1195 (C.D. Cal. 2026).

Nor could FMCSA provide a legally sufficient justification for the mass bulk data demand it has presented to AAMVA. As you know, like state licensing agencies, FMCSA has access to CDLIS for purposes of querying information on individual drivers. For decades now this level of access has been sufficient for FMCSA to carry out its legitimate governmental functions. In the history of AAMVA's maintenance of the CDLIS, FMCSA has never purported to have, or evinced, need for any bulk data pull, let alone one of the magnitude seen here. Despite the unprecedented nature of its current request, FMCSA has identified no specific reason why such a break from past practice is necessary now.

More problematic still, FMCSA has indicated that it plans to disclose any provided information more broadly "to federal partner agencies," which according to FMCSA, also have a general intent to use the data for their legitimate, governmental functions. To accept FMCSA's request, then, would be to convert a statutory scheme with the "chief aim of privacy protection," *see Senne*, 695 F.3d at 606, into a statutory scheme that facilitates bulk disclosure of personal information across the federal government and potentially beyond. And if any state or local governmental body—or even any "private person" acting on their behalf, 18 U.S.C. § 2721(b)(1)—asserts a similar vague interest in these records for, say, driver safety, then, in the view of FMCSA, they too would apparently be entitled to highly sensitive information for millions of drivers. The

upshot would be to inappropriately transform a provision that "must be read narrowly," *see Senne*, 695 F.3d at 606, into a provision without meaningful limits.

This, of course, is not the federal government's first attempt to obtain highly sensitive personal information on a bulk scale and to use this information for purposes that Congress never authorized.[4] As one court recently wrote: "In the past year, several federal agencies have joined forces to create a centralized federal database that contains the private information of United States citizens, including Social Security numbers, citizenship status, and other sensitive data." *See, e.g.*, *League of Women Voters v. U.S. Dept. of Homeland Security*, __ F. Supp. 3d __, 2026 WL 1784297, at *1 (D.D.C. June 22, 2026). But as this same court explained, "decades ago, Congress put protections in place to prevent precisely this type of centralized data bank." *Id.* The DPPA is an important piece of this effort to safeguard personal information—and it does not authorize the bulk disclosure of the data here.

Furthermore, even if DPPA did permit the disclosure of the data FMCSA requests (it does not), it certainly does not *require* that disclosure. Rather, the law gives states discretion to determine whether disclosure is warranted and to whom, because it is the states' responsibility to protect its residents from having their data broadly disclosed or misused. California has done just that: in its contract with AAMVA, it has prohibited the disclosure of its residents' data without the state's express consent. *See* Agreement, Ex. B at 2 ¶ B(1). AAMVA is bound by that provision, even if DPPA would otherwise permit such a disclosure.

**Federal Privacy Act of 1974**

AAMVA's disclosure of the pointer records to FMCSA would also appear to violate the Privacy Act of 1974.

Congress enacted the Privacy Act to "provide certain safeguards for an individual against an invasion of personal privacy," by requiring government agencies to maintain accurate records and providing individuals with more control over the gathering, dissemination, and accuracy of information about themselves. Pub. L. No. 93-579, § 2(b), 88 Stat. 1896 (1974). To that end, the Act gives agencies detailed instructions for managing "systems of records"—a term

---

[4] *See, e.g.*, Kimberly Kindy & Amanda Seitz, *Trump administration hands over Medicaid recipients' personal data, including addresses, to ICE*, AP News (July 17, 2025), https://apnews.com/article/immigration-medicaid-trump-ice-ab9c2267ce596089410387bfcb40eeb7.

defined to mean "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S. Code § 552a(a)(5).

Among other requirements, the Act provides that when an agency "establish[es] or revis[es]" a "system of records" containing retrievable information about individuals, it must "publish in the Federal Register . . . a notice of the existence and character of the system of records." 5 U.S.C. § 552a(e)(4). This notice, commonly called a System of Records Notice or SORN, must identify the agency's intended uses and disclosures of those records. *Id*. § 552a(e)(4). At least 30 days before publishing a SORN, the agency must also publish notice in the Federal Register "of any new use or intended use of the information in the system" and provide an opportunity for interested parties to submit "written data, views, or arguments to the agency." *Id*. § 552a(e)(11). Thus, before an agency can establish or revise a system of records, it must provide notice and an opportunity for public comment at least 30 days in advance.

In its communications with AAMVA, FMCSA appears to acknowledge that the Privacy Act is applicable here. *See also* CDLIS Cooperative Agreement, Art. 6 at 6-7. But it asserts that it "will maintain this data within established Systems of Records in accordance with the Privacy Act of 1974" and would provide relevant SORNs "under separate cover." FMCSA July 24, 2026 letter. At this stage, however, California has not seen these referenced SORNs. We have thus been asked to provide comments about FMCSA's extraordinary request, under an extremely expedited timeline, without even receiving adequate information to evaluate FMCSA's compliance with federal law. This alone warrants a pause in this process to allow time for AAMVA to share the relevant information with the states before seeking comments. At this juncture, AAMVA appears not to have any basis for concluding that the requirements of the Privacy Act have been met. And knowing that the federal government has recently struggled to comply with the Privacy Act (*see, e.g.*, *League of Women Voters*, 2026 WL 1784297, at *21), we have serious concerns about FMCSA's compliance with the Privacy Act, as well as other federal privacy statutes.

## IV. AAMVA's Proposed Disclosure Would Violate State Law.

AAMVA's proposed bulk disclosure to FMCSA would also violate California law that AAMVA explicitly agreed to follow in its contract with the California DMV. Agreement, Ex. B at 1. This includes the Information Practices Act, the Vehicle

Code, and other state law provisions designed to protect the confidentiality of personal information contained in the pointer records.

The California Information Practices Act ("IPA," California Civil Code § 1798 et seq.) strictly prohibits the disclosure of personal information by state agencies, including the California DMV, subject to limited exceptions. California Civil Code § 1798.1. For purposes of the IPA, "personal information" means "any information that is maintained by an agency that identifies or describes an individual, including, but not limited to, the individual's name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history." California Civil Code § 1798.3(a).

Among other types of limited disclosure that the IPA permits, "[a]n agency shall not disclose any personal information in a manner that would link the information disclosed to the individual to whom it pertains unless the information is disclosed . . . [t]o a person, or to another agency if the transfer is necessary for the transferee agency to perform its constitutional or statutory duties, and the use is compatible with a purpose for which the information was collected and the use or transfer is in accordance with Section 1798.25." California Civil Code § 1798.24(e). Disclosure is also permitted "[t]o a governmental entity if required by state or federal law." California Civ il Code § 1798.24 (f).

FMCSA's stated purposes for collecting this data are so vague that the California DMV cannot determine whether the data would be used for some permissible purpose. Moreover, AAMVA's contract with the California DMV specifically limits the disclosure and use of the CDLIS database. A bulk disclosure to FMCSA, and not strictly tailored for the use for which the California DMV permitted disclosure to the AAMVA, would violate not only the DPPA but California's IPA.

California Government Code § 11015.5 likewise prohibits the transfer of personal information to private entities and other agencies unless permitted by the IPA. Cal. Gov. Code § 11015.5(b) (A state agency shall not distribute or sell any electronically collected personal information about users to any third party without prior written permission from the user, except as required to investigate possible violations of Section 502 of the Penal Code or as authorized under the Information Practices Act.).

In addition, the California Vehicle Code contains numerous privacy protections that AAMVA's proposed wholesale dissemination would violate. For example,

California Vehicle Code § 1808.47 explicitly states that "[n]o agent shall obtain or use any confidential or restricted records for any purpose other than the reason the information was requested." California Vehicle Code § 1808.47.

Other Vehicle Code provisions state that records received by the department to prove residence, identity, or lawful presence are not public records and cannot be disclosed except in limited circumstances (e.g., in response to subpoena for individual records in a criminal proceeding or court order, or in response to law enforcement request to address an urgent health or safety need). See, e.g., Cal. Veh. Code § 12801.9(j) and (k); 12800.7. Even then, the records cannot be produced unless "the law enforcement agency certifies in writing the specific circumstances that do not permit authorities time to obtain a court order." Cal. Veh. Code § 12800.7(b).

***

For all of these reasons, the California DMV directs AAMVA not to disclose the California DMV's data to FMCSA, and urges AAMVA to respect the contractual and other legal rights of state licensing agencies that reach a similar conclusion, not to mention the rights of the 17 million affected individuals. Acquiescence to FMCSA's unprecedented demand would not only violate the parties' contract and various laws, as described above, but would also breach the trust that exists between our organizations, which have worked together productively for many years. More importantly, it would erode the public's trust in the nation's motor vehicle licensing programs.

As requested above, by August 6, 2026, please confirm, in writing, that AAMVA does not intend to disclose bulk California DMV information to FMCSA, and will provide the California DMV with at least five business days' notice if that intention changes. If AAMVA cannot provide such assurances, please provide the California DMV with a written explanation of AAMVA's intended response to FMCSA's request by August 6. If we do not receive any response by August 6, we will interpret AAMVA's silence as a concession that it has decided to imminently disclose the California DMV's bulk data in violation of its contract with the California DMV and the federal and state laws described above.

In addition to your written response, we would appreciate the opportunity to meet with representatives from AAMVA to further discuss these issues. Our team can be available at your earliest convenience. In the meantime, please do not hesitate to reach out with any questions.

Sincerely,

STEVE GORDON, Director
Department of Motor Vehicles