**IN THE UNITED STATES DISTRICT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-2547 (AJT/IDD) |

**FEDERAL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

BENJAMIN T. HAYES
Senior Counsel to the Assistant Attorney General
Civil Division

NOAH T. KATZEN
Assistant Branch Director

EITAN R. SIRKOVICH
(D.C. Bar No. 90030102)
WILLIAM S. JANKOWSKI
(D.C. Bar No. 90021524)
LINDSEY GILMAN
(AZ Bar No. 034003)
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20005
Tel. (202) 353-5525
Eitan.r.sirkovich@usdoj.gov

TODD BLANCHE
United States Attorney General

THEOPHANI K. STAMOS
First Assistant United States Attorney

MATTHEW J. MEZGER
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3731
Fax: (703) 299-3983
Email: Matthew.Mezger@usdoj.gov

*Counsel for Federal Defendants*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

BACKGROUND ........................................................................ 2

A. The Commercial Motor Vehicle Safety Act ........................................................................ 2

B. Privacy Statutes ........................................................................ 4

C. Factual Allegations ........................................................................ 6

LEGAL STANDARD ........................................................................ 8

ARGUMENT ........................................................................ 9

I. Plaintiffs Are Not Likely to Succeed on the Merits. ........................................................................ 9

A. The Court Lacks Subject-Matter Jurisdiction. ........................................................................ 9

1. The August 11 Letter is not final agency action. ........................................................................ 10

2. Alternatively, if the August 11 Letter is a final order, the Hobbs Act bars district-court review. ........................................................................ 12

B. Plaintiffs Cannot Circumvent the Remedial Schemes Provided by the Privacy Act and DPPA Through an APA Challenge. ........................................................................ 13

C. Plaintiffs' APA Claims Are Not Likely to Succeed. ........................................................................ 15

1. The August 11 Letter does not violate the CMVSA's consultation requirement. ........................................................................ 15

2. FMCSA's request does not violate the Driver's Privacy Protection Act. ........................................................................ 16

3. FMCSA's request does not violate the Privacy Act. ........................................................................ 18

4. Issuance of the August 11 Letter was not arbitrary and capricious. ........................................................................ 20

D. Plaintiffs' Spending Clause Claim Is Not Likely to Succeed. ........................................................................ 25

II. Plaintiffs Fail to Satisfy the Demanding Irreparable-Harm Standard. ........................................................................ 27

III. The Balance of the Equities and Public Interest Do Not Favor Plaintiffs. ........................................................................ 29

CONCLUSION ........................................................................ 30

## INTRODUCTION

The Federal Motor Carrier Safety Administration (FMCSA) contracts with the American Association of Motor Vehicle Administrators (AAMVA) to maintain a consolidated, nationwide database of commercial-driver information. Both the contract and the governing statute recognize that FMCSA has the right to obtain information from that database. Exercising that right, FMCSA has asked AAMVA to provide information about commercial drivers. Plaintiffs, a coalition of States and the District of Columbia, seek a temporary restraining order to block FMCSA from obtaining information it is lawfully entitled to. The Court should decline that invitation.

*First*, the Court lacks subject matter jurisdiction. FMCSA's request to AAMVA is not a "final agency action" subject to review under the Administrative Procedure Act. The request does not consummate an agency decisionmaking process, but merely contemplates future agency action. Nor does it determine rights or obligations or have any legal consequence. Conversely, if FMCSA's request somehow *were* final agency action, it would be a "final order" under "chapter 313" of "title 49," and thus subject to the "exclusive" jurisdiction of courts of appeals under the Hobbs Act. Even if Plaintiffs could escape the horns of that dilemma (they cannot), their Privacy Act and Driver's Privacy Protection Act (DPPA) claims are not reviewable under the APA.

*Second*, even apart from these jurisdictional and review hurdles, Plaintiffs are unlikely to succeed on the merits. The governing statute permits the agency to promulgate a policy governing access to information in the database. The policy preserves the agency's right to obtain information from AAMVA, as well as its ability to share that information with other federal agencies pursuing law enforcement investigations. That right is expressly reserved in FMCSA's contract with AAMVA. Contrary to Plaintiffs' contentions, the governing statute did not require FMCSA to consult with Plaintiffs before requesting information. Nor does that request—or FMCSA's

intention to share information with the Department of Homeland Security (DHS)—violate the Privacy Act, DPPA, or the Spending Clause of the Constitution. And far from being arbitrary and capricious, FMCSA's request was reasonable and reasonably explained to AAMVA.

*Third*, Plaintiffs fail to satisfy their burden on irreparable harm, the balance of equities, and the public interest. If AAMVA complies with FMCSA's request, the federal government will honor applicable privacy protections, and the States offer no reason to think otherwise. And it is, at this point, speculative what harm (if any) the States will suffer if AAMVA does not provide the requested information. Plaintiffs have therefore failed to demonstrate any irreparable harm. But even if they satisfy that threshold requirement, any irreparable harm is plainly insufficient to outweigh the equities and public interest favoring FMCSA's data request.

## BACKGROUND

### A. The Commercial Motor Vehicle Safety Act

The Commercial Motor Vehicle Safety Act of 1986 (CMVSA), as amended, established the Commercial Driver's License Information System (CDLIS) and tasked the Secretary of Transportation with the maintenance of that system to "serve as a clearinghouse and depository of information about the licensing, identification, and disqualification of operators of commercial motor vehicles." 49 U.S.C. § 31309(a); *see also* Commercial Driver's License (CDL) Standards; Incorporation by Reference of a New State Procedures Manual (SPM), 89 Fed. Reg. 50235, 50237 (June 13, 2024). The Act requires the Secretary[1] to "consult with the States in carrying out" the provision establishing CDLIS. 49 U.S.C. § 31309(a).

---

[1] For the purposes of this brief, the Federal Defendants—the Secretary of Transportation, Department of Transportation ("DOT"), the Administrator of FMCSA, and FMCSA—are each referenced according to the specific statutory, regulatory, or record source cited in each relevant portion of the brief. Ultimately, though, those terms are interchangeable throughout, as the FMCSA and its Administrator—as an agency of DOT and direct report to the Secretary,

The CMVSA outlines certain categories of information CDLIS must include for "each operator of a commercial motor vehicle," like an operator's name, address, and physical description; his social security number; and information about any prior revocations, suspensions, or cancellations of the operator's right to operate commercial motor vehicles by any State. *See id.* § 31309(b)(1). To avoid a funding penalty, States must share certain information on an ongoing basis with CDLIS. *See* 49 U.S.C. § 31314(c). And States must also comply with certain other participation requirements, like a requirement to notify CDLIS of license issuances, *id.* § 31311(a)(5), and license suspensions, revocations, or cancellations, *id.* § 31311(a)(8).

The CMVSA directs the Secretary to develop an information policy and ensure that information in CDLIS "shall be made available and subject to review and correction in accordance" with that policy. 49 U.S.C. §§ 31106(e), 31309(c). DOT has developed such a policy, which reiterates the original CMVSA's understanding that there were "four entities authorized to access information from CDLIS. These entities were the Secretary of Transportation, the States, an employer or prospective employer of a person who operates a commercial motor vehicle (CMV), and a person who operates a CMV for an employer that owns or leases a CMV or assigns employees to operate a CMV." Policy on Availability of Information from the Commercial Driver's License Information System, 70 Fed. Reg. 2454, 2455 (2005).[2] The policy further

---

respectively—exercise the Secretary's delegated authority. *See* 49 U.S.C. § 113(a), (c); *see also id.* § 113(f)(1) (explaining that the FMCSA Administrator shall carry out duties and powers vested in the Secretary by chapter 313 of title 49).

[2] Section 12007(e) of the original CMVSA stated, "Upon the request of the Secretary, the operator of the information system shall make available to the Secretary such information pertaining to the driving status and licensing of operators of commercial motor vehicles." Pub. L. No. 99-570, 100 Stat. 3207-177. "This provision remained in effect until Congress passed TEA-21 (Pub. L. 105-85) and revised the access provision through sections 4004(a) and 4011(d) (5) (codified at 49 U.S.C. 31106(e) and 31309(c), respectively). Sections 4004(a) and 4011(d)(5) of

provides that "another Federal agency may request access to information in CDLIS by written submission to FMCSA's Chief Safety Officer." *Id.* "In the request, the applicant must state the legal basis and the need for access to CDLIS." *Id.* "A Federal agency will be required to execute a Memorandum of Understanding (MOU) with the Department of Transportation and/or FMCSA before access to CDLIS data will be provided." *Id.* And, finally, the CMVSA obligates the Secretary to "establish and operate" certain "data analysis programs to support regulatory and enforcement activities" required under governing law. 49 U.S.C. § 31106(a)(1).

The CMVSA gives the Secretary the ability to "authorize a qualified entity," also referred to as an "authorized operator," to (1) operate, maintain, develop, modernize, and enhance CDLIS; (2) collect fees on the Secretary's behalf; and (3) use any fees collected. *Id.* § 31309(d). Since 1988, that entity has been AAMVA. *See* 89 Fed. Reg. at 50237. Article 7 of the presently operative agreement between FMCSA and AAMVA specifies that "[u]pon request, AAMVA shall make available . . . [t]o FMCSA: all information on all driver records, including non-CDL holders who operate CMVs." Defs.' Ex. A at 19–20. This provision of the agreement is "is guided by 49 USC § 31106 and all other applicable Federal statutes," which includes 49 U.S.C. § 31309, as well as the information access policy. *Id.* at 19.

**B. Privacy Statutes**

1. Other statutes regulate the maintenance and disclosure of certain sensitive information. DPPA prohibits "*State* department[s] of motor vehicles, and any officer, employee, or contractor thereof" from "knowingly disclos[ing] or otherwise mak[ing] available" personal information or highly restricted personal information as defined by the Act. 18 U.S.C. § 2721(a)

---

TEA-21 expanded CDLIS access by requiring the Secretary of Transportation to develop a policy on making information available from CDLIS." 70 Fed. Reg. at 2455.

(emphasis added). Furthermore, it specifically exempts disclosures made "[f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions." *Id.* § 2721(b)(1). DPPA separately makes it "unlawful for any person knowingly to obtain or disclose personal information" from a "motor vehicle record," but it exempts from that prohibition "any use" permitted under § 2721(b). *Id.* § 2722(a). As other courts have observed, the chief goal of DPPA was to prevent stalking and other crimes. *See, e.g.*, *Senne v. Village of Palatine*, 784 F.3d 444, 448 (7th Cir. 2015). The law's lead sponsor explained that it was not intended to be an impediment to the federal government's access to information, as it "authorizes unlimited access to personal information for courts, law enforcement, governmental agencies, and for other driver and automobile safety purposes." 140 Cong. Rec. H2522 (daily ed. Apr. 20, 1994) (statement of Rep. Jim Moran).

2. The Privacy Act provides that "[e]ach agency that maintains a system of records shall . . . publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records." 5 U.S.C. § 552a(e)(4). If the agency intends to publish the information, then it must issue the notice "at least 30 days prior . . . and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11). An agency is required to "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President." *Id.* § 552a(e)(1). An agency may disclose information "to another agency . . . for a civil or criminal law enforcement activities" or for any routine use identified in the systems of record notice (SORN). *Id.* § 552a(b)(3), (7).

As relevant here, FMCSA has an existing system of records named the Electronic Document Management System (EDMS), which (according to its SORN) covers "[a]ll operators

of interstate commercial motor vehicles, licensed or unlicensed." Privacy Act of 1974: System of Records, 71 Fed. Reg. 35727, 35727 (June 21, 2006). EDMS is used to store information related to FMCSA's business processes, including "the performance of compliance reviews and inspections on motor carrier operations and inspections of commercial motor vehicles, which may result in enforcement actions being taken against a motor carrier for failure to adhere to motor carrier laws and regulations." *Id*. at 35728. The categories of information contemplated for the SORN include but are not limited to carrier enforcement case documents, general carrier documents and compliance reviews, driver enforcement case documents, and administrative documents. *Id*. at 35727–28.

DOT has issued notice of routine uses applicable to "each system of records maintained by the Department of Transportation," including EDMS. Privacy Act of 1974; System of Records; Statement of General Routine Uses, 75 Fed. Reg. 82132, 82133 (Dec. 29, 2010). The first routine use permits disclosure to other federal agencies when DOT identifies records "indicat[ing] a violation or potential violation of law, whether civil, criminal or regulatory in nature" that a sister agency is responsible for enforcing. *Id*. The ninth routine use authorizes disclosure for another agency's "use in law enforcement activities, either civil or criminal, or to expose fraudulent claims, regardless of the stated purpose for the collection of the information in the system of records." *Id*. at 82134.

### C. Factual Allegations

On June 25, 2026, FMCSA asked AAMVA for information associated with each commercial driver's record within CDLIS for the last five years. *See* ECF No. 1-2 at 2; ECF No. 1 (Compl.) ¶ 80; *see also* Declaration of Thomas J. Liberatore ¶ 16 ("Liberatore Decl."). Specifically, under its authority to "conduct routine reviews and data analysis to oversee the

national [commercial driver's license (CDL)] program," FMCSA requested drivers' names, dates of birth, States of record, license numbers, and social security numbers (if available). *See* ECF No. 1-2 at 2; *see also* 49 U.S.C. § 31106(a)(1), (a)(3) (outlining DOT's responsibility to establish and maintain "data analysis capacity and programs" for, among others, CDLIS).

In response, AAMVA raised concerns about FMCSA's authority to request such records. *See* Compl. ¶ 82; *see also* ECF No. 1-2 at 3–4. After FMSCA explained that its request fell under the terms of the AAMVA's agreement with FMCSA, *see* ECF No. 1-2 at 5, and the DPPA and Privacy Act authorized access to the data at issue, *see id.* at 5, 9; *see also* Compl. ¶¶ 82–93, AAMVA expressed that it "intend[ed] to disclose the records in compliance with the applicable law," which it anticipated it could complete by "August 17," ECF No. 1-2 at 11. After receiving notice of this intention from AAMVA, the Plaintiff States informed AAMVA that they "oppos[ed] disclosure." *Id.* ¶ 98. AAMVA then rescinded its earlier commitment to provide FMCSA with the data the agency had requested. *See* ECF No. 1-2 at 14.

On August 11, FMCSA issued a letter to AAMVA, explaining that "States have no veto over the production of records that AAMVA is holding on DOT's behalf," records which "DOT has statutory authority and responsibility to maintain," and "are urgently needed for the federal government to help prevent fatal trucking accidents involving the many drivers to whom States have improperly issued [CDLs]." *Id.* at 21. In light of its responsibilities, FMCSA told AAMVA that DHS would reissue a subpoena for the records that it previously withdrew, and that, "[u]nless AAMVA provides DOT with the requested records by August 17, DOT will pursue all available options to secure production, including canceling AAMVA's grants, filing an enforcement action to enforce the subpoena, and considering terminating its contract with AAMVA." *Id.* The letter

states that if AAMVA does not "reconsider its position," "DOT will pursue all available options to obtain the records to which it is entitled." *Id.* at 22.

Plaintiffs filed suit two days later, *see* Compl., seeking a temporary restraining order and asking to enjoin the Federal Defendants from "demanding" data from Plaintiffs or from taking any action to implement or enforce that "demand." *See* ECF No. 2. Plaintiffs raise claims under the APA, *i.e.*, that the Federal Defendants' actions were contrary to law because they violate a consultation requirement in the CMVSA, violate the DPPA, and violate the Privacy Act, *see* ECF No. 3 (TRO Br.) at 12–18; that the Federal Defendants' actions were arbitrary and capricious under the APA, *id.* at 18–21; and that the Federal Defendants' actions violated the Spending Clause, *id.* at 21–22. That same day, the Court entered an "administrative stay" ordering AAMVA not to provide the requested data and information and directing the Federal Defendants from taking any adverse action to implement or enforce that request. ECF No. 25.

## LEGAL STANDARD

To obtain a temporary restraining order, a plaintiff must show (1) likelihood of success on the merits; (2) irreparable harm in the absence of injunctive relief; (3) that the balance of equities tip in the plaintiff's favor; and (4) that the issuance of preliminary injunctive relief is in the public interest. *See Sarmiento v. Perry*, 824 F. Supp. 3d 514, 523–24 (E.D. Va. 2026) (Trenga, J.); *HIAS, Inc. v. Trump*, 985 F.3d 309, 318–19 (4th Cir. 2021); *see also Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) (Trenga, J.) ("The standard for granting either a TRO or a preliminary injunction is the same." (citation omitted)). The balance of equities and public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Preliminary injunctive relief is an "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted). The bar to

obtain such relief is high—temporary restraining orders and preliminary injunctions are "the exception," not "the rule." *Id.* at 690.

Plaintiffs suggest that they need only have a "[s]erious" merits argument to meet their burden on the first *Winter* factor. TRO Br. 11. That is wrong. *See Sarsour*, 245 F. Supp. 3d at 729 (explaining that the first *Winter* factor is "far stricter than" a "requirement that the plaintiff demonstrate only a grave or serious *question* for litigation") (emphasis in original) (quoting *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089 (2010)). On the "core substantive issue[s] of law," Plaintiffs must "establish a clear likelihood of success." *Id.* at 730. Anything less means that a temporary restraining order may not issue.

## ARGUMENT

### I. Plaintiffs Are Not Likely to Succeed on the Merits.

#### A. The Court Lacks Subject-Matter Jurisdiction.

Plaintiffs are not clearly likely to succeed on the merits because this Court lacks jurisdiction over any challenge to FMCSA's actions. Federal courts are courts of limited jurisdiction and "may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). The burden of establishing jurisdiction rests upon the party asserting it. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Plaintiffs cannot satisfy that burden for two alternative reasons. First, the APA does not authorize review of Plaintiffs' claims because the August 11 Letter (what Plaintiffs call "the Data Demand," Compl. ¶ 1) is not final agency action. Second, if the August 11 Letter *were* final agency action, it would mean this lawsuit falls under the courts of appeals' exclusive Hobbs Act jurisdiction.

***1. The August 11 Letter is not final agency action.***

The Court's review under the APA is limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Final agency action "is a term of art that does not include all" conduct by the agency. *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, 990 F.3d 834, 839 (4th Cir. 2021) (citation omitted). It refers only to an agency's "[final] *determination* of rights and obligations whether by rule, order, license, sanction, relief, or similar action." *Id.* (alterations in original) (citation omitted). And because the APA's waiver of sovereign immunity permits judicial review of "only" final agency actions, finality "is a jurisdictional requirement." *Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) (citation omitted); *see also Nat'l Veterans Legal Servs.*, 990 F.3d at 839; *Food Town Stores, Inc. v. Equal Emp. Opportunity Comm'n*, 708 F.2d 920, 922–23 (4th Cir. 1983).

The "core question" of finality is "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). To be "final," a plaintiff must show that the action at issue satisfies two conditions. *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the 'consummation' of the agency's decisionmaking process" and "must not be of a merely tentative or interlocutory nature." *Id.* at 177–78 (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)); *see also Biden v. Texas*, 597 U.S. 785, 808 (2022) (applying *Bennett*). The August 11 Letter meets neither requirement.

*First*, the letter is "tentative or interlocutory," *Bennett*, 520 U.S. at 178, because it merely expresses the possibility of *future* agency action *if* AAMVA does not provide the requested

information. Even then, FMCSA did not commit to any specific final action, instead stating that it would "pursue all available options to secure production, including canceling AAMVA's grants" and "considering terminating [the agency's] contract with AAMVA. TRO Br. 12. By definition, this promise to consider options *if* AAMVA doesn't change course did not "consummat[e]" the agency's decisionmaking process. *Bennett*, 520 U.S. at 178; *see also Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940, 944 (D.C. Cir. 2012) (holding that FDA warning letters do not constitute final agency action because they give "firms an opportunity to take voluntary and prompt corrective action *before* [the agency] initiates an enforcement action" (first alteration in original)); *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (defining a "nonfinal agency order" as one that "does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action"); *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (explaining that, to be "fit for judicial review," a claim should be presented in a "clean-cut and concrete form" that is "not dependent on future uncertainties or intervening agency rulings" (citations omitted)). Indeed, the record reflects that AAMVA has not yet consummated its *own* decisionmaking process—it told States that it would call a board meeting for August 14th at which it would "consider" its options. ECF No. 1-2 at 14. FMCSA's August 11 Letter did not terminate any contract; it did not cancel any grant. Some *future* agency action would need to occur for either one to happen, which means the August 11 Letter is not final agency action.

*Second*, and for the same reasons, the August 11 Letter did not determine any cognizable rights or obligations or produce any legal consequences. Like the warning letter found to be non-final in *Holistic Candlers*, the August 11 Letter is a "means of achieving prompt *voluntary* compliance" with the agency's request. 664 F.3d at 944. And it does not even contemplate *State*

compliance with the letter—it asks only that *AAMVA* provide information to the agency. The August 11 Letter, though strongly worded, is no binding legal "order compelling" Plaintiffs or AAMVA "to do anything." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003).

### ***2. Alternatively, if the August 11 Letter is a final order, the Hobbs Act bars district-court review.***

If, however, the letter *is* final agency action, then the Hobbs Act bars review of Plaintiffs' claims in this Court. The Hobbs Act grants the courts of appeals[3] "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity" of "all rules, regulations *or final orders*" of "the Secretary of Transportation issued" pursuant to "chapter 313" of "title 49." 28 U.S.C. § 2342(3)(A) (emphasis added). If the August 11 Letter satisfies the *Bennett* test, then it is necessarily a "final order" under the Hobbs Act. *See, e.g.*, *Honicker v. U.S. Nuclear Regul. Comm'n*, 590 F.2d 1207, 1209 (D.C. Cir. 1978) ("A 'final order' is one that imposes an obligation, denies a right, or fixes some legal relationship, usually at the consummation of an administrative process." (citation omitted)). It also would be issued pursuant to chapter 313 of title 49, which governs the Secretary of Transportation's maintenance of CDLIS, *see* 49 U.S.C. § 31309(a), (d), and outlines requirements for States' participation in CDLIS, *see id.* § 31311; *see also* ECF No. 1-2 at 21 (invoking 49 U.S.C. § 31309). So if the letter satisfies *Bennett*, then jurisdiction lies only in a court of appeals.

That is so regardless of whether Plaintiffs are "part[ies] aggrieved by the final order" permitted to file petitions for review. 28 U.S.C. § 2344; *cf. Nuclear Regul. Comm'n v. Texas*, 605

[3] The appropriate venue for such claims is the court of appeals where "the petitioner resides or has its principal office, or in the United States Court of Appeals for the District of Columbia Circuit." 28 U.S.C. § 2343.

U.S. 665, 675 (2025) (holding that individuals who are not parties to an agency proceeding may not obtain judicial review of the decision resulting from the proceeding). The court of appeals' jurisdiction is "exclusive" in *any* proceeding "to enjoin, set aside, suspend (in whole or in part), or to determine the validity" of a final order within its ambit. 28 U.S.C. § 2342. In limiting review to petitions filed by parties aggrieved, Congress "foreclosed review" to others. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984); *see also id.* at 349 ("In particular, at least when a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded.").

* * *

In short, no matter how the Court construes the August 11 Letter, the Court lacks jurisdiction to review it. "The issue of finality" leaves Plaintiffs "somewhere between Scylla and Charybdis." *Americopters, LLC v. Fed. Aviation Admin.*, 441 F.3d 726, 735 (9th Cir. 2006). If the August 11 Letter is a "final order[]" under chapter 313 of title 49, then the Hobbs Act "preempts [this] court from considering" Plaintiffs' claims. *Id.* But if the letter is not a final order, then the APA "bars the district court from hearing the case for lack of jurisdiction." *Id.* Plaintiffs' claims may not proceed.

**B. Plaintiffs Cannot Circumvent the Remedial Schemes Provided by the Privacy Act and DPPA Through an APA Challenge.**

Even if the August 11 Letter were somehow both "final agency action" under the APA but not a "final order" subject to Hobbs Act jurisdiction, Plaintiffs cannot use the APA to assert their Privacy Act and DPPA claims. Each statute has its own distinct judicial review mechanism, limited to certain plaintiffs whose own privacy is at issue. The Privacy Act authorizes an "individual," defined as "a citizen of the United States or an alien lawfully admitted for permanent residence,"

to bring a civil action against the federal government to remedy violations. 5 U.S.C. § 552a(a)(2), (g). Similarly, DPPA authorizes an "individual to whom [unlawfully divulged] information pertains" to bring a civil action for damages against any responsible "person," defined as "an individual, organization or entity, but [] not includ[ing] a State or agency thereof." 18 U.S.C. §§ 2724, 2725(2).

Thus, both the Privacy Act and DPPA provide "other adequate remed[ies] in a court" for the appropriate plaintiff. 5 U.S.C. § 704; *see also Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175 (4th Cir. 2025) ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here."), *abrogated on other grounds by* 172 F.4th 361 (4th Cir. 2026). Plaintiff States are not the proper parties to challenge violations of either statute, and they cannot circumvent the applicable remedial schemes through an APA challenge. *Block*, 467 U.S. at 349 (holding that where a remedial scheme identifies the proper plaintiff, "judicial review . . . at the behest of other persons may be found to be impliedly precluded"); *see also* 5 U.S.C. § 701(a)(1) (providing that the APA waiver of sovereign immunity does not apply where "statutes preclude judicial review").

The States also fail to assert the type of harm the statutes envision giving rise to a cause of action because they do not allege their own privacy interests will be harmed. *See* TRO Br. at 24-25. The CDLIS information does not concern them, and they are not asserting a *parens patriae* theory of standing (nor could they against the federal government, *see Haaland v. Brackeen*, 599 U.S. 255, 295 (2023)). They are proceeding on the theory that their ownership interest in the information will be infringed (a dubious theory given that the pointer data belongs to AAMVA and is separate from the drivers' records supplied by the States), but such an injury does not come

within the "zone of interest" of either the Privacy Act or DPPA. Because Congress presumptively does not extend a cause of action to a plaintiff whose asserted interests do not "fall within the zone of interests protected by the law invoked," the States cannot proceed on claims of violations of either statute. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). And the zone of interest test applies "whether or not a statute is invoked under the APA." *Maryland v. U.S. Dep't of Agric.*, 770 F. Supp. 3d 779, 807 (D. Md. 2025).

**C. Plaintiffs' APA Claims Are Not Likely to Succeed.**

Jurisdiction aside, Plaintiffs' claims fail on the merits. Article 7 of FMCSA's contract with AAMVA unambiguously provides that, upon the agency's request, AAMVA "shall make available . . . all information on all driver records." Defs.' Ex. A at 19–20. The amended CMVSA, too, requires information in the information system to be "available and subject to review and correction in accordance with the policy developed under section 31106(e)." 49 U.S.C. § 31309(c). That authority confirms FMCSA's right of access. *See supra* Background. Plaintiffs dispute none of this, and their arguments that FMCSA's request is unlawful and arbitrary and capricious do not hold water.

***1. The August 11 Letter does not violate the CMVSA's consultation requirement.***

Notwithstanding FMCSA's clear entitlement to the CDLIS data, Plaintiffs argue FMCSA violated § 31309 by failing to consult with the States before requesting data. TRO Br. 12–14. That provision requires that the agency "consult with the States in carrying out this section." 49 U.S.C. § 31309. But the statutory authority for the policy that preserves the agency's access to data is located not in "this section," but in § 31106(e). In any event, merely requesting data is not, in any rational sense, "carrying out" § 31309. Even Plaintiffs admit that § 31309's consultation requirement is reserved for "significant changes concerning CDLIS." TRO Br. at 12. In other

words, FMCSA is not required to consult with the States before taking such mundane acts as communicating with its authorized operator, AAMVA, or accessing the CDLIS database. Far from a "dramatic alteration" to FMCSA's statutory role, TRO Br. at 13, Congress always envisioned FMCSA would be able to access the information it is responsible for maintaining. *See supra* Background (citing 49 U.S.C. § 31309(c), 49 U.S.C. § 31106(e), and 70 Fed. Reg. 2454).

***2. FMCSA's request does not violate the Driver's Privacy Protection Act.***

Nor, contrary to Plaintiffs' view (TRO Br. 14–16), does DPPA prohibit the agency from accessing CDLIS data. DPPA's prohibition applies to "any person," *see* 18 U.S.C. § 2722, but there is a "longstanding interpretive presumption that 'person' does not include the sovereign." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000); *see Al Fayed v. CIA*, 229 F.3d 272, 274 (D.C. Cir. 2000) ("[T]he [Supreme] Court has repeatedly held that the word 'person' in a statute does not include a sovereign government absent affirmative evidence of such an inclusory intent."). There is no such evidence here. To the contrary, DPPA's lead sponsor explained that the Act was intended to authorize "unlimited access to personal information for . . . governmental agencies," 140 Cong. Rec. H2522 (daily ed. Apr. 20, 1994) (statement of Rep. Jim Moran).

In any event, the statute reinforces the agency's right of access by specifically allowing disclosure "[f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions." 18 U.S.C. § 2721(b)(1). This exception notably applies regardless of whether the data is personal information or highly restricted personal information, which the DPPA affords greater protections. *Id.* § 2721(a)(2).

While the Supreme Court has cautioned that the DPPA exceptions must be construed narrowly, the disclosures challenged here are of the kind Congress has "clear[ly] and explicit[ly]" permitted. *Maracich v. Spears*, 570 U.S. 48, 60, 64 (2013). FMSCA is plainly a "government agency," and it has expressed that its purpose in requesting the data is to assist "in carrying out its functions," 18 U.S.C. § 2721(b)(1), namely, "FMCSA intends to use this data to execute its statutory safety and regulatory mandates under 49 U.S.C. Chapters 311 and 313, including verifying Commercial Driver's License (CDL) validity and conducting motor carrier safety assessments." ECF No. 1-2 at 9; *see also* Liberatore Decl. ¶¶ 17–19. FMSCA's reliance upon Section 2721(b)(1) employs a natural reading of the exception and does not contort its language to "operate to the farthest reach of [the exception's] linguistic possibilities" in "contraven[tion] [of] the statutory design." *Maracich*, 570 U.S. at 60.

The DPPA does not require a more exacting inquiry into how the agency intends to use each individual datapoint it obtains. *Contra* TRO Br. 15. Even under the Seventh Circuit approach that Plaintiffs invoke, the existence of "a number of permissible uses of the personal information" is sufficient to satisfy the government-use exception. *Senne*, 784 F.3d at 446. That approach does not require that the government pair each individual piece of data obtained to a particular one of those specified uses. To the contrary, in *Senne* "the personal information collected by [a government agency] was 'for use' in connection with the [agency's] duties, *whether or not each item of information . . . would ever be used*." *Id.* at 447 (emphasis added). Once FMCSA establishes it has a use in carrying out its functions, moreover, the inquiry is at its end; contrary to Plaintiffs' view, *see* TRO Br. at 16, there is no statutory basis for limiting FMCSA to carrying out only its functions that do not *also* overlap with another agency's functions, *see* 18 U.S.C. § 2721(b)(1).

### *3. FMCSA's request does not violate the Privacy Act.*

Next, Plaintiffs accuse FMCSA of violating three types of "core privacy protections in the Privacy Act." TRO Br. 17. Not so.

*First*, contrary to Plaintiffs' contentions, the FMCSA has not violated "notice requirements for creating or modifying 'systems of records.'" TRO Br. 17; *see* 5 U.S.C. § 552a(a)(5), (e)(4), (e)(11), (r). The records FMCSA has requested from AAMVA are covered by FMCSA's existing system of records, EDMS, which covers "[a]ll operators of interstate commercial motor vehicles, licensed or unlicensed." 71 Fed. Reg. at 35727. The CDLIS data naturally belongs in EDMS, as it concerns the "licensing, identification, and disqualification of operators of commercial motor vehicles." 49 U.S.C. § 31309(a). FMCSA has already issued notice of the existence of EDMS, its purpose, the information it may contain, its routine uses, and other details required by § 552a(e)(4). Therefore, the Privacy Act's notice requirements for a system of records have been met. *See id*.

*Second*, as the Liberatore Declaration explains, FMCSA's data request satisfies the Privacy Act's requirement that it "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President." 5 U.S.C. 552a(e)(1). Statutorily, FMCSA is bound by the CMVSA, which mandates that the agency "establish and enforce uniform, minimum federal standards for State CDL programs for testing and ensuring the fitness of commercial drivers. 49 U.S.C. § 31301 *et seq*." Liberatore Decl. ¶ 9. These obligations require FMCSA to guarantee that each State issues CDLs to the "same rigorous safety standards." *Id*. ¶ 11. Without access to CDL data, FMCSA is materially hindered in its statutory obligation to conduct oversight of States' CDL issuance and prevent the regulatory CDL framework from fracturing into national dis-uniformity. *See id*. ¶ 17.

Furthermore, obtaining this data supports FMCSA's ongoing efforts to comply with Executive Order 14286, issued on April 28, 2025, which explicitly directed FMCSA to "review non-domiciled [CDLs] issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities." *Id.* ¶ 19. Ultimately, centralized access to this data "will facilitate the Agency's review of State non-domiciled CDL issuance records, assist the Agency in evaluating the efficacy of Federal oversight, and support the Agency's efforts to ensure that every driver permitted to operate an 80,000-pound commercial motor vehicle on the Nation's roadways is properly tested, licensed, and qualified." *Id.*

Acquiring and reviewing this CDL data is necessary because recent audits demonstrated that State-level issuance systems have broadly failed to meet federal standards. *Id.* ¶ 14. During the 2025 Annual Program Reviews, FMCSA uncovered widespread, systemic non-compliance, identifying more than 30 states that failed to adhere to non-domiciled CDL regulations. *Id.* This breakdown resulted in tens of thousands of improperly issued licenses, highlighted by staggering error rates of 53 percent in New York, 49 percent in Texas, and 25 percent in California. *Id.* Beyond non-domiciled credentials, FMCSA also possesses evidence demonstrating that numerous States have issued non-compliant standard CDLs as a result of their failure to regularly issue CDLS in accordance with the federal regulatory framework. *Id.* Consequently, maintaining centralized access to CDL data is "critical for FMCSA to verify regulatory compliance, correct systemic errors, and fulfill its statutory duty to protect the traveling public." *Id.* ¶ 20.

*Third*, the Privacy Act authorizes, rather than prohibits, FMCSA's intention to share the CDL data with DHS. The Privacy Act permits disclosure of covered records to another federal agency for a published routine use of the system or "for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a

written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought." 5 U.S.C. 552a(b)(7). Both requirements are satisfied here. Possible data sharing with DHS falls under two of the DOT-wide routine uses applicable to EDMS, which permit disclosure to other agencies when the information "indicates a violation or potential violation of law," including immigration laws, as well as when its "for use in law enforcement activities," also including immigration enforcement. 75 Fed. Reg. at 82133–34. Even if these routine uses had not already been publicized, however, the exception for civil or criminal law enforcement would readily apply to data sharing with DHS for immigration enforcement.

Plaintiffs counter that the Privacy Act describes sharing the "specific portion" of information requested by a sister agency, which they believe forbids "bulk transfers." TRO Br. 18. The objection is irrelevant because FMCSA has not initiated a "bulk transfer" of information to DHS. It is also wrong. The Privacy Act says nothing about "bulk transfers." It requires only a request "specifying the particular portion desired." 5 U.S.C. § 552a(b). Even if DHS were to request all the CDLIS data from FMCSA, that dataset is undoubtedly a "specific portion" of the entire EDMS dataset. And at a minimum, nothing in the Privacy Act would prevent DOT from transferring records to DHS about individuals who are not lawfully present, as such records are not subject to the Privacy Act. 5 U.S.C. § 552a(a)(2) (covering records on an "individual," defined as "a citizen of the United States or an alien lawfully admitted for permanent residence").

***4. Issuance of the August 11 Letter was not arbitrary and capricious.***

Even considering that the August 11 Letter is not a final agency action and thus requires no express justification under the APA, *see supra* Section I.B.1, FMCSA rationally explained why it had chosen to issue the August 11 Letter. And although Plaintiffs invoke the APA's requirement

that agency changes in policy must "display awareness" of any change in position, TRO Br. 19 (citation omitted), they identify no policy that the Federal Defendants actually changed upon issuing the August 11 Letter. Moreover, any change in policy—just like the actual basis for issuing the letter—was rationally explained. And the purported change did not implicate legitimate or reasonably held reliance interests.

The APA's arbitrary-and-capricious standard is "narrow," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), and "very deferential," *Bacardi & Co. v. Squires*, 179 F.4th 237, 244 (4th Cir. 2026) (citation omitted). Agencies must "offer a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Ohio v. EPA*, 603 U.S. 279, 292 (2024)). And, underscoring that deference, the APA requires courts to "uphold" an explanation, even of "less than ideal clarity," if the agency's "path may reasonably be discerned." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Indeed, a "court is not empowered" under the APA "to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 416.

Further, purported changes in agency policies need not be supported by "a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Indeed, at the threshold, a plaintiff must show that an agency actually "changed existing policy," which typically occurs only for agency positions made "express[]" in a "more formal setting." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 569 & n.5 (2025). And the reliance interests invoked must be "serious," *Fox Television*, 556 U.S. at 515, in that any asserted reliance on agency policy may not be "unreasonable," *Mozilla Corp. v. FCC*, 940 F.3d 1, 64 (D.C. Cir. 2019). Finally, although an agency explanation may not be wholly "pretextual," *Dep't of Com. v. New York*, 588 U.S. 752,

782 (2019), an adequately supported decision must be upheld even if "the agency might also have had other unstated reasons" for acting, *id.* at 781 (citing *Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1185–86 (10th Cir. 2014)).

The August 11 Letter provides a rational basis for requesting the data: DOT needs the requested data "to help prevent fatal trucking accidents involving the many drivers to whom States have improperly issued Commercial Driver's Licenses."[4] ECF No. 1-2 at 21. And numerous earlier communications underscore FMCSA's reasons for the request. FMCSA "conduct[s] routine reviews and data analysis to oversee the national [CDL] program." *Id.* at 2. It intends to use the data "as part of [its] statutory and regulatory oversight in [its] ongoing efforts to ensure the integrity and issuance of [CDLs] and Commercial Motor Vehicles (CMVs)." *Id.* at 5. And FMCSA further explained that, to execute its "statutory safety and regulatory mandates under 49 U.S.C. Chapters 311 and 313," it would use the requested data to "verify[] [CDL] validity and conduct[] motor carrier safety assessments." *Id.* at 9; *see also, e.g.*, 49 U.S.C. § 31305 (requiring agency to ensure that commercial drivers are fit to operate commercial motor vehicles); *id.* § 31310 (requiring agency to ensure that commercial drivers do not present safety risks). That reasoning provides ample basis—directly rooted in FMCSA's statutory authorities—to request the data at issue here.

To the extent that the Court finds that the contemporaneous communications between FMCSA and AAMVA fail to provide an adequate basis to support issuance of the August 11 Letter—a basis that, again, the agency was not required to provide, as the letter is not final agency action, *see supra* Section I.A.1—it may consider the Liberatore Declaration under APA review as "background information or evidence of whether all relevant factors were examined by an agency"

[4] Plaintiffs omit this record statement from their opening brief, arguing that the "sole explanations" FMCSA provided were "generic statements" related to FMCSA's statutory safety and regulatory mandates. TRO Br. 19.

because the declaration is "explanatory of the original record" and contains "no new rationalizations." *Roe v. Dep't of Def.*, 947 F.3d 207, 221 (4th Cir. 2020) (citation omitted). And as that declaration shows, FMCSA's asserted bases relate to the agency's responsibility to ensure that CDLs are validly issued, a responsibility that is itself tied to the agency's duty to ensure that commercial drivers are fit and properly trained to operate commercial motor vehicles, *see* 49 U.S.C. § 31305, and do not present significant safety risks, *see id.* § 31310. *See also* Liberatore Decl. ¶¶ 11, 14, 16–17, 19 (explaining that FMCSA is required to ensure that States comply with "rigorous safety standards" in issuing CDLs and that FMCSA "uncovered evidence of systemic, nationwide regulatory non-compliance by States in the issuance" of "non-domiciled" CDLs). FMCSA requested data from AAMVA specifically to ensure that States are complying with applicable regulations and to ensure that commercial drivers are "properly tested, licensed, and qualified." *Id.* ¶¶ 17, 19. And it seeks to use the requested data to correct "systemic errors" and to "fulfill its statutory duty to protect the traveling public." *Id.* ¶ 20. Indeed, it intends "to use the data to ensure that States issue [permits] and CDLs to drivers who are qualified, properly trained, and do not pose significant safety risk, and to assess whether significant safety incidents were caused by drivers who were improperly issued a [permit] or CDL." *Id.*¶ 17. Those rationales provide ample support for FMCSA's decision to issue the August 11 letter.

Plaintiffs next claim that FMCSA failed to "display awareness" of the agency's purported "dramatic change in policy," which Plaintiffs characterize as the demand for "[d]irect access" to the "entirety of the pointer records in CDLIS." TRO Br. 20. Tellingly, Plaintiffs point to no embodiment of any previous policy—presumably, a policy against direct access to the entirety of the pointer records in CDLIS—that they allege the Federal Defendants changed. *See id.* At most, they claim that FMCSA "has long acknowledged that CDLIS is not federal database and FMCSA

is not the owner of the data in CDLIS." TRO Br. 19-20. But FMCSA does not now contend otherwise—it merely asserts a right it has always had to request access to that data. Because there has been no change in policy,[5] the change-in-policy doctrine does not apply. *See Wage & White Lion*, 604 U.S. at 569–70, 569 n.5.

Moreover, even if the doctrine did apply, the purported reliance interests Plaintiffs identify—State and driver reliance on "the security and confidentiality of CDLIS records," TRO Br. 20—are not "legitimate" or reasonable. *Id.* at 585; *Mozilla*, 940 F.3d at 64. Specifically, if State Departments of Motor Vehicles understood that the federal government does not have "lawful authority to obtain the contents of CDLIS," ECF No. 3-3 ¶ 37–38 (Miles Decl.); *see also* ECF No. 3-18 ¶ 34–35 (Beuckens Decl.); ECF No. 3-13 ¶ 42–43 (Smith Decl.); ECF No. 3-21 ¶ 37–38 (Boardman Decl.), then that understanding contradicts the statutory scheme. As explained above, the amended CMVSA expressly contemplates that information in the system "be made available and subject to review" pursuant to agency policy, 49 U.S.C. § 31309(c), and that longstanding policy clearly permitted access by DOT and other federal agencies. *See supra* Background. To the extent the States genuinely relied on its erroneous belief that the federal government could not access CDLIS data, such reliance—which is founded on no provision of law or express policy that Plaintiffs identify—was not reasonable.

Finally, Plaintiffs assert that the August 11 Letter is arbitrary and capricious because its asserted basis is a pretext for "immigration enforcement purpose[s]." TRO Br. 20–21. Plaintiffs immediately undermine that theory by acknowledging that FMCSA expressly told AAMVA that it was coordinating with DHS—which undertakes immigration enforcement—with respect to its

[5] To the extent there is a relevant policy, it is the Policy on Availability of Information from the Commercial Driver's License Information System, 70 Fed. Reg. 2454, which FMCSA's actions are consistent with.

data request. *See id.* at 20 (citing ECF No. 1-2 at 14, 21). A stated basis is no pretext at all. Further, the mere fact that an agency might have multiple reasons to take an action is not a basis to reject the stated reasons. *See Dep't of Com.*, 588 U.S. at 781. Indeed, "a court may not set aside an agency's policy making decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Id.* Policymaking decisions are "routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *Id.* FMCSA had—and provided to AAMVA—a rational safety-related basis for issuing its letter. That suffices to defeat Plaintiffs' arbitrary-and-capricious claim.

**D. Plaintiffs' Spending Clause Claim Is Not Likely to Succeed.**

Plaintiffs are incorrect that the CDLIS statute fails to provide clear notice to States that the federal government might seek or have access to the information included in the CDLIS database. *Contra* TRO Br. 21. Again, § 31309(c) provides that "[i]nformation in the information system shall be made available and subject to review and correction in accordance with" a policy developed by the Secretary. 49 U.S.C. § 31309(c). And that policy expressly contemplates that the Secretary could obtain access to the information and that other federal agencies may "request access to information" upon executing a "Memorandum of Understanding" with either DOT or FMCSA. 70 Fed. Reg. at 2455. The States therefore had clear notice that DOT and FMCSA control dissemination of that information within the federal government.

That is all the Spending Clause requires. Congress "has broad power to set the terms on which it disburses federal money to the States." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Any conditions to States' acceptance or use of federal funds must be set out "unambiguously." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). That test asks whether States receive "clear notice" of the condition attached to the

funding they accept. *Id.* And the "plain" statutory language here, *id.* (citation omitted), communicates clearly that information in CDLIS "shall be made available" per the terms of a "policy," 49 U.S.C. § 31309(c), developed by the Secretary, *see id.* § 31106(e). Statutory text gets no more plain than that. *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) (noting it is "generally clear" that "shall" imposes a "mandatory duty").

Indeed, the interpretation of the law that States advance—that the "federal government's sole role is to maintain and administer a platform on which States can post their own records for the purposes of exchanging information with other States when evaluating CDL applications," TRO Br. 22, itself finds no support anywhere under the law. While § 31309(a) notes that CDLIS will "serve as a clearinghouse or depository of information," 49 U.S.C. § 31309(a), it nowhere suggests that the Secretary may not access that information or share it within the federal government. The law clearly contemplates the opposite: that information be "made available" pursuant to a policy the Secretary develops. *Id.* § 31309(c).

Underscoring that Federal Defendants' actions have not run afoul of any contrary provision in the CMVSA is the fact that FMCSA here requested "pointer[]" data from AAMVA, ECF No. 1-2 at 2—a request that falls exactly within the statutory provisions contemplating that FMCSA maintain access to information from CDLIS. As AAMVA made clear in its July 27 notice to States, "pointer" data refers only to those "Master Pointer Records" stored centrally with CDLIS. *Id.* at 19. The system "maintain[s] national oversight while protecting state sovereignty over driver records," which records are themselves "full[y] control[led]" by States. *Id.* The CMVSA clearly contemplates that FMCSA would have access to records—like pointer records—that are themselves stored centrally in CDLIS and are *not* under the control of States. *See* 49 U.S.C. § 31309(c). The Spending Clause is readily satisfied here.

## II. Plaintiffs Fail to Satisfy the Demanding Irreparable-Harm Standard.

A party seeking a preliminary injunction must demonstrate that that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 20). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent'" and that the harm "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (citations omitted). Courts may not issue injunctions "based only on a *possibility* of irreparable harm." *Winter*, 555 U.S. at 22 (emphasis added). Instead, a movant must demonstrate "that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original).

Plaintiffs have not established that they would be irreparably harmed if AAMVA honors FMSCA's request. The declarations from State Departments of Motor Vehicles broadly claim that States are being harmed because they would "lose control and oversight" over their confidential records. *E.g.*, ECF No. 3-13 ¶ 28 (Smith Decl.). But those declarations do not explain how that purported loss of oversight represents a *harm* to the States. Indeed, while the States insist that the data FMCSA has requested belongs to them, they overlook that FMCSA has requested only AAMVA's "pointer data," not the underlying driving records that the States have supplied to AAMVA. *See* ECF No. 1-2 at 19 ("CDLIS uses a 'pointer' system to maintain national oversight while protecting state sovereignty over driver records."). FMCSA has expressly assured that the requested data would be held within an established System of Records in accordance with the Privacy Act of 1974. ECF No. 1-2 at 9. Plaintiffs have made no showing that the requested data will be improperly disclosed or made public at all, let alone before litigation can be resolved. *See Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361, 374 (4th

Cir. 2026) (noting that the role of a preliminary injunction is to protect a plaintiff from suffering *further* irreparable harm during litigation) (emphasis added).

Nor do Plaintiffs' fears about a (lawful) disclosure to another federal agency change the analysis. Courts have "declined to find irreparable injury" from the disclosure of private information "where the challenged disclosure is not 'public,'" but instead is to a small number of "individuals obligated to keep [the information] confidential." *Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 121 (D.D.C. 2025). Under those circumstances, a court can fashion "adequate . . . corrective relief" after the fact or order those individuals to return or destroy the records. *Id.* (citation omitted). Because adequate relief would be available at a later date, such harms are not irreparable. *See Wis. Gas. Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

Nonetheless, Plaintiffs speculate that AAMVA's disclosure to FMCSA harms "public trust in Plaintiff States' handling of driver data" and will lead to reduced applications for driver's licenses. TRO Br. 25. But it is entirely speculative that the public would lose trust in States because AAMVA complied with a lawful request from a federal agency to share information. Nor is it clear why trust could not be restored if Plaintiffs ultimately prevail in this litigation.

Plaintiffs also fail to establish that they will suffer irreparable harm if AAMVA does *not* provide FMCSA access to CDLIS. The States' theories that they will lose all access to CDLIS or that the system will shut down imminently should AAMVA decline to produce the requested information, *see* TRO Br. 24–25, are speculative. Numerous intervening steps must occur before such a possibility might become sufficiently concrete. For one, the Federal Defendants must *actually* terminate AAMVA's grants and contracts. They have not done so. Nor have they

confirmed that they will do so imminently—or even at all. *See* ECF No. 1-2 (noting that FMCSA would "consider[] terminating its contract with AAMVA" at some date after August 17). And Plaintiffs provide no evidence that even an immediate termination of grants or contracts would *necessarily* result in an *immediate* shutdown of CDLIS. *See* TRO Br. 24–25 (asserting without support that FMCSA will "effectively shut down CDLIS"); Compl. ¶ 127 (same).

**III. The Balance of the Equities and Public Interest Do Not Favor Plaintiffs.**

Even if Plaintiffs could show likelihood of success and the merits and irreparable injury, the balance of equities and public interest tilt decisively against preliminary injunction. The public has an interest in ensuring that CDLs and Commercial License Permits are appropriately regulated and issued. Plaintiffs' requested relief would disrupt Federal Defendants' efforts to ensure the integrity and issuance of CDLs and Commercial License Permits, thus harming that interest. *See* Liberatore Decl. ¶ 17. Indeed, the CMVSA contemplates DOT will have access to information systems established under chapter 313 of title 49 for the express purpose of "evaluat[ing] the safety fitness of motor carriers and drivers" and "develop[ing] strategies to mitigate safety problems." 49 U.S.C. § 31106(a)(3)(B), (C). Limiting DOT's access will severely harm the public interest—as identified expressly in the CMVSA—in ensuring that the nation's roadways are safe for public use. That equity weighs strongly in the Federal Defendants' favor.

Further weighing against preliminary relief here is that FMCSA has no other means to assess State compliance with applicable statutory and regulatory requirements than to make an across-the-board request for all pointer records from AAMVA. Liberatore Decl. ¶ 18. CDLIS permits "bulk queries" of its data, but such queries require that FMCSA "input a driver's license number for each of the driver records FMCSA seeks to obtain." *Id.* "Because CDLs are issued by States, FMCSA does not have a list of corresponding numbers for each CDL in CDLIS, and thus

cannot perform a bulk query that would capture all relevant records." *Id.* FMCSA has the statutory obligation to ensure State compliance with commercial motor vehicle requirements and to protect the safety of the public on the nation's roadways. It has identified significant rates of State non-compliance with applicable legal requirements, *see id.* ¶ 14, which threatens public safety. And it has no other means to address those concerns. The balance of the equities and public interest weigh firmly in the Federal Defendants' favor.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiff's motion for a temporary restraining order.

Dated: August 17, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

BENJAMIN T. HAYES
Senior Counsel to the Assistant Attorney General
Civil Division

NOAH T. KATZEN
Assistant Branch Director

EITAN R. SIRKOVICH
(D.C. Bar No. 90030102)
WILLIAM S. JANKOWSKI
(D.C. Bar No. 90021524)
LINDSEY GILMAN
(AZ Bar No. 034003)
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20005
Tel. (202) 353-5525
Eitan.r.sirkovich@usdoj.gov

TODD BLANCHE
United States Attorney General

THEOPHANI K. STAMOS
First Assistant United States Attorney

/s/
MATTHEW J. MEZGER
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3741
Fax: (703) 299-3983
Email: Matthew.Mezger@usdoj.gov

*Counsel for Federal Defendants*