**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

STATE OF ILLINOIS, et al.,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, et al.,

*Defendants*.

No. 1:26-cv-2547

Hon. Anthony J. Trenga

# PLAINTIFF STATES' REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

Kwame Raoul
*Attorney General of Illinois*
Cara Hendrickson*
*Executive Deputy Attorney General*
Katharine Roller†
Paul Berks*
*Complex Litigation Counsels*
Gretchen Helfrich†
*Deputy Chief, Special Litigation Bureau*
Molly Mauck†
*Assistant Attorney General*
OFFICE OF THE ILLINOIS ATTORNEY GENERAL
115 South LaSalle St.
Chicago, IL 60603
312-814-3000

Counsel for the State of Illinois

** Pro hac vice forthcoming*
*† Admitted pro hac vice*

*Additional counsel in signature block*

Jay Jones
*Attorney General of Virginia*
Tillman J. Breckenridge (#85647)
*Solicitor General*
Megan C. Keenan (#102489)
*Deputy Solicitor General*
Counsel of Record
Mikaela A. Phillips (#97164)
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 786-1991
SolicitorGeneral@oag.state.va.us

Counsel for the Commonwealth of Virginia

August 19, 2026

## TABLE OF CONTENTS


Introduction .......... 1

Argument .......... 2

I. This Court Has Jurisdiction .......... 2

A. The Data Demand Is Final Agency Action. .......... 2

B. The Hobbs Act Does Not Deprive the Court of Jurisdiction. .......... 4

II. Plaintiff States Are Likely to Succeed on the Merits of Their APA Claims .......... 5

A. The Data Demand Violates the Statutory Consultation Requirement. .......... 5

B. The Data Demand Violates the DPPA and the Privacy Act .......... 6

1. Plaintiff States May Raise Claims Under the APA Challenging Violations of the DPPA and the Privacy Act. .......... 6

2. The Data Demand Violates the DPPA .......... 9

3. The Data Demand Violates the Privacy Act. .......... 11

C. The Data Demand Is Arbitrary and Capricious .......... 13

III. Plaintiff States Are Likely to Succeed on the Merits of Their Spending Clause Claim .......... 15

IV. Plaintiff States Are Likely to Succeed on Their Contract Claims .......... 17

V. Plaintiff States Satisfy the Test for Preliminary Relief .......... 18

A. Plaintiff States Face Irreparable Harm Absent a TRO .......... 18

B. The Equities and the Public Interest Favor Enjoining the Data Demand .......... 19

Conclusion .......... 20

For nearly forty years, FMCSA has carried out its mission by accessing pointer records in CDLIS one-by-one, as the need arises, just like the States and the employers of commercial drivers. *See* ECF No. 45 at 5 (hereinafter, DOT Opp.) (Page numbers of filed documents cited herein are from the ECF header.); ECF No. 46 at 3 (hereinafter, AAMVA Br.). Now FMCSA asserts that it cannot carry out that same mission without either swallowing the CDLIS database whole or shuttering it altogether: in either case, a drastic shift in an essential system the States and the public depend on to keep our roads safe. *See* DOT Opp. at 8–10; AAMVA Br. at 8.

In defense of its unprecedented demand for the sensitive personal information of 17 million drivers (the Data Demand), FMCSA argues that its own information policy and contract with Defendant the American Association of Motor Vehicle Administrators (AAMVA) grant it the right to "access" CDLIS records or require that they be "available" to FMCSA. DOT Opp. at 17. But that argument is a wolf in sheep's clothing: FMCSA pleads its right to "access" the States' records, when what it truly seeks is to possess them. Individual CDLIS pointer records are already "available" to FMCSA, as Plaintiff States noted in their opening brief and as FMCSA concedes; if that were all FMCSA sought, it would have no need to hold the States' ability to issue CDLs at gunpoint. And regardless, FMCSA's regulatory and contractual rights, if any, must give way to the express statutory and constitutional prohibitions that bar its extraordinary demand.

This court has jurisdiction to enjoin that demand. FMCSA's conduct in hounding AAMVA for nearly two months and threatening the shutdown of commercial driver licensing nationwide to get the data shows that there is nothing tentative or interlocutory about its decision. *See* ECF No. 1-2. Neither is the Data Demand a "rule[], regulation[], or final order[]" within the meaning of the Hobbs Act, 28 U.S.C. § 2342(3)(A), providing no "record for review" by a court of appeals.

Plaintiff States's APA claims are likely to succeed: Agency Defendants do not dispute that they failed to consult the States before seeking this wholesale change in CDLIS's operation; do not dispute that they will not, in fact, use all of the massive trove of data they have demanded, thus failing to qualify for an exception to the Driver's Privacy Protection Act (DPPA); mischaracterize a decades-old and unrelated internal system to claim that they have fulfilled the requirements of

the Privacy Act as to the unprecedented new system they seek to create; and cannot, even on their second try, present a reasonable, non-pretextual basis for upending 40 years of exclusive State ownership and AAMVA custody of CDLIS pointer records. Nor can Agency Defendants point to a clear statement putting Plaintiff States on notice that, by accepting federal highway funds, they were surrendering their commercial driver records to the federal government—not now, and certainly not when Plaintiff States first accepted the funds, as the Spending Clause requires. Finally, AAMVA does not dispute Plaintiff States' contract claims.

Plaintiff States' evidence of dire and irreparable harm is unrefuted; Agency Defendants argue that those harms are speculative but muster no contrary evidence to rebut the score of declarations outlining the severe costs to the States and public safety if CDLIS shuts down or if FMCSA expropriates 17 million sensitive State records. And FMCSA's claim that those records are its only means to carry out its statutory mission, despite having done so for nearly four decades *without* obtaining them, is simply not credible. The public interest in the federal government following the law—to say nothing of public safety and personal privacy—far outweighs such a flimsy justification. The Court should enjoin Agency Defendants, the Department of Homeland Security (DHS), and any other agencies acting in concert with them from pursuing the unlawful Data Demand, and enjoin AAMVA from producing data pursuant thereto.

## ARGUMENT

### I. This Court Has Jurisdiction

#### A. The Data Demand Is Final Agency Action.

The Data Demand is unquestionably final agency action. It is well-established that an agency action need not be in any particular form or observe any particular formalities to constitute "final agency action" under the APA. *Am. Fed. of State, Cnty. & Mun. Emps., AFL-CIO v. SSA*, 2025 WL 1249608, at *52 (4th Cir. Apr. 30, 2025) ("[T]he challenged agency action need not be formal action or reduced to writing."); *Her Majesty the Queen in Rt. of Ont. v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) ("absence of a formal statement of the agency's position . . . is not dispositive."); *Saliba v. SEC*, 47 F.4th 961, 967 (9th Cir. 2022) (finality is "interpreted in a

pragmatic and flexible manner" (citation omitted)).

Since June 25, 2026, FMCSA has repeatedly and aggressively demanded that AAMVA produce 17 million master pointer records (MPRs) stored in CDLIS, *see* ECF No. 3 at 9–12 (hereinafter, States' Br.); ECF No. 1-2, enforcing its demand with escalating threats to cut off AAMVA's federal contracts and funding. *See, e.g.*, ECF No. 1-2 at 11–12, 22. FMCSA also "coordinated" with DHS on its Data Demand—an aspect of this case that Agency Defendants barely mention—leading DHS to withdraw a subpoena based on AAMVA's initial willingness to provide the data to FMCSA. ECF No. 1-2 at 14. There is nothing "tentative or interlocutory" about the Data Demand, *contra* DOT Opp. at 12; FMCSA has clearly made up its mind. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). And, the Data Demand has "legal consequences," *id.*, whether AAMVA accedes or resists: either 17 million records will come under federal control, or FMCSA will effectively shut down CDL issuance nationwide. AAMVA Br. at 12–13.

FMCSA's arguments to the contrary are not persuasive. First, FMCSA declares that the Data Demand refers only to FMCSA's most recent letter to AAMVA, dated August 11, 2026. DOT Opp. at 12. But Plaintiff States' complaint and TRO motion expressly challenge FMCSA's demand for 17 million records and the implementing threats across FMCSA's correspondence and meetings with AAMVA, not any single instantiation of that demand. *See, e.g.*, ECF No. 1 ¶¶ 80–110 (recounting exchange of letters between FMCSA and AAMVA); ECF No. 1-2; States' Br. at 10 (referring to Data Demand in context of FMCSA's July 24, 2026 letter).

And even if the Data Demand were limited to the August 11 letter, FMCSA's argument still fails. For one thing, FMCSA never addresses the finality of the demand for data itself, thus waiving any argument that it is not a final agency action. *See Hagans v. Raimondo*, 2024 WL 2155022, at *3 n.3 (D. Md. May 13, 2024) (argument not meaningfully raised is waived). Instead, FMCSA focuses only on the threats it made in the August 11 letter, claiming that they "did not 'consummat[e]' the agency's decisionmaking process," because they "merely express the possibility of *future* agency action *if* AAMVA does not provide the requested information," and do not "commit to any specific final action" against AAMVA. DOT Opp. at 12–13. But in that

August 11 letter, FMCSA stated that, if AAMVA did not produce records, it would have "*no choice* but to take *immediate* action to secure the production of the requested pointer records," and it "*will pursue* all available options to secure production, including canceling AAMVA's grants," "filing an enforcement action to enforce the [DHS] subpoena," and "considering terminating its contract with AAMVA." ECF No. 1-2 at 21–22 (emphasis added). FMCSA's assertion that these threats were not the end of the decision-making process is not credible. Moreover, because both possible outcomes of the Data Demand have damaging legal consequences, this case is readily distinguishable from those cited by Agency Defendants, where the challenged action might have no legal consequences at all, depending on the plaintiffs' conduct. *See* DOT Opp. at 13.

**B. The Hobbs Act Does Not Deprive the Court of Jurisdiction.**

The Hobbs Act does not divest this Court of jurisdiction. That statute grants the court of appeals "exclusive jurisdiction" over challenges to three types of DOT actions: "rules, regulations, or final orders." 28 U.S.C. § 2342(3)(A). As the D.C. Circuit explained in *Weaver v. FMCSA*, these terms do not include every "activity . . . that qualifies as a 'final agency action.'" 744 F.3d 142, 146 (D.C. Cir. 2014). On the contrary, a different subsection of the Hobbs Act specifically withholds district-court jurisdiction over certain "final agency actions," 28 U.S.C. § 2342(7), making clear that the statute "contemplate[s] 'actions' . . . that are *not* rules, regulations or final orders." *Weaver*, 744 F.3d at 146 (emphasis in original). Furthermore, the words "rules" and "regulations" refer to "statement[s] of 'general or particular applicability and future effect,'" *id*. at 147 (quoting 5 U.S.C. § 551(4)), while "order" means the product of an "adjudication" in which the agency has "compiled a record with an eye toward judicial review." *Id*. These terms thus leave "a residue of agency action subject to initial review in the district court." *Id*. at 146; *see Silverado Stages, Inc. v. FMCSA*, 809 F.3d 1268, 1274 (D.C. Cir. 2016).[1]

Here, as in *Weaver* and *Silverado*, the challenged action does not constitute a "rule,

[1] Agency Defendants' cases do not suggest otherwise. *Honicker v. U.S. Nuclear Regul. Comm'n*, 590 F.2d 1207 (D.C. Cir. 1978), mentioned the "final order" language of the Hobbs Act in a single unreasoned sentence and has, in any event, been superseded by *Weaver* and *Silverado*. *Id.* at 1209. *Americopters, LLC v. FAA*, 441 F.3d 726 (9th Cir. 2006), meanwhile, does not address the Hobbs Act at all. *Id.* at 735.

regulation, or final order" subject to the jurisdiction-channeling provisions of the Hobbs Act. FMCSA's demand is plainly not a "rule" or "regulation," since it is not a statement of general applicability and future effect. And it is not a "final order," since FMCSA did not conduct any kind of adjudication or "compile[] a record with an eye toward judicial review." *Weaver*, 744 F.3d at 147. Indeed, the absence of anything like an administrative record would make direct review in the court of appeals a poor fit, as the court would have only a "bare" factual record before it and no means to collect factual information to conduct an "effective judicial review." *Id*. at 147–48.

## II. Plaintiff States Are Likely to Succeed on the Merits of Their APA Claims

### A. The Data Demand Violates the Statutory Consultation Requirement.

FMCSA does not dispute that it is required to "consult with the States" before taking steps to "carry[] out" the CDLIS statute. 49 U.S.C. § 31309(a). Nor does it dispute that it failed to engage in any such consultation here. *See* DOT Opp. at 17–18. Its sole argument is that, when it threatened to effectuate one of the most significant transformations of CDLIS in its history, FMCSA was "not, in any rational sense, 'carrying out' § 31309." DOT Opp. at 17.

That claim does not withstand scrutiny. Both of the actions FMCSA has threatened to take relied squarely on its authority under § 31309. FMCSA's authority to fund AAMVA and permit it to operate CDLIS rests on § 31309(d), which provides that "[t]he Secretary may authorize a qualified entity . . . to operate, maintain, develop, modernize, and enhance the information system." Likewise, FMCSA's authority to set rules governing the availability of information in CDLIS rests on § 31309(c), which provides that "[i]nformation in [CDLIS] shall be made available . . . in accordance with the policy developed under section 31106(e)." Agency Defendants' suggestion (DOT Opp. at 17) that "the statutory authority" for its policy comes exclusively from § 31106(e) is irreconcilable with this text, which contains the operative legal command ("shall be made available") and merely requires that access be granted "in accordance with" § 31106(e). More broadly, as Agency Defendants elsewhere concede, § 31309 "governs the Secretary of Transportation's maintenance of CDLIS." DOT Opp. at 14 (citing 49 U.S.C. § 31309(a), (d)).

Agency Defendants' assertion (DOT Opp. at 18) that its threats were too "mundane" to

require consultation is similarly unavailing. Canceling funding to AAMVA and thus shutting down CDLIS would be an act of massive significance to the States and the public. *See* AAMVA Br. at 12–13. And even accepting the premise that FMCSA can demand copies of every record in CDLIS—which Plaintiff States vigorously dispute—it is undisputed that FMCSA has never before done so, and that taking this step now would contravene numerous state contracts and upset the settled expectations of the States and their residents. *See* AAMVA Br. at 10–12. Regardless of whether FMCSA has statutory authorization or not, these are at minimum the types of matters on which consultation is required. And FMCSA has regularly consulted with the States on less consequential matters in the past. *See, e.g.*, 71 Fed. Reg. 25885, 25887 (May 2, 2006) (describing consultation with States in developing modernization plan); 52 Fed. Reg. 19792, 19792 (May 27, 1987) (describing "symposium with States to discuss aspects of system development" for CDLIS).

### B. The Data Demand Violates the DPPA and the Privacy Act

#### 1. Plaintiff States May Raise Claims Under the APA Challenging Violations of the DPPA and the Privacy Act.

Plaintiff States may raise claims under the APA predicated on violations of both the Privacy Act and the DPPA. The APA authorizes judicial review of agency action when "there is no other adequate remedy in a court." 5 U.S.C. § 704. Accordingly, the Supreme Court has long held that even when a statute does not itself provide a plaintiff with a cause of action, the plaintiff may generally obtain relief under the APA. *See, e.g.*, *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967) ("The mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others" (citation omitted)); *see also, e.g.*, *Bowen v. Massachusetts*, 487 U.S. 879, 904–05 (1988); *Chrysler Corp. v. Brown*, 441 U.S. 281, 317–18 (1979).

Applying this approach, the Fourth Circuit and other courts have repeatedly held that plaintiffs may raise APA claims challenging violations of the Privacy Act. The Fourth Circuit so held in *Doe v. Chao*, where it explained that if the federal government violates a provision of the Privacy Act that does not itself authorize equitable relief, it will "[o]ften" be the case that "injunctive relief for a Government's violation of the Act will instead be appropriate and

authorized by the APA"—as "was the case," the court added, "in the instant action." 435 F.3d 492, 504 & n.17 (4th Cir. 2006). The Supreme Court indicated that it agreed with that conclusion at a different stage of the same case. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004). And numerous other courts have reached the same conclusion. *See, e.g.*, *Doe v. Stephens*, 851 F.2d 1457, 1463, 1466–67 (D.C. Cir. 1988); *League of Women Voters v. DHS*, __ F.Supp.3d __, 2026 WL 1784297, at *21–23 (D.D.C. June 22, 2026); *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. DOL*, __ F.Supp.3d __, 2026 WL 879518, at *20 (D.D.C. Mar. 31, 2026). Agency Defendants' authorities do not suggest otherwise. They cite a single, vacated Fourth Circuit decision opining that "[i]t is not obvious" that the APA provides a cause of action for violations of the Privacy Act. *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175 (4th Cir. 2025). But the panel acknowledged the contrary precedent from the Fourth Circuit and the Supreme Court, expressly declined to rule on the question, and was later vacated by the en banc court for applying a flawed methodology. *See AFL-CIO v. SSA*, 172 F.4th 361 (4th Cir. 2026). That is hardly compelling authority.

Agency Defendants also suggest that the Privacy Act precludes review under the test set forth in *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984). That line of cases holds that the "'strong presumption' favoring judicial review of administrative action" is rebutted only when "a statute's language or structure demonstrate that Congress wanted an agency to police its own conduct." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (citing *Block*, 467 U.S. at 349 and *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)). The mere existence of a cause of action for other plaintiffs does not meet that standard. And "[i]t is hard to imagine Congress" intended to "render courts powerless to prevent an agency from systematically running roughshod over the rights the [Privacy] Act was promulgated to protect" when it "deliberately set out to prevent government abuses of an individual's privacy rights." *Doe v. Herman*, 1998 WL 34194937, at *6 (W.D. Va. Mar. 18, 1998).

For much the same reason, Plaintiff States can plainly bring APA claims challenging violations of the DPPA. Like the Privacy Act, the DPPA allows private plaintiffs to bring a cause of action for monetary damages, but it includes no language suggesting that claims for equitable

relief under the APA are barred. *See* 18 U.S.C. §§ 2723, 2724. Nor does it establish a scheme for administrative review that could sustain Defendants' "heavy burden" of showing that Congress "wanted an agency to police its own conduct." *Mach Mining*, 575 U.S. at 486.

Finally, Plaintiff States' claims fall within the zone of interests protected by both the Privacy Act and the DPPA. As the Supreme Court has repeatedly instructed, the zone-of-interests test "is not meant to be especially demanding," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987), and permits judicial review whenever "[t]he interest [the plaintiff] asserts [is] 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (citation omitted). The test "do[es] not require any 'indication of congressional purpose to benefit the would-be plaintiff,'" and "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* at 225 (citation omitted).

This lenient test is readily satisfied here for both statutes. Congress enacted the Privacy Act in the wake of Watergate-era abuses to safeguard the privacy rights of individuals. *AFL-CIO v. Dep't of Labor*, __ F. Supp. 3d __, 2026 WL 879518, at *1, *21 (D.D.C. Mar. 31, 2026). It also sought to rebuild trust in government institutions, with the legislative history showing deep concern over the "American people's loss of confidence in their Government," 120 Cong. Rec. S36897 (1974) (statement of Sen. Edmund Muskie), and an interest "in restoring confidence by the American people that Government is indeed responsive and sensitive to individual rights," 120 Cong. Rec. 36644 (1974) (statement of Rep. William Moorhead). Plaintiff States' interest in protecting their drivers' sensitive personal information and maintaining trust in their institutions at least "arguably" falls within the interests the Privacy Act is designed to protect.

For similar reasons, Plaintiff States' interests bear at least "a plausible relationship to the policies underlying" the DPPA. *Clarke*, 479 U.S. at 403. Congress enacted the DPPA for the purpose of "protecting an individual's right to privacy in his or her motor vehicle records." *Maracich v. Spears*, 570 U.S. 48, 60–61 (2013). It was particularly concerned with unconstrained

bulk productions of such data, which enabled harassment, threats, and unwanted solicitations. *Id.* at 57. And its drafters emphasized that they wanted to ensure "the exception for law enforcement use" did not create a "gaping loophole in the law," but would be limited to disclosures for "legitimate law enforcement functions." *Senne v. Vill. of Palatine*, 695 F.3d 597, 607–08 (7th Cir. 2012) (en banc). Plaintiff States' interests in preventing unconstrained disclosure of millions of personal records to FMCSA and DHS are at least "arguably" within the scope of those interests.

**2. The Data Demand Violates the DPPA**

The Data Demand violates the DPPA. That statute provides that "personal information" and "highly restricted personal information" drawn from motor vehicle records "may be disclosed" only if one of fourteen exceptions applies. 18 U.S.C. § 2721(b); *see id*. § 2721(a)(1)-(2), (c). The sole exception Agency Defendants invoke here—the government-use exception—permits information to be disclosed "[f]or *use* by any government agency . . . in carrying out its functions." *Id*. § 2721(b)(1) (emphasis added). As the en banc Seventh Circuit has explained, the plain meaning of this text permits disclosure only where each "particular piece of disclosed information is . . . used to effectuate" a government function. *Senne*, 695 F.3d at 606. FMCSA cannot satisfy that standard: it does not contend that "each particular piece of . . . information" in 17 million records will be "used" to carry out FMCSA's functions. States' Br. at 15.

Instead of attempting to satisfy that textual standard, Agency Defendants seek to rewrite it, claiming that it is enough that FMCSA's "purpose in requesting the data is to assist 'in carry[ing] out its functions," even if FMCSA will not actually use "each particular piece of data." DOT Opp. at 17. But the DPPA does not ask whether the agency had a valid motive for requesting the data in a general sense. It requires that the "personal information"—all of it—be "disclosed . . . [f]or use" in carrying out a government function. 18 U.S.C. § 2721(b)(1). In other words, "[e]ach distinct disclosure or use of personal information . . . must be permitted by the DPPA." *Maracich*, 570 U.S. at 74. FMCSA thus cannot lawfully obtain any piece of "personal information" that it will not actually "use" in carrying out its functions.

The Seventh Circuit's panel decision in *Senne* is not to the contrary. That opinion—which

followed the en banc court's remand—exhaustively detailed the unrebutted evidence the government presented as to how "'all of the disclosed information actually was used' in effectuating one of the permissible purposes" in the statute. *Senne v. Vill. of Palatine*, 784 F.3d 444, 446 (quoting *Senne*, 695 F.3d at 608)). In particular, the government demonstrated that each piece of information it disclosed on a person's parking ticket—including name, date of birth, sex, height, weight, and address—had "utility to the police" because its disclosure increased the likelihood the ticket would be paid, enabled police to match the car with its owner, and more. *Id*. at 446–47. Further, the court explained that disclosing all of this information served those functions even if, as the plaintiff claimed, the government did not ultimately use the information "on his parking ticket." *Id*. at 447.

Defendants have not made a comparable showing here. Their letters to AAMVA do not explain how FMCSA will "use" each of the data fields it has requested; unlike in *Senne*, for instance, it has not explained how the agency will derive utility from taking custody of a person's name or date of birth or social security number. Nor have Defendants explained how FMCSA will use all 17 million records, dating back five years. Even the agency's post hoc declaration sheds no light on these questions: it includes boilerplate about how the MPRs will allegedly help it fulfill its statutory functions, but does not explain how FMCSA will use the particular information demanded. *See* ECF No. 45-2 ¶¶ 16–20. Allowing a government entity to obtain vast stores of highly restricted information on such a feeble showing would "contravene the statutory design" and "undermine in a substantial way the DPPA's purpose of protecting an individual's right to privacy in his or her motor vehicle records." *Maracich*, 570 U.S. at 60–61.

Finally, Agency Defendants err in suggesting (DOT Opp. at 16) that the DPPA does not restrict disclosures to the federal government. The DPPA provides that an "authorized recipient" of personal information, such as AAMVA, may "redisclose the information only for a use permitted under subsection (b)." 18 U.S.C. § 2721(c). There is no exception to that rule for disclosures to the federal government; on the contrary, the government-use exception specifically constrains the disclosure of information to "*any* government agency," including "a *Federal*, state,

or local agency." *Id.* § 2721(b)(1) (emphases added). Agency Defendants' demand that AAMVA disclose information to FMCSA outside of the circumstances permitted by the government-use exception is therefore unlawful. And that demand is doubly unlawful because the federal officers and employees who would receive such records are unquestionably "persons" who may not "knowingly obtain" information "for any use not permitted under section 2721(b)." *Id.* § 2722(a); *see id.* § 2725(2) (defining "person" to include "an individual, organization, or entity").

**3. The Data Demand Violates the Privacy Act**

In their efforts to create a name-retrievable data bank of commercial drivers that they may share with DHS, Agency Defendants have also ignored several Privacy Act requirements, namely, (1) the Act's mandate that agencies publish a public notice when creating or modifying databases, 5 U.S.C. § 552a(e)(4); (2) the Act's direction that agencies maintain only personal information that is necessary to accomplish a mandatory agency function, *id.* § 552a(e)(1); and (3) the Act's restrictions on sharing information with other agencies, *id.* § 552a(b). Agency Defendants' efforts to explain away each of these requirements are unavailing.

First, FMCSA claims that it has satisfied the Privacy Act because MPRs "are covered by" an existing FMCSA system, namely, its "Electronic Document Management System" (or "EDMS"), which already has a published system of records notice ("SORN"). DOT Opp. at 18; *see* 71 Fed. Reg. 35727 (2006). But this is an untenable reading of the EDMS SORN: A SORN must, *inter alia*, describe the "categories of sources of records in the system" and the "categories of records maintained in the system." 5 U.S.C. § 552a(e)(4)(C), (I). In describing the sources and records in EDMS, the EDMS SORN makes clear that it was not intended to house millions of MPRs from an outside source like CDLIS. Indeed, it does not mention outside sources like AAMVA or the States: Unlike SORNs for other FMCSA systems of records, which explicitly state any external sources of data, *see, e.g.*, 78 Fed. Reg. 59082, 59085 (2013) (explaining that records are obtained from "crash reports submitted by state and local law enforcement"), the EDMS SORN states that all records in the database will come from a single source, namely, FMCSA. 71 Fed. Reg. at 35,728. And in describing the categories of records in the system, the EDMS SORN does

not describe CDLIS MPRs or other driver identity records. To the contrary, the SORN explains that, in addition to internal FMCSA documents, EDMS will store incident-specific FMCSA information about motor carriers, such as "crash reports," "safety audits," and "driver enforcement case documents" like "notice[s] of claim." 71 Fed. Reg. at 35727–28. Nothing alerted the public that EDMS would be used to host a third-party-sourced data bank of driver identifying information untethered to any incident-specific record, and under the Privacy Act, agencies cannot force the public to "to guess the [agency's] true intent." *Louis v. DOL*, 419 F.3d 970, 975 (9th Cir. 2005).

Second, Agency Defendants have not shown that they have met the Privacy Act's data-minimization requirement. 5 U.S.C. § 552a(e)(1). Agency Defendants complain that "[w]ithout access to CDL data, FMCSA is materially hindered" in its statutory functions. DOT Opp. at 18. But their focus on "access" is unavailing because FMCSA *already has* access to CDLIS MPRs. *See* AAMVA Br. at 8. And though Agency Defendants say that they need "bulk queries" of data for program reviews and to "assess whether significant safety incidents were caused by drivers who were improperly issued a CLP or CDL," ECF No. 45-2 ¶¶ 17–18, they do not explain why bulk data is suddenly "necessary" (5 U.S.C. § 552a(e)(1)) for these purposes, or why, for instance, FMCSA could not conduct reviews with sample data or access only specific drivers' information after "safety incidents" (ECF No. 45-2 ¶ 17).[2]

Third, Agency Defendants' efforts to circumvent the Privacy Act's limits on data disclosure are also wide of the mark. Agency Defendants argue that they can share CDLIS data with DHS under the Privacy Act's law-enforcement exemption. DOT Opp. at 19–20. But, by its own terms, that exemption requires the requesting agency to identify the "specific portion" of an individual record sought, 5 U.S.C. § 552a(b)(7), and not, as Agency Defendants suggest, the "'specific portion' of the entire . . . dataset." DOT Opp. at 22. Nor is their sharing of data with

[2] To the extent Agency Defendants claim that "systemic non-compliance" identified in 2025 audits excuses their unlawful demand (DOT Opp. at 21), that claim does not hold water, as previously explained by many of these Plaintiff States in *Rivera Lujan v. FMCSA*, Nos. 26-1032, 26-1046 (D.C. Cir.) ECF No. 2179896 (Brief of 21 States as *amici curiae*). In short, FMCSA's purported findings of "widespread noncompliance" are in fact based on (1) an expiration date requirement that FMCSA imposed *ex post*; (2) clerical errors; and (3) FMCSA's dissatisfaction with documentation provided for the reviews. *Id.* at 20–23.

DHS justified by two "general" routine uses that DOT has applied to all of its systems of record. *See* 75 Fed. Reg. 82132, 82132 (2010), because, as explained above, CDLIS data is not covered by any DOT system of record, such as EDMS.

Moreover, the DOT routine uses would not help FMCSA even if they did apply: The first (Routine Use 1) allows DOT to share records only where "a system of records" itself "indicates a violation or potential violation of law." 75 Fed. Reg. at 82133; *see Doe v. DiGenova*, 779 F.2d 74, 86 (D.C. Cir. 1985) (construing identical routine use and concluding that it "deals with referral of records to law enforcement officials only when the records themselves indicate a violation of law"). Nothing in Agency Defendants' (or DHS's) brief suggests that CDLIS MPRs, on their own, evidence violations of law. The second (Routine Use 9) allows DOT to disclose lists of names through "matching programs" "for use in law enforcement activities," but also requires that each disclosure be evaluated individually "on the basis of its purpose" to protect against "unrestricted access to systems of record for such law enforcement." 75 Fed. Reg. at 82134. Handing over an entire database to DHS is exactly the "unrestricted access" that Routine Use 9 sought to avoid.

### C. The Data Demand Is Arbitrary and Capricious

FMCSA's Data Demand is also arbitrary and capricious. As Plaintiff States explained, the agency failed to offer a reasoned explanation for its unprecedented demand, did not acknowledge (much less justify) its dramatic change in longstanding policy, and gave reasons that contradict the contemporaneous statements of DHS and its own staff. States' Br. at 20-23. Defendants offer no persuasive rebuttal to any of these points.

First, FMCSA failed to provide a "rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Assn. of U.S, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). In its series of escalating demand letters, FMCSA never explained why it suddenly required custody of 17 million MPRs to conduct its longstanding regulatory functions, when it had performed those functions for decades by accessing those records through CDLIS. States' Br. at 21. Nor did it explain why terminating AAMVA's funding—thus disabling the operation of CDLIS—was a rational response to AAMVA's refusal to accede to this

demand. *Id.* FMCSA's brief does nothing to rehabilitate its explanations: it simply regurgitates the agency's boilerplate citations of its statutory authority as a basis for the Data Demand, with no attempt to argue that the agency justified its unprecedented threat. DOT Opp. at 24.

Instead—and perhaps recognizing the inadequacy of FMCSA's explanations—Agency Defendants ask the Court to rely on a post hoc explanation contained in an agency declaration. DOT Opp. at 24–25. But it is "a foundational principle of administrative law that judicial review of agency actions is limited to the grounds that the agency invoked when it took the action." *DHS v. Regents of Univ. of Calif.*, 591 U.S. 1, 20 (2020) (citation modified); *see also Roe v. Dep't of Defense*, 947 F.3d 207, 220 (4th Cir. 2020). Although an agency may "elaborate later on the reason (or reasons)" for its decision, it "may not provide new ones" unless it "tak[es] new agency action." *Regents*, 591 U.S. at 21. The new explanations found in the Liberatore affidavit for why FMCSA requires custody of, rather than access to, the records are nowhere present in FMCSA's letters. ECF No. 45-2 ¶¶ 17–19. And that declaration still offers nothing to explain why the agency believed it rational to shut down CDLIS altogether.

Second, FMCSA failed to either acknowledge or explain its change in position. An agency that "change[s] existing policy" must "'display awareness that it *is* changing position,'" offer "'good reasons for the new policy,'" and take "serious reliance interests" into account. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 569–70 (2025) (quoting *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009)). It is undisputed that FMCSA "abandon[ed] a decades-old practice." *HMO La., Inc. v. HHS*, 179 F.4th 62, 71 (D.C. Cir. 2026) (citation omitted). "AAMVA had never before received a request like [the Data Demand]" nor faced any threat to cut off its funding. AAMVA Br. 7. The Data Demand also contradicted FMCSA's own repeated pronouncements that the "records in CDLIS are not controlled by FMCSA," 70 Fed. Reg. 2454, 2455 (Jan. 13, 2005), and that that they belong to the States. *See, e.g.*, 91 Fed. Reg. 28514, 28517 (May 18, 2026) (describing the MPRs as "owned by each state."). *Contra* ECF No. 1-2 at 21 (referring to these as "DOT's own records"). And as explained further below, FMCSA's information-access policy contradicted this novel approach. *See infra* p. 17.

Given that FMCSA changed policy, it was required to display awareness that it was changing position, explain the change, and consider reliance interests. It did none of those things. FMCSA has resolutely refused to acknowledge any change in practice. *See* DOT Opp. at 26 (claiming the Data Demand asserts a right FMCSA "has always had"). As noted above, FMCSA gave no reasoned explanation for its change. And it failed to consider the significant reliance interests of Plaintiff States on a system premised on record-specific access (not bulk transfer) of CDLIS data by FMCSA. Although Agency Defendants belittle those concerns, they are plainly reflected in, *inter alia*, the carefully crafted contracts between AAMVA and certain Plaintiff States, which show States' understanding that data in CDLIS will always remain their property. *E.g.*, ECF Nos. 1-5 at 13 ¶ B(1) (California contract); 1-10 at 17 ¶ 42(A) (Maine contract).

Finally, Agency Defendants fail to refute the pretextual nature of the Data Demand. In its letters to AAMVA, FMCSA repeatedly asserted that it was seeking the information to carry out its statutory functions under Title 49. *See* ECF No. 1-2 at 9, 21. FMCSA now admits that was false: a primary reason it seeks the information is to turn it over to DHS for immigration enforcement. DOT Opp. at 26–27. The fact that FMCSA staff eventually admitted to their "coordination" with DHS in informal communications with AAMVA did not adequately apprise AAMVA or anyone else of this true reason; an agency's explanation should be forthrightly stated in its decisional documents, not left to inference or deliberately obscured. And due entirely to FMCSA's own obfuscation, it is far from clear whether FMCSA's desire to aid DHS merely provided one of "multiple reasons" for the Data Demand, DOT Opp. at 27, or the dispositive reason why FMCSA sought the vast and unprecedented store of data it has threatened to shut down CDLIS to collect.

## III. Plaintiff States Are Likely to Succeed on the Merits of Their Spending Clause Claim

In addition to all of the reasons above, the Data Demand is unlawful because Agency Defendants have failed to identify any affirmative statutory authority that permits them to take custody of the records in CDLIS. As they recognize, participation in CDLIS is a prerequisite to the receipt of federal highway funding, and so any conditions on participation "must be set out 'unambiguously.'" DOT Opp. at 27 (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,

548 U.S. 291, 296 (2006)). Agency Defendants labor mightily to find language in the CDLIS statute, FMCSA's regulations, or its contract with AAMVA that put the States on "clear notice," *id.*, that they must grant the Secretary custody of their records as a condition of participation in CDLIS. But none of the authorities FMCSA cites grants it this extraordinary prerogative.

The CDLIS statute itself does not grant FMCSA the right to custody of the States' data. On the contrary, as Agency Defendants explain, that statute "task[s] the Secretary of Transportation with the maintenance of [CDLIS] to 'serve as a clearinghouse and depository of information.'" DOT Opp. at 4 (quoting 49 U.S.C. § 31309(a)). "[C]learinghouse" and "depository" describe an "intermediary" who "lack[s] ownership or control over the funds and property that they handle." AAMVA Br. at 9 (collecting authorities). The list of "requirements for State participation" similarly directs States to provide records to the "operator" of CDLIS solely for the purpose of conveying the information to other States. *See* 49 U.S.C. § 31311(a)(5), (7)–(8); States' Br. at 23. None of those provisions suggest that States must transfer their records to FMCSA.

Agency Defendants rely heavily on a provision of the CDLIS statute stating that information in CDLIS "shall be *made available* and subject to review and correction in accordance with the policy developed under section 31106(e)." 49 U.S.C. § 31309(c) (emphasis added); *see* DOT Opp. at 5, 26–28. But "made available" is most naturally read to refer to a right of *access* to State records, not a right to *obtain* those records. That reading is bolstered by the neighboring words, "review" and "correction," which refer to rights to view and suggest changes to—not assume custody of—State records. It is consistent with the way the term "available" is used elsewhere in the statute. *See, e.g.*, 49 U.S.C. § 31311(a)(18) (requiring that a record of traffic violations "shall be made available upon request to the individual, the Secretary, employers, prospective employers, State licensing and law enforcement agencies, and their authorized agents"); *id.* § 31311(a)(19) (requiring a State to "make available" a driving record "to all authorized persons and governmental entities having access to such record"). And it is consistent with the way Congress used the phrase "make available" in Section 31309(c)'s immediate predecessor, which instructed that the "operator" of CDLIS could "make available" information

in CDLIS to States, employees, employers, and the Secretary. Commercial Motor Vehicle Safety Act of 1986, Pub. L. No. 99-570, § 12007(e) (1986). This provision plainly did not grant every employer, employee, and State a right to take the States' records; rather, it granted them a right of access through CDLIS itself.

Furthermore, even if the Secretary could establish a policy entitling him to demand custody of the States' records, he has not done so. The policy that FMCSA has promulgated under Section 31309(c) nowhere mentions such an entitlement. To the contrary, it explicitly states that that "the records in CDLIS are *not* controlled by FMCSA." 70 Fed. Reg. 2454, 2455 (Jan. 13, 2005) (emphasis added); *see also* ECF No. 45-1 at 7 (same). The only right of access it grants is to other agencies, which "may request access to"—not custody of—"information in CDLIS by" making a written request. 70 Fed. Reg. at 2455. In addition, because this policy must "be consistent with existing Federal information laws," 49 U.S.C. § 31106(e)(1), it cannot (and does not purport to) supersede the limits on disclosure in the DPPA or the Privacy Act.

Finally, CDLIS's contract with AAMVA also does not place the States on clear notice that FMCSA can take possession of State records. It is extremely doubtful that a contract between the federal government and a third party could ever put the States on clear notice of a federal funding condition. *See Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1942 (2026) (holding that federal agency's entry into "contract with a third party" cannot bind an entity under the Spending Clause). It is all the more doubtful where, as here, that condition first would have been imposed in 2008, decades after many States joined CDLIS and imposed disclosure restrictions in their own agreements with AAMVA. *See* ECF No. 45-1 at 3. In any event, as AAMVA explains, it has long "understood" its CDLIS contract "as requiring AAMVA to give FMCSA access to 'information on driver records' via specific CDLIS searches," not by turning over the records themselves. AAMVA Br. at 10. If even AAMVA did not understand its contract to impose the condition Defendants claim, the States could not have been on "clear notice" of such a term.

## IV. Plaintiff States Are Likely to Succeed on Their Contract Claims

Contract Plaintiffs (Illinois, California, Maine, and the District of Columbia) are also likely

to succeed on the merits of their contract claims against AAMVA. AAMVA does not dispute Plaintiff States' assertion that "AAMVA's disclosure of state data to FMCSA or DHS would violate AAMVA's contracts with" the Contract Plaintiffs, States' Br. at 25; indeed, it acknowledges that complying with FMCSA's Data Demand "could breach these contractual obligations [with the States], especially given that nearly two dozen . . . States have objected to AAMVA's sharing their data," AAMVA Br. at 11. Neither does AAMVA object to being enjoined from complying, or to being named in Plaintiff States' complaint as a necessary party. Thus, the Court should enjoin AAMVA from sharing Plaintiff States' CDLIS data with FMCSA or DHS.

## V. Plaintiff States Satisfy the Test for Preliminary Relief

### A. Plaintiff States Face Irreparable Harm Absent a TRO.

In a key concession, neither Agency Defendants nor AAMVA dispute the severe harms that Plaintiff States assert will occur if FMCSA carries out its threats, including a total cessation of CDL issuance and renewal, with dire economic consequences. Instead, Agency Defendants attempt to paint Plaintiff States' harm as too "speculative" because they only *threatened* to cancel AAMVA's contract and cut off its funding, they "have not [actually] done so." DOT Opp. at 30. Agency Defendants mistake the procedural posture here: the precise purpose of a TRO is to prevent imminent, but not yet actual, harm. And nowhere in its 30-page opposition does FMCSA ever state that it does not intend to follow through on its threats. That glaring omission should eliminate any doubt the Court might have that FMCSA will cancel AAMVA's contract and cut off its funding if AAMVA does not comply with the Data Demand, forcing AAMVA to "shutter the CDLIS system[.]" AAMVA Br. at 12. Defendants do not contest that Plaintiff States would suffer irreparable harm should that happen. DOT Br. at 30–31; AAMVA Br. at 12–13.

Agency Defendants next argue that disclosure of private information to "a small number of 'individuals obligated to keep [the information] confidential'" is not irreparable harm. DOT Opp. at 28 (quoting *Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 121 (D.D.C. 2025)). Other courts have disagreed, finding that similar disclosures do constitute irreparable harm. *See, e.g.*, *Roberts v. Austin*, 632 F.2d 1202, 1214 (5th Cir. 1980) (reversing district court finding of no

irreparable harm from release of SNAP data); *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) ("The disclosure of private, confidential information is the quintessential type of irreparable harm that cannot be compensated or undone by money damages." (citation modified)). More importantly, this case is nothing like *Carter*. The 17 million records at issue here will not be disclosed to "a small number of individuals" with confidentiality obligations. Quite the opposite. FMCSA has provided no confidentiality assurances and openly admits that it intends to share the records with DHS, an agency with over 260,000 employees, *see About DHS*, U.S. Dep't of Homeland Sec., https://www.dhs.gov/about-dhs (last accessed Aug. 17, 2026), so it can be used for immigration enforcement, among other things. *See* DOT Opp. at 26–27. When the public learns that their personal information, which their state governments promised to safeguard, has been turned over to FMCSA in this context, the public's trust in Plaintiff States will inevitably be damaged. *See, e.g.*, ECF No. 3-4 ¶¶ 29–33. Loss of trust in an institution is "very difficult to restore . . . or measure" and is therefore quintessentially irreparable. *See Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 59 (D.D.C. 2025) (finding irreparable harm where IRS disclosure of tax information to ICE would harm trust in the tax system).

Absent a TRO, Plaintiff States will suffer irreparable harm one way or another: If AAMVA complies with the Data Demand, trust in Plaintiff States' ability to safeguard personal information is irreparably damaged. If AAMVA refuses, Agency Defendants will cause CDLIS to shut down, and CDL issuance and renewal nationwide will grind to a halt. The only way to avoid that harm, and preserve the status quo, is to grant Plaintiff States' request for a TRO.

### B. The Equities and the Public Interest Favor Enjoining the Data Demand

Agency Defendants contend that entering an injunction would undermine equitable and public interests because it would disrupt their ability to ensure the integrity of CDLs. DOT Opp. at 31. This ignores the fact that Agency Defendants have fulfilled their statutory obligations for decades without the demanded data. Indeed, as Agency Defendants acknowledge, they already can run CDLIS queries to root out State noncompliance with CDL regulations. *Id.* Furthermore, they cite no change in circumstance that prevents them from carrying out their duty where they were

able to do so before. *See supra* note 2. Therefore, temporarily enjoining the Data Demand and concordant disclosure would not harm Agency Defendants. To the extent FMCSA also argues an injunction would harm its right to "access" CDLIS records, that argument fails, both because FMCSA can already access CDLIS records by querying the database as any State may, and because FMCSA's right of "access," if any, is not a right to obtain the corpus of MPRs. And because the Data Demand is unlawful, the public interest inherently favors issuing an injunction. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting "substantial public interest in having governmental agencies abide by the federal laws" (citation modified)).

Finally, Agency Defendants do not address how enjoining their coercive Data Demand would harm the public interest. On one hand, the termination of federal funding to AAMVA would cause CDLIS to cease operations and impair or preclude Plaintiff States' ability to issue and renew CDLs and ensure the safe operation of commercial motor vehicles. *See, e.g.*, ECF No. 3-7 ¶¶ 34–37. Furthermore, because "CDLIS … is interconnected with all forms of driver licensing, … a shutdown … could disrupt, or even stop, the issuance and renewal of any driver license in the United States." AAMVA Br. at 13. On the other hand, the broad disclosure of State proprietary confidential data would erode public trust, discourage prospective CDL applicants and driver license applicants more generally, reduce State revenue, and likely increase unauthorized driving and the attendant public safety risk. *See, e.g.*, ECF No. 3-3 ¶¶ 29–31; ECF No. 3-20 ¶ 29. For these reasons, the equities and the public interest tip sharply in favor of enjoining the Data Demand and AAMVA's compliance therewith.

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court enter the proposed temporary restraining order. *See* ECF No. 2-1.

Dated: August 19, 2026

Respectfully Submitted,

**KWAME RAOUL**
Attorney General of Illinois

**JAY JONES**
Attorney General of Virginia

/s/ Katharine Roller
Cara Hendrickson*
*Executive Deputy Attorney General*
Katharine Roller†
Paul Berks*
*Complex Litigation Counsel*
Gretchen Helfrich†
*Deputy Chief, Special Litigation Bureau*
Molly Mauck†
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St.,
Chicago, IL 60603
312-814-3000
Cara.Hendrickson@ilag.gov
Katharine.Roller@ilag.gov
Paul.Berks@ilag.gov
Gretchen.Helfrich@ilag.gov
Molly.Mauck@ilag.gov
*Counsel for Plaintiff State of Illinois*

/s/ Megan C. Keenan
Tillman J. Breckenridge (#85647)
*Solicitor General*
Megan C. Keenan (#102489)
*Deputy Solicitor General*
*Counsel of Record*
Mikaela A. Phillips (#97164)
*Assistant Solicitor General*
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219
804-786-2071
mkeenan@oag.state.va.us
mphillips@oag.state.va.us
*Counsel for Plaintiff Commonwealth of Virginia*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

/s/ Mitchell P. Reich
Mitchell P. Reich†
*Senior Counsel to the Attorney General*
Karthik Reddy†
*Special Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth St. NW
Washington, DC 20001
202-279-1261
Mitchell.Reich@dc.gov
*Counsel for Plaintiff District of Columbia*

**ROB BONTA**
Attorney General of California

/s/ David Green
Thomas S. Patterson*
Michael L. Newman*
*Senior Assistant Attorneys General*
Seth E. Goldstein*
Robin L. Goldfaden*
*Supervising Deputy Attorneys General*
David Green*
Maria Buxton*
Chase Goldstein*
Ezra Kautz*
Emilia P. E. Morris*
*Deputy Attorneys General*
1300 I Street, Suite 125
Sacramento, CA 95814
916-210-6242
David.Green@doj.ca.gov
*Counsel for Plaintiff State of California*

**KRISTIN MAYES**
Attorney General of Arizona

/s/ Mary M. Curtin
Mary M. Curtin*
*Senior Litigation Counsel*
Arizona Attorney General's Office
2005 N. Central Ave.
Phoenix, AZ 85004
602-542-3333
Mary.Curtin@azag.gov

**PHIL WEISER**
Attorney General of Colorado

/s/ Gabe Podesta
Gabe Podesta†
Sarah H. Weiss†
*Senior Assistant Attorneys General*
1300 Broadway, 10th Fl.
Denver, CO 80203
720-508-6000
Gabe.Podesta@coag.gov

ACL@azag.gov
*Counsel for Plaintiff State of Arizona*

Sarah.Weiss@coag.gov
*Counsel for Plaintiff State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

/s/ Vianca Malick
Vianca Malick†
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Vianca.Malick@ct.gov
*Counsel for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

/s/ Ian R. Liston
Ian R. Liston*
*Director of Impact Litigation*
Vanessa L. Kassab*
*Deputy Attorney General*
Anuradha Sivaram*
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov
*Counsel for Plaintiff State of Delaware*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

/s/ Kalikoʻonālani D. Fernandes
Kalikoʻonālani D. Fernandes
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
808-586-1360
kaliko.d.fernandes@hawaii.gov†
*Counsel for Plaintiff State of Hawaiʻi*

**AARON M. FREY**
Attorney General of Maine

/s/ Halliday Moncure
Halliday Moncure*
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
Halliday.Moncure@maine.gov
*Counsel for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

/s/ Yasmin Dagne
Yasmin Dagne†
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-223-1580
ydagne@oag.maryland.gov
*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

/s/ Gerard J. Cedrone
Gerard J. Cedrone†
*Deputy State Solicitor*
Michelle Pascucci†
*State Trial Counsel*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
617-963-2282
Gerard.Cedrone@mass.gov
*Counsel for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

/s/ Neil Giovanatti
Neil Giovanatti*

**AARON D. FORD**
Attorney General of Nevada

/s/ K. Brunetti Ireland
K. Brunetti Ireland*

*Assistant Attorney General*
P.O. Box 30212
Lansing, MI 48909
517-241-1050
GiovanattiN@michigan.gov
*Counsel for the State of Michigan*

*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov
*Counsel for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

*/s/ Amanda McElfresh*
Amanda McElfresh†
*Deputy Attorney General*
New Jersey Office of the Attorney General
124 Halsey Street
Newark, NJ 07101
609-696-5363
Amanda.McElfresh@law.njoag.gov
*Counsel for Plaintiff State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samanti*
Anjana Samant*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
asamant@nmdoj.gov
*Counsel for Plaintiff State of New Mexico*

**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
Rabia Muqaddam†
*Chief Counsel for Federal Initiatives*
Matthew Conrad†
*Assistant Attorney General*
28 Liberty St.
New York, NY 10005
212-416-8333
Rabia.Muqaddam@ag.ny.gov
Matthew.Conrad@ag.ny.gov
*Counsel for Plaintiff State of New York*

**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Scott P. Kennedy*
Scott P. Kennedy*
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880
Scott.Kennedy@doj.oregon.gov
*Counsel for Plaintiff State of Oregon*

**JOSH SHAPIRO**
Governor for Commonwealth of Pennsylvania

*/s/ Jacob B. Boyer*
Jennifer C. Selber*
Jacob B. Boyer*
Governor's Office of General Counsel
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
JacobBoyer@pa.gov
*Counsel for Governor Josh Shapiro*

**CHARITY R. CLARK**
Attorney General of Vermont

*/s/ Ryan Patrick Kane*
Ryan Patrick Kane†
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
802-828-3171
Ryan.Kane@vermont.gov
*Counsel for Plaintiff State of Vermont*

**NICHOLAS W. BROWN**
Attorney General of Washington

*<u>/s/ Lauryn K. Fraas</u>*
Lauryn K. Fraas*
*Assistant Attorney General*
800 Fifth Ave., Suite 2000
Seattle, WA 98104-3188
206-464-7744
Lauryn.Fraas@atg.wa.gov
*Counsel for Plaintiff State of Washington*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*<u>/s/ Brian Keenan</u>*
Brian Keenan[†]
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707
608-266-0020
Brian.Keenan@wisdoj.gov
*Counsel for Plaintiff State of Wisconsin*