IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>Plaintiffs',<br><br>v.<br><br>U.S. DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) | 1:26-cv-2547 (AJT-IDD) |

**ORDER**

Before the Court is an Emergency Motion for a Temporary Restraining Order, filed by twenty-one states and the District of Columbia, which requests an order temporarily enjoining Defendant the American Association of Motor Vehicle Administrator (the AAMVA") from transferring into the custody of the Defendants Federal Motor Carrier Safety Administration (FMCSA) and the Department of Transportation ("DOT") (collectively, other than the AAMVA, the "Federal Defendants") its database containing limited but highly personalized information pertaining to over 17 million persons who have obtained Commercial Drivers Licenses ("CDLs"), which the Federal Defendants do not control, which are owned by the states that provided that information, and which would continue to be available to the Federal Defendants, as it has been, based on specific individualized requests, and also enjoining the Federal Defendants from imposing any adverse actions or sanctions in the event such data is not produced as demanded [Doc. No. 2] (the "Motion"). The Federal Defendants have opposed the Motion. [Doc. No. 45].[1] The parties have fully briefed the issues raised in the Motion and the

[1] Defendant AAMVA has also filed a response to the Motion separate from that filed by the Federal Defendants, in which the AAMVA "takes no view on most of those legal issues," and "seeks only to comply with State and federal law while maintaining the safety critical functionality of the CDLIS clearinghouse." [Doc. No. 46] at 1.

Court held a hearing on August 20, 2026. For the reasons stated herein, the Motion is **GRANTED.**

## I. BACKGROUND

Several weeks ago, the FMCSA requested that the AAMVA—a nonprofit that holds its records on behalf of the States—turn over the 17 million records in its database (the Data Demand). When AAMVA did not immediately comply with the Data Demand, the Department of Homeland Security (DHS) issued a subpoena for the same records, claiming that it needed them for immigration enforcement. At first, AAMVA told the federal government that it would produce the records to FMCSA, at which point DHS withdrew its subpoena. But after nearly two dozen States objected that this disclosure would breach their contracts with AAMVA, violate their laws, and violate federal law, AAMVA informed FMCSA that it was considering an opt-out mechanism under which it would produce only the records of those States that did not object to their production. DHS then issued a new subpoena for the records and on August 11, 2026,[2] FMCSA presented Defendant AAMVA with the ultimatum that it turn over the database by August 17, 2026, or face immediate termination of all of AAMVA's federal funding, including approximately $10 million that funds the database itself. *See* [Doc. No. 1-2] (letters between FMCSA and AAMVA concerning data request). On August 13, 2026, the Court, finding that it needed additional time and briefing to consider the Motion, entered an "administrative stay" that directed that the AAMVA not provide the requested data and that the Federal Defendants not take any adverse action against the AAMVA in order to maintain the status quo until the Court could further consider the Motion with the benefit of a hearing and the response of the Federal Defendants. [Doc. No. 25].

---

[2] The letter issued on August 11, 2026 from Chief Counsel for the FMCSA to the AAMVA, [Doc. No. 1-2] at 21–22, is herein described as the "August 11 letter."

In their Complaint, the Plaintiff States bring seven causes of action alleging the following: (1) the Data Demand is contrary to law under the Administrative Procedure Act ("the APA") because it violates the Commercial Motor Vehicle Safety Act ("CMVSA"), the Driver's Privacy Protection Act ("DPPA"), and the Privacy Act (Counts I, II, III, IV); (2) the Data Demand is arbitrary and capricious under the APA (Count V); (3) the Data Demand violates the Spending Clause of the Constitution (Count VI); and (4) the Data Demand breaches the contracts the AAMVA has with Illinois, California, Maine, and the District of Columbia (Count VII). [Doc. No. 1]

## II. LEGAL STANDARD

In order to obtain a temporary restraining order, a plaintiff must show (1) likelihood of success on the merits; (2) irreparable harm in the absence of injunctive relief; (3) that the balance of equities tip in the plaintiff's favor; and (4) that the issuance of preliminary injunctive relief is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) ("The standard for granting either a TRO or a preliminary injunction is the same." (citation omitted)). The balance of equities and public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Preliminary injunctive relief is an "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).

## III. DISCUSSION

### A. <u>Legal Framework</u>

In 1986, Congress determined that the absence of an efficient means for States to share information about CDL holders had led to "the practice of multiple license use by commercial drivers," which allowed them to "spread their traffic violations over a number of licenses, and

maintain a 'good driver' rating regardless of the number of violations." S. Rep. No. 99-570, at 3 (1986). To remedy this problem, Congress enacted the CMVSA, in which it directed the Secretary of Transportation to "maintain an information system," known as the Commercial Driver's License Information System ("CDLIS"), that serves "as a clearinghouse and depository of information pertaining to the licensing and identification of operators of commercial motor vehicles and the disqualification of such operators from operating commercial motor vehicles." 49 U.S.C. §§ 31309(a), (d). The CMVSA provides that "[t]he Secretary shall consult with the States in carrying out this section." *Id.* § 31309(a).

The Secretary is authorized to maintain this database either directly or through a third-party "authorized operator." *Id.* § 31309(d). Since 1988, the Secretary has designated AAMVA, a nonprofit member association composed of motor vehicle administrators in every State and territory, to serve as CDLIS's only authorized operator. *See* 76 Fed. Reg. 68328, 68329 (Nov. 4, 2011).

States must participate in CDLIS as a condition of receiving up to eight percent of formula based federal highway funds. 49 U.S.C. § 31314(c). Each participating State must make available through CDLIS records containing personally identifying information about every CDL holder in the State, as well as every person disqualified from holding a CDL or whose CDL has been revoked, suspended, or canceled. *Id.* §§ 31311(a)(5), (7)–(8), (23). Those records—known as "master pointer records," or MPRs—consist of an individual's name, date of birth, Social Security number (SSN) (or a non-SSN with an indicator that the number is an SSN alternative), sex, driver's license number, and the State of Record. *Id.* § 31309(b). The states, however, retain exclusively the detailed information pertaining to the actual issuance of a CDL, including the individual's qualifications. *Id.* § 31311(a)(6).

In sum, CDLIS, which AAMVA maintains, is a pointer system: it identifies the State maintaining the driver's underlying record and facilitates access to that State-held record, rather than serving as the repository of the driver's complete history. [Doc. No. 46] at 6. The CDLIS Central Site is thus distinct from the full driver record that is maintained by the States and exchanged between jurisdictions. *Id.* Though highly sensitive personal information, the information at the CDLIS Central Site is therefore limited and allows both the states and FMCSA to submit a query through its infrastructure to access the MPR and identify which jurisdiction maintains an individual's complete driver record and to retrieve the full driver record from that state jurisdiction. *Id.*

The CMVSA directs the Secretary to develop an information policy and ensure that information in CDLIS "shall be made available and subject to review and correction in accordance" with that policy. 49 U.S.C. § 31309(c). DOT has developed such a policy, issued on January 13, 2005, which explicitly states that that "the records in CDLIS are not controlled by FMCSA." 70 Fed. Reg. 2454, 2455 (Jan. 13, 2005). A subsequent policy statement issued on May 18, 2026, states that the MPR records belong to the states, not the federal government. 91 Fed. Reg. 28514, 28517 (May 18, 2026) (describing the MPRs as "owned by each state."). The January 13, 2005 policy also reiterates that there are only four entities authorized to access information from CDLIS: "the Secretary of Transportation, the States, an employer or prospective employer of a person who operates a commercial motor vehicle (CMV), and a person who operates a CMV for an employer that owns or leases a CMV or assigns employees to operate a CMV." 70 Fed. Reg. at 2455. Reflecting the highly sensitive and protected nature of the CDLI, under the Policy, other federal agencies may "request access to information" only upon a required showing in accordance

with a designated procedure within the FMCSA and upon executing a "Memorandum of Understanding" with either DOT or FMCSA. *Id.*

B. <u>Jurisdiction</u>

As an initial matter, the Court concludes it has jurisdiction over the claims in this action. The FMCSA's unequivocal demand that the AAMVA turn over 17 million records constitutes "final agency action" because it (1) "mark[s] the consummation of the agency's decisionmaking process" and is not "tentative or interlocutory"; and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified). In that regard, the August 11 letter from the FMCA, the last communication to the AAMVA, states in unequivocal terms its demand for transfer of the database, stating that AAMVA's decision to submit the decision to produce the requested records to its Board is "unacceptable," and leaves DOT with "no choice but to take immediate action to secure the production of the requested pointer records." [Doc. No. 1-2] at 21. As a result, the letter states in no uncertain terms that that "[u]nless AAMVA provides DOT with the requested records by August 17, DOT *will* pursue all available options to secure production, including canceling AAMVA's grants, filing an enforcement action to enforce the subpoena, and considering terminating its contract with AAMVA." *Id.* (emphasis added).

As reflected in these exchanges between the AAMVA and FMCSA, FMCSA's demand for transfer of the database and its threatened action of terminating federal grants if the database is not transferred is "not dependent on future uncertainties or intervening agency rulings," but "clean-cut and concrete," *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019). Indeed, the only contingency that is stopping the FMCSA from acting on its promise to terminate federal funds

is the AAMVA declining, as it has stated it intends to do, to produce all the records the FMCSA initially requested.

Likewise, "legal consequences will flow" from that demand. *Bennett*, 520 U.S. at 178. No matter how AAMVA acts, either FMCSA will terminate AAMVA's contracts and funding, thereby disabling the CDLIS and preventing the States from issuing or renewing CDLs to any of their residents, or AAMVA will transfer 17 million State-owned records to federal custody. In sum, AAMVA is effectively "compel[led]" to take one of the above actions. *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003). These are "legal consequences" by any measure.

The Court also concludes that the Hobbs Act, 28 U.S.C. § 2342(3)(A), does not preclude this Court's exercise of jurisdiction, as the Federal Defendants contend. As the D.C. Circuit has previously recognized, a "final agency action" under 5 U.S.C. § 704 of the APA does not necessarily render it a "final order" under § 2342(3) of the Hobbs Act that would subject the decision to the exclusive jurisdiction of the Court of Appeals. *Weaver v. FMCSA*, 744 F.3d 142, 146 (D.C. Cir. 2014). And the only "final agency action" under the Hobbs Act that places exclusive jurisdiction in the Court of Appeals is final agency action under § 2342(7), which does not apply to the FMCSA's demands and threats. Here, the August 11 letter constitutes neither a rule nor a regulation that would subject the challenge to the Court of Appeals' exclusive jurisdiction under 28 U.S.C. § 2342(3)(A) or (7). Nor did the FMCSA, in issuing the Data Demand, engage in any kind of adjudication or "compile[] a record with an eye toward judicial review" that would make the August 11 letter a "final order." *Weaver*, 744 F.3d at 147.

Finally, Plaintiff States have the required statutory standing to assert their challenges based on the DPPA and the Privacy Act as the interests of Plaintiff States who seek to protect the data of

their citizens clearly fall within the zone of interests to be protected by the DPPA, whose purpose is "protect[] an individual's right to privacy" in motor vehicle records, *Maracich v. Spears*, 570 U.S. 48, 60–61 (2013), and the Privacy Act whose purpose is to "safeguard[] for an individual privacy against Government invasion." *F.A.A. v. Cooper*, 566 U.S. 284, 295 (2012); *Carlson v. People of State of Cal.*, 310 U.S. 106, 113 (1940) ("The power and duty of the State to take adequate steps to preserve the peace and protect the privacy, the lives, and the property of its residents cannot be doubted.").

For these reasons, the Court has jurisdiction to adjudicate the claims raised in the Motion.

C. Likelihood of Success of Plaintiffs' Claims

With respect to the merits of the Plaintiff States' claims, the core issue in this case is whether the FMCSA is entitled to have transferred to it, and in effect take custody and control, of the AAMCA's highly restricted and protected database that consists of state-provided information. As stated in the DOT's policy statements pertaining to the CDLIS, those records are not controlled by the FMCSA and belong to the states.

1. APA Claims

The Court concludes the Plaintiffs are likely to succeed on the merits of their APA claims that the FMCSA's demand for the wholesale transfer of the CDLIS database, and threatened sanctions, violates the CMVSA and is contrary to the DPPA and the Privacy Act.

Reflecting the protected status of the information transferred from the states to the CDLIS, established and maintained by the AMMVA, Section 31309(a) of the CMVSA requires that the Secretary of Transportation "maintain an information system . . . that will serve as a clearinghouse and depository of information about the licensing, identification, and disqualification of operators of commercial motor vehicles," and "consult with the States in carrying out this section." 49

U.S.C. § 31309(a). The Federal Defendants have invoked Section 31309(a) as a basis for their Data Demand, *see, e.g.*, [Doc. No. 1-2] at 21, and do not dispute that they failed to consult the States before issuing the Data Demand that seeks the transfer to them of 17 million records. Nevertheless, they contend that no consultation was required because their demands and threatened sanctions are not sufficiently related to carrying out that section to trigger the consultation requirement. But the Federal Defendants' actions contravene the very premise of the CMVSA, and its implementing regulations, which make clear that the States will provide highly sensitive information under certain protections, including the retention of ownership, and that they play a central role in CDLIS's design and operation, including the exclusive power to add, delete, or alter the records they have contributed. [Doc. No. 3] at 5. The FMCSA has never before requested any information on the scale reflected in the Data Demand or threatened sanctions for non-compliance, all of which clearly reflect a change in policy and practice with respect to carrying out the CMVSA that requires consultation with the states; and given the Federal Defendants' lack of control or ownership over the requested data, the Federal Defendants cannot, in effect, unilaterally replace the AAMCA with the FMCSA as the depository for CDLIS.

As to the DPPA, the Federal Defendants have failed to articulate how their obtaining the Data is authorized by one of the four enumerated exceptions in 18 USC 2721(b) that authorize disclosing or making available the highly restricted personal information contained in the Data Demand. The government use exception, which the Federal Defendants rely upon, authorizes disclosure "[f]or use by any government agency . . . in carrying out its functions." 18 U.S.C. § 2721(b)(1). The FMCSA states that it "intends to use this data to execute its statutory safety and regulatory mandates," [Doc. No. 1-2] at 9, without explaining how it would actually assist in that effort, particularly when it has ostensibly carried out those functions for decades

without such a bulk transfer based on its recognized abilities to already access specific MPRs and access state records directly through program reviews. Indeed, when repeatedly pressed at the hearing on this point, the Federal Defendants were unable to explain how the data would in fact assist them in performing their statutory functions, or point to anything that they cannot already do without this data, and conceded in their briefing, that the FMCSA has already been performing detailed safety and regulatory reviews authorized by the CMVSA through its annual program reviews and audits on the state-maintained records that contain the needed detailed information concerning the issuance and validity of state-issued CDLs. *See* [Doc. No. 45] at 21. The FMCSA has also conceded it has not demanded the MPRs solely to use those records itself, but also to share them with DHS for "immigration enforcement purpose[s]." [Doc. No. 1-2] at 14. But the relied upon exception under the DPP A that authorizes disclosure of protected data to effectuate FMCSA's own statutory mandate does not authorize FMCSA to simply pass that data onto another agency.

Finally, with respect to the Privacy Act, the Court finds that the Plaintiff States are likely to succeed on their claims that the Data Demand (1) violates the Privacy Act's notice requirements that FMCSA must satisfy before ingesting new data into a new or newly modified "system of records," (2) violates restrictions on what information FMCSA may maintain into such a system, and (3) violates prohibitions against disclosing personal information to third parties, including other federal agencies such as DHS.

The Court also concludes that Plaintiff States are likely to succeed on their claim that the Data Demand in the August 11 letter is arbitrary and capricious. In that regard, under the APA, an agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). An action is arbitrary and capricious if the agency "'failed to consider . . . important aspects of the problem'" or weigh relevant "alternatives." *Dep't Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25, 33 (2020) (quoting *State Farm Mut. Auto. Ins.*, 463 U.S. at 43). In addition, when an agency changes policy, it must "display awareness that it is changing position," "provide a reasoned explanation for the change," and consider any "serious reliance interests" engendered by its prior policy. *FDA v. Wages & White Lion Invests., LLC*, 604 U.S. 542, 568 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)). And an agency may not provide a justification for a policy that is "pretextual." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019).

The explanations contained in its letters to the AAMVA state that the FMCSA seeks the information to "conduct routine reviews and data analysis to oversee the national CDL program," to carry out its "statutory safety and regulatory mandates" under its governing statutes, and "to help prevent fatal trucking accidents involving the many drivers to whom States have improperly issued Commercial Driver's Licenses." [Doc. No. 1-2] at 9, 21. These generic statements, coupled with the Federal Defendants' inability to explain how this data is needed to accomplish their goals, do not explain why or how the bulk transfer of MPRs for the first time in AAMCA or FMCSA's history is rationally related to their stated goals. Nor does the letter evidence consideration of "important aspects of the problem," including the costs and potential harms of disclosing the sensitive personal information of 17 million individuals as well as the reliance interests in having this data kept private. In the absence of any substantive explanation for how the requested data transfer is related to FMCSA's performing its statutory purpose, the Federal Defendants have failed to dispel the compelling inference that they seek these 17 million files in large part, if not primarily, for immigration enforcement, which is not part of its statutory mandate.

For all these reasons, the Court concludes that the Plaintiffs are likely to succeed on their APA Claims.

2. Spending Clause Claim

The Court also concludes that the Plaintiff States are likely to succeed on their claim that the Data Demand, with its threatened sanctions, violates the Spending Clause of the Constitution, which requires that any condition on federal funding be imposed through "clear notice" of the condition it intended to impose.

49 USC § 31309(c) provides that "[i]nformation in the information system shall be made available and subject to review and correction in accordance with" a policy developed by the Secretary, 49 U.S.C. § 31309(c). Even if the Secretary could establish a policy entitling him to demand custody of the States' records, the policy that FMCSA has promulgated under Section 31309(c) nowhere mentions such an entitlement. To the contrary, it explicitly states that "the records in CDLIS are *not* controlled by FMCSA." 70 Fed. Reg. 2454, 2455 (Jan. 13, 2005) (emphasis added) with an understanding by the States that only they, and neither the AAMVA nor the FMSCA, have the authority to add, delete, or change its own records maintained in CDLIS. *See, e.g.*, [Doc. No. 3-2] ¶ 13. The only right of access it grants to other agencies is through a detailed written request for "access to," not custody of, "information in CDLIS." 70 Fed. Reg. at 2455. And because this policy must "be consistent with existing Federal information laws," 49 U.S.C. § 31106(e)(1), it cannot (and does not purport to) supersede the limits on disclosure in the DPPA or the Privacy Act. Moreover, the character of CDLIS as a clearinghouse that is intended to allow States to exchange with one another information owned by the States themselves reinforces the conclusion that the States did not knowingly or voluntarily agree to have all of their records transferred over to FMCSA by accepting federal highway funds.

For these reasons, the Plaintiff States are also likely to succeed on their Spending Clause claim because the Federal Defendants have failed to identify any "clear notice" to the states that a condition for receiving federal funding was the States' willingness to let FMCSA take custody of the highly sensitive personal information provided to AAMVA.

3. Contract Claims

The Court also concludes that the Contract Plaintiffs (Illinois, California, Maine, and the District of Columbia) are likely to succeed on the merits of their contract claims against AAMVA. Each of these states have entered into contracts with the AAMVA to restrict what AAMVA may do with the State's proprietary and confidential driver information. The Federal Defendants take no position on these claims and Defendant AAMVA indeed acknowledges that complying with FMCSA's Data Demand "could breach these contractual obligations [with the States], especially given that nearly two dozen . . . States have objected to AAMVA's sharing their data." [Doc. No. 46] at 11.

D. Irreparable Harm

The Plaintiff States have also made a clear showing of irreparable harm in the absence of injunctive relief. Courts have often found that the unauthorized disclosures of information provided to agencies, particularly those involving a large-scale disclosure of sensitive information, constitute irreparable harm. For example, in *Roberts v. Austin*, the Fifth Circuit reversed district court a finding of no irreparable harm from release of SNAP data), 632 F.2d 1202, 1214 (5th Cir. 1980), and in *Airbnb, Inc. v. City of New York*, the Southern District of New York observed that "the disclosure of private, confidential information is the quintessential type of irreparable harm that cannot be compensated or undone by money damages." 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) (citation modified)). Moreover, the 17 million records at issue here, the overwhelming

portion of which no doubt includes data on U.S. citizens, will not be disclosed to a small number of individuals with confidentiality obligations. FMCSA has provided no confidentiality assurances and openly admits that it intends to share the records with DHS so that it can be used for immigration enforcement, among other things. Such large scale and unregulated distribution inevitably compromises and undermines the public's trust in the Plaintiff States' promises to safeguard its residents' personal information.

In addition, neither the Federal Defendants nor the AAMVA appear to seriously dispute the severe harms that are likely to be inflicted on the Plaintiff States if FMCSA carries out its threats, including a total cessation of CDL issuance and renewal, with dire economic and safety related consequences. Instead, the Federal Defendants argue that Plaintiff States' harm as too "speculative" because they only threatened to cancel AAMVA's contract and cut off its funding but "have not [actually] done so." [Doc. No. 45] at 30. Since the purpose of a TRO is to prevent "imminent harm," and the Federal Defendants have clearly threatened to cut off federal funding, the standard for granting a TRO is readily satisfied.

E. Equities and Public Interest

The equities and the public interest also favor enjoining the Data Demand. The Federal Defendants contend that entering an injunction would undermine equitable and public interests because it would disrupt their ability to ensure the integrity of CDLs. [Doc. No. 45] at 31. But, as stated earlier, the Federal Defendants have been unable to explain how precisely the limited but highly sensitive personal information would assist them in that regard. This contention is also hard to square with the fact that the FMCSA has fulfilled its statutory obligations for decades without the demanded transfer of data. Indeed, as the Federal Defendants acknowledge, they already can run CDLIS queries and regularly conduct state audits to root out State noncompliance with CDL

regulations, and they cite to no change in circumstances that prevents them from carrying out their duties when they were previously able to do so through such program reviews and by accessing pointer records in CDLIS with specific individualized requests. Finally, because the Data Demand is unlawful, the public interest inherently favors issuing an injunction. S*ee League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting "substantial public interest in having governmental agencies abide by the federal laws" (citation modified)).

The issuance of an injunction is also in the public interest given the harm the termination of federal funding to AAMVA would cause since CDLIS would effectively cease its operations and impair Plaintiff States' ability to issue and renew CDLs and compromise the safe operation of commercial motor vehicles. *See, e.g.*, [Doc. No. 3-7] ¶¶ 34–37. Furthermore, as the AAMVA contends, the "CDLIS . . . is interconnected with all forms of driver licensing" and therefore any shutdown "could disrupt, or even stop, the issuance and renewal of any driver license in the United States." [Doc. No. 46] at 13.

## IV. CONCLUSION

For all of the above reasons, the Plaintiff States' Motion is **GRANTED** pending the Court's consideration and ruling on a motion for a preliminary injunction, and until that time, it is hereby

**ORDERED** that the administrative stay previously entered, [Doc. No. 25], be, and the same hereby is, **VACATED**; and it is further

**ORDERED** that the Defendant AAMVA, its officers, agents, servants, employees and attorneys, and those who are in active concert or participation with them, be, and the same hereby are, **ENJOINED** from transferring Plaintiff States' CDLIS Master Pointer Records, as requested in the Data Demand, to the Federal Defendants or any other agency; and it is further

**ORDERED** that the Federal Defendants, their officers, agents, servants, employees and attorneys, and those who are in active concert or participation with them, be, and the same hereby are, **ENJOINED**, from taking any adverse actions against the Plaintiff States or the AAMVA based on the failure to transfer to them the requested information in the Data Demand including, without limitation, terminating or threatening to terminate AAMVA's federal contracts or funding, terminating or threatening to terminate Plaintiff States' federal contracts or funding, or taking any other action that could impair the operation of CDLIS or Plaintiff States' ability to issue commercial driver's licenses; and it is further

**ORDERED** that the Plaintiff States are **DIRECTED** to file any motion for a preliminary injunction on or before August 27, 2026; and the Defendants file their response to any such motion on or before September 3, 2026, and the Court will hold a hearing on September 10, 2026 at 10:00 a.m. in Courtroom 900. In any briefing on a motion for a preliminary injunction, the parties are permitted to incorporate, by reference, the briefing filed in connection with the TRO Motion and the arguments made at the hearing on the TRO Motion; and it is further

**ORDERED** that no security is required to be posted by the Plaintiff States pursuant to Fed. R. Civ. P. 65.

The Clerk is directed to forward a copy of this Order to all counsel of the record.

August 20, 2026
Alexandria, Virginia

/s/
Anthony J. Trenga
Senior United States District Judge