**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

STATE OF ILLINOIS; DISTRICT OF COLUMBIA; STATE OF CALIFORNIA; COMMONWEALTH OF VIRGINIA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAI'I; OFFICE OF THE GOVERNOR *ex rel.* Andy Beshear, in his official capacity as Governor of the COMMONWEALTH OF KENTUCKY; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN;

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, *in his official capacity as Secretary of Transportation*; FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION; DEREK D. BARR, *in his official capacity as Administrator of the Federal Motor Carrier Safety Administration*; AMERICAN ASSOCIATION OF MOTOR VEHICLE ADMINISTRATORS,

*Defendants*.

No. 1:26-cv-2547

Hon. Anthony J. Trenga

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Kwame Raoul
*Attorney General of Illinois*
Cara Hendrickson*†
*Executive Deputy Attorney General*
Katharine Roller*†
~~Paul Berks*~~
*Complex Litigation Counsels*
Gretchen Helfrich*†
*Deputy Chief, Special Litigation Bureau*
Molly Mauck*†
*Assistant Attorney General*
OFFICE OF THE ILLINOIS ATTORNEY GENERAL
115 South LaSalle St.
Chicago, IL 60603
312-814-3000

Jay Jones
*Attorney General of Virginia*
Tillman J. Breckenridge (#85647)
*Solicitor General*
Megan C. Keenan (#102489)
*Deputy Solicitor General*
Counsel of Record
Mikaela A. Phillips (#97164)
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 786-1991
SolicitorGeneral@oag.state.va.us

Counsel for the Commonwealth of Virginia

August 2513, 2026

Counsel for the State of Illinois

** Pro hac vice forthcoming†Admitted pro hac vice*
*Additional counsel in signature block*

## I. INTRODUCTION

1. On August 11, 2026, Defendant the Federal Motor Carrier Safety Administration (FMCSA) made an extraordinary and unprecedented threat to Defendant the American Association of Motor Vehicle Administrators (AAMVA): turn over a database containing 17 million driver records containing sensitive personal information (the Data Demand) no later than Monday, August 17, or face immediate termination of all of AAMVA's federal contracts and funding, including approximately $10 million that funds the database itself. On the same date, the Department of Homeland Security (DHS) issued a subpoena to AAMVA for precisely the same records, due precisely the same day, in admitted collusion with FMCSA.

2. If AAMVA resists the Data Demand, and if that threat is carried out, the database—the Commercial Driver License Information System (CDLIS)—will cease to function. Because federal law requires Plaintiff States to query CDLIS before issuing or renewing commercial driver's licenses (CDLs), every State in the nation would be forced to stop issuing CDLs or face the loss of hundreds of millions of dollars or more in federal highway funds. Moreover, even if States were willing to risk those penalties, they would still be operating in the dark, deprived of the database they use to check whether a given license applicant has an adverse driving record in another State.

3. If, on the other hand, AAMVA were to yield to the threat and turn over the sensitive personal information of millions of drivers, that disclosure would breach the confidentiality of millions of individuals by divulging personal information that Plaintiff States promised to keep private, subject to narrow exceptions, damaging public trust in the States and foreseeably deterring many people from applying for CDLs, which would deprive the States of revenue and potentially

cause some to attempt to drive without valid licenses. Further, it would break the bargain that the States struck with the federal government when they agreed to participate in CDLIS.

4. Put to this untenable choice, AAMVA informed the States that it will not produce the records demanded by FMCSA by August 17. Accordingly, absent court intervention, the CDLIS system could cease operating as soon as Monday, upending the licensing systems in all 50 states and the District of Columbia and sowing chaos on the nation's streets and highways.

5. The Data Demand is unlawful and should be enjoined before FMCSA carries out its threat. FMCSA has taken this action in the absence of any statutory authority and in violation of the Driver's Privacy Protection Act (DPPA) and the Privacy Act of 1974 (the Privacy Act). It has contravened the Administrative Procedure Act (APA) by seeking to shut down or dramatically alter the structure of CDLIS—turning it from a platform on which States mutually share their own records for purposes of driver licensing to a database that the federal government may mine for its own purposes, including unrelated immigration enforcement purposes—without acknowledgment or a shred of reasoned explanation. And it has violated the Spending Clause, by imposing a new condition on States' receipt of federal highway funding without the clear notice the Constitution requires.

6. AAMVA is also barred from disclosing records to FMCSA or DHS. AAMVA's contracts with many States flatly bar this disclosure, and the federal government's lawless threat does not excuse AAMVA's breach of those agreements.

7. For these reasons, the Data Demand should be declared unlawful, set aside, and preliminarily and permanently enjoined, and AAMVA should be enjoined from producing records to FMCSA or DHS.

## II. JURISDICTION AND VENUE

8. The Court has jurisdiction over Plaintiff States' claims against FMCSA pursuant to 28 U.S.C. § 1331 (federal question). The Court has authority to grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 702, 705, and 706.

9. The Court has jurisdiction over Plaintiff States' claims against AAMVA under 28 U.S.C. § 1367 (supplemental jurisdiction).

10. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants include a United States officer sued in his official capacity. Plaintiff the State of Virginia and Defendant AAMVA are residents of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the Eastern District of Virginia.

11. Assignment to the Alexandria Division of this District is proper pursuant to Local Civil Rule 3(C) because Defendant AAMVA has its principal office in Arlington.

## III. PARTIES

### A. Plaintiffs

12. Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign State in the United States of America. The Attorney General of Illinois is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern. *See* Ill. Const. art. V, § 15; 15 Ill. Comp. Stat. 205/4 (2010).

13. Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits

initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

14. Plaintiff State of California is a sovereign State of the United States of America and is represented by Rob Bonta, the Attorney General of California. The Attorney General is the State's chief law officer and is authorized by the California Constitution, article V, section 13, to pursue this action on the State's behalf.

15. Plaintiff Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

16. Plaintiff State of Arizona is a sovereign state of the United States of American. The State is represented by and through Attorney General Kristin Mayes, who is the chief law enforcement officer of the State and authorized to "[r]epresent this state in any action in a federal court." Ariz. Rev. Stat. § 41-193(A)(3); *see* Ariz. Const. art. V, § 1(A).

17. Plaintiff State of Colorado is a sovereign state of the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colorado Revised Statute § 24 31-101 to pursue this action.

18. Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

19. Plaintiff State of Delaware is a sovereign state of the United States of America. Delaware is represented by and through its Attorney General, Kathleen Jennings. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to Del. Code Ann. tit. 29, § 2504, on behalf of the State.

20. Plaintiff State of Hawai'i, represented by and through its Attorney General Anne E. Lopez, is a sovereign state of the United States of America. The Attorney General is Hawai'i's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statutes § 28-1 to pursue this action.

~~20.~~21. Plaintiff Office of the Governor, *ex rel.* Andy Beshear, brings this suit in his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," *id.* § 81; *Beshear v. Bevin*, 498 S.W.3d 355, 369 (Ky. 2016) (citing Ky. Const. § 81). Under Kentucky statute, the Governor is the head of his General Cabinet and his Executive Cabinet. Ky. Rev. Stat. §§ 11.060, 11.065. The Governor's Executive Cabinet consists of the Secretaries of executive branch cabinets, including the Kentucky Transportation Cabinet, that he appoints. In fulfilling his constitutional duties, the Governor has authority to bring this action.

~~21.~~22. Plaintiff State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

~~22.~~23. Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G.

Brown. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter. See Md. Const. art. V, § 3(a)(2); Md. Code Ann., State Gov't § 6-106.1(b)(1).

~~23.~~24. Plaintiff Commonwealth of Massachusetts is a sovereign state of the United States of America. The Commonwealth is represented in this action by Attorney General Andrea Joy Campbell, the Commonwealth's chief lawyer and law enforcement officer, who is authorized to act in federal court on behalf of the Commonwealth on matters of public concern.

25. Plaintiff State of Michigan a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan and authorized to pursue this action on the State's behalf.

~~24.~~26. Plaintiff State of Minnesota is a sovereign state of the United States. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who has common law and statutory authority to sue on Minnesota's behalf.

~~25.~~27. Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

~~26.~~28. Plaintiff State of New Jersey is a sovereign State of the United States of America and is represented by Jennifer Davenport, the Attorney General of New Jersey. Attorney General Davenport is the State's chief legal officer and is authorized to pursue this action on the State's behalf.

~~27.~~29. Plaintiff State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico.

~~28.~~30. Plaintiff State of New York, represented by and through its Attorney General Letitia James, is a sovereign state of the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Exec. Law § 63 to pursue this action.

~~29.~~31. Plaintiff the State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

32. Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 Pa. Stat. §§ 732-204(c), 732-301(6).

~~30.~~33. Plaintiff State of Rhode Island, represented by and through its Attorney General Peter F. Neronha, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

~~31.~~34. Plaintiff State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown, who is the State's Chief Legal Officer.

~~32.~~35. Plaintiff State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

~~33.~~36. Plaintiff State of Vermont is a sovereign state of the United States of America. Vermont is represented by its Attorney General, Charity R. Clark, who is the chief legal officer of Vermont and has authority to represent the State in this matter.

**B. Defendants**

~~34.~~37. Defendant United States Department of Transportation (DOT) is a department of the executive branch of the United States government, which, through its sub-agency the Federal Motor Carrier Safety Administration, is responsible for administering CDLIS.

~~35.~~38. Defendant Sean Duffy is the Secretary of Transportation, DOT's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

~~36.~~39. Defendant Federal Motor Carrier Safety Administration is an administration of DOT and is responsible for administering CDLIS on behalf of the States.

~~37.~~40. Defendant Derek D. Barr is the Administrator of FMCSA and is charged with the supervision and management of all decisions of that administration. He is sued in his official capacity.

~~38.~~41. DOT, Duffy, FMCSA, and Barr are referred to collectively herein as the "Agency Defendants."

~~39.~~42. Defendant American Association of Motor Vehicle Administrators (AAMVA) is a tax-exempt, nonprofit organization, headquartered in Virginia, that develops model programs in motor vehicle administration, law enforcement, and highway safety. It serves as an information clearinghouse and provides a variety of technology services to members, including system applications, network services, software products, and standards. One of these services is CDLIS, a nationwide data clearinghouse and depository that enables States, including Plaintiff States, to ensure that each commercial driver has only one driver license and one complete driver record,

and to ensure that States do not improperly issue CDLs to applicants with a history of unsafe commercial driving.

~~40.~~43. Defendant AAMVA is the custodian of the data in CDLIS that is the subject of this action. AAMVA has not moved to quash the August 11 subpoena that it received from DHS demanding disclosure of Plaintiff States' CDLIS data.

~~41.~~44. Plaintiff States seek relief directly from Defendant AAMVA.

~~42.~~45. In addition, AAMVA is a required party to this action. *See E.E.O.C. v. Peabody Western Coal Co.*, 400 F.3d 774, 781 (9th Cir. 2005) (private parties can be named as defendants along with federal agencies in a suit brought under the Administrative Procedure Act). AAMVA is subject to service of process and its joinder will not deprive the court of subject matter jurisdiction. In AAMVA's absence, the court cannot accord complete relief among the parties.

## IV. ALLEGATIONS

### A. State Responsibility for Driver Licensing

~~43.~~46. The licensing of drivers has long been the province of the sovereign states. States began issuing driver's licenses when consumer use of motor vehicles became widespread, and they have continued to exercise that function ever since.

~~44.~~47. States are responsible for issuing personal driver's licenses (PDLs or DLs) and CDLs. The purpose of such licensing is to ensure that only qualified, safe drivers will be allowed to operate motor vehicles.

~~45.~~48. In pursuit of that aim, Plaintiff States validate the identity of each driver applicant, ensure each applicant's medical fitness to operate a motor vehicle, test each applicant's ability to follow the rules of the road, and check each applicant's licensing and driving history to ensure that drivers with a record of unsafe or unlawful driving are not put behind the wheel again. For CDLs, Plaintiff States also verify an applicant's citizenship or immigration status.

~~46.~~49. Once an applicant is issued a license, Plaintiff States maintain for each driver a record of any traffic offenses, citations, or other adverse driving history.

~~47.~~50. The federal government does not habitually or typically perform any of the aforementioned tasks; they are the responsibility of the States.

~~48.~~51. As issuers of driver's licenses, and thus as the owners and holders of large amounts of personal information about their residents, Plaintiff States have a responsibility to protect the privacy and security of that information.

~~49.~~52. To ensure that privacy and security, the legislatures of Plaintiff States have passed laws governing how State driver's license information may be handled, to whom it may be disclosed, and for what purpose. For example, the California Information Practices Act (IPA), Cal. Civil Code § 1798 *et seq.*), among other state laws, strictly prohibits the disclosure of personal information by State agencies, including the California DMV, subject to limited, narrow exceptions. Cal. Civil Code § 1798.1. Similarly, the Illinois Vehicle Code (625 Ill. Comp. Stat. 5/*et seq.*) strictly limits the disclosure of highly restricted personal information (HRPI), including Social Security numbers and personal identifying information (PII), such as names, addresses, dates of birth, and driver's license numbers. 625 Ill. Comp. Stat. 5/1-125.9, 159.2. The District of Columbia and other states have similar laws. *See, e.g.*, D.C. Code § 50-1401.0lb; Del. Code Ann. tit. 21, §§ 305; 305(p); Wis. Stat. § 343.14(2j); Mich. Comp. Laws § 257.208c; 2022 Mass. Acts, ch. 81, § 7, *available at* https://perma.cc/B5A5-247V; 940 Mass. Code Regs. § 37.01 *et seq.*

~~50.~~53. In keeping with those laws, and the federal privacy laws discussed below, Plaintiff States take measures to protect driver information from unauthorized use or disclosure. For example, some states limit access to driver information databases and systems only to employees

whose job duties require such access, and track each employee's use of those databases and systems to identify and deter improper patterns of access.

~~51.~~54. In order to protect the public from unsafe drivers, however, it is important for States to have some means of accessing driver history information from other States. A multistate resource such as CDLIS prevents drivers from seeking licenses from multiple jurisdictions at once, or, for drivers with problematic driving histories, from simply moving to a new jurisdiction to obtain a license.

~~52.~~55. For almost forty years, Plaintiff States have used CDLIS to accomplish this goal of sharing driver information between States without compromising driver privacy or the States' ownership of their own records.

**B. The Commercial Driver's License Information System**

~~53.~~56. Congress authorized the creation of CDLIS in 1986 to provide States an efficient means of sharing information with one another about CDL applicants. *See* Commercial Motor Vehicle Safety Act of 1986, Pub. L. No. 99-570, tit. XII, 100 Stat. 3207 (1986). At that time, interstate motor carrier accidents led to more than 4,000 fatalities per year, and intrastate truck accidents "claim[ed] another 2,000 lives." S. Rep. No. 99-411, at 2 (1986). Congress determined that one major source of the problem was "[t]he practice of multiple license use by commercial drivers": nearly a third of commercial drivers in some States had multiple licenses, which allowed them to "spread their traffic violations over a number of licenses, and maintain a 'good driver' rating regardless of the number of violations." *Id.* at 3. Congress therefore identified the need for a system that would enable States to "determine if a license applicant had another license, and transmit and receive driver record information to stop unsafe drivers from operating commercial vehicles." *Id.* at 4.

~~54.~~57. To achieve this goal, Congress directed the Secretary of Transportation to "maintain an information system," known as CDLIS, to "serve as a clearinghouse and depository of information about the licensing, identification, and disqualification of commercial motor vehicles." 49 U.S.C. § 31309(a). By statute, the Secretary may maintain and operate this clearinghouse either directly or through a third party, referred to as the "authorized operator." *Id.* § 31309(d).

~~55.~~58. Since 1988, the Secretary has engaged a private nonprofit, AAMVA, to act as the authorized operator for CDLIS. *See* Commercial Driver's License Information System State Procedures Manual, Release 5.2.0, 76 Fed. Reg. 68328, 68329 (Nov. 4, 2011). AAMVA is a trade association for motor vehicle administrators, of which all 50 States and the District of Columbia are members.

~~56.~~59. As the Secretary has recognized, because it has chosen to contract with AAMVA to operate and maintain CDLIS, "FMCSA does not own CDLIS, and [CDLIS] is not a Federal system of records" under the Privacy Act. Commercial Driver's License (CDL) Standards; Incorporation by Reference of a New State Procedures Manual (SPM), 89 Fed. Reg. 50235, 50237 (June 13, 2024). Instead, as DOT has separately explained, CDLIS is best understood to be "maintained and operated by the States" through AAMVA. U.S. Dep't of Transp., *Privacy Impact Assessment for CDLIS* (Jan. 11, 2011), available at https://www.transportation.gov/individuals/privacy/pia-commercial-drivers-license-information-system-cdlis-gateway.

~~57.~~60. As a condition of receiving up to eight percent of its total allocation of federal highway funding, each State must consent to exchange information in CDLIS prior to issuing a CDL. 49 U.S.C. § 31314(c). In particular, each State must "notify" the CDLIS operator—

AAMVA—"of the proposed issuance of the license and other information the Secretary may require to ensure identification of the individual applying for the license." *Id.* § 31311(a)(5). Within 30 days of receiving that notice, AAMVA must "notify the State whether the individual has a commercial driver's license issued by another State or has been disqualified from operating a commercial motor vehicle by another State or the Secretary." *Id.* § 31311(c). The State must then "request from any other State that has issued a driver's license to the individual all information about the driving record of the individual." *Id.* § 31311(a)(6). If that information reveals derogatory information that disqualifies a person from receiving a license—for instance, prior records of motor vehicle infractions, or an extant CDL in another State—the State must deny the license. *See, e.g.*, *id.* § 31311(a)(9)–(12).

~~58.~~61. In order to facilitate this exchange of information, States must also agree to make certain information available through CDLIS. Each State must notify AAMVA whenever it issues a CDL, *id.* § 31311(a)(7), or whenever it "disqualif[ies] the holder of a commercial driver's license from operating a commercial motor vehicle" or "revok[es], suspend[s], or cancel[s] the license," *id.* § 31311(a)(8). In addition, States must operate their own driver's license information systems that are compatible with CDLIS. *Id.* § 31311(a)(21). And they must implement a system for "the exclusive electronic exchange of driver history record information" through CDLIS itself. *Id.* § 31311(a)(23).

~~59.~~62. Congress has made clear that States play a central role in CDLIS's design and operation. The statute governing the creation, maintenance, and design of CDLIS, 49 U.S.C. § 31309, provides that "[t]he Secretary shall consult with the States in carrying out this section." *Id.* § 31309(a). Likewise, when Congress instructed the Secretary to develop, publish, and implement a plan to "modernize" CDLIS in 2005, it directed the Secretary to do so "in consultation

with representatives of . . . State safety enforcement agencies[] and State licensing agencies." *Id.* § 31309(f)(1), (2), (5); *see* Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109-59, § 4123, 119 Stat. 1734–36 (2005).

~~60.~~63. Congress, in other words, envisioned CDLIS as a platform for States to exchange information with each other. States make information about CDL holders available on CDLIS for the benefit of other States, and they query the network to obtain information about CDL applicants from other States. AAMVA's role is simply to maintain and operate this "clearinghouse and depository." AAMVA and the Secretary are neither the owners of the information the States provide nor the ultimate recipients of that information; rather, their sole role is to facilitate the exchanges of information between and among States.

~~61.~~64. Since CDLIS's inception, the Secretary and AAMVA have administered the statute consistent with that understanding—*i.e.*, that States are the owners of the underlying information.

~~62.~~65. For example, in a DOT 2022 Privacy Impact Assessment regarding CDLIS, DOT affirmed that "FMCSA is not the owner of the data," and instead "relies on the [States] for the quality and integrity of the CDLIS data, as the information is collected, owned, and maintained by each individual [State]."[1]

~~63.~~66. Even today, persons applying for an account that would permit them to query CDLIS are told on DOT's application form that: "Data obtained using the FMCSA CDLIS Gateway is coming from State databases subject to the Driver Privacy Protection Act (DPPA) (18 U.S.C. § 2721–25). The States own the CDLIS data accessed using the FMCSA CDLIS Gateway."

[1] U.S. Dep't of Transp., *Privacy Impact Assessment: Federal Motor Carrier Safety Administration (FMCSA) State Compliance Records Enterprise (SCORE) System*, p. 8 (Aug. 15, 2022).

~~64.~~67. The way that CDLIS operates in practice makes this relationship very clear. All information stored in CDLIS is contributed by the States, and only the States—not AAMVA or FMCSA—have the power to add, delete, or alter the CDLIS records they have contributed. *See, e.g.*, AAMVA, CDLIS State Procedures Manual d.2, at 17, 50–52 (2025).

~~65.~~68. Moreover, the records stored in CDLIS are merely pointer records (Master Pointer Records, or MPRs), not drivers' full records with any driving and disciplinary history. The full records, called Driver History Records (DHRs), remain in the custody of each State, accessible *through* CDLIS but never stored *in* it.

~~66.~~69. Master Pointer Records—called "pointers" because they serve only to "point" the searcher to the State that can provide more complete information—contain a driver's name, date of birth, Social Security number (SSN) (or a substitute or "pseudo" SSN along with an indicator that the number is an SSN alternative), sex, and driver's license number, as well as the name of the State that provided the record.

~~67.~~70. By way of an example, if a driver applied for an Illinois CDL, the driver licensing agency in Illinois would query CDLIS with either (1) the driver's SSN or (2) the driver's name *and* date of birth. If the Illinois driver had a previous CDL in California, CDLIS would return that driver's Master Pointer Record, saying, in effect, "this driver has a commercial driving history in the following State(s)." But to learn what that history might be, CDLIS would direct the Illinois agency to the State of record and facilitate a connection between Illinois's system and the California system that stores the driver's full record.

~~68.~~71. For almost forty years, this system has fulfilled its intended purpose, promoting public safety by facilitating the efficient sharing of information between States regarding the driving history of commercial motor vehicle operators.

~~69.~~72. Plaintiff States have built their driver information systems and designed their agency procedures regarding issuance and management of driver's licenses around CDLIS. Most States query the database hundreds of times a day or more, and many consult it before issuing even non-commercial driver's licenses.

~~70.~~73. Plaintiff States rely on CDLIS, not only because they are incentivized to do so by conditions on their highway funding and participation in the CDL program, but because they know CDLIS is an essential tool for keeping dangerous drivers off the roads, and because they have confidence in the security and confidentiality of CDLIS records. In some instances, Plaintiff States are also required by state law to use CDLIS.

**C. The Driver's Privacy Protection Act**

~~71.~~74. In addition to the limits contained in the CDLIS statute itself, Congress has also enacted a separate statute—the Driver's Privacy Protection Act, or DPPA—that sharply limits the use and disclosure of personal information related to driver records.

~~72.~~75. Congress enacted the DPPA in light of concerns that "personal information collected by States in the licensing of motor vehicles was being released . . . with resulting loss of personal privacy for many persons." *Maracich v. Spears*, 570 U.S. 48, 52 (2013). It thus designed a "regulatory scheme that restricts" the ability of States and other persons "to disclose a driver's personal information without the driver's consent." *Reno v. Condon*, 528 U.S. 141, 144 (2000).

~~73.~~76. Under the DPPA, it is unlawful for "any person" to knowingly "obtain or disclose any personal information[] from a motor vehicle record" unless one of fourteen enumerated exceptions applies. 18 U.S.C. § 2722(a); *see id.* § 2721(a)(1), (c) (specifically barring disclosure by any State department of motor vehicles or "authorized recipient" of such information). The DPPA defines "personal information" to include any information that "identifies an individual," including an individual's social security number, driver identification number, name, or address.

18 U.S.C. § 2725(3). The statute permits disclosure of such information for an enumerated list of permitted uses, largely for law enforcement and litigation, *see, e.g.*, *id.* §§ 2721(b)(1)–(b)(4); for operation of businesses related to transportation or public safety, *see, e.g.*, *id.* §§ 2721(b)(2), (b)(6)–(b)(10); and where a driver has given consent, *see, e.g.*, *id.* §§ 2721(b)(11)–(b)(14).

~~74.~~77. The DPPA grants heightened protections to "highly restricted personal information," which it defines to include an individual's "photograph, social security number, or medical or disability information." *Id.* § 2725(4). The statute permits States and other persons to disclose highly restricted personal information in only four circumstances: "For use by any government agency . . . in carrying out its functions," "for use in connection with" a court proceeding, "in connection with [insurance] claims investigation activities" and underwriting, and "[f]or use by an employer or its agent or insurer" to determine whether a CDL holder has more than one driver's license or an adverse driving history. *Id.* §§ 2721(a)(2), (b)(1), (b)(4), (b)(6), (b)(9). Given the special sensitivity of this information and the "substantial . . . intrusion on privacy" its disclosure would entail, the Supreme Court has instructed that those four exceptions should be "read . . . narrowly," and may not be construed to permit disclosure absent "clear and explicit" language. *Maracich*, 570 U.S. at 60, 64 (citation omitted).

~~75.~~78. As relevant here, one of those exceptions, commonly referred to as the government use exception, provides that highly restricted personal information may be disclosed "[f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions." 18 U.S.C. § 2721(b)(1). As the *en banc* Seventh Circuit has explained, this provision requires that "the actual information disclosed . . . must be information that is *used* for the identified purpose." *Senne v. Vill. of Palatine*, 695 F.3d 597, 606 (7th Cir. 2012) (en banc).

In other words, an agency must demonstrate that "all of th[e] information" it obtained "actually *was used* in effectuating" some legitimate government function. *Id.* "When a particular piece of disclosed information is not *used* to effectuate [a government] purpose in any way, the exception" does not apply. *Id.* at 606; *see United States v. Weber*, 816 F. Supp. 3d 1168, 1195 & n.35 (C.D. Cal. 2026) (holding that this exception did not authorize the federal government's attempted collection of "millions of Californians' drivers license numbers," because the federal government "ha[d] not identified" how all of that information would be used in carrying out any government function).

**D. The Privacy Act**

~~76.~~79. The Privacy Act, 5 U.S.C. § 552a, is the principal law governing the collection, handling, retention, and disclosure of personal information by the federal government. Congress enacted the Privacy Act out of concern over "the impact of computer data banks on individual privacy." *Dep't of Justice v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 766 (1989) (quoting H.R. Rep. No. 93–1416, at 7 (1974)). The Privacy Act governs what records pertaining to individuals may be collected and maintained by an agency, and how and when an agency may use or disseminate those records.

~~77.~~80. Under the Privacy Act, "the term 'record' means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph." 5 U.S.C. § 552a(a)(4).

~~78.~~81. "[T]he term 'system of records' means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some

identifying number, symbol, or other identifying particular assigned to the individual." *Id.* § 552a(a)(5).

~~79.~~82. The Privacy Act imposes procedural requirements and substantive limits on any agency that establishes or maintains a system of records, including:

a. **Pre-establishment publication requirement (System of Record Notice or SORN).** "[E]ach agency that maintains a system of records shall . . . publish in the Federal Register upon establishment . . . a notice of the existence and character of the system of records," which shall include "(A) the name and location of the system; (B) the categories of individuals on whom records are maintained in the system; (C) the categories of records maintained in the system; (D) each routine use of the records contained in the system, including the categories of users and the purpose of such use; (E) the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records; (F) the title and business address of the agency official who is responsible for the system of records; (G) the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him; (H) the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and (I) the categories of sources of records in the system." 5 U.S.C. § 552a(e)(4).

b. **Intergovernmental Notice Requirement.** "Each agency that proposes to establish or make a significant change in a system of records or a matching program shall provide adequate advance notice of any such proposal (in duplicate) to the

Committee on Government Operations of the House of Representatives, the Committee on Governmental Affairs of the Senate, and the Office of Management and Budget in order to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals." 5 U.S.C. § 552a(r).

c. **Relevant and Necessary Requirement.** "Each agency that maintains a system of records shall . . . maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President." 5 U.S.C. § 552a(e)(1).

d. **Direct Request Requirement.** "Each agency that maintains a system of records shall . . . collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs." 5 U.S.C. § 552a(e)(2).

e. **Non-Disclosure Requirement.** "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless" a specific statutory exception applies. 5 U.S.C. § 552a(b). "Legitimate government functions" is not among the enumerated exceptions to the non-disclosure requirement.

**E. FMCSA's Demand for CDLIS Data**

~~80.~~83. On June 25, 2026, FMCSA sent a letter to AAMVA making an unprecedented demand: that AAMVA turn over records containing the name, date of birth, State of record, license number, and social security number of every driver in the entire CDLIS database going back five

years, comprising some 17 million pointer records. ~~Ex. 1~~ECF No. 1-2 at 2.[2] According to AAMVA itself, FMCSA had never before demanded *any* portion of the CDLIS database, much less the entire corpus of data. *Id.* at 3. In addition to this demand, FMCSA demanded to know, for any pointer record that did not contain a social security number, the date when that number was removed. *Id.* at 2. This final request is not information that AAMVA stores in the ordinary course.

~~81.~~84. This is not information that FMCSA could gather from CDLIS itself by querying the database. FMCSA has the ability to query CDLIS in the same way that the States may; but CDLIS is designed to respond only to searches by social security number, or by the combination of an applicant's name and date of birth. There is no way to query CDLIS on an indiscriminate or categorical basis—such as to pull all drivers with the last name "Smith"—much less to make a query that would return the entire corpus of records.

~~82.~~85. The June 25 letter initiated an exchange of correspondence between AAMVA and FMCSA about this demand. In a response sent on June 30, AAMVA raised several concerns. It noted that the contract between the two entities did not entitle FMCSA to pointer records. It also noted that it would have to assess its legal obligations under both the DPPA and the privacy laws in all U.S. jurisdictions. To assess these issues, AAMVA asked for "the specific intended use of the information," saying that it "must understand what agency or agencies will use the information and for what government function or functions." *Id.* at 3–4.

~~83.~~86. AAMVA also pointed out that "the data set presently requested seems likely to create a Privacy-Act-covered system of records," and asked FMCSA to provide "any pertinent system of records notice ('SORN')." *Id*. at 4.

---

[2] Plaintiff States incorporate all exhibits filed with the original complaint (ECF No. 1) into this first amended complaint and refer to them herein by their CM/ECF docket numbers (ECF Nos. 1-2 through 1-12).

~~84.~~87. In an undated response sent on July 7, 2026, FMCSA stated that it was entitled to the records under its contract with AAMVA. It also asserted that it would "use the CDLIS data as part of our statutory and regulatory oversight in our ongoing efforts to ensure the integrity and issuance of [CDLs]" and "to fulfill its federal safety and regulatory obligations." FMCSA provided no further justification for its demand, but asserted that its demand "falls squarely within" the so-called "government use" exception to the DPPA, 18 U.S.C. § 2721(b)(1). *Id.* at 5–6.

~~85.~~88. Regarding AAMVA's concern that FMCSA would be creating a system of records covered by the Privacy Act, FMCSA said only that it would "handle all legal coordination necessary under the Privacy Act." It did not provide a SORN or indicate any intention to issue one. *Id*.

~~86.~~89. On July 10, 2026, AAMVA wrote again. AAMVA reiterated its concerns about its obligations under the DPPA, and set forth its "understanding that such exception does not create a blanket authorization to disclose driver records whenever asked by a government agency." On the contrary, AAMVA's view was that it "must consider whether each data element requested is necessary to the governmental purposes for which it was requested. In other words, we must at least know what government agency will use the records for what government function." *Id.* at 6–7.

~~87.~~90. AAMVA also reiterated its concerns about the propriety of the disclosure under its own contract with FMCSA, as well as the creation of a new federal system of records. AAMVA requested a meeting with FMCSA to discuss the "key issues" raised by FMCSA's request. *Id.*

~~88.~~91. On July 23, 2026, AAMVA officials and FMCSA officials met in-person to discuss FMCSA's demand and AAMVA's concerns. The meeting ended with FMCSA making an explicit threat to terminate all of AAMVA's federal grants and contracts and potential litigation if

AAMVA did not inform DOT by the following day (July 24, 2026) whether AAMVA intended to produce the 17 million pointer records.

~~89.~~92. In its July 24 follow-up letter to AAMVA, FMCSA reiterated its view that its request was covered by the government functions exception to the DPPA, because "FMCSA intends to use this data to execute its statutory safety and regulatory mandates under 49 U.S.C. §§ 311 and 313, including verifying CDL validity and conducting motor carrier safety assessments." FMCSA also stated that it was authorized to make "subsequent redisclosure[s] to federal partner agencies . . . provided the data is used strictly in furtherance of legitimate government functions." FMCSA did not identify in writing any particular other agency to which it intended to disclose the data, or for what function such other agency intended to use it. *Id.* at 9.

~~90.~~93. FMCSA also asserted that "[r]elevant System of Records Notices (SORNs) will be provided under separate cover." On information and belief, as of the time of this filing, no SORNs have been provided. *Id.*

~~91.~~94. AAMVA responded the same day, writing that it intends to disclose the records to FMCSA "on or around August 17." *Id.* at 11.

~~92.~~95. Perhaps recognizing that AAMVA faced potential legal liability for making this disclosure, AAMVA asked DOT to "confirm in writing that AAMVA's production of the pointer records will be an act carried out on behalf of, and at the specific direction of, DOT." *Id.*

~~93.~~96. In the same letter, AAMVA asked FMCSA not to follow through on its threat to terminate AAMVA's grants and contracts, because "[d]oing so will cause significant disruption to the national commercial driver licensing program, including CDLIS. Disruption to these programs, particularly CDLIS, will have immediate negative impacts on all jurisdictions, including the

inability for all 50 states and the District of Columbia to issue or renew any CDL as well as non-CDL driver licenses." *Id.* at 12.

~~94.~~97. On July 27, 2026, AAMVA sent a letter to U.S. State driver licensing agency administrators, informing them of FMCSA's data demand, which the letter described as "unique." *Id.* at 17–18.

~~95.~~98. AAMVA also asserted, despite its earlier objections, that "[f]ederal statutes establish FMCSA access to all information in CDLIS and the CDLIS Cooperative Agreement [between FMCSA and AAMVA] provides that AAMVA shall make available to FMCSA all information on driver records." *Id.* at 17.

~~96.~~99. AAMVA also conveyed FMCSA's "understanding and commitment" that subsequent disclosure to other federal agencies "is authorized pursuant to 18 U.S.C. § 2721(c) and § 2721(b)(1), provided the data is used strictly in furtherance of legitimate government functions." *Id.*

~~97.~~100. AAMVA asserted that it was "fully assess[ing] any remaining legal implications, including any jurisdiction-specific-law or agreement-related limitations that may be relevant." It asked that State driver licensing agencies provide information about any such limitations to AAMVA for review by August 3, 2026. *Id.* at 18.

~~98.~~101. In response, many Plaintiff States sent letters to AAMVA opposing disclosure outright or requesting additional time to assess the implications of FMCSA's extraordinary demand. Plaintiff States' letters varied, but generally the substance was the same: some warned AAMVA that disclosing their CDLIS records to FMCSA would violate the express terms of their contracts with AAMVA, while others expressed concern that the disclosure would

violate federal and State laws meant to protect individual privacy, including the DPPA and the Privacy Act.

~~99.~~102. On July 28, the day after AAMVA sent its letter to its membership, the Department of Homeland Security served a subpoena on AAMVA, in person.

~~100.~~103. The subpoena, entitled "Immigration Enforcement Subpoena," calls for the production of exactly the same data demanded by FMCSA. It cites as legal authority for DHS's demand 8 U.S.C. § 1225(d), which states that:

> The Attorney General and any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service, and to that end may invoke the aid of any court of the United States.

~~101.~~104. On August 7, 2026, AAMVA sent another letter to FMCSA in which it explained that, having "worked aggressively" to "assess the relevant privacy laws of all fifty-one (51) impacted jurisdictions, AAMVA viewed itself as caught between DOT's assertion of a right to unrestricted access to the records on the one hand, and the views expressed by many member states that disclosure is unlawful. *Id.* at 13.

~~102.~~105. AAMVA specifically noted that its legal analysis was "informed by the Department of Homeland Security ('DHS') subpoena served upon AAMVA in person on Tuesday, July 28." *Id.* at 14.

~~103.~~106. AAMVA's letter also noted that FMCSA staff had informed AAMVA via email that FMCSA and DHS had "coordinated their data demands" and that DHS intended to withdraw the subpoena "due to AAMVA's efforts to cooperate with FMCSA." AAMVA then told FMCSA that it had to "incorporate" into its legal analysis "the fact of an immigration enforcement purpose in collection of the data."

~~104.~~107. AAMVA informed FMCSA that it was convening its board on August 14, 2026, to consider an "opt-in or opt-out choice by the states whether to authorize AAMVA's transmission of that state's data." It also suggested facilitating a forum in which DOT could "address the jurisdictions on this important matter." AAMVA noted that FMCSA had requested that production begin on a rolling basis on August 10, but stated that it could not produce any bulk data before the August 14 meeting, emphasizing that "[a]t bottom, this is state data that does not belong to AAMVA, necessitating a measured approach." *Id.*

~~105.~~108. The federal government evidently disagreed. On August 11, two business days after FMCSA learned that AAMVA might not produce all fifty States' records on August 17 after all, DHS served a second subpoena on AAMVA. *See* ~~Ex. 6~~ECF No. 1-12.

~~106.~~109. This subpoena is identical to the first DHS subpoena served on AAMVA, and seeks exactly the same information as FMCSA's Data Demand, right down to the specific requirement that records without an SSN must specify when the SSN was deleted. The title of the subpoena, again, is "IMMIGRATION ENFORCEMENT SUBPOENA." *Id.* at 6.

~~107.~~110. It demands a response by 8:00 a.m. Eastern Time on August 17, 2026—less than one week after service, and the same date that AAMVA had previously planned to disclose the records at issue to FMCSA. *Id.* The stated reason for the subpoena, as identified in the cover letter, is "investigating illegal practices in commercial driver's license (CDL) schools, identifying and addressing criminal fraud regarding the issuance of CDLs to illegal aliens, and conducting civil immigration enforcement." *Id.*

~~108.~~111. On the same day, August 11, 2026, FMCSA sent AAMVA a new letter, rejecting the opt-in/opt-out proposal before it was even formally made, calling it "unacceptable." ~~Ex. 1~~ECF No. 1-2 at 21.

~~109.~~112. FMCSA also told AAMVA that, "[u]nless AAMVA provides DOT with the requested records by August 17, DOT will pursue all available options to secure production [of the records], including canceling AAMVA's grants, filing an enforcement action to enforce the subpoena," notably, a subpoena issued by DHS, *not* DOT, "and considering terminating its contract with AAMVA." *Id*.

~~110.~~113. On August 12, AAMVA informed Plaintiff States that it would not produce the requested records to either FMCSA or DHS by August 17.

**F. AAMVA's Contracts with Plaintiff States**

~~111.~~114. In CDLIS, AAMVA stores driver data that is collected, maintained, and owned by the States. To gain access to that sensitive data, AAMVA has contracted with each State through the relevant State agencies, which act as agents of the State.

~~112.~~115. As laid out above, Plaintiff States are responsible for the confidentiality and security of driver information, and take measures to protect it from misuse and unauthorized disclosure. Pursuant to that goal, many State contracts restrict what AAMVA may do with the State's proprietary and confidential driver information. By agreeing to comply with the Data Demand, AAMVA has violated those contracts.

~~113.~~116. The Illinois Secretary of State (ILSOS) entered into a contract with AAMVA on August 5, 2025. That contract is found at ECF No. 1-3~~attached as Exhibit 2~~ (IL Contract) and is incorporated herein by reference. In July 2025, the California Department of Motor Vehicles (California DMV) entered into an agreement with AAMVA which governs California's data-sharing with AAMVA, as part of California's participation in CDLIS, among other programs. That contract is found at ECF No. 1-5~~attached as Exhibit 3~~ (CA Contract) and is incorporated herein by reference. Maine entered into an agreement to purchase services with AAMVA effective February 1, 2018 – January 31, 2021, which was amended and extended several

times, including through 2027. That contract, and the subsequent amendments, are found at ECF Nos. 1-6 to 1-10attached as Exhibits 4–4D (ME Contract) and are incorporated herein by reference. The District of Columbia entered into an agreement to procure services from AAMVA on March 27, 2025. That contract is found at ECF No. 1-11attached as Exhibit 5 (DC Contract) and is incorporated herein by reference. Hereinafter, these contracts are collectively referred to as the "State Contracts" and Illinois, California, Maine, and the District of Columbia are collectively referred to as the "Contracting States."

114.117. The data FMCSA demands fall under the definition of "confidential information" in the State Contracts. Ex. 2ECF No. 1-3 (IL Contract) at 13 ¶ 4.8; Ex. 3 ECF No. 1-5 (CA Contract), at 12–13 ¶¶ A, B(4); Ex. 4 ECF No. 1-6 at 20 ¶ 7; Ex. 4 ECF No. 1-6 at 24; Ex. 4D ECF No. 1-10 at 13 ¶ 30(A); Ex. 5 ECF No. 1-11 at 15 ¶ I.3, 21 ¶ I.10.

115.118. The State Contracts place strict limitations on the disclosure of such confidential information.

116.119. For example, California and Maine's contracts provide that the data shared with CDLIS remain the property of the State, not AAMVA. Ex. 3ECF Nos. 1-5 at 13 ¶ B(1); Ex. 4DECF No. 1-10, at 17 ¶ 42(A).

117.120. California and Illinois' contracts prohibit AAMVA from releasing confidential information without written permission from the state. Ex. 2ECF No. 1-3 at 13 ¶ 4.8. ("No confidential data collected . . . in the course of performance of this contract shall be disseminated except as authorized by law and with the written consent of the disclosing Party[.]"); Ex. 3ECF No. 1-5 at 13 ¶ B(1). Neither Illinois, California, nor any other Contracting State, has given AAMVA permission to disclose state data to FMCSA in response to its Bulk Data Demand.

~~118.~~121. The State Contracts only permit disclosure of confidential information to third parties in narrow circumstances not present here. For example, the CA Contract prohibits AAMVA from "disclos[ing] or mak[ing] available" any confidential information "to any person or for any purpose or object except as authorized by this agreement." ~~Ex. 3~~ECF No. 1-5 at 22 ¶ 2(b)(II); *see also id.* at 13 ¶ B(2) ("[I]nformation obtained under this Agreement shall not be . . . released . . . for any purpose other than identified in this Agreement."); *id.* at 14 ¶ B(9) ("Disclosure of any DMV information to any person or entity not specifically authorized in this Agreement is strictly prohibited."); *see also* ~~Ex. 2~~ECF No. 1-3 at 13 ¶ 4.8 ("No confidential data collected, maintained, or used in the course of performance of this contract shall be disseminated except as authorized by law and with the written consent of the disclosing Party, either during the period of this contract or thereafter."); ~~Ex. 4D~~ECF No. 1-10 at 13 ¶ 30(B) (requiring AAMVA to "take all necessary steps to protect confidential information regarding all persons served by [Maine BMV], including the proper care, custody and use" of confidential information); ~~Ex. 5~~ECF No. 1-11 at 15 ¶ I.3, 21 ¶ I.10 (providing that AAMVA shall "keep all information relating to any . . . customer of the District in absolute confidence and shall not use the information in connection with any other matters . . .").

~~119.~~122. If confidential information is properly disclosed, the State Contracts require certain security measures to protect that data from further dissemination or misuse. For example, the California Contract requires AAMVA to "ensure" that any third party "adhere[s] to" the Agreement's "Information Security and Privacy Provisions." CA Contract, ~~Ex. 3~~ECF No. 1-5 at 12. On information and belief, FMCSA has not agreed in writing to comply with these provisions.

~~120.~~123. The Illinois contract requires that AAMVA familiarize itself with the Data Security Standards of the Illinois Secretary of State and "remain in full compliance" with those

standards "at all times." ~~Ex. 2~~ECF No. 1-3 at 18 ¶ 5.1. These standards require that "[a]ccess to Confidential/Restricted information shall be granted at the *minimum level of access necessary to perform assigned responsibilities*." ~~Ex. 2A~~ECF No. 1-4 (Ill. SOS Security Policies and Standards) at 7. AAMVA's planned data disclosure to FMCSA violates the Data Security Standards because it is not tailored to provide the minimum level of access necessary for FMCSA to perform its responsibilities, which FMCSA has been performing for nearly 40 years without demanding full access to CDLIS records.

~~121.~~124. Maine's contract requires AAMVA to comply with Maine's law regarding notice both to Maine BMV and to Maine citizens when the confidentiality provisions are breached. ~~Ex. 4D~~ECF No. 1-10 at 13 ¶ 30(D) (incorporating 10 M.R.S. Ch. 210-B, Notice of Risk to Personal Data Act). Upon information and belief, AAMVA has not provided notice to Maine BMV or to Maine citizens in connection with its plan to disclose Maine's CDLIS data. It also requires that confidential information authorized to be distributed outside of AAMVA be encrypted and "consideration must be given" to encrypting at the file or record level. ECF No. 1-6~~Ex. 4~~ at 24, 20 ¶ 7; ECF No. 1-10~~Ex. 4D~~ at 13, ¶ 30(A).

~~122.~~125. The State Contracts further require AAMVA to comply with state and federal privacy laws, which prohibit the unauthorized sharing of the requested bulk data. ~~Ex. 2~~ECF No. 1-3 at 15 ¶ 4.14; ECF No. 1-5~~Ex. 3~~ at 12, 13 ¶ B; ECF No. 1-10~~Ex. 4D~~ at 13 ¶ 30(B); ECF No. 1-11~~Ex. 5~~ at 14 ¶ I.3, 21 ¶ I.10; *see supra* Sections III & IV; *see also, e.g.*, Cal. Civ. Code § 1798 *et seq.* (California Information Practices Act); Cal. Gov. Code § 11015.5(b); Cal. Vehicle Code § 1808.47; Cal. Penal Code § 502.

~~123.~~126. If AAMVA is required or permitted to comply with FMCSA's or DHS's demand for States' data, AAMVA will be in breach of the above-described provisions of the State Contracts.

~~124.~~127. Such a breach will cause Illinois, California, Maine, and the District of Columbia irreparable harm, as set forth below. *See infra* Section VI. Given the nature of disclosing confidential information, it is difficult, if not impossible, to quantify the harm such a breach will cause.

**G. FMCSA's Data Demand Harms Plaintiff States**

~~125.~~128. The Data Demand will irreparably harm Plaintiff States. FMCSA has demanded that AAMVA turn over State records—records reflecting sensitive, personal information for millions of State residents—and threatened to terminate the federal grant funding that permits CDLIS to continue operating if AAMVA does not comply. Plaintiff States thus face an impossible predicament: either FMCSA takes their data (in violation of the States' basic commitments to their residents and, in many cases, state law), or it withdraws AAMVA's grant funds, prompting the shutdown of the basic infrastructure that powers the States' issuance of CDLs. Either outcome is untenable.

~~126.~~129. As discussed, CDLIS today serves as the backbone of the States' issuance of CDLs: Consistent with federal law and longstanding practice, Plaintiff States query CDLIS before issuing any CDL, and supply information through CDLIS to other States to facilitate the issuance of *their* CDLs. Indeed, the States' reliance on CDLIS (and AAMVA more broadly) goes further: Many Plaintiff States also query CDLIS before issuing or renewing *non*-commercial driver's licenses, to ensure that individuals obtaining traditional driver's licenses have not been disqualified elsewhere from obtaining a commercial license. And *all* Plaintiff States rely on an analogous AAMVA-operated system called the Problem Driver Pointer System (PDPS), which

allows States to check an applicant's non-commercial driving history in other States in much the same way that CDLIS allows States to check a CDL applicant's driving history. Thus, all Plaintiff States query at least one AAMVA system every time an individual applies for a driver's license.

~~127.~~130. The Data Demand poses an existential threat to this system. AAMVA depends on federal grant funding from FMCSA, and a significant portion of that funding is used to operate CDLIS. Thus, FMCSA's threat to withdraw *all* of AAMVA's federal grants if it does not comply with the Data Demand puts both CDLIS and all other AAMVA services, including the PDPS database, in jeopardy.

~~128.~~131. If AAMVA's funding is withdrawn and Plaintiff States are not able to use CDLIS, Plaintiff States' ability to issue CDLs and to monitor and ensure the safe operation of commercial motor vehicles within their borders would be impaired or lost. Indeed, the threat to Plaintiff States from the shutdown of CDLIS is significant: Because Plaintiff States are required to query CDLIS as a condition of receiving up to eight percent of their federal highway funds—at least hundreds of millions of dollars annually—the shutdown of CDLIS would put Plaintiff States at risk of losing hundreds of millions of dollars in critical highway funds. Plaintiff States that might attempt to continue issuing CDLs without CDLIS would face significant risk and, practically, see long delays in issuance as those States attempted to replace CDLIS with manual jurisdiction-to-jurisdiction checks. Plaintiff States *not* willing take on these risks would have no choice but to simply cease issuing CDLs at all until CDLIS was restored, curtailing commercial motor vehicle traffic and the business activity—and State revenues, including fuel taxes and roadway tolls—that depend on it.

~~129.~~132. That result, in turn, would be deeply detrimental to Plaintiff States' economies. Truck drivers account for millions of jobs and billions of dollars in tax revenue.

According to the American Trucking Association (ATA), the trucking industry employed 8.4 million people in industry-related jobs, including 3.58 million professional drivers, in 2024. In Illinois, for example, industries that rely on the frequent shipment of goods collectively represent over one-quarter of all jobs in the Chicago region and add over $158 billion per year to the regional economy. ATA also reports that commercial trucks accounted for $30.26 billion in federal and state fuel taxes in 2023. The shutdown of State CDL programs would throw this share of States' economies into disarray.

~~130.~~133. Plaintiff States will also be irreparably harmed if AAMVA *does* comply with the Data Demand, turning over millions of records to FMCSA. The real-world consequences of FMCSA's unlawful transfer of custody would be significant. The data in CDLIS—including individuals' names, dates of birth, and Social Security numbers or lack thereof—is highly sensitive personal identification information that is protected by both federal and state law. FMCSA has offered no assurances regarding the protections it will take with the data—if any.

~~131.~~134. Moreover, as explained above, CDLIS data is the *States'* data, not the federal government's data. States maintain and populate the data; they update CDLIS in real time; and they regularly amend their records to eliminate or correct erroneous or out-of-date entries.

~~132.~~135. Transfer of the States' CDLIS records to FMCSA would profoundly alter the nature of the CDLIS database and deprive the States of control over their data. It would create a brand-new database controlled by the federal government but populated in the first instance by the States' data. Plaintiff States would have no access to, or control over, that data, and so would lose the ability to superintend, secure, and verify their records. That creates a significant risk that FMCSA or other federal agencies would take adverse action against Plaintiff States (such as

decertification of their CDL programs) or their residents (such as demanding cancellation of driver's licenses) on the basis of out-of-date, incomplete, and erroneous data.

~~133.~~136. Most significantly, it is now clear that FMCSA has not been candid about its purposes in seeking the data, and in fact intends to share the data with DHS for immigration enforcement purposes. That agency could take action against the States and their residents—including immigration enforcement proceedings—based on that data, even if the data is incomplete or erroneous. Or, if FMCSA transfers data to other federal agencies, including the U.S. Department of Homeland Security, those agencies could also take action against the States or their residents—including initiating immigration enforcement proceedings—based on that data, again even if the data is incomplete or erroneous.

~~134.~~137. Disclosure of Plaintiff States' CDLIS data pursuant to the Data Demand will also impose significant compliance burdens on the States, which have relied on the security and confidentiality of CDLIS records in designing their own driver information systems, and in making representations to applicants about the confidentiality of the information they submit to Plaintiff States. Those representations, on application forms and other communications, may need to be revised, requiring the expenditure of significant State resources.

~~135.~~138. Plaintiff States' residents entrust them with their personal data when they apply for a commercial driver's license. That trust would be damaged if the data is turned over to FMCSA without controls and without a clear and specific statement of FMCSA's purpose in seeking it—particularly given the likelihood that FMCSA will disclose the database to other federal agencies, as FMCSA has stated it may do. An obvious consequence of this loss of trust would be that fewer people would seek CDLs from Plaintiff States. This would mean a loss of revenue to Plaintiff States from fees that CDL applicants pay.

~~136.~~139. The chilling effect of the transfer of data is particularly acute for some individuals who are concerned in general about disclosing their personal information to the federal government, such as non-citizens who are legally present in the United States and lawfully qualified to obtain a CDL, or individuals who are part of mixed-status immigration families. These residents, who would otherwise become qualified operators of commercial motor vehicles and contributors to the Plaintiff States' economies, may avoid doing so, or they may attempt to drive commercial motor vehicles without a license. If the latter were to happen in even a small number of cases, it would pose public-safety risks, as Plaintiff States would not be able to identify the drivers of those commercial motor vehicles and ensure that they are properly qualified to drive them.

**FIRST CAUSE OF ACTION**
**By All Plaintiffs**
**Against Agency Defendants**
**Violation of Administrative Procedure Act**
**Contrary to Law and in Excess of Statutory Authority – 49 U.S.C. § 31309**

~~137.~~140. Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

~~138.~~141. Agency Defendants are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

~~139.~~142. The Data Demand is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

~~140.~~143. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C).

~~141.~~144. The Data Demand, which will result in either the shutdown of CDLIS or the transfer of more than 17 million of the States' confidential driving records to the federal government, is final agency action.

~~142.~~145. The Data Demand is contrary to 49 U.S.C. § 31309(a), because FMCSA issued the Data Demand without "consult[ing] with the States."

~~143.~~146. The CDLIS statute requires the Secretary to "consult with the States in carrying out this section." *Id.* Under the "ordinary meaning" of the word consult, this provision requires, at minimum, that Agency Defendants engage in "a dialogue" with the States "*before*" the Secretary makes any significant changes concerning CDLIS. *HIAS, Inc. v. Trump*, 985 F.3d 309, 320–21 (4th Cir. 2021); *accord Cal. Wilderness Coal. v. Dep't of Energy*, 631 F.3d 1072, 1087 (9th Cir. 2011) (the "ordinary meaning of the word consult" requires that the Secretary "confer with the . . . States before" taking action); *Confederated Tribes & Bands of Yakima Indian Nation v. Fed. Energy Regul. Comm'n*, 746 F.2d 466, 474 (9th Cir. 1984) (agency failed to fulfill its "consultation obligation" merely by giving "notice"); *Env't Def. Ctr., Inc. v. EPA.*, 344 F.3d 832, 864 (9th Cir. 2003) (holding that an agency met its "statutory duty of consultation" because it "circulated" its proposed plan with affected States and "revised [it] based on comments received").

~~144.~~147. Agency Defendants did not confer with the States before issuing or carrying out the Data Demand. Among other things, they did not notify the States of the demand, request or receive their views, or take those views into account before taking this action. Nor have they conferred with the States at any point since issuing the demand.

~~145.~~148. Further, the Data Demand is plainly the type of action that triggers the consultation requirement. If carried out, it would represent a dramatic alteration in the way CDLIS operates, by either shutting down the system or altering it from a platform in which States mutually

exchange information contained in State-owned records, to one in which the federal government may assume control of State records and redisclose them to other agencies or entities as it sees fit. Agency Defendants were obligated to confer with the States before taking this significant step and failed to do so.

~~146.~~149. Agency Defendants' failure to consult was not harmless. Had the States been consulted, they would have provided a wealth of relevant information to FMCSA: Among other things, they would have informed the agency of the dire practical consequences for the States if FMCSA carried carrying through on its threat to shut down CDLIS; the serious adverse consequences the data-sharing would have on the States' administration of their CDL programs; and the contractual agreements between AAMVA and the States that barred AAMVA from sharing information with FCMSA. The relevant correspondence indicates that FMCSA took into account none of these considerations before making its decision.

~~147.~~150. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Data Demand is contrary to law and in excess of statutory authority.

~~148.~~151. Plaintiff States are also entitled to vacatur of the Data Demand, 5 U.S.C. § 706, a stay of the Data Demand, 5 U.S.C. § 705, and a preliminary and permanent injunction prohibiting Defendants from demanding State records available on CDLIS.

**SECOND CAUSE OF ACTION**
**By All Plaintiffs**
**Against Agency Defendants**
**Violation of Administrative Procedure Act**
**Contrary to Law and in Excess of Statutory Authority – Driver's Privacy Protection Act**

~~149.~~152. Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

~~150.~~153. The Data Demand is also contrary to the DPPA.

~~151.~~154. The DPPA prohibits "any person" from knowingly "obtain[ing] or disclos[ing] any personal information[] from a motor vehicle record" unless one of fourteen enumerated exceptions applies. 18 U.S.C. § 2722(a); *see id.* §§ 2721(a)(1), (c). "Highly restricted personal information" may be disclosed only if one of four exceptions applies. 18 U.S.C. § 2721(a)(2).

~~152.~~155. The MPRs that are the subject of the Data Demand contain "personal information" drawn directly from "motor vehicle records" of the Plaintiff States. Moreover, they contain "highly restricted personal information," including social security numbers. *Id.* § 2725(4). Thus, this disclosure is prohibited unless one of four exceptions applies.

~~153.~~156. The sole exception FMCSA has identified as basis for the disclosure is the government use exception. Under the exception, an agency may disclose highly restricted personal information "[f]or use by any government agency, including any court or law enforcement agency, in carrying out *its* functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions." 18 U.S.C. § 2721(b)(1) (emphasis supplied). Because this exception pertains to the disclosure of highly restricted personal information, it must be "narrowly . . . read," and construed to permit only those disclosures that are authorized in "clear and explicit language." *Maracich*, 570 U.S. at 60, 64. As the *en banc* Seventh Circuit has explained, this exception permits disclosure only where the requesting agency demonstrates that "*all* of th[e] information" it obtains "actually [i]s used in effectuating" a legitimate government function. *Senne*, 695 F.3d at 606 (citation modified).

~~154.~~157. The Data Demand does not satisfy this requirement. FMCSA has not demonstrated that "all of th[e] information" in the 17 million MPRs that it has demanded from AAMVA will "actually [be] used in effectuating" any of its statutory functions. Instead, it has

vaguely asserted that it "intends to use this data to execute its statutory safety and regulatory mandates" under various provisions of law, and that "[d]irect access to this data" will assist FMCSA in carrying out those responsibilities. But FMCSA has not claimed that it will "actually" use "all" 17 million names, social security numbers, dates of birth, and driver's license numbers currently held by AAMVA in carrying out any statutory function—nor is it plausible that the agency has any present intention of using every "particular piece of disclosed information" in that vast database. *Senne*, 695 F.3d at 606; *see Weber*, 816 F. Supp. 3d at 1195 & n.35 (federal government's attempted collection of "millions of Californians' drivers license numbers" unlawful because the federal government "ha[d] not identified" how all of that information would be used). And an agency's mere desire for "[d]irect access" for information does not constitute "*use*" of the information "in carrying out [the agency's] functions," as the statute requires.

~~155.~~158. Further, FMCSA has not actually identified any statutory function it believes this information will help it carry out. In its correspondence with AAMVA, FMCSA asserted that it would use this information to carry out its functions under "49 U.S.C. Chapters 311 and 313" and its "core responsibilities under 49 U.S.C. § 113." These sections of the U.S. Code, however, collectively encompass the entirety of FMCSA's statutory mandate. 49 U.S.C. § 113 alone vests the Administrator of FMCSA with the "duties and powers related to motor carriers or motor carrier safety vested in the Secretary by chapters 5, 51, 55, 57, 59, 133 through 149, 311, 313, 315, and 317 and by section 18 of the Noise Control Act of 1972," as well as any "additional duties and powers prescribed by the Secretary." 49 U.S.C. § 113(f). FMCSA's request thus does nothing to narrow or specify the functions for which FMCSA will ostensibly use the information; it is tantamount to a statement that FMCSA will use the information "in fulfilling its lawful functions." Reading the statute to permit disclosure on this ground would drain it of any

meaningful content, and it would allow disclosure to an agency based on nothing more than its say-so. It is implausible that Congress intended to authorize disclosure of "highly restricted personal information" based on this empty formality.

~~156.~~159. Finally, FMCSA's rationale for seeking the records is solely not to carry out its own statutory duties, but to turn the records over to DHS to help it engage in in "immigration enforcement." The government use exception, however, authorizes disclosure only "for use by any government agency . . . in carrying out its functions." Obtaining records in order to share them with another agency is not "use." And FMCSA may only obtain the records for purpose of "carrying out *its* functions," not to assist other agencies in carrying out theirs. Its demand is thus unlawful for that reason, as well.

~~157.~~160. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Data Demand is contrary to law and in excess of statutory authority.

~~158.~~161. Plaintiff States are also entitled to vacatur of the Data Demand, 5 U.S.C. § 706, as well as a stay of the Data Demand, 5 U.S.C. § 705, and preliminary and permanent injunctive relief prohibiting any implementation of the Data Demand as to the Plaintiff States.

**THIRD CAUSE OF ACTION**
**By All Plaintiffs**
**Against Agency Defendants**
**Violation of Administrative Procedure Act**
**Contrary to Law and in Excess of Statutory Authority – Privacy Act**

~~159.~~162. Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

~~160.~~163. The Data Demand is contrary to the Privacy Act.

~~161.~~164. FMCSA is an agency under the APA and the Privacy Act. 5 U.S.C. § 551(1); *id.* § 552a(a)(1).

~~162.~~165. CDLIS contains "record[s]" of "individual[s]" within the meaning of the Privacy Act. 5 U.S.C. §§ 552a(a)(2), (a)(4).

~~163.~~166. The transfer of the CDLIS records to FMCSA will establish a system of records maintained by FMCSA under the Privacy Act. *Id.* §§ 552a(a)(3), (a)(5).

~~164.~~167. The Privacy Act requires FMCSA to issue a SORN by publishing in the Federal Register and providing an opportunity for interested persons to submit comments when it establishes a system of records. *Id.* § 552a(e)(4), (11). FMCSA failed to issue a SORN notifying the public of its intention to create a new system of records to hold CDLIS records. And no existing System of Records is defined in a manner that could permissibly include the records that would be transferred to FMCSA pursuant to the Data Demand, meaning that none of FMCSA's existing SORNs would permit the agency to hold CDLIS records in an existing system of records.

~~165.~~168. The Privacy Act required FMCSA to "provide adequate advance notice of" the establishment or significant modification of a system of records "to the Committee on Government Operations of the House of Representatives, the Committee on Governmental Affairs of the Senate, and the Office of Management and Budget in order to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals." *Id.* § 552a(r). FMCSA failed to do so.

~~166.~~169. The Privacy Act required that FMCSA's system of records include "only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President." *Id.* § 552a(e)(1). The federal government's role relating to CDLIS is to maintain and administer a platform on which States can post their own records for the purposes of exchanging information

with other States. FMCSA's Data Demand includes information that is not relevant and necessary to accomplish this purpose and thus violates section 552a(e)(1).

~~167.~~170. The Privacy Act required that FMCSA "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs." *Id.* § 552a(e)(2). FMCSA violated section 552a(e)(2) by collecting information from AAMVA without attempting to collect the information from the individuals whose information is contained in CDLIS.

~~168.~~171. The Privacy Act prohibits FMCSA from "disclos[ing] any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless" a specific statutory exception applies. *Id.* § 552a(b). FMCSA's intended disclosure of its system of records to "federal partner agencies" "in furtherance of legitimate government functions" would violate section 552a(b).

~~169.~~172. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Data Demand is contrary to law and in excess of statutory authority.

~~170.~~173. Plaintiff States are also entitled to vacatur of the Data Demand, 5 U.S.C. § 706, as well as a stay of the Data Demand, 5 U.S.C. § 705, and preliminary and permanent injunctive relief prohibiting any implementation of the Data Demand as to the Plaintiff States.

**FOURTH CAUSE OF ACTION**

**By All Plaintiffs**
**Against Agency Defendants**
**Violation of Administrative Procedure Act**
**Contrary to Law and in Excess of Statutory Authority – 49 U.S.C. § 31301 *et seq.***

~~171.~~174. Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

~~172.~~175. Neither the CDLIS statute nor any other provision of law authorizes FMCSA to acquire State-owned records from AAMVA.

~~173.~~176. Because the CDLIS statute was enacted pursuant to the Spending Clause, Congress must provide "clear notice" of any conditions it intended to impose on participation in CDLIS. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Thus, any statutory "obligations" must "be set out 'unambiguously,'" so that the States can "clearly understand" the duties they are undertaking in exchange for federal funding. *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

~~174.~~177. The CDLIS statute nowhere expresses—let alone "unambiguously"—that States must agree to turn over their driver license records to the federal government as a condition of their participation in CDLIS. The CDLIS statute contains an explicit, detailed list of the "Requirements for State participation" in CDLIS. 49 U.S.C. § 31311. None alludes to such a condition. Instead, the statute repeatedly states only that States are required to make relevant "information" available through CDLIS for the benefit of other States considering applications for CDLs. *Id.* §§ 31311(a)(5)–(9).

~~175.~~178. Further, the CDLIS statute repeatedly makes clear that the federal government's sole role relating to CDLIS is to maintain and administer a platform on which States can post their own records for the purposes of exchanging information with other States. The statute provides that the CDLIS "will serve as a *clearinghouse* and *depository* of information," *id.*

§ 31309(a)—both words that refer to a system that securely stores third-party information so that it can be viewed by others. *See* Webster's Third New International Dictionary at 420 (1986) (defining "clearinghouse" as "an agency for collection, classification and distribution . . . of information . . . requiring wide distribution"); *id.* at 606 (defining "depository" as a place "with which something . . . is deposited for preservation or safekeeping"). It charges the Secretary or the system's authorized operator with "notify[ing]" other States of the content of that information. 49 U.S.C. § 31311(c). Nothing in the statute says or even suggests that the federal government may take advantage of this service to copy and use State-provided records for its own purposes. *Cf.* S. Rep. No. 99-411, at 7 (stating that the establishment of CDLIS "will not affect the existing privacy rights of commercial drivers" because it will only permit "an inquiring State, employer, or prospective employer to obtain person's commercial driving record"). States accordingly did not "voluntarily and knowingly" agree to that term as a condition of participation. *Arlington*, 548 U.S. at 296.

~~176.~~179. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Data Demand is contrary to law and in excess of statutory authority.

~~177.~~180. Plaintiff States are also entitled to vacatur of the Data Demand, 5 U.S.C. § 706, a stay of the Data Demand, *id.* § 705, and a preliminary and permanent injunction prohibiting Defendants from demanding State records available on CDLIS.

**FIFTH CAUSE OF ACTION**
**By All Plaintiffs**
**Against Agency Defendants**
**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action**

~~178.~~181. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

~~179.~~182. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

~~180.~~183. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

~~181.~~184. An action is also arbitrary and capricious if the agency "'failed to consider . . . important aspects of the problem'" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs*., 463 U.S. at 43). In particular, when an agency changes policy, it must "display awareness that it is changing position," "provide a reasoned explanation for the change" and consider any "serious reliance interests" engendered by its prior policy. *FDA v. Wages & White Lion Invests., LLC*, 604 U.S. 542, 568 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)).

~~182.~~185. The Data Demand is arbitrary and capricious. In issuing this demand, FMCSA sharply departed from decades of policy: until this point, FMCSA had never demanded "direct access" to the records in CDLIS to perform its statutory functions. Instead, in numerous policy documents and agency pronouncements dating to the system's inception in 1986, FMCSA and its predecessor agencies asserted that the records in CDLIS belong to the States and are shared by CDLIS for the purpose of assisting other States in verifying the qualifications and identity of CDL applicants. States in turn relied on that settled approach in assuring applicants for CDLs that

their information would be disclosed only for limited purposes and in choosing to participate in CDLIS at all.

~~183.~~186. The Data Demand upends that settled approach. It now asserts that FMCSA itself will assume control of all of the records in the system and that FMCSA may disclose that information to any *other* agency it wishes who seeks those records to carry out its own duties.

~~184.~~187. This change of policy is neither "reasonable" nor "reasonably explained." *Prometheus Radio*, 592 U.S. at 423. FMCSA did not even "display awareness" that it was "changing position," *White Lion*, 604 U.S. at 568 (citation omitted), much less offer any explanation to the States or the public for its about-face. FMCSA did not consider the "serious reliance" that its longstanding approach had created—both among the States that used the system based on the expectation that their records would remain their own, and the CDL applicants who submitted information to the States based on legitimate assurances of confidentiality. *Id.* Nor did FMCSA weigh the potential costs of its dramatic break with past practice or consider alternatives to its chosen approach. *See State Farm*, 463 U.S. at 43.

~~185.~~188. Even if FMCSA had statutory authority to adopt this new policy—which it did not—it had a duty to ensure that its change of course was "the product of a reasoned decisionmaking process" and "properly explained." *California v. Dep't of Health & Hum. Servs.*, No. 25-cv-05536-VC, 2025 WL 2356224, at *1 (N.D. Cal. Aug. 12, 2025) (enjoining agreement between HHS and DHS to share Medicaid data with DHS for immigration purposes, where agency departed without explanation from longstanding "policy against using Medicaid data for immigration enforcement purposes"). Agency Defendants did not fulfill that duty here.

~~186.~~189. The Data Demand is also arbitrary and capricious because FMCSA has not adequately justified it, weighed costs, or considered alternatives. Its correspondence with AAMVA

does not identify any particular statutory authority this vast database would assist it in fulfilling or explain why FMCSA suddenly requires these records to fulfill its longstanding statutory duties. FMCSA has not weighed the costs of upending the confidentiality interests of millions of drivers. And it has not considered alternatives short of compelling the production of all 17 million records.

~~187.~~190. In addition, the Data Demand is also arbitrary and capricious because it is premised on an unprecedented threat to withdraw all of AAMVA's funding—and thereby shut down CDLIS—unless AAMVA complied with the demand. FMCSA did not explain or weigh the consequences of putting AAMVA to this extraordinary choice. Among other things, FMCSA neglected to consider the harms of eliminating access to CDLIS nationwide, which would have included halting the issuance of CDLs by all 50 States and the District of Columbia. And FMCSA did not consider the federalism impacts of effectively shutting down the core State function of issuing licenses that allow individuals to drive trucks, buses, and other commercial motor vehicles on State roads.

~~188.~~191. Finally, the Data Demand is arbitrary and capricious because FMCSA's stated rationale is plainly "pretextual." *Dep't of Commerce v. New York*, 588 U.S. 752 (2019). Although FMCSA claimed its purpose in collecting the records was to carry out its own statutory mandates, it admitted to AAMVA that it is coordinating its demands with DHS; DHS issued a subpoena requesting the same records three days after FMCSA submitted its request; DHS said it would withdraw that subpoena after AAMVA indicated it would comply with FMCSA's request; then DHS re-issued the subpoena after FMCSA rejected AAMVA's opt-in/opt-out plan; and FMCSA then threatened to move to enforce the subpoena that DHS (not FMCSA) had served. In this circumstance, the obvious inference, as AAMVA itself concluded, is that FMCSA sought the records, at least in part, for an "immigration enforcement purpose." That straightforward

conclusion is reinforced by the unprecedented nature of FMCSA's request and the absence of any apparent reason FMCSA would suddenly need this vast body of records (as it claimed) to fulfill its longstanding statutory mandates.

~~189.~~192. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Data Demand is arbitrary and capricious.

~~190.~~193. Plaintiff States are also entitled to vacatur of the Data Demand, 5 U.S.C. § 706, as well as a stay of the Data Demand, *id.* § 705, and preliminary and permanent injunctive relief prohibiting any implementation of the Data Demand as to the Plaintiff States.

**SIXTH CAUSE OF ACTION**
**By All Plaintiffs**
**Against Agency Defendants**
**Violation of the Spending Clause**

~~191.~~194. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

~~192.~~195. The Spending Clause of the U.S. Constitution provides that "[t]he Congress shall have Power To . . . provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Legislation establishing CDLIS was enacted pursuant to the Spending Clause.

~~193.~~196. Among other requirements, the Spending Clause requires that States must receive "fair notice" of any conditions on the receipt of federal funds. *Arlington*, 548 U.S. at 304. Any conditions on federal funding must be accepted by States "voluntarily and knowingly," and it is well established that "States cannot knowingly accept conditions of which they are 'unaware.'" *Id.* at 296 (quoting *Pennhurst*, 451 U.S. at 17). Any condition on the States' acceptance of federal funds must thus be set forth "unambiguously." *Id.*

~~194.~~197. In creating the CDLIS program, Congress made clear that eight percent of each State's federal highway funding would be conditioned upon the State granting other States access to their drivers' sensitive information. 49 U.S.C. § 31314(c). The States also understood that, by accepting this funding, they would be required to query CDLIS before issuing CDLs, *id.* § 31311(a)(5), notify CDLIS upon issuing or cancelling CDLs, *id.* § 31311(a)(7)–(8), invest in computer systems that would interoperate with CDLIS, *id.* § 31311(a)(21), and forgo creating any other exchange for driver-record information with other States, *id.* § 31311(a)(23). However, when they agreed to these conditions, the States also understood that this repository would be accessed only by *States*, and then only on an individualized basis when the States themselves had a legitimate need for an individual's information.

~~195.~~198. At no point in this web of requirements did Congress or FMCSA provide that, as a condition for receiving highway funding, the States would need to hand over, in bulk, their CDL holders' sensitive information to the *federal government* to use and share as it sees fit. To the contrary, the States had every expectation that their data would *not* be shared in this manner: Congress made clear that the role of the FMCSA Secretary and AAMVA was simply to maintain and operate CDLIS for *States* to use for licensing, not to trawl the database for their own purposes.

~~196.~~199. The States could not have known that, by agreeing to invest in and contribute to an inter*state* exchange mechanism for checking driver history for safety purposes, they would be granting *FMCSA* access to their residents' sensitive data to be shared with unknown third parties for unknown purposes, and without the privacy protections that federal law mandates.

~~197.~~200. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Data Demand violates the Spending Clause of the U.S. Constitution.

~~198.~~201. Plaintiff States are also entitled to a preliminary and permanent injunction prohibiting any implementation of the Data Demand as to Plaintiff States.

**SEVENTH CAUSE OF ACTION**
**By Plaintiffs Illinois, California, Maine, District of Columbia**
**Against Defendant AAMVA**
**Breach of Contract**

~~199.~~202. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

~~200.~~203. Illinois, California, Maine, and the District of Columbia (hereinafter, the Contracting States) have contracts with AAMVA that govern their participation in CDLIS. The Contracting States have performed their duties under their respective contracts with AAMVA.

~~201.~~204. If AAMVA produces MPRs to either FMCSA or DHS, it will be in breach of its contracts with the Contracting States.

~~202.~~205. The State Contracts provide that the information demanded by FMCSA and DHS is confidential information, and should therefore be strictly controlled. The State Contracts prohibit AAMVA from turning over confidential information, except in narrow circumstances not present here, and with additional security protections on that data.[3] AAMVA's compliance with the Data Demand or the DHS subpoena will violate these contractual provisions of the State Contracts.

~~203.~~206. The Illinois, California, and Maine contracts prohibit AAMVA from sharing confidential information with third parties absent the State Agencies' permission. Neither Illinois nor California (nor any Contracting States) have given AAMVA permission to release the

[3] For example, California's contract requires that AAMVA ensure any third party receiving CDLIS data also agree to the data security provisions in the California Contract.

demanded data to FMCSA. AAMVA's compliance with the Data Demand or the DHS subpoena will therefore violate these contractual provisions.

~~204.~~207. Further, California, Maine, and the District of Columbia's contracts require AAMVA to comply with state and federal law regarding the handling of confidential information. As described above, compliance with the Data Demand or the DHS subpoena violates federal law and state privacy laws. *See e.g.*, Cal. Civil Code § 1798.1.

~~205.~~208. If AAMVA breaches its contract, the Contracting States will suffer irreparable harm, as described herein. Money damages will be impossible to quantify and insufficient to remedy the harm to Contracting States from the disclosure of those States' confidential information to FMCSA. Therefore, a preliminary and permanent injunction is warranted to prevent AAMVA from turning over the Contracting States' CDLIS data to FMCSA or DHS.

## V. PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

a. Enter judgment for Plaintiff States and against Defendants;

b. Declare that the Data Demand and any implementation of it is unlawful;

c. Set aside the Data Demand;

d. Stay and preliminarily and permanently enjoin implementation or enforcement of the Data Demand as to any records owned or provided by Plaintiff States;

e. Prohibit any terminations of grants based on the Data Demand or any purported noncompliance with the Data Demand;

f. Enjoin Defendant AAMVA from transferring the Contracting States' CDLIS data to FMCSA or DHS;

g. Enjoin Defendants FMCSA and DOT from accepting from AAMVA any transfer of records owned or provided by Plaintiff States responsive to the Data Demand;

h. Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

i. Award the States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

j. Award such additional relief as this Court may deem just and proper.

DATED this 2513th day of August 2026.

**KWAME RAOUL**
Attorney General of Illinois

*/s/ Katharine Roller*
CARA HENDRICKSON*†
*Executive Deputy Attorney General*
KATHARINE ROLLER†*
~~PAUL BERKS*~~
*Complex Litigation Counsel*
GRETCHEN HELFRICH*†
*Deputy Chief, Special Litigation Bureau*
MOLLY MAUCK*†
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St.,
Chicago, IL 60603
312-814-3000
Cara.Hendrickson@ilag.gov
Katharine.Roller@ilag.gov
~~Paul.Berks@ilag.gov~~
Gretchen.Helfrich@ilag.gov
Molly.Mauck@ilag.gov
*Counsel for Plaintiff State of Illinois*

**JAY JONES**
Attorney General of Virginia

*/s/ Megan C. Keenan*
TILLMAN J. BRECKENRIDGE (#85647)
*Solicitor General*
MEGAN C. KEENAN (#102489)
*Deputy Solicitor General*
*Counsel of Record*
MIKAELA A. PHILLIPS (#97164)
*Assistant Solicitor General*
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219
804-786-2071
mkeenan@oag.state.va.us
mphillips@oag.state.va.us
*Counsel for Plaintiff Commonwealth of Virginia*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

*/s/ Mitchell P. Reich*
MITCHELL P. REICH†*
*Senior Counsel to the Attorney General*
KARTHIK REDDY†*
*Special Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth St. NW
Washington, DC 20001
202-279-1261
Mitchell.Reich@dc.gov
*Counsel for Plaintiff District of Columbia*

**ROB BONTA**
Attorney General of California

*/s/ David Green*
THOMAS S. PATTERSON*
MICHAEL L. NEWMAN*
*Senior Assistant Attorneys General*
SETH E. GOLDSTEIN*
ROBIN L. GOLDFADEN*
*Supervising Deputy Attorneys General*
DAVID GREEN*
MARIA BUXTON*
CHASE GOLDSTEIN*
EZRA KAUTZ*
EMILIA P. E. MORRIS*
*Deputy Attorneys General*
1300 I Street, Suite 125
Sacramento, CA 95814
916-210-6242
David.Green@doj.ca.gov
*Counsel for Plaintiff State of California*

**KRISTIN MAYES**
Attorney General of Arizona

*/s/ Mary M. Curtin*
MARY M. CURTIN†*
*Senior Litigation Counsel*
Arizona Attorney General's Office
2005 N. Central Ave.
Phoenix, AZ 85004
602-542-3333
Mary.Curtin@azag.gov
ACL@azag.gov
*Counsel for Plaintiff State of Arizona*

**PHIL WEISER**
Attorney General of Colorado

*/s/ Gabe Podesta*
GABE PODESTA†*
SARAH H. WEISS†*
*Senior Assistant Attorneys General*
1300 Broadway, 10th Fl.
Denver, CO 80203
720-508-6000
Gabe.Podesta@coag.gov
Sarah.Weiss@coag.gov
*Counsel for Plaintiff State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

*/s/ Vianca Malick*
VIANCA MALICK†*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Vianca.Malick@ct.gov

**KATHLEEN JENNINGS**
Attorney General of Delaware

/s/ *Ian R. Liston*
IAN R. LISTON†*
*Director of Impact Litigation*
VANESSA L. KASSAB*
*Deputy Attorney General*
ANURADHA SIVARAM†*
*Assistant Attorney General*

*Counsel for Plaintiff State of Connecticut*

Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov
*Counsel for Plaintiff State of Delaware*

**ANNE E. LOPEZ**
Attorney General of Hawai'i

/s/ Kaliko'onālani D. Fernandes
KALIKO'ONĀLANI D. FERNANDES*†
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
808-586-1360
kaliko.d.fernandes@hawaii.gov
*Counsel for Plaintiff State of Hawai'i*

**AARON M. FREY**
Attorney General of Maine

/s/ Halliday Moncure
HALLIDAY MONCURE*
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8800
Halliday.Moncure@maine.gov
*Counsel for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

/s/ Yasmin Dagne
YASMIN DAGNE†*
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-223-1580
ydagne@oag.maryland.gov
*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

/s/ Gerard J. Cedrone
GERARD J. CEDRONE†*
*Deputy State Solicitor*
MICHELLE PASCUCCI†*
*State Trial Counsel*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
617-963-2282
Gerard.Cedrone@mass.gov
*Counsel for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

/s/ Neil Giovanatti
NEIL GIOVANATTI*
*Assistant Attorney General*
P.O. Box 30212
Lansing, MI 48909
517-241-1050
GiovanattiN@michigan.gov

**AARON D. FORD**
Attorney General of Nevada

/s/ K. Brunetti Ireland
K. BRUNETTI IRELAND*
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Michigan*

*Counsel for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

/s/ Amanda McElfresh
AMANDA MCELFRESH†*
*Deputy Attorney General*
New Jersey Office of the Attorney General
124 Halsey Street
Newark, NJ 07101
609-696-5363
Amanda.McElfresh@law.njoag.gov
*Counsel for Plaintiff State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

/s/ Anjana Samanti
ANJANA SAMANT*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
asamant@nmdoj.gov
*Counsel for Plaintiff State of New Mexico*

**LETITIA JAMES**
Attorney General of New York

/s/ Rabia Muqaddam
RABIA MUQADDAM†*
*Chief Counsel for Federal Initiatives*
~~ZOE LEVINE*~~
~~*Special Counsel for Immigrant Justice*~~
MATTHEW CONRAD†*
*Assistant Attorney General*
28 Liberty St.
New York, NY 10005
212-416-8333
Rabia.Muqaddam@ag.ny.gov
~~Zoe.Levine@ag.ny.gov~~
Matthew.Conrad@ag.ny.gov
*Counsel for Plaintiff State of New York*

**DAN RAYFIELD**
Attorney General of Oregon

/s/ Scott P. Kennedy
SCOTT P. KENNEDY*
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
971-673-1880
Scott.Kennedy@doj.oregon.gov
*Counsel for Plaintiff State of Oregon*

**JOSH SHAPIRO**
Governor for Commonwealth of Pennsylvania

/s/ Jacob B. Boyer
JENNIFER C. SELBER*
JACOB B. BOYER†*
Governor's Office of General Counsel
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
JacobBoyer@pa.gov
*Counsel for Governor Josh Shapiro*

**CHARITY R. CLARK**
Attorney General of Vermont

/s/ Ryan Patrick Kane
RYAN PATRICK KANE†*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
802-828-3171
Ryan.Kane@vermont.gov
*Counsel for Plaintiff State of Vermont*

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Lauryn K. Fraas*
LAURYN K. FRAAS†*
*Assistant Attorney General*
800 Fifth Ave., Suite 2000
Seattle, WA 98104-3188
206-464-7744
Lauryn.Fraas@atg.wa.gov
*Counsel for Plaintiff State of Washington*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Brian Keenan*
BRIAN KEENAN†*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707
608-266-0020
Brian.Keenan@wisdoj.gov
*Counsel for Plaintiff State of Wisconsin*

**ANDY BESHEAR**
Governor for Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO*
*General Counsel*
SAM FLYNN*
*Chief Deputy General Counsel*
LAURA C. TIPTON*
*Deputy General Counsel*
Office of the Governor
501 High Street, 2nd Floor
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov
*Counsel for Governor Andy Beshear*

**KEITH ELLISON**
Attorney General of Minnesota

*/s/ Lindsey E. Middlecamp*
LINDSEY E. MIDDLECAMP*
*Special Counsel, Rule of Law*
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0711
Lindsey.Middlecamp@ag.state.mn.us
*Counsel for Plaintiff State of Minnesota*

**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Patrick Reynolds*
PATRICK REYNOLDS*
*Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400
preynolds@riag.ri.gov
*Counsel for Plaintiff State of Rhode Island*

** Pro hac vice forthcoming*