**IN THE UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

STATE OF ILLINOIS, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, et al.,

Defendants.

Case No. 26-cv-2547 (AJT/IDD)

# FEDERAL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

BENJAMIN T. HAYES
Senior Counsel to the Assistant Attorney General
Civil Division

NOAH T. KATZEN
Assistant Branch Director

EITAN R. SIRKOVICH
(D.C. Bar No. 90030102)
WILLIAM S. JANKOWSKI
(D.C. Bar No. 90021524)
LINDSEY GILMAN
(AZ Bar No. 034003)
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20005
Tel. (202) 353-5525
Eitan.r.sirkovich@usdoj.gov

TODD BLANCHE
United States Attorney General

THEOPHANI K. STAMOS
First Assistant United States Attorney

MATTHEW J. MEZGER
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3731
Fax: (703) 299-3982
Email: Matthew.Mezger@usdoj.gov

*Counsel for Federal Defendants*

# TABLE OF CONTENTS


INTRODUCTION ........ 1

ARGUMENT ........ 2

I. The Court Should Revisit Its Jurisdictional Conclusions. ........ 2

- A. The August 11 Letter Contemplated Future Agency Action but Did Not Itself Constitute a Final Action. ........ 3
- B. The August 11 Letter Is an Order Over Which the Hobbs Act Precludes District Court Review. ........ 5
- C. Plaintiffs Do Not Fall Within the Statutory Zones of Interests. ........ 9

II. The Court Should Reevaluate Plaintiffs' Likelihood of Success on the Merits. ........ 11

- A. DOT's Access to CDLIS Is a Clear Condition on Federal Spending, Allowing DOT to Take Custody of the Information. ........ 11
- B. Plaintiffs' Arbitrary and Capricious Claim is Unlikely to Succeed. ........ 12
- C. Plaintiffs' Contrary to Law Claims Are Unlikely to Succeed. ........ 16

III. The Court Should Appropriately Tailor Any Preliminary Relief. ........ 18

CONCLUSION ........ 19

## INTRODUCTION

The Department of Transportation's (DOT) request in the August 11 Letter to the American Association of Motor Vehicle Administrators (AAMVA) for bulk access to the Commercial Drivers License Information System (CDLIS), which the agency is responsible for maintaining, was rationally grounded in the clear conditions Congress set on Federal Highway Funding and the terms of the agency's contract with AAMVA. Though the Court granted Plaintiff States' request for a temporary restraining order (TRO) after finding that it had jurisdiction over this matter and that the Plaintiff States were likely to succeed on the merits of their claims, it should reevaluate both conclusions at this juncture, as key details were overlooked in the rushed TRO posture.

On jurisdiction, the Court should revisit several aspects of its analysis of final agency action, the Hobbs Act, and statutory standing. First, the Court mistook DOT's indication of future agency action as a final agency action itself, notwithstanding the multiple steps that would need to occur before the culmination of any decision to terminate AAMVA's grants or contracts. It also did not heed controlling Fourth Circuit precedent finding that an agency's request for compliance by a date certain is not a final action, even when it is accompanied by warnings of future consequences. *See Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627 (4th Cir. 2024). Second, it concluded that the letter was not an "order" under the Hobbs Act, even though the letter does not fit the description of any of the other finite types of agency action—rules, licenses, sanctions, and relief. Third, it concluded that the States' interest in their citizens' privacy came within the zones of interest of the Privacy Act and Driver's Privacy Protection Act (DPPA), even though the States disavow that interest (as they must, because they cannot assert their citizens' interests against the federal government). But without that interest, the States' case for statutory standing crumbles.

The merits deserve reevaluation as well. The Court's conclusion that Defendants likely violated the Spending Clause by not giving clear notice of conditions on federal funding ignored 49 U.S.C. § 31106(c)(2), which expressly conditions federal funding on "provid[ing] the Secretary access to all State licensing status and driver history records via an electronic information system[.]" The Court also found it was unlikely that DOT rationally considered how it intended to use the requested data, such that its request was likely arbitrary and capricious and insufficient to invoke DPPA's government-use exception. As explained in the attached declarations, however, the agency did consider its intended use and rationally concluded it would improve DOT's effectiveness in carrying out statutory mandates, particularly as it relates to investigations and enforcement, collection of civil penalties, State performance monitoring, and data analytics.

While Defendants devote this brief to elaborating upon these issues, Defendants also incorporate by reference their Opposition to Plaintiffs' Motion for a Temporary Restraining Order, ECF No. 45, in its entirety, including all background information discussed and arguments raised.

## ARGUMENT

### I. The Court Should Revisit Its Jurisdictional Conclusions.

In granting a temporary restraining order, the Court found that it likely has jurisdiction. Respectfully, the Court should not adhere to that view. The Court lacks jurisdiction because (1) the challenged letter is not a final agency action under Fourth Circuit precedent; (2) if it were, then it would be an order barred from review under the Hobbs Act; and (3) the States are not the proper parties to bring a lawsuit under the Privacy Act or DPPA, nor do they assert any interests protected by those statutes.

**A. The August 11 Letter Contemplated Future Agency Action but Did Not Itself Constitute a Final Action.**

The Court should reevaluate its conclusion that the August 11 Letter is final agency action, as Fourth Circuit precedent clearly establishes that it is not. *See Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024).

The Court concluded that the August 11 Letter was final agency action because the letter expressed that if AAMVA did not turn over the requested data, DOT would have "no choice but to take immediate action." TRO Op. 6. This conclusion mistakes the promise of future agency action as a final action itself. *Cf. Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026) ("Federal courts review final rules, not proposed rules."). Contrary to the Court's finding, AAMVA's decision whether to comply was not "the only contingency" preceding the culmination of any of the actions contemplated by the August 11 Letter. TRO Op. at 6.

As the attached Declaration of Keith Graham (Graham Decl.) details, before terminating any of AAMVA's grants, several steps would need to occur, as outlined by 2 C.F.R. § 200.339-340. Graham Decl. ¶¶ 12-14. "Before a grant may be terminated, the Agency must issue a formal written notification specifying the reason for termination, the effective date, and instructions for settling remaining allowable expenses." *Id*. at ¶ 15. Furthermore, the only person with authority to terminate grant funds is the agency's grants officer, who is not the signatory of the August 11 Letter. *Id*. at ¶ 16.

Several steps would also remain before terminating AAMVA's contracts. First, the agency would need to determine whether it is exercising its right to terminate for convenience or terminating for default in accordance with the terms of the Federal Acquisition Regulation (FAR). *Id*. at ¶ 6. Depending on which path is chosen, different procedures would apply, such as a period for the contractor to cure any identified deficiency. *Id*. at ¶¶ 7-8. Furthermore, there is a process of

appeal to the Civilian Board of Contract Appeals or the Court of Federal Claims. *Id*. at ¶ 9. And, like the grants, there is only one person authorized to terminate the contracts—the Contract Officer—who was not a signatory of the August 11 Letter. *Id*. at ¶ 6.

This case is controlled by *Jake's Fireworks*, which held that an agency's notice letters directing the recipient to take specific actions by a date certain in order to comply with the agency's understanding of the recipients' legal obligations, and the agency's accompanying promise to explore all available enforcement actions should the recipient fail to comply, was not a final agency action. 105 F.4th at 631. There, like here, the agency sent a "request" that "concluded by warning of potential [] penalties" if the recipient did not comply within a 90-day deadline. *Id*. at 630; *compare with* ECF 1-2 at 21 (writing to "ensure the timely production of the pointer records DOT requested in its initial June 25, 2026, letter" and concluding with a warning that "[u]nless AAMVA provides DOT with the requested records by August 17, DOT will pursue all available options to secure production"). The Fourth Circuit looked both to "the statutes and regulations that govern the agency action at issue" and to "the language of the notices" to determine they were not final. *Jakes' Fireworks Inc.*, 105 F.4th at 631, 633.

Beginning with the statutes and regulations, the Fourth Circuit examined whether the official who sent the letter had actual authority to take a final agency action. *See id.* at 631. The panel found that the official did not have that authority, which demonstrated the non-final nature of the action. *See id*. Similarly, here, the signatory of the August 11 Letter had no final decisionmaking power over the termination of grants and contracts—that power rests with the grants officer and contracts officer respectively. Graham Decl. ¶¶ 6, 16. The "lack[] [of] authority to issue binding final orders" meant that the deadline given to comply was "render[ed] . . . advisory." *Jakes' Fireworks Inc.*, 105 F.4th at 633. So too here.

Turning to the language of the notices, the Fourth Circuit emphasized that the letter stated "*the staff requests*" compliance. *Id*. (emphasis in original). Similarly, here, the August 11 Letter—as well as the previous letters—consistently describes the outreach as a "request" for the data. ECF 1-2 at 21. Furthermore, the Fourth Circuit was not persuaded that the inclusion of more compulsory language, stating that the recipient "must" comply, could transform the letter into a final agency action. *Jakes' Fireworks Inc.*, 105 F.4th at 633; *see also Int'l Tel. & Tel. Corp., Commc'ns Equip. & Sys. Div. v. Loc. 134, Int'l Bhd. of Elec. Workers, AFL-CIO*, 419 U.S. 428, 444 (1975) (declining to find that "intense pressure, practically, to conform" made an agency action final). Like the August 11 Letter, the letter in *Jakes' Fireworks* "simply d[id] not represent the [agency's] last word on this matter." 105 F.4th at 634. This case is on all fours with *Jakes' Fireworks*, and its conclusion that no final agency action took place controls here.

### B. The August 11 Letter Is an Order Over Which the Hobbs Act Precludes District Court Review.

If the Court nevertheless continues to believe that the August 11 Letter is final agency action, the Court should revisit its conclusion that the Hobbs Act does not preclude district court jurisdiction over this matter. The Hobbs Act affords courts of appeals exclusive jurisdiction over "all rules, regulations, or final orders of . . . the Secretary of Transportation issued pursuant to . . . chapter[s] 311 [or] 313 . . . of title 49" codifying the CMVSA.[1] 28 U.S.C. § 2342(3)(A). This provision covers *any* final agency action issued pursuant to those chapters. And even if it did not, it would cover the August 11 Letter. Plaintiffs insist that the August 11 Letter is not an "order" within the meaning of the Hobbs Act, but they are conspicuously silent on what it is, if not an order. To the extent the August 11 Letter does not seem sufficiently formal to be a true order, that

[1] Plaintiffs do not dispute that the August 11 Letter was issued pursuant to these chapters.

tension stems from its non-final status just discussed. But if the August 11 Letter is a final agency action, then it cannot be anything other than an "order."

### *1. The Hobbs Act Covers All Final Agency Actions*

When Congress gives the courts of appeals exclusive jurisdiction over agency actions issued under a particular statute, that jurisdiction generally extends broadly to *all* reviewable final agency actions. For example, although the Federal Aviation Act gives the courts of appeals jurisdiction over "orders," *see* 49 U.S.C. § 46110, "agency actions are reviewable as orders under section 46110 as long as they are final." *See Safe Extensions v. FAA*, 509 F.3d 593, 598 (D.C. Cir. 2007); *see also Magassa v. Mayorkas*, 52 F.4th 1156, 1165 (9th Cir. 2022) ("Although seemingly not an 'order' in the intuitive sense, we have essentially held that final agency actions under the APA are also orders under § 46110."). And following the same logic, the Ninth Circuit held that "a 'final agency action' is analytically equivalent to a 'final order' under the Hobbs Act." *U.S. W. Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1055 (9th Cir. 2000).

Plaintiffs point to the D.C. Circuit's decision in *Weaver v. FMCSA*, which held that the term "rules, regulations, or final orders" in the Hobbs Act does not encompass all "final agency actions" reviewable under the APA, and that there is thus "a residue of agency activity subject to initial review in the district court." 744 F.3d 142, 146 (D.C. Cir. 2014). But that outlier decision was incorrectly decided, and the Court should not follow it. The *Weaver* Court reasoned that because 28 U.S.C. § 2342(7) expressly covers "final agency actions," Congress must not have meant to cover all final agency actions when it used different language in Section 2342(3). *Weaver*, 744 F.3d at 146. But the Court failed to recognize that the Hobbs Act was not enacted all at once. The language of Section 2342(3) originated in 1950 (at the time it covered "final orders"; "rules" and "regulations" were added later). *See* Pub. L. 81-901, 64 Stat. 1129 (1950). When Congress added Section 2342(7) more than forty years later, it likely used the "final agency action"

formulation to mirror a provision it was cross-referencing, not to suggest a narrow construction of Section 2342(3). *See* Pub. L. 102-365, § 5(c), 106 Stat. 972, 975 (1992).

Thus, the August 11 Letter was either: (1) a non-final action not reviewable in any Court (as Defendants argue above); or (2) a final action reviewable exclusively in the courts of appeals. Either way, the letter cannot be reviewed in this Court. *See Americopters, LLC v. FAA*, 441 F.3d 726, 735 (9th Cir. 2006).

#### ***2. The August 11 Letter Is an "Order" Covered by the Hobbs Act***

In any event, even if the Hobbs Act does not cover all final agency actions, the August 11 Letter is an "order" that is covered. When "drafting the special judicial review provisions of the Hobbs Act," Congress kept the "features of [the APA] adopted four years earlier [] prominently in mind, as reflected in both the House and the Senate Reports." *Simmons v. I.C.C.*, 716 F.2d 40, 43 (D.C. Cir. 1983) (Scalia, J.). Thus, where there is not "intentional variation," *id*., between the terms used in the two Acts, it is likely the terms have the same meaning. *See id*. The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The APA defines an "order" as "the whole or a part of a final disposition . . . of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). "[A] 'final agency action' under the APA is analytically equivalent to a 'final order' under the Hobbs Act." *U.S. W. Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1055 (9th Cir. 2000); *see also Am. Trucking Ass'n, Inc. v. United States*, 755 F.2d 1292, 1296 (7th Cir. 1985).[2] Accordingly, if the August 11 Letter was a final agency action, it must have been a final order unless its features suggest otherwise (they do not).

[2] Plaintiffs try to distinguish *U.S. West Communications* as concerning an action that was an "undoubted order" because it "was literally entitled First Local Competition Order." PI Br. at 4. However, "jurisdiction [does not] turn, one way or the other, on the label which the [agency]

*Weaver* does not control the outcome here. *Contra* TRO Op. at 7. *Weaver* concerned a challenge to the mere existence of a record in a database, not a request to turn over the database, thus the challenged "action" was far outside any plausible conception of an "order." Furthermore, in *Weaver*, unlike here, "both sides agree[d] that FMCSA's activity (or inactivity) vis-à-vis Weaver d[id] not qualify as a rule, regulation or final order." *Id*. at 144. Thus, the *Weaver* Court did not need to identify what type of agency action was at issue, and its observation that an agency order may be premised upon a record "compiled . . . with an eye toward judicial review" was dicta not necessary to its resolution of the case. *Id*. at 147 (acknowledging the Court was not "finally resolving the status of the FMCSA activity"). And nowhere did *Weaver* say that such a record was an absolute requirement for all agency orders under the Hobbs Act.[3] *See id*. Indeed, the D.C. Circuit has elsewhere held that "the lack of an adequate agency record to review does not eliminate a circuit court's jurisdiction, but rather requires the court to remand to the agency so the agency can provide a record for review." *Safe Extensions*, 509 F.3d at 72 (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985)).

Process of elimination confirms that, if the August 11 Letter can be called a "final agency action," it must be an order. *Cf. Int'l Tel. & Tel. Corp., Commc'ns Equip. & Sys. Div.*, 419 U.S. at 443 (an "order" is a direction to "anybody to do anything"). The APA only discusses a finite set of possible agency actions: "rule[s], order[s], license[s], sanction[s], relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13). No party contends the August 11 letter is a rule (over which

---

chooses to employ." *Inv. Co. Inst. v. Bd. of Governors of Fed. Rsrv. Sys.*, 551 F.2d 1270, 1278 (D.C. Cir. 1977).

[3] The "touchstone" of a record "compiled with an eye toward judicial review" that *Weaver* relied upon, moreover, was uncritically grafted off of a previous D.C. Circuit interpretation of a different jurisdictional statute, the Bank Holding Company Act, which, unlike the Hobbs Act, "explicitly contemplates review of a record made before the [agency]." *Inv. Co. Inst. v. Bd. of Governors of Fed. Rsrv. Sys.*, 551 F.2d 1270, 1277 (D.C. Cir. 1977).

the Hobbs Act would also preclude review). It is not a "license," as it is not an "agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." *Id*. § 551(8). Even if it were, a "license" is simply a subgenus of an "order." 5 U.S.C. § 551(6). It is not a sanction—the "withholding of relief" or "imposition of a penalty," *see id*. § 551(10)—as it does not directly implement any penalty but simply suggests future ones will be forthcoming if AAMVA does not comply with DOT's directions. *See* TRO Op. at 9 (describing any possible sanctions as "threatened sanctions," not final sanctions). And it is also obviously not "relief." *See id*. § 551(11). Nor is it the "denial" of some agency action. The only remaining option is an "order," over which the Hobbs Act prohibits district courts from exercising jurisdiction.

**C. Plaintiffs Do Not Fall Within the Statutory Zones of Interests.**

Even if the August 11 Letter is "final agency action" that somehow is not a "final order" under the Hobbs Act, the States falls outside the zone of interests of the Privacy Act and DPPA. "To invoke a statutory cause of action, a plaintiff must be within the 'zone of interests' that the statute protects. Put differently, a plaintiff must belong to the class of persons to whom the statute grants a right to sue." *Food & Drug Admin. v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 232 (2025). The "class of persons" granted a right to sue under the Privacy Act and DPPA are "individual[s]," not States. 5 U.S.C. § 552a(g)(1) ("the individual may bring a civil action against the agency"); 18 U.S.C. § 2724(a) (the "individual to whom the information pertains . . . may bring a civil action in a United States district court"). The Privacy Act's definition of "individual" excludes States: "the term 'individual' means a citizen of the United States or an alien lawfully admitted for permanent residence." 5 U.S.C. § 552a(a)(2); *see also* Pub. L. 93–579, 88 Stat 1896 (Dec. 31, 1974) ("The purpose of this Act is to provide certain safeguards *for an individual*. . . .") (emphasis added). DPPA also distinguishes between "individual[s]" and "State[s]" when defining "person" under the

statute. 18 U.S.C. § 2725(2). And as its name suggests, the *Driver's Privacy* Protection Act was enacted to protect individual drivers, not the States.

In granting a TRO, the Court agreed that the Privacy Act and DPPA sought to protect individuals' privacy. *See* TRO Op. at 8 (discussing *Maracich v. Spears*, 570 U.S. 48, 60-61 (2013) and *F.A.A. v. Cooper*, 566 U.S. 284, 295 (2012)). However, the Court concluded Plaintiffs were within the statutory zones of interests because they "seek to protect the data of their citizens." But the States now abandon that theory. PI Br. at 4 ("That is wrong."). As they must: the Supreme Court has unambiguously and repeatedly held that States cannot assert the interests of their citizens against the federal government. *Haaland v. Brackeen*, 599 U.S. 255, 294–95 (2023) (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 323 (1966) ("Nor does a State have standing as the parent of its citizens to invoke these constitutional provisions against the Federal Government, the ultimate *parens patriae* of every American citizen") and *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610, n. 16 (1982) ("it is no part of [a State's] duty or power to enforce their [citizens'] rights in respect of their relations with the Federal Government")); *Murthy v. Missouri*, 603 U.S. 43, 76 (2024).

Foreclosed from relying on the interests of their citizens, the States claim "their own interests in preserving the privacy of CDLIS records." PI Br. at 4. This wordplay is "a thinly veiled attempt to circumvent the limits on *parens patriae* standing." *Haaland*, 599 U.S. at 295 n. 11; *see also Murthy*, 603 U.S. at 76. Moreover, the "sovereign interests" the States assert—"enforcing their State laws and obligations" and "ensuring residents continue to apply for CDLs, which are critical to public safety and the States economies," PI Br. at 4—are not within the zones of interests the Privacy Act and DPPA seek to protect. Those statutes say nothing about those interests.

## II. The Court Should Reevaluate Plaintiffs' Likelihood of Success on the Merits.

The Court should reevaluate Plaintiffs' likelihood of success on the merits because the States had clear notice of DOT's access rights, which includes the right to take custody of the CDLIS data. Furthermore, DOT has legally valid uses for the data that are not arbitrary and capricious and are sufficient to invoke DPPA's government-use exception.

### A. DOT's Access to CDLIS Is a Clear Condition on Federal Spending, Allowing DOT to Take Custody of the Information.

The Commercial Motor Vehicle Safety Act plainly envisions that DOT will have access to CDLIS data as part of its statutory mandate to maintain the system. A necessary corollary of "access" is the ability to obtain the CDLIS information and take custody of it. Because Congress clearly enshrined this condition on federal funding in the CMVSA, Plaintiffs' Spending Clause Claim is unlikely to succeed on the merits.

The CMVSA states, "The Secretary may require a State, as a condition of an award of grant money under this section, to provide the Secretary access to all State licensing status and driver history records via an electronic information system, subject to section 2721 of title 18." 49 U.S.C. § 31106(c)(2).[4] The statutory text thus gives States clear notice that their ability to receive federal highway funding may be conditioned on DOT's access to "all State licensing status and driver history records[.]" *Id.*

Plaintiffs ask the Court to narrow the "access" right the statute confers by creating a dichotomy between "access" and "custody." *See* Pls.' PI Br. at 6-8. That dichotomy contradicts the plain meaning of "access," which is the "freedom or ability *to obtain* or make use of something." "Access," Merriam-Webster's Online Dictionary,

[4] The Court's TRO Opinion overlooked this section of statute, as it was not briefed but only introduced at the TRO Hearing. *See* Hearing Tr. at 22:8-14, ECF No. 85-1.

https://www.merriam-webster.com/dictionary/access (emphasis added) (definition 1b); *see also* "Access," Black's Law Dictionary (12th ed. 2024) (definitions 4 and 6, which relate to access to information, define "access" as "[t]he right to obtain information"). Obtaining something is a form of "accessing" it. The statute does not narrow the government's right of "access" by restricting it to only those forms of "access" that do not involve taking custody.[5]

Other provisions of the CMVSA also evince a broad delegation of authority to DOT over CDLIS. DOT is entrusted with "maintain[ing]" CDLIS and establishing the terms on which the information will be "made available." 49 U.S.C. §§ 33109(a), (c). DOT is permitted to designate an "authorized operator," as it has done with AAMVA, but it does not relinquish its ultimate control over CDLIS or responsibility for maintaining it by enlisting AAMVA to perform certain functions. *Id*. § 33109(d). A necessary corollary of DOT's "access" rights and overall responsibility for the system is the ability to obtain the CDLIS information and take custody of it, as DOT has sought to do here. The data request falls within the clear condition on federal funding agreed to by the States under 49 U.S.C. § 31106(c)(2).

**B. Plaintiffs' Arbitrary and Capricious Claim is Unlikely to Succeed.**

As discussed in Defendants' TRO Opposition, ECF No. 45, the August 11 Letter requesting the CDLIS pointer records was grounded in a rational basis for requesting the data: DOT needs the requested data "to help prevent fatal trucking accidents involving the many drivers to whom States have improperly issued Commercial Driver's Licenses." ECF No. 1-2 at 21. Numerous

[5] *Cf. also* 28 C.F.R. § 202.201 (DOJ Rule on Bulk U.S. Sensitive Personal Data) ("The term *access* means logical or physical access, including the ability to obtain, read, copy, decrypt, edit, divert, release, affect, alter the state of, or otherwise view or receive, in any form, including through information systems, information technology systems, cloud-computing platforms, networks, security systems, equipment, or software."); 45 C.F.R. § 164.304 (Security Standards for the Protection of Electronic Protected Health Information) ("*Access* means the ability or the means necessary to read, write, modify, or communicate data/information or otherwise use any system resource.").

earlier communications underscore DOT's reasons for the request. DOT "conduct[s] routine reviews and data analysis to oversee the national [CDL] program." *Id.* at 2. It intends to use the data "as part of [its] statutory and regulatory oversight in [its] ongoing efforts to ensure the integrity and issuance of [CDLs] and Commercial Motor Vehicles (CMVs)." *Id.* at 5. And DOT further explained that, to execute its "statutory safety and regulatory mandates under 49 U.S.C. Chapters 311 and 313," it would use the requested data to "verify[] [CDL] validity and conduct[] motor carrier safety assessments." *Id.* at 9; *see also*, *e.g.*, 49 U.S.C. § 31305 (requiring agency to ensure that commercial drivers are fit to operate commercial motor vehicles); *id.* § 31310 (requiring agency to ensure that commercial drivers do not present safety risks). That reasoning provides ample basis—directly rooted in DOT's statutory authorities—to request the data at issue here.

The Court discounted several governing principles of APA review in concluding the August 11 Letter was likely arbitrary and capricious. First, in dismissing the agency's explanation for its actions as "generic," TRO Op. at 11, the Court misapplied the APA's "narrow" and "very deferential" arbitrary-and-capricious review standard. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Bacardi & Co. v. Squires*, 179 F.4th 237, 244 (4th Cir. 2026). Underscoring this deference, the APA requires courts to "uphold" an explanation, even if believed to be generic and of "less than ideal clarity," if the agency's "path may reasonably be discerned." *Bacardi & Co*. 179 F.4th at 244 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*)).

Second, the Court concluded that DOT had likely changed positions without explanation. But the Court did not engage at all with *FDA v. Wages & White Lion Invs., L.L.C.*, which explains that a plaintiff must show that an agency actually "changed [an] existing policy" made "express[]" in a "more formal setting." 604 U.S. 542, 569 & n. 5 (2025). Purported changes in agency policies,

moreover, need not be supported by "a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Yet the Court faulted DOT for not explaining to AAMVA why it needed the data "for the first time in AAM[V]A or FMCSA's history." TRO Op. at 11.

Third, the Court credited Plaintiffs' asserted reliance interests even though they were "unreasonable," *Mozilla Corp. v. FCC*, 940 F.3d 1, 64 (D.C. Cir. 2019). As discussed *supra* Section II.A., the clear condition on federal funding was that the States would be turning the CDLIS data over to the federal government. It was therefore unreasonable for Plaintiffs to rely on a belief that the data would not be shared.

Finally, the Court's conclusion that DOT's request was a pretext for immigration enforcement ignored the agency's genuine interest in promoting commercial motor vehicle safety and unfairly faulted it for having "other unstated [or stated] reasons" for acting, which the APA permits. *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (citing *Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1185–86 (10th Cir. 2014)).

While the Court was not convinced at the TRO Stage that the forthcoming administrative record would demonstrate that DOT had reasonable plans for how it would use the CDLIS data to perform its statutory duties, the Court may consider further declarations from the agency under APA review as "background information or evidence of whether all relevant factors were examined by an agency" when they are "explanatory of the original record" and contain "no new rationalizations." *Roe v. Dep't of Def.*, 947 F.3d 207, 221 (4th Cir. 2020) (citation omitted). While "courts may not accept appellate counsel's *post hoc* rationalizations for agency action," *State Farm*, 463 U.S. at 50, Federal Defendants' declarations here are permissible because they simply provide additional detail explaining the contemporaneous reason for requesting data. As the

attached Second Liberatore Declaration (Liberatore Decl. II) explains, DOT has specific uses for the requested information that were familiar to DOT programmatic experts at the time of the decision, even if those uses were not familiar to counsel at the time of the TRO hearing. *See* Liberatore Decl. II ¶ 3 ("I am fully familiar with the facts set forth in this declaration, which were considered by the agency when it issued the August 11 Letter to AAMVA.").

DOT "intends to cross-reference [the data] against existing driver information in the Agency's information and enforcement systems. Each category of data element requested will support FMCSA's oversight, analysis, and enforcement efforts." *Id.* ¶ 7. Those efforts include "investigation and enforcement activities, collection of civil penalties, State performance monitoring (particularly as it relates to the issuance of non-domiciled CDLs), and data analytics." *Id.* ¶ 6. The information will assist with identifying targets of investigations and enforcement activities, "especially when a driver has a common first or last name . . . multiple different names or multiple variations of the same name." *Id.* ¶¶ 9-10. It will also allow the agency to "use the driver's full or partial social security number when initiating collection proceedings" for monetary penalties the agency assesses, thereby "mak[ing] the collection process more efficient and [] ensur[ing] proper identification." *Id.* ¶¶ 13-14.

The requested CDLIS data, moreover, will allow the agency to engage in State performance monitoring by "conduct[ing] batch queries for this information, which FMCSA may use to cross reference licensing information against other government information systems to ensure States are issuing CDLs to drivers who meet the eligibility requirements and that CDL expiration dates do not exceed the limitations set forth in 49 CFR 383.73." *Id.* ¶ 17. This will "ensure that States issue CLPs [Commercial Learner's Permits] and CDLs to drivers who are qualified, properly trained, and do not pose significant safety risk, and to assess whether significant safety incidents were

caused by drivers who were improperly issued a CLP or CDL." *Id.* ¶ 19; *see also* DOT-OIG Audit Report, *FMCSA Has Gaps and Challenges in its Oversight of CDL Disqualification Regulations*, ST2021030 (Jul. 14, 2021). It will also facilitate several other areas of performance monitoring, including medical recordkeeping and driver training compliance. Liberatore Decl. II ¶ 20.

Finally, the data will allow the agency to generate and review data analytics with greater efficiency and scale, which could not be accomplished with the one-off query process. *See id.* ¶ 23 ("While FMCSA has conducted targeted more limited investigations and data analysis in the past without the ability to conduct bulks queries of CDLIS data, FMCSA intends to conduct broader oversight and data analysis concerning CDL issuance and testing, entry-level driver training, and motor carrier use of CDL drivers."); *id.* ¶ 26 ("individual CDLIS query reports are returned as a PDF document. Consequently, without the requested data, FMCSA personnel would need to manually transfer the information returned in the PDF document to a separate spreadsheet for data analysis. Such a practice would be exceedingly inefficient, time consuming, and labor intensive.").

DOT's wide-ranging uses for the data to fulfill its statutory responsibilities demonstrate the data request was legitimate and rational, not pretextual.

### C. Plaintiffs' Contrary to Law Claims Are Unlikely to Succeed.

As discussed in Defendants' TRO Opposition, ECF No. 45, all of Plaintiffs' contrary-to-law claims are unlikely to succeed. To avoid redundancy, the discussion below focuses upon arguments discussed in the Court's TRO Opinion and in Plaintiffs' Preliminary Injunction Brief.

**The NMVSA**. The Parties appear to agree that consultation with the States is only required prior to DOT making substantial changes to CDLIS under 49 U.S.C. § 31309. The disagreement is over (a) what a substantial change is, and (b) whether such a change has been effectuated.

The States believe they must be consulted before either "assuming custody of every MPR" or "rendering the system inoperative." PI Br. at 5. Regarding the former, such consultation is not

necessary because it was already a condition the States accepted by receiving Federal Highway Funding, *see supra* Section II.A., and is thus not a substantial change. DOT never consulted the States as it accessed the CDLIS records one-by-one; there is no reason to expect it to do so when requesting a bulk transfer. As for "rendering the system inoperative," no action has been taken to render CDLIS inoperative, and it is pure speculation that DOT would not consult with the States before effectuating any of the options for securing compliance discussed by the August 11 Letter.

**DPPA.** As discussed above and elaborated upon in further detail by the Second Liberatore Declaration, the agency has a wide-ranging number of uses it intends for the requested data, including investigation and enforcement, collections, performance monitoring, and data analysis. Each of these is sufficient on its own—and certainly when viewed all together—to avail the agency of DPPA's government-use exception. 18 U.S.C. § 2721(b)(1). The Court applied a more exacting test than the government-use exception requires by asking whether it was possible DOT could achieve its statutory objectives without the data, as it has done until this point. *See* TRO Op. at 9-10 ("[DOT] has ostensibly carried out those functions for decades without such a bulk transfer based on its recognized abilities to already access specific MPRs and access state records directly through program reviews"). But the DPPA exception only requires that the data be "for [the agency's] use . . . in carrying out its functions," not that the agency be totally frustrated in achieving its statutory objectives without it.

**The Privacy Act**. The Court's finding of a likelihood of success on Plaintiffs' Privacy Act Claims included no legal analysis. At this juncture, the Court should engage with the Privacy Act arguments raised by Defendants in their TRO Opposition, as well as the analysis of the Privacy Act contained in the Department of Justice Office of Legal Counsel's *Authority to Obtain and*

*Share Statewide Voter Roll Data,* 50 Op. O.L.C. (May 12, 2026), which overlaps substantially with the issues presented here.

**III. The Court Should Appropriately Tailor Any Preliminary Relief.**

To the extent the Court remains inclined to enter preliminary relief, it should appropriately tailor such relief within the confines of the APA. "The APA only authorizes courts to 'set aside' and 'postpone' agency actions—a far narrower authority than the court's equitable power to issue preliminary injunctive relief." *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584, 623 n. 14 (D. Md. 2025). "[S]etting aside an agency action is the standard remedy for APA cases." *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 175 (D. Md. 2025), *appeal dismissed*, No. 25-2012, 2026 WL 2057411 (4th Cir. June 23, 2026). Thus, "postpon[ing] the enforceability of certain provisions in the [challenged action], is properly within the scope of the APA," *id.*, but an across-the-board injunction prohibiting any other adverse actions, as the current TRO does, is not. Any order should clarify that Defendants are only enjoined from taking the types of adverse actions contemplated by the alleged final agency action.

Furthermore, any relief should not prohibit DOT's Office of Inspector General (DOT-OIG) from exercising its independent authorities, should it determine a need for the CDLIS data. The Inspector's General Act of 1978 (IG Act) provides that each Inspector General has the duty to provide policy direction for and to conduct, supervise, and coordinate audits and investigations relating to the programs and operations of the agency. 5 U.S.C. § 404(a)(1). DOT-OIG is authorized to "make such investigations and reports relating to the administration of the [DOT] programs and operations . . . as are in the judgment of the Inspector General, necessary or desirable." 5 U.S.C. § 406(a)(2). To facilitate these investigations, the IG Act provides that the DOT-OIG shall have "timely access all records, reports, audits, reviews, documents, papers, recommendations, or other material available to [DOT] which relate to the programs and

operations" for which DOT-OIG has responsibility, which includes CDLIS. 5 U.S.C. § 406(a)(1)(A). Given that APA review is limited to setting aside the challenged action, any relief should not restrain a different office's potential future activities based on different authorities. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" before the court).

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiff's motion for a preliminary injunction.

Dated: September 3, 2026

Respectfully submitted,

TODD BLANCHE
United States Attorney General

THEOPHANI K. STAMOS
First Assistant United States Attorney

/s/
MATTHEW J. MEZGER
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3741
Fax: (703) 299-3982
Email: Matthew.Mezger@usdoj.gov

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

BENJAMIN T. HAYES
Senior Counsel to the Assistant Attorney General
Civil Division

NOAH T. KATZEN
Assistant Branch Director

EITAN R. SIRKOVICH
(D.C. Bar No. 90030102)
WILLIAM S. JANKOWSKI
(D.C. Bar No. 90021524)
LINDSEY GILMAN
(AZ Bar No. 034003)
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20005
Tel. (202) 353-5525
Eitan.r.sirkovich@usdoj.gov

*Counsel for Federal Defendants*