IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>Defendants. | 1:26-cv-2547 (AJT-IDD) |

**ORDER**

By order dated August 20, 2026, the Court issued a Temporary Restraining Order (the "TRO"), [Doc. No. 54], enjoining the Defendant American Association of Motor Vehicles Administrators ("AAMVA") from transferring to Defendants the Federal Motor Carrier Safety Administration (FMCSA) and the Department of Transportation (DOT) (the "Federal Defendants")[1] or any other agency "its database containing limited, but highly personalized, information pertaining to over 17 million persons who have obtained Commercial Drivers Licenses ("CDLs")," [the "Data Demand"], "which the Federal Defendants do not control, which are owned by the states that provided that information, and which would continue to be available to the Federal Defendants, as it has been, based on specific individualized requests, and also enjoining the Federal Defendants from imposing any adverse actions or sanctions in the event such data is not produced as demanded." *Id.* at 1.

On August 27, 2026, Plaintiffs filed a Motion for a Preliminary Injunction (the "PI

[1] Although the term "Federal Defendants" in the TRO also includes the Secretary of Transportation and the Administrator of FMCSA, the Court for ease of reference has used in this Order the term "Federal Defendants" to refer, without differentiating, both to all Defendants and also when only the Defendants DOT and FMCSA are being referenced.

Motion"), [Doc. No. 84], on which the Court held a hearing on September 10, 2026, following which it took the PI Motion under advisement.

The Federal Defendants have opposed the PI Motion on essentially the same grounds as they opposed the Emergency Motion for a Temporary Restraining Order, [Doc. No. 2], and while reasserting their previously filed opposition to the TRO have asked the Court to "revisit" certain specific aspects of its TRO in light of their additional arguments presented in opposition to the PI Motion, together with their newly filed declarations. More specifically, the Federal Defendants asked the Court to reconsider (1) whether the Court had jurisdiction, particularly in light of the Fourth Circuit's decision in *Jake's Fireworks Inc. v. United States Consumer Product Safety Commission*, 105 F.4th 627 (4th Cir. 2024), which the Federal Defendants contend is binding precedent that requires that this Court not exercise jurisdiction; (2) whether the Federal Defendants acted arbitrarily and capriciously with respect to its Data Demand based on its duty to consult, the Privacy Act of 1974, and the Driver's Privacy Protection Act ("DPPA"); (3) whether the Federal Defendants' Data Demand violated the Spending Clause; and (4) the scope of any injunctive relief. [Doc. No. 101]. The Federal Defendants do not present any new arguments with respect to the Court's reasoning and findings with respect to the Plaintiffs' contract claims or its findings concerning irreparable injury, the balance of equities, or the public interest, and relies in that regard upon the briefing and arguments made in connection with their opposition to the entry of the TRO.

Upon consideration of the PI Motion, the memoranda in support thereof and in opposition thereto, including the declarations submitted in connection therewith, and for the reasons stated in the TRO, which is incorporated herein by reference and made a part hereof, and the additional reasons stated below, including the findings of fact and conclusions of law contained therein, the Motion is **GRANTED**.

## I. The Court has Jurisdiction.

With respect to jurisdiction, the Court continues to conclude that for the purposes of exercising jurisdiction under the Administrative Procedure Act ("APA"), the Federal Defendants engaged in a "final agency action" that was not an "order" within the meaning of the Hobbs Act.

Under the APA, judicial review is permitted only for "final agency actions," and an agency action is final when it is both (1) "the consummation of the agency's decisionmaking process," and (2) one "from which legal consequences will flow." *Jake's Fireworks*, 105 F.4th at 631 (cleaned up) (quoting *U.S. Army Corps. Of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016)).

Here, by letter dated June 25, 2026, Defendants DOT and FMCSA, relying upon Article 7(b) of the 2013 Commercial Driver's License Information System ("CDLIS") Cooperative Agreement, made the Data Demand, viz., that AAMVA turn over records containing the name, date of birth, state of record, license number, and social security number of every driver in the entire CDLIS database going back five years, comprising approximately 17 million "master pointer records" ("MPRs"). [Doc. No. 1-2] at 2–3.

In its response by letter dated June 30, 2026, AAMVA raised concerns with the Data Demand, including that the relied upon Section 7(b) of the Cooperative Agreement "calls for access to 'driver records,' for authorized purposes, [which] FMCSA personnel may access . . . directly from the State of Record," and that the requested '"pointer records,' although built in large part from information in 'driver records,' are separate from driver records." *Id.* at 3. It also stated that:

> driver records are maintained by originating jurisdictions and merely accessed via the [CDLIS]. As stated in Section 6(C) of the Cooperative Agreement, they are not considered a federal system of records under the Privacy Act, 5 U.S.C. § 552a and the Department of Transportation's implementing regulations at 49 C.F.R. Part 10. By comparison, the data set presently requested seems likely to create a Privacy-Act-covered system of records.

*Id.* at 4. The AAMVA also requested that FMCSA (1) provide information regarding "the specific intended use of the information" and "what agency or agencies will use the information and for what government function or functions" and (2) "share [its] analysis of whether this dataset will be a federal system of records under the Privacy Act and provide us any pertinent system of records notice ("SORN")." *Id.* at 3–4.

By letter dated July 7, 2026, FMCSA responded to AAMVA's request for information. In that response, FMCSA did not identify a provision of the Commercial Motor Vehicle Safety Act ("CMVSA") supporting its use of the Data or identify a SORN applicable to the data, but stated broadly that it "will use the CDLIS data as part of [its] statutory and regulatory oversight in [its] ongoing efforts to ensure the integrity and issuance of [CDLs and CMVs]" and that it "will handle all legal coordination necessary under the Privacy Act . . . ." *Id.* at 5–6. Notably absent from this explanation of need in light of subsequent disclosures is any indication that the requested Data would be transferred to the Department of Homeland Security ("DHS") to be used in connection with immigration enforcement.

In response, AAMVA reiterated its DPPA and Privacy Act compliance concerns, including that member states have a "meaningful role under the federal Privacy Act when the source records are state records." *Id.* at 7–8. In its follow-up letter, dated July 24, 2026, FMCSA explained that (a) it "intend[ed] to use this data to execute its statutory safety and regulatory mandates under 49 U.S.C. Chapters 311 and 313," (b) it was authorized to make "subsequent redisclosure[s] to federal partner agencies . . . provided the data is used strictly in furtherance of legitimate government functions," and (c) it would provide relevant SORNs "under separate cover." *Id.* at 9. In that letter, FMCSA did not identify particular agencies to which it intended to disclose the Data or functions for which such other agencies would use it; and there is no indication in the record that, to date,

FMCSA has provided any SORNs.

An exchange of letters and communications further ensued, and by letter dated July 24, 2026, AAMVA advised Defendants DOT and FMCSA that "AAMVA intends to disclose the records [requested in the Data Demand] in compliance with applicable law, mindful of our regulatory obligations and the rights of the data owners." *Id.* at 11.[2] In that regard, it summarized the restrictions on AAMVA's disclosure of the MPRs, including that several states restrict disclosure of social security numbers, many states restrict disclosure of data for immigration enforcement, and AAMVA has agreements with states that restrict disclosure of state data. With respect to this last category, AAMVA advised:

> All MPRs are created by states and provided to AAMVA specifically for the operation of CPLIS to facilitate individual queries. Many of AAMVA's agreements with states classify state-provided data as "Protected" or "Confidential" and prohibit disclosure of state data to any third parties except as authorized by the state. Specifically, our analysis has revealed express restrictions on AAMVA's disclosure of state data in agreements with [certain states]. Numerous states have objected to AAMVA's disclosure of the data on the basis of these contractual restrictions. States have also asserted that they, not AAMVA, are owners of the data and therefore responsible for determining whether and when to disclose the data in response to requests by any third party. Both sets of restrictions can be resolved by states authorizing the release of the data to FMCSA.

*Id.* at 16 (letter dated August 7, 2026).

By the same letter dated August 7, 2026, AAMVA advised the Federal Defendants that it provided notice of their Data Demand to the "[51 impacted jurisdictions] that own the data" and that "AAMVA's response to this [Data] demand is complicated by the fact that, on the one hand, DOT asserts that MPRs are subject to unrestricted federal access, while, conversely, many of the AAMVA's member jurisdictions assert strict disclosure constraints on the data." *Id.* at 13 ("In fact,

---

[2] In the same letter, AAMVA requested that DOT "confirm in writing that AAMVA's production of the pointer records will be an act carried out on behalf of, and at the specific direction of, DOT under AAMVA's agreements with DOT, and thereby subject to liability protection under the government contractor defense or related doctrines of derivative sovereign immunity." [Doc. No. 1-2] at 11.

in response to our notice, more than twenty jurisdictions have formally objected to AAMVA's proposed production of this state data."). Pointing out that "AAMVA is a private non-profit corporation subject to compliance with state laws as a custodian of state data," AAMVA

> concluded that production of the MPRs would create significant questions as to AAMVA's compliance with its obligations under many user agreements between AAMVA and states that participate in the [CDLIS], state civil laws prohibiting disclosure of information contained in MPRs, and even certain state criminal laws prohibiting disclosure of information contained in MPRs.

*Id.* Given these considerations, AAMVA advised that "one of the options AAMVA will consider with respect to the data demand will be facilitating an opt-in or opt-out choice by the states whether to authorize AAMVA's transmission of that state's data." *Id.* at 14.

In response, by letter dated August 11, 2026, to AAMVA, Defendants DOT and FMCSA, acting through their General Counsel, stated that AAMVA's "opt-in or opt-out choice by the states" is "unacceptable" and that "[g]iven your shift in position, DOT has no choice but to take immediate action to secure the production of the requested pointer records," referencing, as implementation of that decision, that "[t]oday, the Department of Homeland Security will reissue the administrative subpoena it previously withdrew[]" and that "[u]nless AAMVA provides DOT with the requested records by August 17, DOT will pursue all available options to secure production, including canceling AAMVA's grants, filing an enforcement action to enforce the subpoena, and considering terminating its contract with AAMVA." *Id.* at 21.

Unlike in *Jake's Fireworks*, in which a Notice of Noncompliance functioned "more like a tentative recommendation than a final and binding determination" because the Compliance Office staff indicated only that they "*may request*" the Consumer Product Safety Commission to approve the issuance of an administrative complaint, 105 F.4th at 632, nothing in the August 11 letter with respect to the Federal Defendants' Data Demand and their decision to enforce it is "tentative or

interlocutory in nature . . . ." *Id.* at 631. Rather, the August 11 letter reaffirmed without qualification the Federal Defendants' Data Demand and likewise stated in unqualified terms that noncompliance with DOT's Data Demand would give DOT "no choice" but "to take immediate action to secure the production of the requested pointer records." [Doc. No. 1-2] at 21. Given these aspects of the DOT's Data Demand, *Jake's Fireworks* is clearly distinguishable and does not counsel finding that the Court has no jurisdiction.

The Court likewise finds unpersuasive the Federal Defendants' criticism of the Court's reliance on the D.C. Circuit's decision in *Weaver v. FMCSA*, 744 F.3d 143 (D.C. Cir. 2014), which they contend was an "outlier decision" that was "incorrectly decided," [Doc. 101] at 9, or its reliance on readily distinguishable Ninth Circuit cases, such as *U.S. West Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1054 (9th Cir. 2000), which held that "agency *orders* are 'final orders' for the purposes of the Hobbs Act." (emphasis added).

**II. Plaintiffs have made a clear showing that they are likely to succeed on the merits of their claims.**

A. Plaintiffs' Claims under the Administrative Procedure Act

For the reasons stated in the TRO and below, the Plaintiffs are likely to prevail on their claims that the Federal Defendants' actions are contrary to law or arbitrary and capricious in violation of the APA.

***First***, the Federal Defendants issued the Data Demand without consulting with the States in likely violation of their duty to consult under 49 U.S.C. § 31309(a). As explained in the Court's TRO, the CMVSA, which the Federal Defendants invoke as a basis for the Data Demand, reflects the protected status of the information transferred from the states to the CDLIS and requires that the Secretary of Transportation "consult with the States in carrying out this section." 49 U.S.C. § 31309(a). The Federal Defendants do not dispute that they failed to consult the States before

issuing the Data Demand that seeks the transfer to them of 17 million records. Nevertheless, they contend that no consultation was required because their demands and threatened sanctions are not sufficiently related to carrying out that section to trigger the consultation requirement. But the Federal Defendants' actions contravene the very premise of the CMVSA and its implementing regulations, which make clear that the States will provide highly sensitive information under certain protections, including the retention of ownership, and that they play a central role in CDLIS's design and operation, including the exclusive power to add, delete, or alter the records they have contributed. [Doc. No. 3] at 7 (citing administrative and legislative materials). The FMCSA has never before requested any information on the scale reflected in the Data Demand or threatened sanctions for non-compliance, all of which clearly reflect a change in policy and practice with respect to carrying out the CMVSA that requires consultation with the states; and given the Federal Defendants' lack of control or ownership over the requested data, the Federal Defendants cannot, in effect, unilaterally replace the AAMVA with the FMCSA as the depository for CDLIS.

***Second***, compliance with the Federal Defendants' demand that the AAMVA transfer the MPRs would likely violate the DPPA, which prohibits "any person" from knowingly "obtain[ing] or disclos[ing] any personal information[] from a motor vehicle record" unless one of fourteen enumerated exceptions applies. 18 U.S.C. § 2722(a); *see id.* §§ 2721(a)(1), (c). In that regard, the sole exception under the DPPA which FMCSA identified as a basis for disclosure, the government use exception, *id.* § 2721(b)(1), is likely not applicable here because the Federal Defendants have not made any credible showing that FMCSA will actually use all of the records it demands or that there is a particular statutory function for which FMCSA intends to use the bulk data, while making clear that they are not seeking the data solely for FMCSA's own use in discharge of its own

statutory mandates, but so that the FMCSA can share the information with DHS for use in connection with immigration enforcement.

***Third,*** the transfer of the MPRs as demanded in the Data Demand would likely violate the Privacy Act because the Federal Defendants (a) have not complied with the Act's notice requirements that FMCSA must satisfy before including new data into a new or newly modified "system of records"; (b) have failed to articulate a specific purpose "required to be accomplished" by FMCSA that would justify the possession and maintenance of these records, *see* 5 U.S.C. § 552a(e)(1); and (c) intend to transfer the Data to third parties, including other federal agencies, such as DHS, in likely violation of prohibitions against disclosing personal information. The Federal Defendants also likely failed to comply with their own longstanding policy, developed pursuant to federal statute, that prescribes how other federal agencies can obtain access to information in CDLIS. *See* 49 U.S.C. § 31106(e) ("The Secretary shall develop a policy on making information available from [CDLIS]," which "shall be consistent with existing Federal information laws, including regulations, and shall provide for review and correction of such information in a timely manner."); *id.* § 31309(c) ("Information in the information system shall be made available and subject to review and correction in accordance with the policy developed under section 31106(e)."); FMCSA Policy on Availability of Information From CDLIS, 70 Fed. Reg. 2455 (Jan. 13, 2005) (outlining FMCSA's policy that other federal agencies can "request access" to CDLIS information by submitting a written request to FMCSA's Chief Safety Officer and executing a "Memorandum of Understanding" with "[DOT] and/or FMCSA"). In sum, nothing in the Federal Defendants' policies allows federal agencies to obtain CDLIS records in bulk, only at most *access*, as AAMVA provides, and as the states provide on a more substantive level.

With respect to their challenge to the Court's conclusion that the Plaintiffs fall within the

"zone of interests," the Federal Defendants contend that Plaintiff States are in reality asserting *parens patriae* standing. [Doc. No. 101] at 12. But as the Court found, Plaintiffs' own interests relating to the information conveyed to the AAMVA fell within "the zone of interests" protected by the Privacy Act and the DPPA, as reflected, *inter alia*, in DOT's own policy statement that the MPRs, which contain personal identity information on already-registered individuals and those seeking registrations in the States, are documents "owned by each State." *See, e.g.*, Fees for Commercial Driver's License Information System, 91 Fed. Reg. 28514, 28517 (proposed May 18, 2026). Federal Defendants contend that this "property interest" is not protected or does not give standing under the Privacy Act or the DPPA, but that "property interest" simply underscores and reflects the protectible privacy interests the States themselves have in preserving from improper disclosure the confidential information they required their residents to turn over to them, including maintaining the public trust, ensuring that residents continue to apply for driver's licenses, and protecting their sovereign interest in enforcing their state laws and obligations that protect the privacy of CDLIS records.

In sum, Plaintiff States seek to protect their own interest in maintaining public trust and ensuring that residents continue to apply for driver's licenses and to protect their sovereign interests in enforcing their state laws and obligations that protect the privacy of CDLIS records. These interests clearly fall within the zone of interests to be protected by the DPPA and the Privacy Act.

***Fourth***, to the extent that the Federal Defendants have offered any rationale for their decision to issue the Data Demand, it is likely to be found insufficient to meet the requirements for reasoned agency decisionmaking under the APA. For example, the Federal Defendants have failed to (a) consider important aspects of the problem, including the available alternatives, costs,

and potential harms of taking possession and sharing the sensitive personal information of 17 million individuals as well as the consequences that would ensue if FMCSA carried out its threat to shut down CDLIS; (b) acknowledge or explain the dramatic change in policy that the Data Demand embodies; (c) consider the reliance interests in having this data kept private; and (d) follow their own policy, developed pursuant to federal statute, by which other federal agencies can obtain access to information in CDLIS when lawful to do so.

With respect to the Federal Defendants' professed "urgent need" for the Data, they again rely on the *ipse dixit* that the data transfer is needed to perform their statutory mandates, but even if this most recent *post hoc* explanation, far beyond anything presented in the August 11 letter, is to be considered, the most recent declaration filed in support of that position, [Doc. No. 101-1] (second Liberatore declaration), does little more than underscore the Federal Defendants' inability to give any understandable substantive explanation for how the limited but highly sensitive information contained in the MPRs would contribute in any meaningful way to any of its stated, mostly hypothetical uses. Nor does it explain why their recognized access to the CDLIS or their existing access to state records (where the information that would appear useful to them resides) is not sufficient, as it apparently has been for decades, during which the Federal Defendants have conducted annual audits of the States' driver records. Moreover, as mentioned above, there is nothing in any of the Federal Defendants' relied upon statements of need that reflects in any way the required administrative decisionmaking that has considered alternatives to the requested information, which appear in this case to be substantial and fulsome, or the costs imposed on the Plaintiffs and their residents, which are substantial and irreparable.

Given the absence of any credible substantive explanation for how the requested data transfer is needed for FMCSA to perform its statutory purpose, and given that FMCSA can already

access CDLIS records by making individual queries and continue to access the driver records themselves held by the States, the compelling inference is that the Federal Defendants seek these 17 million files in large part, if not primarily, for immigration enforcement, which is not part of FMCSA's statutory mandate, particularly given that, as they concede, they are acting in coordination with and in concert with the DHS, as evidenced by, *inter alia*, DOT's own statement in their August 11 letter that should AAMVA not comply with the Data Demand, DOT would "fil[e] an enforcement action to enforce the [DHS Administrative] subpoena." [Doc. No. 1-2] at 21.

B. The Spending Clause

Plaintiff States are likely to prevail on their claim that the Data Demand, with its threatened sanctions, violates the Spending Clause because the CDLIS statute does not provide or identify any clear notice to the states that as a condition of receiving a portion of their federal highway funds they have agreed to surrender or transfer in bulk their sensitive personal identifying information on their residents to FMCSA, or any other agency of the federal government. *See* 49 U.S.C. § 31311 (providing a detailed list of requirements for state participation in CDLIS). Moreover, the CDLIS's existence to serve as a clearinghouse, so as to allow States to exchange with one another information owned by the States themselves, reinforces the conclusion that the States did not knowingly or voluntarily agree to turn over their records wholesale to FMCSA by accepting federal highway funds. The Federal Defendants see no difference between a condition that requires access to information in the CDLIS and the transfer of the entire CDLIS into a substitute depository system not qualified to hold it; and in support of that position, the Federal Defendants contend that "[a] necessary corollary of 'access' is the ability to obtain the CDLIS information and take custody of it." [Doc. No. 101] at 13. But given the nature of the information

involved, the source of that information, who owns that information, the purpose for which the AAMVA was created in the first place, and the assurances and protections put in place with respect to its creation and operation, the relied upon "corollary" is hardly a "necessary" one or even one reasonably inferred, and in any event, it is hardly a "clear condition" of federal funding, as required.

C. State Contracts

The Plaintiff States of Illinois, California, Maine, and the District of Columbia (the "Contract Plaintiffs") are likely to succeed on their claims that AAMVA cannot lawfully disclose their records under its contracts with those States. Each of these States have entered into contracts with AAMVA to restrict what AAMVA may do with the State's proprietary and confidential driver information, and each imposes strict limitations on the disclosure of such information. The Data Demand does not fall within these strict limitations and none of the Contract Plaintiffs have given AAMVA permission to disclose state data to FMCSA or DHS in response to the Data Demand. Rather, the Contract Plaintiffs have unambiguously communicated that AAMVA does not have permission to carry out a bulk transmission of their respective data. AAMVA's transfer of Plaintiffs' contract protected data to FMCSA or DHS would likely violate the respective contracts. *See* [Doc. No. 46] at 11.

**III. The Plaintiffs have made a clear showing of irreparable harm in the absence of injunctive relief.**

The shutdown of CDLIS or the transfer of Plaintiff States' CDLIS data in response to Federal Defendants' Data Demand would irreparably harm Plaintiff States and the public. The unauthorized disclosure of the MPRs, which involves a large-scale disclosure of sensitive personal information, constitutes irreparable harm. Such a large-scale, unregulated, and irreversible distribution inevitably compromises and undermines the public's trust in the Plaintiff States'

promises to safeguard their residents' personal information, possibly resulting in fewer people seeking driver's licenses, a drop in fee revenue, and a potential increase in unauthorized driving and the attendant public safety risks. Additionally, if Federal Defendants follow through on the threat to effectively shut down CDLIS by terminating the federal funding that sustains it and the cooperative agreement that authorizes AAMVA to operate it, Plaintiff States could lose the ability to issue CDLs—and possibly *all* driver's licenses—and their ability to monitor and ensure the safe operation of commercial motor vehicles within their respective borders would be impaired. Disclosure of the States' data would also impose significant compliance burdens on Plaintiff States, requiring some States to give notice to residents and necessitating revisions to official forms and communications. If the Federal Defendants succeed in taking custody of Plaintiff States' CDLIS data, thereby creating a new database of State-owned information that the States can no longer control, update, or correct, the Plaintiff States and their residents face the risk that the Federal Defendants, or other federal agencies with whom they share the data, will take adverse actions against them based on out-of-date, incomplete, or erroneous information.

**IV. The balance of equities is in Plaintiffs' favor.**

Maintaining the status quo by preliminarily enjoining Federal Defendants from carrying out their threats would not harm Federal Defendants because they retain their demonstrated abilities to perform their statutory functions, as they have done for decades, without the demanded data and do not have a satisfactory explanation as to how obtaining this wholesale transfer of data would materially assist them. Preliminary relief also would not harm AAMVA, which has not endorsed this transfer and joins in the request for injunctive relief.

**V. Preliminary injunctive relief is also in the public interest.**

Injunctive relief would preserve the system that has been in place for decades that facilitates

the issuance of commercial driver licenses to qualified individuals and, as a result, public safety. Were federal funding to AAMVA terminated, the CDLIS would effectively cease its operations, impairing Plaintiff States' ability to issue and renew CDLs to qualified individuals and compromising the safe operation of commercial motor vehicles. Any shutdown of CDLIS, which is interconnected with all forms of driver licensing, could disrupt or even stop the issuance and renewal of any driver's licenses in the United States. *See* [Doc. No. 46] at 13.

**VI. The entered injunction is the appropriate remedy.**

The Federal defendants contend that "[t]he APA only authorizes courts to 'set aside' and 'postpone' agency actions—a far narrower authority than the court's equitable powers of issue plumbing or injunctive relief." [Doc. No. 101] at 20 (internal quotations omitted) (quoting *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584, 623 n. 14 (D. Md. 2025)). The Federal Defendants also contend that "any relief should not prohibit DOT's Office of Inspector General (DOT-OIG) from exercising its independent authorities, should it determine the need for the CDLIS data." *Id.*

The appropriate scope of preliminary injunctive relief is that which is necessary to afford a plaintiff complete relief from the threatened harm. *Dmarcian, Inc. V. DMARC Advisor BV*, 182 F.4th 289, 305 (4th Cir. 2026). Nor does the APA restrict the entry of injunctive relief, as the Federal Defendants contend. *See Roe v. Dep't of Def.*, 947 F.3d 207, 219, 234 (4th Cir. 2020) (affirming the grant of a preliminary injunction resting on an APA claim). The Court has considered the appropriate scope of injunctive relief and concludes that the preliminary injunction it intends to enter is of necessary scope, and to the extent the Federal Defendants conclude that it improperly restricts them from engaging in other lawful agency action, it may present that issue to the Court for consideration, with a request that the injunction be amended.

## VII. CONCLUSION

For all of the above reasons, Plaintiffs have made a clear showing that (1) they are likely to succeed on the merits of their claims, (2) they would experience irreparable harm in the absence of injunctive relief, (3) the balance of equities is in their favor, and (4) granting injunctive relief is in the public interest. Accordingly, it is hereby

**ORDERED** that pending further order of the Court the Defendant AAMVA, its officers, agents, servants, employees and attorneys, and those who are in active concert or participation with them, be, and the same hereby are, **ENJOINED** from transferring to the Federal Defendants or any other agency the Plaintiff States' CDLIS Master Pointer Records, as requested in the Data Demand; and it is further

**ORDERED** that pending further order of the Court the Defendants DOT, FMCSA, Secretary of Transportation, and the Administrator of FMCSA, their officers, agents, servants, employees and attorneys, and those who are in active concert or participation with them, be, and the same hereby are, **ENJOINED** from taking any adverse actions against the Plaintiff States or the AAMVA based on the failure to transfer to them the information requested in the Data Demand, including, without limitation, terminating or threatening to terminate AAMVA's federal contracts or funding, terminating or threatening to terminate Plaintiff States' federal contracts or funding, or taking any other action that could impair the operation of CDLIS or Plaintiff States' ability to issue commercial driver's licenses; and it is further

**ORDERED** that no security is required to be posted by the Plaintiff States pursuant to Federal Rule of Civil Procedure 65, the Court finding that no such security is necessary.

The Clerk is directed to forward a copy of this Order to all counsel of the record.

/s/
Anthony J. Trenga
Senior United States District Judge

September 17, 2026
Alexandria, Virginia