**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>*Defendants*. | No. 1:26-cv-2547 (AJT/IDD) |

**MEMORANDUM OF LAW IN SUPPORT OF AMERICAN FEDERATION OF TEACHERS' MOTION FOR A STAY UNDER 5 U.S.C. § 705**

Adam R. Pulver
(admitted pro hac vice)
Nandan M. Joshi
(admitted pro hac vice)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org
njoshi@citizen.org

Mark Hanna (Virginia Bar No. 45442)
Murphy Anderson PLLC
1401 K Street NW
Suite 300
Washington, DC 20005
(202) 223-2620
mhanna@murphypllc.com

*Counsel for Plaintiff-Intervenor*

October 8, 2026

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

BACKGROUND ..... 1

A. The Commercial Driver's License Information System ..... 1

B. FMCSA's Data Demand of AAMVA ..... 3

C. This Litigation ..... 6

D. Harm to AFT Members from the Data Demand ..... 9

LEGAL STANDARD ..... 10

ARGUMENT ..... 11

I. AFT is likely to succeed on the merits of its claims. ..... 11

A. AFT has standing. ..... 11

B. AFT is likely to succeed on the merits of its claim. ..... 15

II. AFT's members will suffer irreparable harm absent a stay. ..... 17

III. The remaining stay factors support grant of a stay. ..... 20

IV. The Court should stay the Data Demand in its entirety. ..... 20

CONCLUSION ..... 21

## TABLE OF AUTHORITIES

**Cases** **Pages**

*Advanced Energy United v. FERC*,
185 F.4th 186 (D.C. Cir. 2026) ... 15

*AFL-CIO v. Department of Labor*,
836 F. Supp. 3d 137 (D.D.C. 2026) ... 14

*American Federation of State, County, and Municipal Employees, AFL-CIO v. Social Security Administration*,
172 F.4th 361 (4th Cir. 2026) ... 11, 12, 19

*Association of American Railroad v. Hudson*,
144 F.4th 582 (4th Cir. 2025) ... 11

*Asylum Seeker Advocacy Project v. United States Citizenship & Immigration Services*,
808 F. Supp. 3d 708 (D. Md. 2025) ... 21

*Building & Construction Trades Council v. Downtown Development, Inc.*,
448 F.3d 138 (2d Cir. 2006) ... 14

*Cabrera v. U.S. Department of Labor*,
792 F. Supp. 3d 91 (D.D.C. 2025) ... 20, 21

*Career Colleges & School of Texas v. U.S. Department of Education*,
98 F.4th 220 (5th Cir. 2024) ... 20

*Casa de Maryland, Inc. v. Wolf*,
486 F. Supp. 3d 928 (D. Md. 2020) ... 10, 17

*City of Columbus v. Kennedy*,
796 F. Supp. 3d 123 (D. Md. 2025) ... 21

*Center for Taxpayer Rights v. IRS*,
815 F. Supp. 3d 1 (D.D.C. 2025) ... 19

*FEC v. Cruz*,
596 U.S. 289 (2022) ... 11, 13

*Frazier v. Prince George's County*,
86 F.4th 537 (4th Cir. 2023) ... 11

*Garey v. James S. Farrin, P.C.*,
35 F.4th 917 (4th Cir. 2022) ... 13

*Gaston v. LexisNexis Risk Solutions, Inc.*,
483 F. Supp. 3d 318 (W.D.N.C. 2020) .......... 13

*Guilford College v. McAleenan*,
389 F. Supp. 3d 377 (M.D.N.C. 2019) .......... 14

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989) .......... 21

*Humane Society of the U.S. v. Hodel*,
840 F.2d 45 (D.C. Cir. 1988) .......... 15

*Jake's Fireworks, Inc. v. CPSC*,
105 F.4th 627 (4th Cir. 2024) .......... 15

*Kiakombua v. Wolf*,
498 F. Supp. 3d 1 (D.D.C. 2020) .......... 21

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 20

*National Mining Ass'n v. U.S. Army Corps of Engineers*,
145 F.3d 1399 (D.C. Cir. 1998) .......... 21

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 17

*Pierce v. N.C. Board of Elections*,
97 F.4th 194 (4th Cir. 2024) .......... 11

*Presidio Golf Club v. National Park Service*,
155 F.3d 1153 (9th Cir. 1998) .......... 14

*Salazar v. National Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) .......... 13

*Scripps-Howard Radio, Inc. v. FCC*,
316 U.S. 4 (1942) .......... 17

*Senior Executives Ass'n v. United States*,
891 F. Supp. 2d 745 (D. Md. 2012) .......... 18

*Texas v. Biden*,
646 F. Supp. 3d 753 (N.D. Tex. 2022) .......... 18

*TransUnion v. Ramirez*,
594 U.S. 413 (2021) .......... 11

*UFCW v. Brown Group, Inc.*,
517 U.S. 544 (1996) .......... 14

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) .......... 19

*West Virginia Coalition Against Domestic Violence, Inc. v. Morrisey*,
No. 2:19-CV-00434, 2020 WL 6948093 (S.D.W. Va. Nov. 25, 2020) .......... 14

*Whitaker v. Appriss, Inc.*,
229 F. Supp. 3d 809 (N.D. Ind. 2017) .......... 13

*Woonasquatucket River Watershed Council v. Department of Agriculture*,
186 F.4th 25 (1st Cir. 2026) .......... 20

*Z.A. v. Blanche*,
No. 26-cv-04998, 2026 WL 2212873 (N.D. Cal. July 31, 2026) .......... 18

**Statutory and Constitutional Provisions**

U.S. Constitution, article I, § 8, clause 1 .......... 6

5 U.S.C. § 552a .......... 3

5 U.S.C. § 551a(e)(1) .......... 16

5 U.S.C. § 552a(g)(1)(C) .......... 19

5 U.S.C. § 552a(g)(1)(D) .......... 19

5 U.S.C. § 702 .......... 15

5 U.S.C. § 705 .......... 1, 10, 21

5 U.S.C. § 706(2)(A) .......... 9

18 U.S.C. § 2721 .......... 3

18 U.S.C. § 2721(b)(1) .......... 4, 7, 16

18 U.S.C. § 2724 .......... 18

49 U.S.C. § 31106(e) .......... 13

49 U.S.C. § 31302 .......... 1, 9

49 U.S.C. § 31309(a) .......... 2, 6

49 U.S.C. § 31309(b)(1) .......... 3

49 U.S.C. § 31309(c) .......... 13

49 U.S.C. § 31311(a) .......... 3

49 U.S.C. § 31311(a)(4) .......... 2

49 U.S.C. § 31311(a)(5) .......... 2

49 U.S.C. § 31311(a)(6) .......... 2

49 U.S.C. § 31311(a)(7) .......... 2

49 U.S.C. § 31311(a)(8) .......... 2

49 U.S.C. § 31311(a)(11) .......... 2

49 U.S.C. § 31311(a)(23) .......... 2

49 U.S.C. § 31314 .......... 3

Commercial Motor Vehicle Safety Act of 1986,
Pub. L. No. 99-570, tit. XII, 100 Stat. 3207-170 .......... 1

**Federal Rules of Civil Procedure**

Rule 24(a) .......... 9

Rule 24(b) .......... 9

**Regulations**

49 C.F.R. § 384.225(e) .......... 3

**Other Authorities**

Commercial Driver's License Information System State Procedures Manual, Release 5.2.0,
76 Fed. Reg. 68328 (Nov. 4, 2011) .......... 3

Policy on Availability of Information From CDLIS,
70 Fed. Reg. 2455 (Jan. 13, 2005) .......... 13

S. Rep. No. 99-411 (1986) .......................................................................................................... 2

## INTRODUCTION

Defendant Federal Motor Carrier Safety Administration (FMCSA) has demanded that the American Association of Motor Vehicle Administrators (AAMVA) turn over state-supplied records containing the sensitive personal information of 17 million individuals who have applied for commercial driver's licenses (CDLs) (the Data Demand)—including the personal information of approximately 11,000 members of Plaintiff-Intervenor American Federation of Teachers (AFT). As this Court has already recognized, that Data Demand is likely unlawful.

Although this Court has preliminarily enjoined AAMVA from transferring the records of the Plaintiff States to FMCSA and Defendant Department of Transportation (DOT), and has enjoined FMCSA, DOT, Secretary Duffy, and Administrator Barrs (collectively, the Agency Defendants) from taking adverse action against the Plaintiff States or AAMVA for failing to comply with the Data Demand, ECF No. 113, that injunction does not fully prevent irreparable harm for AFT members whose information was supplied to AAMVA by *other* states. To protect directly AFT members who submitted applications for CDLs to *any* state, including the non-Plaintiff States, AFT seeks a stay of the Data Demand pursuant to 5 U.S.C. § 705.

## BACKGROUND

### A. The Commercial Driver's License Information System

In 1986, Congress enacted the Commercial Motor Vehicle Safety Act of 1986, Pub. L. No. 99-570, tit. XII, 100 Stat. 3207-170 (CMVSA). The CMVSA prohibits any individual from operating a commercial motor vehicle without a valid CDL and from having more than one driver's license. 49 U.S.C. § 31302. Although the CMVSA recognizes that CDLs will be issued "by the States," it authorizes the Secretary of Transportation (the Secretary) to prescribe "minimum uniform standards for the issuance of commercial drivers' licenses and learner's permits" and the "information to be contained on each of the licenses and permits." *Id.* § 31308. These minimum

federal standards prevent "the practice of multiple license use by commercial drivers," which allowed them to "spread their traffic violations over a number of licenses and maintain a 'good driver' rating regardless of the number of violations." S. Rep. No. 99-411, at 3 (1986). Thus, under the CMVSA, states may issue CDLs "to an individual who has a commercial driver's license issued by another State only if the individual first returns the driver's license issued by the other State," and may not issue a CDL until the state has "request[ed] from any other State that has issued a driver's license to the individual all information about the driving record of the individual." 49 U.S.C. § 31311(a)(6), (11). The CMVSA also provides that CDLs must include "the name and address of the individual issued the license or learner's permit and a physical description of the individual" and "the social security account number or other number or information the Secretary decides is appropriate to identify the individual." *Id.* §§ 31308(4), 31311(a)(4).

The CMVSA requires the Secretary to "maintain an information system" to "serve as a clearinghouse and depository of information about the licensing, identification, and disqualification of operators of commercial motor vehicles." *Id.* § 31309(a). States must use this "Commercial Driver's License Information System" (CDLIS) to facilitate the exchange of information about CDL holders. For instance, states are required to include in CDLIS "the proposed issuance of the license and other information the Secretary may require to ensure identification of the individual applying for the license," *id.* § 31311(a)(5), the issuance of a CDL, *id.* § 31311(a)(7), disqualifications of CDL holders from operating a motor vehicle, *id.* § 31311(a)(8), and other "driver history record information," *id.* § 31311(a)(23).

To facilitate this exchange of information, the CDLIS contains records on CDL holders called "pointer" records (Master Pointer Records, or MPRs) because they use the driver's personal information to "point" a user to additional information about the driver contained in state motor

vehicle databases. *See* Collier Decl., ECF No. 85-2 ¶ 10; *see* AAMVA Products & Services Catalog, ECF No. 1-3 at 29. MPRs consist of "the name, address, and physical description of the operator" and the "social security account number of the operator or other number or information the Secretary considers appropriate to identify the operator," 49 U.S.C. § 31309(b)(1), as well as information on a CDL holder's date of birth and driver's license number, *see* Collier Decl., ECF No. 85-2 ¶ 10.

States that do not comply with these requirements may lose their federal highway funding. 49 U.S.C. §§ 31311(a), 31314.

**B. FMCSA's Data Demand of AAMVA**

Since 1988, FMCSA has authorized AAMVA to operate the CDLIS. *See* Commercial Driver's License Information System State Procedures Manual, Release 5.2.0, 76 Fed. Reg. 68328, 68329 (Nov. 4, 2011). FMCSA consistently has recognized that the federal Privacy Act, 5 U.S.C. § 552a, *does not apply* to pointer records as retained within CDLIS because they are not FMCSA records but records "created and maintained by the States." *Id.* at 68332; *see also* FMCSA, *PIA–Commercial Driver's License Information System (CDLIS)-Gateway*, (Jan. 11, 2011) (2011 PIA) ("CDLIS is not a Federal Privacy Act system of records"), https://www.transportation.gov/individuals/privacy/pia-commercial-drivers-license-information-system-cdlis-gateway. FMCSA has also recognized that CDLIS records maintained by AAMVA *are protected* by the Driver's Privacy Protection Act (DPPA). *See* 2011 PIA ("Restrictions on the permissible use of CDLIS driver information, including [personally identifiable information (PII)], by States is regulated by 49 CFR 384.225(e) and the DPPA of 1994, as amended (18 U.S.C. 2721 et seq.).").

On June 25, 2026, FMCSA sent a letter to AAMVA demanding that it turn over data from each and every pointer record within the CDLIS for the last five years. ECF No. 1-2 at 2. AAMVA

responded five days later, advising FMCSA that it was "working to assess feasibility" of compliance with FMCSA's request "from both a technical and legal standpoint." *Id.* at 3. AAMVA noted concerns about whether the requested data disclosure would violate state and federal law, including the DPPA and the Privacy Act, and whether the request was authorized under the Cooperative Agreement between FMCSA and AAMVA that governs the CDLIS. *Id.* at 3–4. AAMVA also asked "that FMCSA provide AAMVA the specific intended use of the information," stating that it "must understand what agency or agencies will use the information and for what government function or functions" in order to assess the lawfulness of disclosure under the DPPA and "other relevant privacy laws." *Id.* at 3.

FMCSA responded by disputing AAMVA's reading of the Cooperative Agreement and stating that "FMCSA will use the CDLIS data as part of our statutory and regulatory oversight in our ongoing efforts to ensure the integrity and issuance of Commercial Driver's Licenses (CDLs) and Commercial Motor Vehicles (CMVs)." *Id.* at 5. FMCSA stated that the disclosure of CDLIS data would thus be a permissible use under 18 U.S.C. § 2721(b)(1). *Id.* The agency further advised that "FMCSA will handle all legal coordination under the Privacy Act," and it "strongly encourage[d]" AAMVA to provide the data requested. *Id.* at 5–6.

FMCSA and AAMVA continued to have discussions over FMCSA's request, in which FMCSA made "an explicit threat of termination of all of AAMVA's federal grants and contracts and potential litigation if AAMVA did not inform [DOT] by [July 24, 2026] whether AAMVA intend[ed] to produce the 17 million pointer records." *Id.* at 11. On that day, AAMVA informed FMCSA that "AAMVA intend[ed] to disclose the records in compliance with applicable law, mindful of [its] regulatory obligations and the rights of the data owners," but that it was first

"providing notice of the circumstances to [its] member jurisdictions, as they are the owners of the data." *Id*. AAMVA also asked that FMCSA "not carry through on [its earlier] threats." *Id*. at 12.

On July 28, 2026, the U.S. Department of Homeland Security (DHS) served an administrative subpoena upon AAMVA, seeking the same information requested in FMCSA's June 25 letter. *Id.* at 14. The subpoena's stated purpose was the production of documents "in connection with an investigation or inquiry relating to the enforcement of U.S. immigration laws." *Id.* "FMCSA staff separately indicated via email that FMCSA and DHS had coordinated on their data demands and that the subpoena would be withdrawn due to AAMVA's efforts to cooperate with FMCSA." *Id.* In light of this development, and recognizing that "more than twenty jurisdictions had formally objected to AAMVA's proposed production of" CDLIS data, AAMVA informed FMCSA that it was reevaluating its response to FMCSA's request, and that it was considering whether to "facilitat[e] an opt-in or opt-out choice by the states whether to authorize AAMVA's transmission of that state's data." *Id*.

On August 11, 2026, FMCSA sent a final Data Demand to AAMVA, asserting that AAMVA's position was "unacceptable." *Id.* at 21. FMCSA argued that CDLIS data was "not 'state data,'" that "[s]tates have no veto over the production of records that AAMVA is holding on DOT's behalf," and that the records were "urgently needed for the federal government to help prevent fatal trucking accidents." *Id.* at 21. FMCSA stated that DHS would "reissue the administrative subpoena it previously withdrew," and demanded that AAMVA provide DOT with the requested records by August 17, 2026. *Id.* If AAMVA did not comply with this Data Demand, "DOT w[ould] pursue all available options to secure production, including canceling AAMVA's grants, filing an enforcement action to enforce the [DHS] subpoena, and considering terminating its contract with AAMVA." *Id.*

### C. This Litigation

On August 13, 2026, twenty-one states and the District of Columbia commenced this action against the Agency Defendants and AAMVA. ECF No. 1.[1] The Plaintiff States challenged FMCSA's Data Demand and asked the Court to declare it unlawful, set it aside, and issue injunctive relief prohibiting the Agency Defendants from implementing or enforcing the Data Demand as to any records owned or provided by the Plaintiff States, from terminating any grants based on the Data Demand, and from accepting from AAMVA any transfer of records owned or provided by the Plaintiff States. *Id.* at 51. The Plaintiff States assert that the Data Demand (1) violated 49 U.S.C. § 31309(a), which requires the Secretary to "consult with the States in carrying out" the CDLIS statute; (2) was contrary to the DPPA; (3) was contrary to the Privacy Act; (4) exceeded FMCSA's statutory authority; (5) was arbitrary and capricious; and (6) was inconsistent with the Constitution's Spending Clause, U.S. Const. art. I, § 8, cl. 1. ECF No. 1, ¶¶ 137–198. In addition, four States raised a claim against AAMVA asserting that compliance with the Data Demand would violate their contracts with AAMVA. *Id.* ¶¶ 199–205.

Along with their complaint, the Plaintiff States filed a motion for a temporary restraining order (TRO). ECF No. 3. This Court entered an administrative stay enjoining AAMVA "from providing the demanded data and information to any Defendant, or any other agency acting in coordination with Defendants" and enjoining any defendant "from taking any adverse actions to implement or enforce, or that are otherwise related to, its data demand." ECF No. 25 at 2.

[1] Kentucky, Minnesota, and Rhode Island joined as plaintiffs on August 25, 2026. ECF No. 77. As used with respect to events preceding that date, the term "Plaintiff States" refers to the original group of 22 plaintiffs. As used with respect to events from August 25, 2026, the term refers to the current group of 25 plaintiffs.

On August 20, 2026, the Court issued a TRO. ECF No. 54. As relevant here, the Court found that the Plaintiff States were likely to succeed on their DPPA, Privacy Act, and arbitrary and capricious claims. *Id.* at 9–12. As to the DPPA, the Court concluded that the Agency Defendants had "failed to articulate" how the Data Demand was authorized by DPPA's exceptions that permit disclosure of "highly restricted information." *Id.* at 9–10. Although the Agency Defendants had relied on the exception authorizing disclosure "[f]or use by any government agency . . . in carrying out its functions," 18 U.S.C. § 2721(b)(l), the Court noted that they were "unable to explain how the data would in fact assist them in performing their statutory functions, or point to anything that they cannot already do without this data." ECF No. 54 at 10. As to the Privacy Act, the Court found a likelihood of success on the Plaintiff States' claim that the Agency Defendants failed to satisfy the Act's notice requirements for "new or newly modified" systems of records," "violate[d] restrictions on what information FMCSA may maintain into such a system," and "violate[d] prohibitions against disclosing personal information to third parties, including other federal agencies such as DHS." *Id*. The Court also found it likely that the Data Demand was arbitrary and capricious because the Agency Defendants failed to explain how the "bulk transfer of MPRs for the first time in AAMCA or FMCSA's history is rationally related to [the Agency' Defendants'] stated goals"; ignored "the costs and potential harms of disclosing the sensitive personal information of 17 million individuals as well as the reliance interests in having this data kept private"; and "failed to dispel the compelling inference that they seek these 17 million files in large part, if not primarily, for immigration enforcement, which is not part of [their] statutory mandate." *Id.* at 11. The Court also found irreparable harm, explaining that "the 17 million records at issue here, the overwhelming portion of which no doubt includes data on U.S. citizens, will not be disclosed to a small number of individuals with confidentiality obligations." *Id.* at 13–14.

The Plaintiff States filed their motion for a preliminary injunction on August 26, 2026. ECF No. 84. In their motion, they asked the Court to enjoin AAMVA "from transferring Plaintiff States' CDLIS Master Pointer Records, as requested in the Data Demand, to Federal Defendants or any other federal agency," to enjoin the Federal Defendants "from demanding and/or accepting transfer of Plaintiff States' CDLIS Master Pointer Records pursuant to the Data Demand," and to enjoin the Federal Defendants "from taking any adverse actions against Plaintiff States or AAMVA based on the failure to transfer to them the requested information in the Data Demand." Plaintiff States' Proposed Order, ECF No. 84-1 at 8.

On September 17, this Court granted the States' motion for a preliminary injunction and reaffirmed its earlier conclusions as to the Plaintiffs States' DPPA, Privacy Act, and arbitrary and capricious claims. ECF No. 113. The Court explained that the DPPA's government-use exception "is likely not applicable" because there had been no "credible showing that FMCSA will actually use all of the records it demands or that there is a particular statutory function for which FMCSA intends to use the bulk data," and because FMCSA sought the data to share with DHS "for use in connection with immigration enforcement." *Id*. at 8–9. The Court also reaffirmed its conclusion that the Agency Defendants did not satisfy their duties under the Privacy Act. *Id*. at 9. And as to the arbitrary and capricious claim, the Court concluded that the Agency Defendants likely failed to "consider[] alternatives to the requested information, which appear in this case to be substantial and fulsome, or the costs imposed on the Plaintiffs and their residents, which are substantial and irreparable." *Id.* at 11. The Court also concluded that the "unauthorized disclosure of the MPRs, which involves a large-scale disclosure of sensitive personal information, constitutes irreparable harm." *Id.* at 13. In light of these findings and others, the Court enjoined AAMVA from transferring "the Plaintiff States' CDLIS Master Pointer Records" to FMCSA pursuant to the Data

Demand, and enjoined the Agency Defendants "from taking any adverse actions against the Plaintiff States or the AAMVA based on the failure to transfer to them the information requested in the Data Demand." *Id.* at 16.

While the State Plaintiffs' preliminary injunction motion was pending, AFT moved to intervene to protect the interests of its members as a matter of right under Federal Rule of Civil Procedure 24(a) or, alternatively, for permissive intervention under Rule 24(b). ECF No. 91. On September 21, 2026, this Court held that permissive intervention was warranted and granted AFT's motion to intervene on those grounds. ECF No. 114. On September 22, 2026, AFT filed its complaint in intervention, which states three claims under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). ECF No. 115. First, AFT alleges that the Data Demand is not in accordance with the DPPA. *Id.* ¶¶ 47–52. Second, AFT alleges that the Data Demand is not in accordance with law because it seeks to collect records on individuals in violation of the Privacy Act. *Id.* ¶¶ 53–58. Finally, AFT alleges that the Data Demand is arbitrary and capricious. *Id.* ¶¶ 59–63.

**D. Harm to AFT Members from the Data Demand**

AFT is a national labor union representing approximately 1.875 million members. *See* Porcari Decl. ¶ 4. Among AFT members are approximately 11,000 workers in the U.S. transportation industry, including school bus drivers and maintenance drivers. These 11,000 members are located in Alabama, California, Colorado, Florida, Georgia, Illinois, Kansas, Michigan, Minnesota, Montana, New Mexico, New York, Oklahoma, Oregon, and Texas. Second Porcari Decl. ¶ 9.

AFT members who drive commercial motor vehicles must hold a valid CDL to perform their jobs. 49 U.S.C. § 31302 ("No individual shall operate a commercial motor vehicle without a valid commercial driver's license[.]"). To obtain a CDL, these members provided the CDL-issuing state with sensitive personal information, including name, address, and social security or other

identification number. *Id.* § 31308(4). The CDL-issuing state, in turn, was required to transmit that personal information to CDLIS, as described above.

AFT members whose sensitive personal information is contained within the CDLIS database do not want AAMVA to turn that information over to FMCSA. *See* Jane Doe Decl., ECF No. 92-2, ¶ 4; John Doe Decl. ¶ 4.[2] Members do not trust "the federal government to maintain the information securely and use it appropriately." John Doe Decl. ¶ 4. They also do not want to see their personal data handed over to DHS for purposes of immigration enforcement. *Id.* ¶ 4; Jane Doe Decl., ECF No. 92-2, ¶ 3. As the Agency Defendants have acknowledged, when CDL applicants provide their personal information to the states in this manner, they do so under a "promise[] of confidentiality." TRO Hearing Transcript, reproduced at ECF No. 85-1, at 20 ("THE COURT: And the residents are obligated to turn it over to the states with the promises of confidentiality? MR. SIRKOVICH: In order to obtain a CDL, yes."). AFT members understand that AAMVA's compliance with FMCSA's Data Demand would violate that expectation of confidentiality. John Doe Decl. ¶ 2.

## LEGAL STANDARD

The Administrative Procedure Act (APA) provides that a reviewing court may "preserve status or rights pending conclusion of the review proceedings" "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. In deciding whether to issue a stay under section 705, courts consider the factors that govern whether to issue a preliminary injunction. *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 949–50 (D. Md. 2020) (citing cases). Under that standard, a plaintiff must show "(1) that he's likely to succeed on the merits; (2) that he's likely to suffer irreparable

[2] Declarations are submitted "under pseudonyms due to the risk of retaliation." *CASA, Inc. v. Trump*, 793 F. Supp. 3d 703, 724 n.8 (D. Md. 2025); see Jane Doe Decl., ECF 92-2, ¶ 5; John Doe Decl. ¶ 5.

harm if preliminary relief isn't granted; (3) that the balance of equities favors him; and (4) that an injunction is in the public interest." *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023). The final two factors "merge when the Government is the opposing party." *Pierce v. N.C. Bd. of Elections*, 97 F.4th 194, 225 (4th Cir. 2024) (internal quotation marks omitted).

## ARGUMENT

### I. AFT is likely to succeed on the merits of its claims.

#### A. AFT has standing.

"To establish standing, a plaintiff must show: '(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.'" *Am. Fed. of State, Cnty. and Mun. Emps., AFL-CIO v. Social Sec. Admin.*, 172 F.4th 361, 367 (4th Cir. 2026) (*AFSCME*) (quoting *TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021)). "At the preliminary injunction stage, a plaintiff must make a clear showing that she is likely to establish each element of standing." *Id.* (internal quotation marks omitted). An association has standing to sue on behalf of its members when "its members would have standing to sue in their own right, … the interests it seeks to vindicate are germane to its mission, and … its claims can be litigated without the participation of individual members as parties to the suit." *Ass'n of Am. R.R. v. Hudson*, 144 F.4th 582, 589 (4th Cir. 2025). "For standing purposes, [the courts] accept as valid the merits of appellees' legal claims." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022). AFT satisfies all three of these requirements.

First, AFT members have standing to sue in their own right. AFT members provided state agencies with their sensitive personal information in order to obtain and/or renew their CDLs, with the expectation that the information would generally be held in confidence, subject to limited exceptions. John Doe Decl. ¶ 3; Jane Doe Decl., ECF No. 92-2, ¶¶ 2–3. For example, Texas's CDL

application represents that social security numbers provided by driver applicants will only be used "for identification purposes," and that the Texas Department of Public Safety "will only release the number as statutorily authorized by Texas Transportation Code section 521.044,"—a statute that does *not* authorize the sharing of social security numbers with FMCSA or DHS. Texas Department of Public Safety, CDL-1, Texas Commercial Driver License Application, https://www.dps.texas.gov/internetforms/Forms/CDL-1.pdf. As the en banc Fourth Circuit has made clear, "disclosing plaintiffs' members' personally identifiable *information* … inflicts a harm" that gives those members standing to sue. *AFSCME*, 172 F.4th at 368. Analogizing unauthorized disclosures to the common-law tort of intrusion upon seclusion, *AFSCME* explained that it is the "intrusion itself" that creates the harm, even assuming "there is no publication or disclosure to any third party." *Id.* at 370 (cleaned up). *AFSCME* further rejected the argument that the disclosure must be "targeted" to inflict harm, casting doubt on the notion that "invading the privacy of millions of people is 'different in kind' from invading the privacy of just one[.]" *Id.* at 371.

Here, the Agency Defendants' demand for the entirety of the CDLIS database maintained by AAMVA inflicts a privacy harm sufficient to confer standing on AFT members who hold CDLs including members in Texas, Oklahoma, and other non-Plaintiff States. *See* Second Porcari Decl. ¶ 9. Those members submitted sensitive, private information to their respective states, subject to the protections of the DPPA. Jane Doe Decl., ECF 92-2, ¶¶ 1–2 John Doe Decl. ¶ 1. And while the DPPA authorized their respective states to share that information with AAMVA, Plaintiffs assert that the DPPA does not authorize the redisclosure of that information to the Agency Defendants.

For standing purposes, the Court must credit that assertion. *Cruz*, 596 U.S. at 298. And under *AFSCME*, this unauthorized disclosure is itself a cognizable harm.[3]

Courts in this circuit have consistently recognized that disclosures of sensitive information in contravention of the DPPA can result in a privacy harm sufficient to give plaintiffs standing. *See Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 922–23 (4th Cir. 2022) (holding that the plaintiffs "alleged a legally cognizable privacy injury" and that they could have pursued injunctive relief had they alleged that "Defendants are currently obtaining their personal information or will do so imminently"); *Gaston v. LexisNexis Risk Sols., Inc.*, 483 F. Supp. 3d 318, 343 (W.D.N.C. 2020) (concluding that plaintiffs had standing to pursue injunctive relief to prevent DPPA violation); *Whitaker v. Appriss, Inc.*, 229 F. Supp. 3d 809, 815 (N.D. Ind. 2017) (concluding that plaintiffs whose information is disclosed in violation of DPPA have standing because "once a plaintiff's information is disclosed or obtained for a prohibited purpose, the damage is already done."); *cf. Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 537 (2d Cir. 2024) (holding that plaintiff had standing because "his personal information was disclosed to a third party, without his consent, in violation of the [Video Privacy Protection Act]"), *cert. denied*, 146 S. Ct. 880 (2025).

AFT on behalf of its driver members also satisfies the other elements of standing. The harm to AFT members' privacy interests is caused by the Agency Defendants' demand to AAMVA and would be redressed by a stay preventing the Agency Defendants from enforcing that demand.

[3] The Agency Defendants' ability to query CDLIS under their preexisting information policy does not eliminate the privacy harms that arise from their decision to demand that AAMVA turn over the entire CDLIS database to them. *See* PI Order, ECF No. 113, at 9 (stating that "nothing in Federal Defendants' policies allows federal agencies to obtain CDLIS records in bulk, only at most *access*, as AAMVA provides, and as the states provide on a more substantive level" (citing 49 U.S.C. §§ 31106(e), 31309(c); and FMCSA Policy on Availability of Information From CDLIS, 70 Fed. Reg. 2455 (Jan. 13, 2005))).

Second, the interests that AFT seeks to vindicate are germane to its mission. The germaneness test is an "undemanding" one, requiring a court to determine only "whether an association's lawsuit would, if successful, reasonably tend to further the general interests that individual members sought to vindicate in joining the association and whether the lawsuit bears a reasonable connection to the association's knowledge and experience." *W. Va. Coal. Against Domestic Violence, Inc. v. Morrisey*, No. 2:19-CV-00434, 2020 WL 6948093, at *7 (S.D.W. Va. Nov. 25, 2020) (first quoting *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998), second quoting *Bldg. & Constr. Trades Counsel v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006)). As explained in the accompanying declaration of Jennifer Porcari, "[a]s part of AFT's mission and purpose of supporting educators who interface with government agencies, [it] advocates for the protection and safeguarding of AFT members' personal data, in courts, legislatures, and elsewhere." Second Porcari Decl. ¶ 8. "[B]ecause of the paramount role, under federal labor law, that unions play in protecting the interests of their members," *UFCW v. Brown Grp., Inc.*, 517 U.S. 544, 556 n.6 (1996), and because AFT's driver members require CDLs as a condition of employment, the connection between AFT's mission and the claims raised here meet the low germaneness bar. *See AFL-CIO v. Dep't of Labor*, 836 F. Supp. 3d 137, 159 (D.D.C. 2026) (holding that "advancing members' privacy rights is germane" to AFT and other unions' purpose); *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 389 (M.D.N.C. 2019) (recognizing that "advocating for the civil rights of its members" is germane to AFT's purpose).

Contrary to the Agency Defendants' assertion in opposing the motion to intervene, neither the fact that not *every* AFT member's information is at issue, nor the fact that AFT's primary mission relates to education, suggests otherwise. As the D.C. Circuit has explained, the germaneness requirement is not one of "centrality of purpose," but rather a modest requirement of

"mere pertinence between litigation subject and organizational purpose[.]" *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 56, 58 (D.C. Cir. 1988). Preventing the unauthorized disclosure of information that its members provided to the government in connection with their employment is pertinent to a labor union's mission.

Finally, participation by AFT's members is not required because the APA claims raised by AFT are "purely legal [] and seek common relief." *Advanced Energy United v. FERC*, 185 F.4th 186, 212 (D.C. Cir. 2026).

AFT is thus likely to demonstrate Article III standing.

**B. AFT is likely to succeed on the merits of its claim.**

AFT alleges that the Data Demand is not in accordance with the DPPA or the Privacy Act and that it is arbitrary and capricious. As this Court has held in granting preliminary relief to the Plaintiff States, whose claims overlap with AFT's, AFT's claims are likely to succeed.

At the outset, the Agency Defendants' Data Demand is final agency action subject to review under 5 U.S.C. § 702 because it embodies both "the consummation of the agency's decisionmaking process," and (2) one "from which legal consequences will flow." *Jake's Fireworks, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) (cleaned up). As this Court has noted, "nothing in the August 11 letter" in which the Agency Defendants demanded that AAMVA turn over the CDLIS database or face reprisals was "tentative or interlocutory in nature." PI Order, ECF No. 113, at 6–7 (quoting *Jake's Fireworks*, 105 F.4th at 631). Moreover, legal consequences flow from the demand because "AAMVA is effectively compelled" to turn over the records to avoid having its contracts and funding terminated by the Agency Defendants. TRO Order, ECF No. 54, at 7 (cleaned up).

On the merits of AFT's claims, the Agency Defendants' "demand that the AAMVA transfer the MPRs would likely violate the DPPA." PI Order, ECF No. 113, at 8. The only statutory

basis the Agency Defendants invoke for obtaining the master pointer records is the DPPA's exception that permits nonconsensual disclosure of records for government "use." 18 U.S.C. § 2721(b)(1). As this Court has explained, that exception "is likely not applicable here because the Federal Defendants have not made any credible showing that FMCSA will actually use all of the records it demands or that there is a particular statutory function for which FMCSA intends to use the bulk data." PI Order, ECF No. 113, at 8. Indeed, the Court observed that FMCSA seeks the data not "solely for [its] own use in discharge of its own statutory mandates," but to share that information with "DHS for use in connection with immigration enforcement." *Id.* at 8–9.

In addition, as this Court has already concluded, "the transfer of MPRs as demanded in the Data Demand would likely violate the Privacy Act." *Id.* at 9. In particular, the Agency Defendants "have not complied with the Act's notice requirements that FMCSA must satisfy before including new data into a new or newly modified 'system of records.'" *Id.* The Agency Defendants also have not "articulate[d] a specific purpose 'required to be accomplished' by FMCSA that would justify the possession and maintenance of these records." *Id.* (quoting 5 U.S.C. § 551a(e)(1)).

Finally, the Court has explained the many ways in which the Data Demand is likely arbitrary and capricious. The Agency Defendants have been unable "to explain how this data is needed to accomplish their goals [and] do not explain why or how the bulk transfer of MPRs for the first time in AAMCA or FMCSA's history is rationally related to their stated goals" of carrying out review and analysis of the CDL program. *Id.* at 11. The Agency Defendants have also failed to consider the "costs and potential harms of disclosing the sensitive personal information of 17 million individuals as well as the reliance interests in having this data kept private." *Id.* And they have not overcome the "inference that they seek these 17 million files in large part, if not primarily,

for immigration enforcement," an arbitrary decision because immigration enforcement "is not part of [their] statutory mandate." *Id.*

For these reasons, the Court should conclude here that AFT is likely to succeed on the merits of its claims.

**II. AFT's members will suffer irreparable harm absent a stay.**

A stay has "the practical effect of preventing some action before the legality of that action has been conclusively determined." *Nken v. Holder*, 556 U.S. 418, 428 (2009). "The authority to grant stays has historically been justified by the perceived need 'to prevent irreparable injury to the parties or to the public'" while judicial review is pending. *Id.* at 432 (quoting *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9 (1942)). To prevent irreparable harm, a court may grant a stay to "suspend administrative alteration of the status quo." *Id.* at 429; *see also Casa de Maryland*, 486 F. Supp. 3d at 949 ("[P]ursuant to section 705 of the APA, a reviewing court may stay 'agency action' pending judicial review 'to prevent irreparable injury.'").

A stay of the Data Demand is justified here to prevent irreparable injury to AFT's members who hold CDLs issued by states other than the Plaintiff States. *See*, *e.g.*, John Doe Decl. ¶ 2 (member whose information was provided to Texas Department of Public Safety). The Court's current preliminary injunction enjoins AAMVA from transferring to the Agency Defendants only the CDLIS Master Pointer Records of the Plaintiff States. PI Order, ECF No. 113, at 16. AAMVA thus currently remains free to transfer the Master Pointer Records of AFT members who hold CDLs from other states—a option that AAMVA has previously considered. ECF No. 1-2 at 14 ("AAMVA will consider with respect to the data demand … facilitating an opt-in or opt-out choice by the states whether to authorize AAMVA's transmission of that state's data."). Although the Court's preliminary injunction prohibits the Agency Defendants from "taking adverse action" against AAMVA for failing to transfer any of "the information requested in the Data Demand,"

ECF No. 113 at 16, the injunction does not prohibit AAMVA from complying with the Data Demand as to data received from non-Plaintiff States. By staying the effectiveness of the Data Demand pending judicial review, the Court would restore the status quo prior to the issuance of the Data Demand and prevent irreparable harm to AFT's members like John Doe who hold CDLs from the non-Plaintiff States. *See Texas v. Biden*, 646 F. Supp. 3d 753, 771 (N.D. Tex. 2022) (explaining that a section 705 stay restores "the last peaceable uncontested status existing between the parties before the dispute developed" (citation omitted)).

This Court has recognized that the "unauthorized disclosure of the MPRs, which involves a large-scale disclosure of sensitive personal information, constitutes irreparable harm." PI Order, ECF No. 113 at 13; *see id*. at 11 (concluding that the Data Demand would impose harms on both the Plaintiff States "and their residents" that "are substantial and irreparable."); *cf. Z.A. v. Blanche*, No. 26-cv-04998, 2026 WL 2212873, at *2 (N.D. Cal. July 31, 2026) ("[T]he near-certain disclosure of [plaintiffs'] personal medical information" constitutes irreparable harm). That was correct. The sharing of AFT driver members' information "is a bell that one cannot unring." *Senior Executives Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012). In particular, money damages cannot adequately repair the harm suffered by AFT members because damages for violations of the DPPA run only against AAMVA, and not the Agency Defendants. *See* 18 U.S.C. § 2724. Indeed, the Agency Defendants cannot themselves violate the DPPA because the DPPA does not apply to federal agencies. Rather, their action is unlawful because they are seeking to exercise the enforcement authorities they do have to compel AAMVA to violate drivers' privacy rights under the DPPA. No monetary relief is available to drivers whose privacy interests would be harmed if the Agency Defendants were successful. And while the Privacy Act does provide for damages against federal agencies, a Privacy Act damages claim, as relevant here, arises only after

an individual suffers an "adverse" determination or effect from the violation. 5 U.S.C. § 552a(g)(1)(C), (D). A Privacy Act cause of action is not designed to protect against situations like this one—where the agency violates the statute's procedural requirements by collecting records on individuals *before* a system of records or necessary purpose has been established with "all legal coordination necessary under the Privacy Act" to occur afterwards, possibly before any adverse decision is made. *See* ECF No. 1-2 at 5–6 (FMCSA July 7 letter to AAMVA); *see also id.* at 9 (suggesting that a System of Records Notice "will be provided" but not identifying such system). Preventing such unlawful agency actions from occurring is the province of the APA, not the Privacy Act. *See United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950) (explaining that the APA was enacted to "check" agencies "whose zeal might otherwise have carried them to excesses" and to protect against "arbitrary official encroachment on private rights").

Finally, the harm caused by the Data Demand cannot be remediated through a reparative injunction issued after final judgment. Such a remedy might be feasible if the disclosure were confined to a small group of individuals within government such that a permanent injunction requiring the agency to return to the status quo ante were feasible. *See AFSCME*, 172 F.4th at 373 (op. of Heytens, J.); *Ctr. for Taxpayer Rights v. IRS*, 815 F. Supp. 3d 1, 61 (D.D.C. 2025), *aff'd on other grounds*, ___ F.4th ___, 2026 WL 2635380 (D.C. Cir. Sept. 8, 2026). But as this Court has already found, "the 17 million records at issue here … will not be disclosed to a small number of individuals with confidentiality obligations," and "FMCSA has provided no confidentiality assurances and openly admits that it intends to share the records with DHS so that it can be used for immigration enforcement, among other things." TRO, ECF No. 54, at 13–14.

The requested stay is therefore necessary to prevent irreparable harm to AFT's members who hold CDLs in the non-Plaintiff States pending final judgment in this case.

## III. The remaining stay factors support grant of a stay.

The balance of equities and the public interest support issuance of a stay pending final judgment. A stay would safeguard the privacy interests of AFT members, including those in the non-Plaintiff States, against intrusion until the claims in this litigation can be conclusively resolved. At the same time, as this Court has already concluded, "[m]aintaining the status quo" would not harm the Agency Defendants "because they retain their demonstrated abilities to perform their statutory functions, as they have done for decades, without the demanded data," and would not harm AAMVA, which resists transferring CDLIS data to FMCSA absent assurances that it is protected from liability. PI Order, ECF No. 113 at 14; *see also* AAMVA Response to Motion for Prelim. Inj., ECF No. 100. And "because the Data Demand is unlawful, the public interest inherently favors issuing an injunction." TRO, ECF No. 54 at 15 (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting "substantial public interest in having governmental agencies abide by the federal laws")).

## IV. The Court should stay the Data Demand in its entirety.

"[T]he scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706." *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024); *see Woonasquatucket River Watershed Council v. U.S. Dep't of Agric*., 186 F.4th 25, 55 (1st Cir. 2026) (reaching same conclusion). "Both provisions specify what courts are authorized to do with respect to *agency actions*, not parties." *Cabrera v. U.S. Dep't of Labor*, 792 F. Supp. 3d 91, 106 (D.D.C. 2025). Relief under section 706 "is not party-restricted and allows a court to 'set aside' an unlawful agency action," *Career Colleges*, 98 F.4th at 255. Thus, for example, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting

*Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)). By the same token, section 705 "permit[s] wholesale, rather than party-specific, stays of agency action." *Cabrera*, 792 F. Supp. 3d at 106; *see also Asylum Seeker Advoc. Project v. U.S. Citizenship & Immigr. Servs.*, 808 F. Supp. 3d 708, 722 (D. Md. 2025) (rejecting argument that "a § 705 stay should be limited to the parties" as "inconsistent with the text of the APA"); *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 175 (D. Md. 2025) (holding that section 705 authorized stay of rule in its entirety, not just as applied to plaintiffs).

Applying this principle here, the Court should stay the Agency Defendants' Data Demand in its entirety. The Agency Defendants made a single Data Demand seeking the entire CDLIS database without drawing distinctions among CDL holders in different states. Indeed, FMCSA considered AAMVA's proposal for a state-by-state opt-in/opt-out process as "unacceptable." ECF No. 1-2 at 21. In this circumstance, there is no reason for the Court's stay of the Data Demand to draw distinctions among CDL holders based on the states in which they reside, as that "would be drawing a line which the agency itself has never drawn." *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 54 (D.D.C. 2020) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 494, 495 (D.C. Cir. 1989)).

The Court should accordingly stay the Data Demand in its entirety.[4]

## CONCLUSION

For the foregoing reasons, this Court should grant AFT's motion for a stay under 5 U.S.C. § 705.

---

[4] Section 705 has no bond requirement. *See City of Columbus*, 796 F. Supp. 3d at 177 (collecting cases).

Dated: October 8, 2026

Respectfully submitted,

/s/ Mark Hanna
Mark Hanna (Virginia Bar No. 45442)
Murphy Anderson PLLC
1401 K Street NW
Suite 300
Washington, DC 20005
(202) 223-2620
mhanna@murphypllc.com

Adam R. Pulver
(admitted pro hac vice)
Nandan M. Joshi
(admitted pro hac vice)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org
njoshi@citizen.org

*Counsel for Plaintiff-Intervenor*