**IN THE UNITED STATES DISTRICT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

STATE OF ILLINOIS, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, et al.,

Defendants.

Case No. 1:26-cv-2547 (AJT/IDD)

# FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF-INTERVENOR'S MOTION FOR A STAY UNDER 5 U.S.C. § 705

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

NOAH T. KATZEN
Assistant Branch Director

EITAN R. SIRKOVICH
(D.C. Bar No. 90030102)
LINDSEY E. GILMAN
(AZ Bar No. 034003)
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20005
Tel. (202) 353-5525
Eitan.r.sirkovich@usdoj.gov

TODD BLANCHE
United States Attorney General

THEOPHANI K. STAMOS
First Assistant United States Attorney

MATTHEW J. MEZGER
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3731
Fax: (703) 299-3983
Email: Matthew.Mezger@usdoj.gov

*Counsel for Federal Defendants*

## TABLE OF CONTENTS


INTRODUCTION ..... 1

PROCEDURAL HISTORY ..... 2

LEGAL STANDARD ..... 2

ARGUMENT ..... 3

I. Plaintiff-Intervenor Lacks Associational Standing for the Relief It Seeks. ..... 3

- A. Plaintiff-Intervenor has failed to identify a member who may have standing. ..... 4
- B. There is likely a substantial conflict of interest with other members. ..... 6

II. Plaintiff-Intervenor Fails the Remaining Requirements For a § 705 Stay. ..... 8

- A. Plaintiff-Intervenor Will Not Be Irreparably Harmed Absent a Stay ..... 8
- B. There Is No Effective Date for the Court to Postpone Under 5 U.S.C. § 705. ..... 10
- C. The Balance of the Equities Weighs Against Further Burdening Federal Defendants ..... 10
- D. Federal Defendants Are Likely to Ultimately Prevail on the Merits ..... 12

CONCLUSION ..... 15

## INTRODUCTION

It has been more than two months since Federal Defendants issued their request to the American Association of Motor Vehicle Administrators (AAMVA) to provide the master pointer records from the Commercial Driver License Information System (CDLIS). Since then, the Court entered an administrative stay, a temporary restraining order, and a preliminary injunction. This has imposed a hefty burden upon the federal government's ability to verify CDLs, protect motor vehicle operators, and take other lawful executive actions. Yet Plaintiff-Intervenor the American Federation of Teachers (AFT) now demands further interim relief under 5 U.S.C. § 705.

This Court should deny AFT's late-breaking request. Section 705 of the Administrative Procedure Act (APA) authorizes district courts to postpone the effective date of agency actions to the extent necessary to preserve the status quo and prevent irreparable harm before a final decision can be reached. But this authority is subject to traditional limits on equitable relief and is inapt in a case like this one, where the effective date of the agency's action has already passed. Regardless, Plaintiff-Intervenor lacks standing to seek this remedy.

Plaintiff-Intervenor asserts no direct harm to itself as an entity and instead seeks to assert the third-party rights of one of its members (whose interests very likely conflict with other members of the union who wish to see the CDLIS data used to prevent unqualified drivers from competing with them for jobs and threatening their safety on the road). That anonymous member resides in Texas, a non-plaintiff State, and therefore Plaintiff-Intervenor asserts he will be irreparably harmed *if* Texas authorizes the transfer of its CDLIS data *and if* AAMVA voluntarily chooses to share that data with Federal Defendants. This chain of events is no more than speculative conjecture, insufficient to establish imminent irreparable harm. Perhaps more importantly, however, staying the August 11 data request will do absolutely nothing to stop it. The

Court should refrain from stacking further obligations upon the extraordinary burdens Federal Defendants have already been preliminarily forced to bear, notwithstanding their strong likelihood of ultimately prevailing on their claims that the data request was not reviewable in district court or violative of the APA. For these reasons and those discussed further below, Plaintiff-Intervenor's motion should be denied.

## PROCEDURAL HISTORY

Plaintiff States commenced this action on August 13, 2026, to prevent AAMVA from conducting a bulk transfer of CDLIS data to the Federal Defendants pursuant to their August 11, 2026, data request. ECF No. 1. The Court entered a preliminary injunction on September 17, 2026, prohibiting AAMVA from transferring the Plaintiff States' data and prohibiting Federal Defendants from taking "adverse actions" against AAMVA or the Plaintiff States for failure to provide the data. ECF No. 113.

While the preliminary injunction motion was pending, the AFT moved to intervene. ECF No. 91. The Court granted permissive intervention on September 21, 2026. ECF No. 114. On October 8, 2026, Plaintiff-Intervenor AFT moved for additional preliminary relief under 5 U.S.C. § 705, asking the Court to stay the effective date of the August 11 Letter, even though Federal Defendants have taken no action pursuant to that letter during the time the administrative stay, TRO, and preliminary injunction have been in effect.

## LEGAL STANDARD

A party seeking a stay under 5 U.S.C. § 705 is subject to the same legal standard governing a motion for a preliminary injunction. *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that

the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. Plaintiff-Intervenor Lacks Associational Standing for the Relief It Seeks.

Standing requires that a party seeking relief show (1) "an injury in fact . . . which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, (2) "a causal connection between the injury and the conduct complained of," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

Here, Plaintiff-Intervenor does not allege direct harm to its organizational interests, so it must demonstrate associational standing to seek a § 705 stay. *See Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 409 (4th Cir. 2024) (Diaz, C.J. concurring) (an organization may show standing "in its own right to seek judicial relief for injury to itself, or as a representative of its members who have been harmed. We call the former organizational standing, and the latter associational or representational standing." (quotations omitted)); Brief of Plaintiff-Intervenor, ECF No. 132 at 11("Pl.-Interv.'s Br.") (advancing only an associational standing theory). Typically, a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This rule flows from a concern that third parties will not adequately represent the individuals whose rights they seek to vindicate. *See Singleton v. Wulff*, 428 U.S. 106, 114 (1976). But an organization can establish associational standing when "(1) its own members would have standing

to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Maryland Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991). Plaintiff-Intervenor fails to meet the first and third prongs.

**A. Plaintiff-Intervenor has failed to identify a member who may have standing.**

To meet its burden, Plaintiff-Intervenor must show a "threatened injury" to one of its members "is certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). But Plaintiff-Intervenor's declarant, John Doe, fails to establish that he faces any imminent injury traceable to Federal Defendants' data request and redressable by a § 705 stay.[1]

Plaintiff-Intervenor argues that notwithstanding the Court's existing preliminary injunction prohibiting Federal Defendants "from taking any adverse actions against the Plaintiff States or AAMVA" to enforce the CDLIS data request, ECF No. 113 at 16, it still faces imminent harm because AAMVA "currently remains free to transfer the Master Pointer Records of AFT members who hold CDLs from [non-plaintiff] states." Pl.-Interv.'s Br. at 17. The assertion that AAMVA might do so, however, is speculative at best. Indeed, AAMVA has repeatedly indicated it has no intention of turning any of the CDLIS data over to Federal Defendants pursuant to the data request prior to the resolution of this case. *See* ECF No. 1-2 at 14 (letter to FMCSA declining to "produce any bulk data" prior to the previously agreed upon August 17 timeframe); ECF No. 85-1 at 43, lns. 2-3 (expressing AAMVA's position that data should not be produced "until all of these legal issues can be resolved at the end of this case"); PI Hearing Tr. at 11, lns. 13-15 ("until AAMVA can have legal certainty at the end of this case, AAMVA thinks the best solution is to enter the preliminary

[1] Plaintiff-Intervenor's other declarant, Jane Doe, lives in a Plaintiff State, Oregon, which is already included in the preliminary injunction. Thus, Jane Doe experiences no imminent harm redressable by a stay.

injunction"); ECF No. 141 at ¶ 45 ("AAMVA denies that it has signaled that it would provide the master pointer records to the Agency Defendants if AAMVA is given immunity from liability.").

AAMVA's representations have not been limited to the data requested from Plaintiff States, either. AAMVA has been assessing the "privacy laws of all fifty-one (51) impacted jurisdictions" as well as "its obligations under many user agreements between AAMVA and states that participate in [CDLIS], state civil laws prohibiting disclosure of information contained in MPRs, and even certain state criminal laws prohibiting disclosure of information contained in MPRs." ECF No. 1-2 at 14. Accordingly, AAMVA has sought to "remov[e] [itself] from the actual disclosure decision about individual state data." *Id.*

To bolster its argument that harm is imminent, however, Plaintiff-Intervenor relies on AAMVA's statement that "one of the options AAMVA will consider with respect to the data demand will be facilitating an opt-in or opt-out choice by the states whether to authorize AAMVA's transmission of that state's data." *Id.*; *see* Pl.-Interv.'s Br. at 17. But even in its own words, AAMVA was only considering this course as *one* of several options. And even if AAMVA pursued this option and a non-plaintiff State were to authorize transmission of its data, AAMVA has not indicated it would transmit the data prior to this litigation's resolution. This highlights the attenuated chain of causation Plaintiff-Intervenor relies upon. *See Rouse v. Fader*, 171 F.4th 272, 280 (4th Cir. 2026) ("Standing's traceability prong demands that a plaintiff's alleged injury be "'fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court.'" (quoting *Lujan*, 504 U.S. at 560)); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to

government action or cause downstream injury to plaintiffs.").[2] AAMVA would need to pursue the opt-in or opt-out choice it was considering (among other options), the non-plaintiff State that AFT's anonymous member is registered in (Texas) would need to authorize transmission of its data, and AAMVA would need to decide to transmit that data before the resolution of litigation. "This attenuated chain cannot support standing." *Rouse*, 171 F.4th at 279, n.7.

Finally, the relief requested—postponing the effective date of the August 11 Letter pursuant to 5 U.S.C. § 705—would not redress the injury Plaintiff-Intervenor speculates may come to pass. AAMVA and the non-plaintiff States like Texas would remain free to voluntarily authorize and execute the transmission of the CDLIS data even if the August 11 Letter were set aside. Thus, Plaintiff-Intervenor has failed to demonstrate standing for the "form of relief that is sought," *Town of Chester*, 581 U.S. at 439.

**B. There is likely a substantial conflict of interest with other members.**

The third prong of the associational standing test is not met when "conflicts of interest among members of the association require that the members must join the suit individually in order to protect their own interests." *Maryland Highways Contractors Ass'n,* 933 F.2d at 1252; *see also Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 864 (7th Cir. 1996). Where some members may benefit if the association were to prevail and other members may suffer a detriment, "there are actual conflicts of interest which would require that the individual members come into the lawsuit to protect their interests." *Id.* at 1253. If a lawsuit is initiated by the board or leadership of an association without a membership vote or adequate communication with the membership, it may "raise suspicion" that members' interests are in conflict. *Id.* The burden is on Plaintiff-Intervenor to show that its members' interests do not conflict with one another. *Id.*

[2] While AAMVA is technically "before the court" in this proceeding, it is not the target of the relief requested.

"It is entirely conceivable in this case . . . that many members of the association . . . would oppose this litigation on ideological grounds or even because they are the beneficiaries [of the challenged action]." *Maryland Highways Contractors Ass'n,* 933 F.2d at 1253 (quotation omitted). There is a strong likelihood that there are as many members of AFT who support FMCSA's actions challenged in this case as there are members like John Doe, who oppose them. As FMCSA has explained, it "urgently needs this information to cross reference licensing information against other government information systems to ensure States are issuing CDLs to drivers who are qualified, properly trained, and do not pose significant safety risk." Third Liberatore Declaration, ECF No. 136-1 at ¶ 7.

Union members are likely to have a strong interest in ensuring that those with whom they compete for jobs are properly licensed and qualified. *See id*. ¶ 6 ("The data access is imperative given the Agency's urgent need to monitor the licensing practices of States that have not downgraded unlawfully issued CLPs and CDLs."). In addition to this competitive interest, AFT members in the transportation industry also have a strong interest in ensuring that the drivers with whom they share the road do not pose serious safety risks associated with unqualified operators of large commercial motor vehicles. *See id*. ¶ 7 ("CDLIS data is critical to the . . . identifying unqualified CLP and CDL holders and taking them off the road before crashes occur that could result in injuries and fatalities.").

While some members, like John Doe, may view a stay of the data request as beneficial to their privacy interests, others are likely to view it as detrimental to their competitive and safety interests. *See Maryland Highways Contractors Ass'n,* 933 F.2d at 1253. The latter group of members would be required to "join the suit individually in order to protect their own interests" against their own union. *Id*. at 1252. Plaintiff-Intervenor has offered no reason to think that its

participation in this suit was authorized by its impacted members, or that it even meaningfully communicated with them. *See id.* at 1253. Thus, it is unlikely Plaintiff-Intervenor satisfies the third prong of associational standing.

**II. Plaintiff-Intervenor Fails the Remaining Requirements For a § 705 Stay.**

**A. Plaintiff-Intervenor Will Not Be Irreparably Harmed Absent a Stay**

For many of the same reasons that Plaintiff-Intervenor fails to identify a member with standing, it also fails to demonstrate a likelihood of irreparable harm absent a stay. *See W. Virginia Rivers Coal., Inc. v. Chemours Co. FC, LLC*, 178 F.4th 102, 116 n. 20 (4th Cir. 2026) ("[T]he requirements for standing and irreparable harm are similar, and courts often discuss them together."). The hypothetical harm offered by Plaintiff-Intervenor is insufficient to meet the requirement that "irreparable harm must be 'likely,' not merely possible." *Id.* at 117.

To reiterate, in order for Plaintiff-Intervenor to encounter any harm at all, AAMVA would need to pursue the opt-in or opt-out choice it was considering, Texas would need to authorize transmission of its data, and AAMVA would need to decide to transmit that data prior to the resolution of litigation. *See supra* 5-6. Plaintiff-Intervenor has not shown that any of these steps are likely; indeed, each is uncertain to occur. And even if they were likely to occur, staying the data request would do nothing to prevent them, as each concerns actions by third parties who did not issue the data request.

Further, Federal Defendant FMCSA has expressly assured that the requested data would be held within an established System of Records in accordance with the Privacy Act of 1974. ECF No. 1-2 at 9. Plaintiff-Intervenor has made no showing that the requested data will be improperly

disclosed[3] or made public at all, let alone before litigation can be resolved, thus any hypothetical harm would not be irreparable. In any event, the "purpose of a preliminary injunction" is not to leapfrog over trial and final judgment to the court of appeals, but "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). As such, the primary reason to grant the "extraordinary remedy" associated with preliminary relief is "to preserve the court's power to render a meaningful decision after a trial on the merits." *Holy Trinity Ukrainian Cath. Church v. Twp. of Collier*, --- F.4th ----, No. 26-2072, 2026 WL 3119159, at *2 (3d Cir. Oct. 19, 2026). Plaintiff-Intervenor has not shown that a preliminary injunction is necessary to prevent irreparable harm before a final merits ruling in this matter.

Additionally, courts have "declined to find irreparable injury" from the disclosure of private information "where the challenged disclosure is not 'public,'" but instead is to a small number of "individuals obligated to keep [the information] confidential." *Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 121 (D.D.C. 2025). Under those circumstances, a court can fashion "adequate . . . corrective relief" after the fact or order those individuals to return or destroy the records. *Id.* (citation omitted). Because adequate relief would be available at a later date, such harms are not irreparable. *See Wis. Gas. Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

[3] The Court's concern that FMSCA has not followed its own policy for data sharing with other agencies is premature, *see* PI Op. at 11, as there is no reason to suspect that FMSCA would not execute the appropriate data sharing agreement.

### B. There Is No Effective Date for the Court to Postpone Under 5 U.S.C. § 705.

5 U.S.C. § 705 empowers a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action[.]" Federal Defendants maintain that the August 11, 2026, Letter requesting the CDLIS data from AAMVA was not a final agency action within the meaning of the APA—and if it were, it would only be reviewable in the Court of Appeals. *See infra* Section II.D. Accordingly, it had no effective date to postpone.

Should the Court maintain its conclusion that the letter was final agency action reviewable in district court, however, any effective date has clearly passed and cannot be "postponed" any further. The August 11 Letter requested "production by August 17[.]" ECF No. 1-2 at 22. Whether the effective date of the letter was the date it was issued, August 11, or the date it requested compliance by, August 17, both dates have long passed; therefore, "[g]iven this litigation's current procedural posture, 5 U.S.C. § 705 is inapposite." *VanDerStok v. Garland*, 633 F. Supp. 3d 847, 863 (N.D. Tex. 2022) (declining to postpone an August 2022 effective date in October 2022); *see also Becerra v. United States Dep't of Interior*, 276 F. Supp. 3d 953, 964 (N.D. Cal. 2017) ("The plain language of the statute authorizes postponement of the 'effective date,' not 'compliance dates.'"); *Safety-Kleen Corp. v. EPA*, No. 92-1629, 1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996). Section 705's limited postponement authority is not available at this juncture.

### C. The Balance of the Equities Weighs Against Further Burdening Federal Defendants

Interim relief should be "no more burdensome to the defendant than necessary." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The existing preliminary injunction ordered over a month ago sufficiently protects the status quo; thus, further relief is unwarranted. Furthermore, a party seeking a preliminary injunction must "generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (citing *Holmberg v. Armbrecht*, 327 U.S. 392 (1946). To establish lack

of diligence, a defendant must show that plaintiff "delayed inexcusably or unreasonably in filing suit." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990). In its motion, Plaintiff-Intervenor failed to explain the delay in seeking preliminary relief almost two months after Plaintiff States sought relief on August 27, 2026. ECF No. 85. A plaintiff's "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Voice of the Arab World, Inc.* v. *MDTV Med. News Now, Inc.,* 645 F.3d 26, 32 (1st Cir. 2011) (*quoting Tough Traveler, Ltd.* v. *Outbound Prods.* 60 F.3d 964, 968 (2d Cir. 1995). Equity aids the diligent, not the tardy. *Americans for Prosperity Found. v. Albence*, No. 26-2469, 2026 WL 2563151, at *5 (3d Cir. Aug. 31, 2026) (citing *Bowman v. Wathen*, 42 U.S. (1 How.) 189, 193, 11 L.Ed. 97 (1843)).

As Federal Defendants have detailed, that preliminary injunction has already had an unduly burdensome "chilling effect on the exercise of legitimate Executive Branch authorities." ECF No. 136 at 7. It would be a mistake to add further burdens to those Federal Defendants are already bearing, particularly when Plaintiff-Intervenor has not credibly asserted any likely irreparable harm. A § 705 stay is neither "necessary" nor "appropriate." 5 U.S.C. § 705.

To the extent the Court is nonetheless inclined to enter § 705 relief, the August 11 Letter may only be stayed to the extent necessary to afford complete relief to the Plaintiff-Intervenor's alleged harm—the injury to John Doe—because § 705 provides no avenue around the equitable limitations on non-party relief identified by the Supreme Court in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). By its own language, § 705 permits a court to stay agency action only "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, which incorporates constitutional and equitable limitations on non-party relief. Indeed, the legislative history makes clear that Congress intended that § 705 relief would be "equitable" and used only "to prevent irreparable injury." H.R.

Rep. No. 79-1980, at 43 (1946). Thus, consistent with equitable principles, Congress understood that "[s]uch relief would normally, if not always, be limited to the parties complainant." *Id.* More generally, the APA is explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702(1). Ultimately, Plaintiff-Intervenor fails to establish that any additional preliminary relief, which is entirely discretionary, is necessary to preserve the status quo. *See, e.g.*, *Americans for Prosperity Found.*, No. 26-2469, 2026 WL 2563151, at *1 (Challengers showed no need for an injunction to keep the case alive). Expanding preliminary here is similarly not necessary to "keep the case alive so that the parties can contest the merits." *Id.* at *5. Thus, consistent with the equitable principles articulated in *CASA*, the APA requires courts to decline to enter universal relief, however styled, where other remedies would fully redress plaintiffs' injuries. Should the Court choose to stay the August 11 Letter, it should limit the stay's effect to John Doe.

**D. Federal Defendants Are Likely to Ultimately Prevail on the Merits**

The Court is familiar with Federal Defendants' remaining merits arguments, which Federal Defendants maintain will likely prevail for the reasons explained in their prior briefing. *See* ECF Nos. 45, 101, 136. Nonetheless, Federal Defendants endeavor below to concisely preserve those arguments.

1. Federal Defendants are likely to prevail on their argument that the August 11 Letter was not final agency action. Under *Bennett v. Spear*, a final action "must mark the consummation of the agency's decisionmaking process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow." 520 U.S. 154, 177-78 (1997) (quotations omitted). The August 11 Letter was an interlocutory step before any actual grant or contract cancellations; it did not itself determine any rights, obligations or legal consequences but instead warned of consequences that were to follow later. Like the letter at issue in *Jake's Fireworks Inc.*

*v. United States Consumer Prod. Safety Comm'n*, 105 F.4th 627 (4th Cir. 2024), the August 11 Letter was simply a request, not a final determination issued by on official authorized to impose binding legal consequences. *See id*. at 633.

This Court distinguished *Jake's Fireworks* on the ground that the letter at issue in that case "indicated only that [the agency] 'may request' compliance." PI Op., ECF No. 113 at 6. But in fact, like the August 11 Letter, the letter at issue Jake's Fireworks went a step further by unambiguously making a request. *Jake's Fireworks*, 105 F.4th at 633 ("The Notices informed Jake's Fireworks that sampling results indicated violations of the agency's fireworks regulations and stated that '*the staff requests*' that Jake's Fireworks destroy the products. Subsequent Notices stated that '*the staff* reiterates its *requests*.'"). The Court also failed to consider that, like the letter in *Jake's Fireworks*, the August 11 Letter was not issued by an official with legal authority to take final agency action. *Id*. ("The "lack[] [of] authority to issue binding final orders" meant that the deadline given to comply was "render[ed] . . . advisory."); *see* Declaration of Keith Graham, ECF No. 101-2.

2. If the agency action was final, then it was a "final order" reviewable only in the Court of Appeals under the Hobbs Act. In holding otherwise, this Court diverged from the Ninth Circuit's conclusion that "a 'final agency action' is analytically equivalent to a 'final order' under the Hobbs Act." *U.S. W. Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1055 (9th Cir. 2000); *see also Am. Trucking Ass'n, Inc. v. United States*, 755 F.2d 1292, 1296 (7th Cir. 1985). Further, the Court never identified what type of agency action the August 11 Letter was, if not a final order. *See* PI Op. at 7.

3. Federal Defendants are likely to prevail on Plaintiff-Intervenor's APA claims. The data request was not arbitrary and capricious, as it was rationally grounded in Federal Defendants'

need for and planned uses of the data to "verify[] [CDL] validity and conduct[] motor carrier safety assessments." ECF No. 45 at 22. The Court previously rejected this rationale, but this mistakenly subjected Federal Defendants' explanation to heightened scrutiny when it should have upheld it so long as the agency's "path may reasonably [have] be[en] discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court also erred in concluding that the agency failed to adequately address a likely "dramatic change in policy." PI Op. at 11. The change-in-position doctrine only applies where the agency has actually articulated a policy from which it departed. *See FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 569-70 (2025) (explaining the applicability of the change-in-position doctrine). In any event, the Plaintiff-Intervenor has no legitimate or serious reliance interest in any prior policy because the records are already accessible by the federal government (and have been accessed on a case-by-case basis), and DOT could have operated CDLIS on its own from the very beginning without using AAMVA as an intermediary. *See id.* at 585; 49 U.S.C. § 31309(d). Thus, if DOT wanted to look up John Doe's CDL information, it could have (and still can).

On the Driver's Privacy Protection Act ("DPPA"), Federal Defendants are likely to prevail on their argument that DOT's expressed need for the data to carry out its statutory responsibilities fit comfortably within with the text of the DPPA exception "[f]or use by any government agency . . . in carrying out its functions." 18 U.S.C. § 2721(b)(1); *see also* 140 Cong. Rec. H2522 (daily ed. Apr. 20, 1994) (statement of DPPA lead sponsor Rep. Jim Moran) (DPPA "authorizes unlimited access to personal information for courts, law enforcement, governmental agencies, and for other driver and automobile safety purposes.").

On the Privacy Act, Federal Defendants are likely to prevail on their argument that an existing system of records named the Electronic Document Management System (EDMS) may be

lawfully used to house the CDLIS data. EDMS covers "[a]ll operators of interstate commercial motor vehicles, licensed or unlicensed." Privacy Act of 1974: System of Records, 71 Fed. Reg. 35727, 35727 (June 21, 2006). For reasons previously discussed by Federal Defendants, ECF No. 45 at 18-20, this system satisfies the Privacy Act requirements relevant here.

**CONCLUSION**

For these reasons, Plaintiff-Intervenor's request for a stay under 5 U.S.C. § 705 should be denied.

Dated: October 22, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

NOAH T. KATZEN
Assistant Branch Director

EITAN R. SIRKOVICH
(D.C. Bar No. 90030102)
LINDSEY E. GILMAN
(AZ Bar No. 034003)
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20005
Tel. (202) 353-5525
Eitan.r.sirkovich@usdoj.gov

TODD BLANCHE
United States Attorney General

THEOPHANI K. STAMOS
First Assistant United States Attorney

/s/
MATTHEW J. MEZGER
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3741
Fax: (703) 299-3983
Email: Matthew.Mezger@usdoj.gov

*Counsel for Federal Defendants*